1      A.   Yes.

2      Q.   The debt that was owed, the under 200 -- the

3  approximately $200,000, I think you said that it was

4  incurred through real estate transactions; is that

5  correct?

6      A.   Yes.

7      Q.   So you still do real estate transactions with

8  Mr. Bains?

9      A.   Yes.

10      Q.   Would you say that the settlement with

11  Mr. Tharwani was one that you made in good faith as

12  well?

13      A.   When you say "good faith," I don't understand

14  the question.

15      Q.   In the context of Mr. Bains, the good faith

16  was because you didn't think that money was owed as a

17  result of it having been discharged in bankruptcy, but

18  you paid Mr. Bains something anyway?

19      A.   Yes.

20      Q.   Okay.  With respect to Tharwani, would you say

21  that the settlement with Tharwani was one that was made

22  even though you feel that you didn't owe Mr. Tharwani

23  any money?

24      A.   Correct.

25      Q.   Is Mr. Tharwani also a good friend?

Case: 10-05196    Doc#:153-1   Filed: 08/10/12    Entered: 08/10/12 15:17:40   Page 1
of 33

1       A.   A very good friend.

2       Q.   Still -- still a very good friend?

3       A.   Very good friend.

4       Q.   How long have you known Mr. Tharwani?

5       A.   Five years.  It's not Mr.  It's Mrs.

6       Q.   I apologize.  Thank you for the correction.

7            Ashraf?

8       A.   Ashraf.

9       Q.   How about Raj Jindia; the settlement that you

10  made with Raj Jindia, was that also made in good faith

11  meaning you settled with Raj Jindia even though you

12  didn't feel you owed Raj Jindia any money?

13      A.   Correct.

14      Q.   Is that because Raj Jindia is also a good

15  friend?

16      A.   Yes.

17      Q.   A very good friend?

18      A.   Friend.

19      Q.   And you've known Raj Jindia how long?

20      A.   For five years.

21      Q.   Did you meet these individuals all at the same

22  time?

23      A.   No.

24      Q.   Or just within the same time frame?

25      A.   I don't recollect.  About two years, two,

1  three years.

2      Q.  Your settlement with Dr. Chadha.  At the time

3  that you settled with Dr. Chadha did you also settle in

4  good faith at a time when you didn't feel as though you

5  owed Dr. Chadha any money?

6      A.  Yes.

7      Q.  And why was that?

8      A.  I just liked his family and him and settled.

9      Q.  Is he a good friend?

10      A.  He's a friend.

11      Q.  He's a friend.  Do you still do business with

12  Dr. Chadha?

13      A.  No.

14      Q.  How about Mr. Flowers?

15      A.  He's not a friend.  I know him.

16      Q.  At the time that you settled with Mr. Flowers,

17  did you settle in good faith?

18      MR. ISON:  Objection.  Misstates the

19  evidence.  He never settled with Mr. Flowers.

20      THE DEPONENT:  No settlements with Flowers.

21  BY MR. CAMPAGNA:

22      Q.  My apologies.  You said that this was

23  discharged in bankruptcy?

24      A.  Yes.

25      Q.  Okay.  Safe to say that Mr. Flowers wasn't a

1    friend?

2         A.   He's an acquaintance.

3         Q.   He's an acquaintance.   Had Mr. Flowers been a

4    friend, would it have been more likely that you settled

5    with him?

6              MR. ISON:  Objection.  Calls for speculation.

7              THE DEPONENT:  I don't know what I would -- I

8    don't know.

9    BY MR. CAMPAGNA:

10        Q.   Well, what I'm seeing is I'm looking --

11   Narinder Bains is a very good friend.  You settled with

12   him.  Ms. Tharwani was a very good friend.  You settled

13   with her.  Raj Jindia was a good friend.  You settled

14   with him.  Mr. Chadha was a friend.  You settled with

15   him.  So I'm just trying to see what the difference is

16   between those folks and Mr. Flowers.  You called him an

17   acquaintance.  So I'm just trying to figure what stands

18   to reason.

19        A.   I didn't borrow the money from Mr. Flowers.

20   Somebody else -- I didn't borrow the money directly

21   from Mr. Flowers.

22        Q.   Who did you borrow the money from?

23        A.   From Rani Hilyar.

24             MR. ISON:  And who borrowed the money?  Who?

25             THE DEPONENT:  SearchTech Medical borrowed the

Case: 10-05196   Doc #:105-2   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 4 of 33

```
 1   money.  I didn't borrow the money from him.  SearchTech

 2   Medical.

 3   BY MR. CAMPAGNA:

 4        Q.   SearchTech Medical borrowed the $250,000

 5   from?

 6        A.   Rani Hilyar.

 7        Q.   Spell the name, please.

 8        A.   R-A-N-I.

 9        Q.   One N?

10        A.   One N.  Hilyar, H-I-L-Y-A-R.

11             MR. ISON:  Is it Y-A-R or Y-E-R?

12             THE DEPONENT:  Y-E-R.  It could be Y-E-R, E-R

13   or A-R.

14   BY MR. CAMPAGNA:

15        Q.   So SearchTech Medical borrowed this money

16   directly from Rani Hilyar and yet Mr. Flowers sued you

17   claiming that SearchTech Medical -- when I say "you,"

18   Mr. Flowers sued SearchTech Medical and Deepak

19   Chopra --

20        A.   Yes.

21        Q.   -- claiming that SearchTech Medical and Deepak

22   Chopra owed Mr. Flowers about $250,000?

23             MR. ISON:  Let me have a conference here.

24             MR. CAMPAGNA:  No, no.  I'd like just to see

25   what his testimony is on that question before you go
```

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    for your conference.

2           MR. ISON:  Wrong.  I get a conference with my

3    client anytime I want.  So here it is.

4           MR. CAMPAGNA:  Mr. Ison, I would like the

5    record to reflect that you're leaving the room and

6    there's no agreement for you to do so.  I just want to

7    make sure that your client understands the question

8    before you go outside and coach him.

9           THE DEPONENT:  I don't understand the

10   question.  That's the problem.

11          MR. CAMPAGNA:  Because my job is to clarify

12   the question.  I want to first ascertain he's

13   saying that he doesn't understand the question.  So

14   let's get it out whether or not he understands the

15   question.  I can ask him a different one or I can have

16   the court reporter read it back so then we know what

17   you're going outside to confer about.

18          MR. ISON:  I can confer with my client at any

19   time for any reason and I don't need your permission to

20   do so.

21          MR. CAMPAGNA:  If we're going off the record,

22   we do need an agreement that we're going off the

23   record.

24          MR. ISON:  We're not going off the record.

25   I'm going out the door to talk with my client.

Case: 10-05196   Doc# 163-1   Filed: 08/10/12   Entered: 08/10/12 16:17:40   Page 6
of 33
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    MR. CAMPAGNA:  When you're going out the door

2  to talk to your client, that's going off the record.

3    MR. ISON:  No.  The court reporter can

4  continue recording anything that has to be done.

5    MR. CAMPAGNA:  Before you go out of the room,

6  can we please have the court reporter read the question

7  that I asked of your client before that prompted you to

8  get up and want to take him outside.

9    MR. ISON:  If you want to have the court

10  reporter reread the question, that's fine.

11    MR. CAMPAGNA:  I would.

12    MR. ISON:  Okay.

13    THE COURT REPORTER:  "Question:  So SearchTech

14        Medical borrowed this money directly from Rani

15        Hilyar and yet Mr. Flowers sued you claiming

16        that SearchTech Medical -- when I say 'you,'

17        Mr. Flowers sued SearchTech Medical and Deepak

18        Chopra claiming that SearchTech Medical and

19        Deepak Chopra owed Mr. Flowers about

20        $250,000?"

21    MR. CAMPAGNA:  And we are off the record.

22        (Pause in the proceedings.)

23    THE DEPONENT:  Go ahead.

24  BY MR. CAMPAGNA:

25    Q.  There was a question pending and I understand

44

```
 1   that you're returning from a conference with your

 2   attorney.

 3        A.   Flowers through -- Rani Hilyar and Flowers

 4   sued SearchTech Medical for the $250,000 note.  They

 5   sued me for another transaction that Rani Hilyar did

 6   with us.

 7        Q.   Were those two separate lawsuits?

 8        A.   They were one lawsuit.

 9             MR. ISON:  Did Rani Hilyar sue you?

10             THE DEPONENT:  Rani Hilyar did not sue me.

11             MR. ISON:  You just got through saying Rani

12   Hilyar sued you.

13             THE DEPONENT:  No.  Flowers sued me.

14   BY MR. CAMPAGNA:

15        Q.   Rani Hilyar and Mr. Flowers sued who?

16        A.   Rani Hilyar did not sue me.

17        Q.   Not part of the lawsuit?

18        A.   Not a part of lawsuit.  Flowers sued us --

19   sued SearchTech Medical for the $250,000 note.

20        Q.   You were not -- you personally were not named

21   in the lawsuit?

22        A.   There was one lawsuit.  Had two different

23   components to it.

24        Q.   Okay.  Explain the components again.

25        A.   One was SearchTech Medical, $250,000, and the
```

45

Case: 10-05196   Doc# 103-2   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 8
of 33

1   other was $100,000 that Rani Hilyar gave me, gave

2   SearchTech Medical -- not SearchTech Medical, Chopra

3   Enterprises, that he claimed was his money and was not

4   her money.  I returned the money to Rani Hilyar.

5       Q.   So Mr. Flowers set forth a claim against you

6   for -- personally for $100,000 in that lawsuit?

7       A.   Against me and Chopra Enterprises for

8   $100,000 that he claimed was his money that Rani Hilyar

9   gave me.

10      Q.   And then you said that you returned the

11  money?

12      A.   To Rani Hilyar.

13      Q.   When did you return the money to Rani Hilyar?

14      A.   Within two months of getting the money.

15      Q.   Was that before the lawsuit was filed?

16      A.   Before the lawsuit was filed.

17      Q.   The remaining $200,000 that Mr. Flowers was

18  then claiming as being owed by SearchTech --

19      A.   Medical.

20      Q.   -- Medical, was that money that Mr. Flowers

21  had loaned to SearchTech Medical?

22      A.   Rani Hilyar was the CFO of Mr. Flowers.  He

23  was the CFO for Mr. Flowers and he was loaning money

24  out to companies such as ours.

25      Q.   Okay.

TORREANO SHORTHAND REPORTING (866) 760-7DEPO

1    A.   And the lawsuit alleged that Mr. Flowers did

2  not give them permission to loan the money out.

3    Q.   I am trying to understand, and I know you're

4  doing the best in recollecting the details.  I thought

5  that Mr. Flowers was the plaintiff?

6    A.   Mr. Flowers -- Rani Hilyar was the CFO for

7  Mr. Flowers and she had excess of millions of dollars

8  of Mr. Flowers.  She loaned money out to 50 or 60

9  different people or companies such as ours.

10       Mr. Flowers sued Rani Hilyar and then sued all

11 the other people who got the money from Rani Hilyar,

12 and SearchTech Medical received money from Rani

13 Hilyar.  So he sued Rani Hilyar for whatever reasons

14 and the court -- the case was --

15   Q.   So then Rani Hilyar sued --

16   A.   Rani Hilyar never sued us.  It's a very simple

17 thing.  Let me repeat myself again.

18   Q.   Okay.

19   A.   Flowers hired Rani Hilyar as the CFO.  Rani

20 Hilyar had checkbooks and she went ahead and spent six

21 or seven million dollars loaning money out to other

22 individuals and companies, and we were loaned that

23 money, $250,000 to SearchTech Medical, which was the

24 Flowers money.

25   Q.   Flowers money through Rani?

Case: 10-05196   Doc# 163-2   Filed: 08/16/12   Entered: 08/16/12 15:27:48   Page 10 of 33
TORREANO SHORTHAND REPORTING (866) 750-DEPO

1      A.  Rani.  Mr. Flowers sued Rani for $6 million

2  for fraud, which is part -- he also to recover his

3  money sued all the other companies or individuals who

4  got the money from Rani Hilyar.

5      Q.  That $100,000 that you say you returned to

6  Rani, I presume Mr. Flowers -- I'm thinking, if I

7  understand you correctly, Mr. Flowers was suing for

8  that money as well?

9      A.  Yes.  Because he claimed that was his money.

10     Q.  Along with the 250,000?

11     A.  Yeah.  But the 100,000 was returned to Rani

12 Hilyar.

13     Q.  And that money was forwarded by CFO Rani

14 Hilyar to Chopra Enterprises?

15     A.  Chopra Enterprises.  And we returned the money

16 to Rani Hilyar.

17     Q.  Do you still do business with Rani Hilyar?

18     A.  No.

19     Q.  Is Rani Hilyar a friend?

20     A.  No.

21     Q.  You know this line of questioning and I

22 appreciate that we're able to tease it out a little

23 bit, but this originally started with me trying to

24 ascertain whether or not Mr. Flowers was a friend.  And

25 you said that he was an acquaintance; correct?

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1     A.   Yes.

2     Q.   Had Mr. Flowers been a friend, would you have

3   been more likely to settle with him on the $250,000

4   amount as you had with these other folks who were also

5   friends or very good friends?

6          MR. ISON:  Objection.  Calls for speculation.

7          MR. CAMPAGNA:  You can answer the question.

8          THE DEPONENT:  I -- I don't know.  I mean,

9   that's something which is -- I have no idea.  I don't

10  know.  That never happened.  So I don't know.

11  BY MR. CAMPAGNA:

12    Q.   What never happened?

13    A.   That never happened.  The scenario never

14  happened that he was a friend.  I don't know if I would

15  settle with him.  I don't know.  I can't answer the

16  question.

17    Q.   Marybeth Whyte.  Did Marybeth Whyte sue you?

18    A.   Marybeth Whyte sued us through Chopra

19  Enterprises.

20    Q.   How do you spell her last name?

21    A.   W-Y-H-T-E (sic), Whyte.

22    Q.   W-H-Y-T-E?

23    A.   Yeah, W-H-Y-T-E.

24    Q.   Is Marybeth one word?

25    A.   Marybeth is one word.

Case: 10-05196   Doc# 103-2   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 12 of 33

1    Q.   Capital B?

2    A.   I don't know.

3    Q.   I'm just trying to get it clear for the

4    record.   So Marybeth Whyte sued who?

5    A.   Chopra Enterprises, Deepak Chopra.

6    Q.   Anybody else or any other entity?

7    A.   It could be.   I don't recollect that.

8    Q.   And when did Marybeth Whyte sue Chopra

9    Enterprises and Deepak Chopra?

10   A.   2005 or '6, I'm not sure.

11   Q.   Approximately?

12   A.   2005 maybe.

13   Q.   Why did she sue you?

14   A.   As I said, a dispute.

15   Q.   What was the dispute?

16   A.   Properties.   We had many properties together.

17   Q.   How much did she sue you for?

18   A.   I don't -- I don't think it was an amount she

19   sued.   It was just a dispute.   I don't recollect the

20   amount because I was claiming the amount from her and

21   she was claiming the amount from me.

22   Q.   You brought a cross-claim against her?

23   A.   I don't recollect.   I may have.

24   Q.   Who was your lawyer at the time?

25   A.   Jeff Forster.

 1      Q.   How did that case resolve?

 2      A.   We settled mutually.

 3      Q.   How did you settle?

 4      A.   We just exchanged properties and we settled.

 5      Q.   Was there a written settlement agreement?

 6      A.   Yes.

 7      Q.   You said you "exchanged properties"?

 8      A.   Yes.

 9      Q.   Did you say that there was no money that

10   changed hands?

11      A.   I don't recollect.  To the best of my

12   knowledge, I don't think so, but I don't recollect

13   that.

14      Q.   What court was that case in?

15      A.   That was I think Los Angeles.

16           MR. CAMPAGNA:  There seems to be a fire

17   alarm.  So let's go off the record and see what's going

18   on here.

19           (Recess taken.)

20           MR. CAMPAGNA:  We can go back on the record.

21   It's not quite a quarter to 12:00.  It's about 11:43.

22   We're back from our fire alarm.

23   BY MR. CAMPAGNA:

24      Q.   We were discussing Marybeth Whyte and the case

25   that was filed against Chopra Enterprises and Deepak

1    Chopra in Los Angeles that resolved with the mutual

2    exchange of properties.

3              Do you recall that?

4         A.   Yes.

5         Q.   Do you still do any business with Marybeth

6    Whyte?

7         A.   No.

8         Q.   Was Marybeth Whyte ever a friend?

9         A.   She was a friend.

10        Q.   Is she still a friend?

11        A.   I don't talk to her.

12        Q.   When was the last time you talked with

13   Marybeth Whyte?

14        A.   I don't recollect.  Maybe three years ago,

15   three or four years ago.

16        Q.   Did you talk with her, Mr. Chopra, after the

17   case settled with her?

18        A.   I don't recollect.

19        Q.   Do you still do business with Rani Hilyar?

20        A.   No.

21        Q.   When was last time you spoke with Rani Hilyar?

22        A.   Four years ago.  Three, four years ago.

23        Q.   So not since that -- not since that lawsuit?

24        A.   No.

25        Q.   I've asked you about lawsuits that people

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196    Doc# 163-2    Filed: 08/10/12    Entered: 08/10/12 15:17:40    Page 15 of 33

1  filed against you or against your company or companies

2  or both.

3       Are there any others that are in that category

4  that you haven't mentioned that you've recalled since

5  we've had that fire alarm break?

6       A.   There could have been, but I don't recollect.

7  I don't recollect.  I've been in business for 20

8  years.

9            (MR. ISON AND THE DEPONENT CONFER.)

10  BY MR. CAMPAGNA:

11       Q.   What was the one that you were discussing with

12  your attorney?

13       A.   Bank of America.  The credit card ones.

14       Q.   I think you said that some of those you ended

15  up paying and some of them you didn't end up paying?

16       A.   Yes.  Some of them I settled.

17       Q.   Some were discharged in bankruptcy?

18       A.   Yes.

19       Q.   Were any of those reduced to judgment?

20       A.   No.

21       Q.   How about Clint Rosenthal; did Clint Rosenthal

22  ever sue you?

23       A.   He sued SEC Venture Group.

24       Q.   I appreciate the clarification.  I used the

25  term --

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1      A.   SEC Venture Group was sued.  I don't know if

2   he sued me or not.  I'm not sure.  Dave Cagley was

3   there, myself, SEC Venture Group.  I'm not sure who he

4   sued, but that was settled.  SEC Venture Group.

5           MR. ISON:  Cagley is C-A-G-L-E-Y.

6           THE DEPONENT:  C-A-G-L-E-Y.

7   BY MR. CAMPAGNA:

8      Q.   And that was David Cagley?

9      A.   David Cagley.

10     Q.   Was Juan Carmona involved in that lawsuit?

11     A.   I don't recollect.

12     Q.   By Clint Rosenthal?

13     A.   I don't recollect.

14     Q.   Okay.  When was the lawsuit filed against SEC

15  Venture Group, you and Cagley and maybe others?

16     A.   I have -- I don't have a recollection of their

17  lawsuit because I didn't handle that lawsuit.

18     Q.   Who handled the lawsuit?

19     A.   Dave Cagley did.  He was the manager of SEC.

20     Q.   David Cagley handled the -- this lawsuit filed

21  by Rosenthal because he was the manager of SEC?

22     A.   Yeah.  He managed SEC.  So he handled the

23  lawsuit with the attorney.  I don't know who

24  represented me on that either or the SEC on that one.

25  I can't recollect that.  I never settled.  So --

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Q.   I want to get at least an approximate frame of

2    reference.  Was it, let's see, in 2012, or was it

3    before you filed for bankruptcy in 2009?

4    A.   Yes.  It was before that.

5    Q.   About how many years before that?

6    A.   Three years or -- two years or three years

7    before that.

8    Q.   So maybe sometime in 2006 or 2007?

9    A.   Yes.

10   Q.   Do you remember where that lawsuit was filed?

11   A.   San Jose.

12   Q.   At the Superior Court?

13   A.   Superior Court.

14   Q.   Why did Clint Rosenthal file that lawsuit

15   against SEC Venture Group and others?

16   A.   I cannot recollect that.  It was settled

17   within a month.  I don't recollect what the reason

18   was.  It was some property dispute.

19   Q.   Was there a written settlement agreement?

20   A.   I don't recollect that.  I'm sure there was.

21   I don't recollect that.

22   Q.   You said it was a property dispute?

23   A.   Some property dispute.

24   Q.   Do you recall whether you ended up having to

25   pay money to settle that case within a month that it

Case: 10-05196   Doc# 124-2   Filed: 08/06/12   Entered: 08/06/12 16:17:45   Page 18 of 33
TORREANO SHORTHAND REPORTING   PO

1    settled?

2        A.   I don't recollect that.

3        Q.   Would David Cagley be the one to ask about

4    that case more so than you?

5        A.   Dave Cagley and Juan Carmona.

6        Q.   Juan Carmona?

7        A.   Yeah.

8        Q.   So Juan was also named?

9        A.   I don't know that, but he was --

10       Q.   Why would Juan Carmona be someone to ask about

11   the Rosenthal case?

12       A.   Because he's running the day-to-day operation

13   of Chopra Enterprises and helping David with SEC.

14       Q.   So back in 2006 or 2007 Juan Carmona was

15   running the day to day of Chopra Enterprises

16   Corporation?

17       A.   Yes.

18       Q.   And you said he was helping David Cagley with

19   SEC Venture Group?

20       A.   Yes.

21       Q.   And that's SEC Venture Group, LLC; right?

22            So you don't know what that lawsuit was

23   about?  Promissory note?  Property dispute?

24       A.   I told you it could be a property dispute.

25       Q.   I recall that now.  What type of company is

Case: 10-05196   Doc# 103-2   Filed: 08/10/12   Entered: 08/10/12 15:17:48   Page 19
of 33

1    SEC Venture Group, LLC?

2         A.   It owned real estate.

3         Q.   Pardon?

4         A.   It owned real estate.

5         Q.   It owned?

6         A.   It owns real estate.

7         Q.   It owns real estate?

8         A.   Yes.

9         Q.   David Cagley is the manager of SEC Venture

10   Group, LLC?

11        A.   No longer.

12        Q.   No longer.  Is there a manager of SEC?

13        A.   I am managing SEC.

14        Q.   You are managing SEC.  As of when?

15        A.   A year, year and a half.  2007 -- yeah.  Two

16   years maybe, yeah.

17        Q.   Is anybody else involved with SEC besides

18   you?

19        A.   I manage SEC.

20        Q.   Are there any other members?

21        A.   Juan Carmona.

22        Q.   Juan Carmona is a member?

23        A.   Member, owner.

24        Q.   Are you also -- you, Deepak Chopra, are also a

25   manager -- excuse me, also a member?

1     A.   Only two members.  Deepak Chopra and Juan

2  Carmona.

3     Q.   You're the managing member?

4     A.   Yeah.

5     Q.   Is there an operating agreement for SEC

6  Venture Group?

7     A.   There is an operating agreement.

8     Q.   Do you have a copy of the operating

9  agreement?

10     A.   No, I don't.

11     Q.   Do you know where it is?

12     A.   With Dr. Pawan Chadha.

13     Q.   Was Mr. Chadha part of that lawsuit filed by

14  Rosenthal?

15     A.   No.

16     Q.   Why would Mr. Chadha have a copy of the

17  operating agreement?

18     A.   Because he -- he gave a lot of money against

19  SEC.  He loaned money against the property.  Then he

20  took both the operating agreement and the original

21  documents.  He has not returned them so far.

22     Q.   When you say that he took them, what do you

23  mean by that?

24     A.   He took the originals with him.  He took the

25  originals with him when he loaned us the money, loaned

Case: 10-05196   Doc#: 124-2 Filed: 08/16/12   Entered: 08/16/12 16:17:48 Page 21
of 33

TORREANO SHORTHAND REPORTING (866) 760-DEPO Page 21

1   SEC the money.

2       Q.   So he took them from -- from you?

3       A.   Yes.

4       Q.   Okay.  Was that at a time when you were in

5   litigation with him?

6       A.   No, before that.

7       Q.   Before that 2009 filing?

8       A.   Yeah.

9       Q.   For the four or five hundred thousand.

10           I want to see if this jogs your memory here

11  because I want to go back to that Rosenthal lawsuit.

12           I was wondering if your wife was named in that

13  lawsuit, Kathleen Chopra.

14      A.   I don't recollect.

15      Q.   Was Chopra Enterprises Corporation involved in

16  that lawsuit?

17      A.   I have -- I don't have a recollection of the

18  lawsuit at all.

19      Q.   How about Beatrice; does that name ring a

20  bell?

21      A.   Yeah.  Beatrice is Dave Cagley's wife.

22      Q.   So as things stand, you and Mr. Carmona owned

23  SEC.  It's SEC Venture Group, LLC.  We'll just

24  abbreviate and say SEC.  The operating agreement is in

25  the hands of Dr. Chadha.

Case: 10-05196   Doc#... FORTGANG SHORTHAND REPORTING ... Filed 08/06/12 ... DEPO Page 22 of 33

1          Does Dr. Chadha still have a lot of money tied

2   up in SEC?

3      A.   No.  He foreclosed on all the properties.

4      Q.   When you say "foreclosed on all the

5   properties," what do you mean?

6      A.   The money had gone -- the money he had given

7   us for SEC, he foreclosed on about 15 properties or

8   maybe 16 properties.

9      Q.   Those properties are no longer owned by SEC?

10     A.   No longer owned.

11     Q.   The 15 that Dr. Chadha --

12     A.   15 or 16.

13     Q.   15 or 16?

14     A.   I don't know how many there are exactly.

15  Maybe 15 or 18, maybe 16.  I don't know, but all of

16  them went to Dr. Chadha.

17     Q.   Does SEC own any properties currently?

18     A.   It owns -- it owns some bonds for title.

19     Q.   What is a bond for title?

20     A.   Just like holding -- giving loan to the person

21  who stays there and you are the bank.  And we have like

22  some properties that give us income on that to SEC.

23     Q.   What state are these bonds for title?

24     A.   Alabama.

25     Q.   Is that like a note?

Case: 10-05196   Doc# 163-2   Filed: 08/30/12   Entered: 08/30/12 15:27:40   Page 23 of 33

1      A.   It's like a note.

2      Q.   Where somebody is paying monthly?

3      A.   Yes.

4      Q.   Does SEC own anything other than bonds for

5  title in Alabama?

6      A.   No.

7      Q.   No real property?

8      A.   No real property, no.

9      Q.   When was the last time that SEC owned

10  property, real property?

11      A.   About a year and a half -- year back.  Maybe a

12  year, a year ago.

13      Q.   What did it own?

14      A.   It owned a warehouse.

15      Q.   What else?

16      A.   And some few homes, four or five homes.

17      Q.   Who or what owns the warehouse?

18      A.   The warehouse was transferred to another LLC

19  and the owner of the LLC is Dilip.  He put in $150,000

20  to save the roof because he couldn't afford to keep the

21  warehouse.

22      Q.   So this warehouse that was owned by SEC a year

23  ago was transferred to somebody by the name of Dilip?

24      A.   Another LLC.

25      Q.   I'm sorry?

1     A.   Another LLC.

2     Q.   What was the name of the LLC?

3     A.   I don't recollect that.  I think it's a D -- I

4  don't have the exact name of the LLC.  I can find out

5  for you if you want.  You can check the records.

6     Q.   Is it LDE Group, LLC?

7     A.   LD -- no.

8     Q.   Was it ESD Investment, LLC?

9     A.   No, no.  It's a brand new LLC.

10    Q.   Caroline Clayton?

11    A.   No.

12    Q.   What is Dilip's last name?

13         MR. ISON:  Gunawardena,

14  G-U-N-A-W-A-R-D-E-N-A.  First name D-I-L-I-P.

15  BY MR. CAMPAGNA:

16    Q.   Dilip Gunawardena, he owns an LLC?

17    A.   He owns an LLC that has a warehouse.  He and

18  me own an LLC that has a warehouse.

19    Q.   You own this together?

20    A.   We own it together.

21    Q.   Is there an operating agreement for that LLC?

22    A.   Yes.  He has it.

23    Q.   Dilip has it?

24    A.   Yes.

25    Q.   Okay.  So you're both members of the LLC?

1      A.   Both members.

2      Q.   Are you both managing members of the LLC?

3      A.   Both managing members of the LLC.

4      Q.   Does the LLC also own the four to five homes?

5      A.   Not any longer because those homes were

6  stripped down.  They are rented and most of them

7  foreclosed.  And the two homes that were there, they

8  had liens on them by two individuals.  So they are

9  not worth -- they were worthless.

10     Q.   Okay.  So there were four or five homes.

11 Aside from the bonds for title and the warehouse, there

12 were four or five homes owned by SEC Venture Group,

13 LLC?

14     A.   Yes.

15     Q.   SEC Venture Group, LLC still owns bonds for

16 title?

17     A.   Yes.

18     Q.   In Alabama?

19     A.   Yes.

20     Q.   Approximately how many?

21     A.   Six.

22     Q.   It owned this warehouse until a year ago at

23 which time it was transferred to Dilip Gunawardena?

24     A.   Uh-huh.

25     Q.   And you?

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1     A.  Uh-huh.

2     Q.  It was transferred to your LLC?

3     A.  Yes.

4     Q.  The four to five homes that were owned by SEC

5  Venture Group, LLC?

6     A.  Uh-huh.

7     Q.  First off, can we clarify whether it was four

8  or five?

9     A.  I don't know.

10    Q.  Approximate?

11    A.  Because there were about 27 homes and all of

12  them foreclosed except four or five.  And we don't know

13  who the title belongs to, but Chadha claims that he

14  still has the title on those homes.  So I have to check

15  the title of those homes.

16    Q.  So those four or five homes are not included

17  in the 15 or 16 properties that you explained earlier

18  were foreclosed by Dr. Chadha?

19    A.  He claimed there were twenty of them.  He

20  claimed those five are also part of the foreclosure.

21  So that homes are still in limbo right there sitting

22  there and --

23    Q.  So they may still be owned by SEC Venture

24  Group, LLC?

25    A.  Could be.

TORREANO SHORTHAND REPORTING (866) 760-DEPO
Case: 10-05196   Doc# 103-2   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 27 of 33

1    Q.   If SEC Venture Group, LLC continues to own

2  those four or five homes, will they be transferred to

3  this new LLC?

4           MR. ISON:  Objection.  Calls for speculation.

5           MR. CAMPAGNA:  You can answer.

6           THE DEPONENT:  I don't know.  SEC Venture

7  Group is broke.  So there's no money in the company

8  right now.  It owes a lot of money.

9  BY MR. CAMPAGNA:

10    Q.   My question is if SEC Venture ends up with the

11  title -- continues to end up -- continues to maintain

12  ownership of the four to five homes, will SEC Venture

13  Group transfer ownership to the new LLC owned by you

14  and Dilip?

15           MR. ISON:  Objection.  Calls for speculation.

16           MR. CAMPAGNA:  You can answer.

17           THE DEPONENT:  I don't know what will happen.

18  It's something which I have to figure out.

19  BY MR. CAMPAGNA:

20    Q.   What's your plan?

21    A.   I don't have a plan.  I'm trying to survive

22  right now.  That's my plan.  SEC is completely broke.

23  It's got a lot of debt on it.  So I don't know what

24  I'll do.  Maybe I'll transfer it out into an LLC.  I

25  don't know what I will do with those.  They are not

1    worth a lot of money.  Maybe 10,000, $15,000.

2        Q.   A piece?

3        A.   No.  Five, six thousand a piece.  They are in

4    a slum area.

5        Q.   I appreciate that you don't have the exact

6    plan of what the disposition of those homes would be,

7    but it's likely that they will no longer be in SEC

8    Venture Group; is that fair to say?

9        A.   Fair to say.

10       Q.   And if they happen to be transferred out of

11   SEC, it's fair to say that they will go into the same

12   LLC as the warehouse?

13            MR. ISON:  Objection.  Calls for speculation.

14            THE DEPONENT:  I don't know where they will go

15   right now.  I have not even talked as far as we're

16   going into that, we'll go to another LLC, it will go

17   somewhere else.  I don't know what will happen.  I do

18   not have an answer for that right now.  I'm still

19   working on the details.

20   BY MR. CAMPAGNA:

21       Q.   You're working with Dr. Chadha on the details;

22   right?

23       A.   No, I'm not working with Dr. Chadha.  Chadha

24   is settled.  The case is settled.  But the -- there

25   was -- there was twenty homes to be transferred to

1  him.  Fifteen were transferred to him.  Five were not.

2  We settled the lawsuit.  I need to take care of the

3  five homes.  Two of them have liens on it so they are

4  worthless.  There were heavy liens on them.

5      Q.  What do you mean you need to take care of the

6  homes then?

7      A.  We need to transfer it out of SEC or keep it

8  there or let it go and just -- just strip them off.  We

9  don't know what we're going to do.  Because they are

10  not like $100,000 homes.  They are 10,000, 8,000,

11  5,000.  They are very small homes.  They are not

12  expensive homes in a downtown area.

13      Q.  They are all rented?

14      A.  No.  Some of them are not rented either.

15      Q.  How many of them are rented?

16      A.  Maybe half of them are not rented.  Another

17  half are rented, but the maintenance cost comes in --

18  very high maintenance cost then for three or four

19  hundred dollars and there is -- people steal, strip

20  things and things like that.

21      Q.  Do you have a property manager --

22      A.  Yes.

23      Q.  -- handling the -- the day-to-day with respect

24  to those four or five properties?

25      A.  Yes, I have a property manager.

```
 1      Q.   Who's the property manager?

 2      A.   Bobby Fletcher.

 3      Q.   Is he also the property manager for the

 4 warehouse?

 5      A.   Yes.

 6      Q.   Does he have anything to do with the bonds for

 7 title?

 8      A.   Yes.

 9      Q.   What does he do with the bonds for title?

10      A.   Collects the money.

11      Q.   Any other properties that Bobby Fletcher

12 manages for you or for companies that you're involved

13 with?

14      A.   Lots of things.  After bankruptcy.

15      Q.   These are properties that you acquired or your

16 company has acquired?

17      A.   After the bankruptcy.

18      Q.   Okay.  The warehouse and the four to five

19 homes and the bonds for title, when were those acquired

20 in relation to the bankruptcy?

21      A.   2005, 2006.

22      Q.   Were those part of the Swanner estate?

23      A.   Yes.

24      Q.   The bonds for title were part of the Swanner

25 estate?
```

1        A.    Yes.

2        Q.    The warehouse was part of the Swanner estate?

3        A.    Yes.

4        Q.    The 20 homes were part of the Swanner estate?

5        A.    Yes.

6        Q.    Were there other properties that were part of

7   the Swanner estate?

8        A.    They vary, but they are gone.   They

9   foreclosed.

10        Q.    At the time that the Swanner estate was

11   acquired by SEC Venture Group, LLC?

12        A.    Yes, yes.

13        Q.    I'm backtracking a little bit.

14              At the time that David Cagley was a manager of

15   SEC and -- I think you said Juan Carmona was also a

16   member and owner of SEC?

17        A.    Yes.

18        Q.    When SEC was initially formed?

19        A.    Yes.

20        Q.    It was SEC Venture Group, LLC that acquired

21   those Swanner properties --

22        A.    Yes.

23        Q.    -- is that right?

24              Did any properties other than the Swanner

25   properties get acquired by SEC?

Case: 10-05196   Document 103-2   Filed 08/10/12   Entered 08/10/12 15:17:40   Page 32
of 33

TORREANO SHORTHAND REPORTING (866) 780-DEPO

1     A.   Yes, they did.

2     Q.   What properties were those?

3     A.   I think there was some in Hawaii that were

4  acquired.   I don't remember the names of the

5  properties.

6     Q.   How about any other Alabama properties?

7     A.   There were a few they acquired.

8     Q.   Still owned?

9     A.   No.   Foreclosed.

10     Q.   By?

11     A.   By the people who gave the money to us.

12  Different people.

13     Q.   Was Dr. Chadha one on those properties, also?

14     A.   No.   There was Dr. -- Mr. Al, Mr. Bobby

15  Fletcher.   A lot of people foreclosed on those

16  properties.

17     Q.   Your property manager was also involved with

18  giving money to those properties?

19     A.   No.   One of them was his property that he

20  acquired.   One of the buildings was acquired that his

21  family owned it and he foreclosed on those buildings.

22  He took them away.

23     Q.   He had a carryback note?

24     A.   I don't remember the details.

25     Q.   I'd like to go back to -- and try to wrap up