1  the issue about the lawsuits.

2          Have you ever sued anybody?

3      A.   I may have.  I don't recollect, but maybe a

4  few times.  Long time ago.

5      Q.   What do you mean by long time ago?

6      A.   Ten, fifteen years ago.

7      Q.   Oftentimes this discussion about prior

8  lawsuits is a shorter discussion.  So I appreciate you

9  bearing with it in this case.  It just so happens that

10  there's a lot of lawsuits that you or your companies

11  have been involved with, which is why this has taken us

12  a little bit further to -- to ferret out some of

13  that -- that background.

14          Before today's deposition and in preparation

15  for today's deposition, did you speak with anybody

16  other than your attorney, Mr. Ison, to prepare for it?

17      A.   No.

18      Q.   Did you review any documents prior to this

19  deposition in order to prepare for it?

20      A.   Yes.

21      Q.   Did you bring them with you?

22      A.   I have them here with me.

23      Q.   May I see them?

24      A.   These are the ones I gave to you, by the way.

25  These are the same documents I sent to you.  These are

71

TORREANO SHORTHAND REPORTING (406) 756-7 DEPO

1  not any documents that are new.  They were sent to you

2  when you asked for the documents.  They are exactly the

3  same documents as you have.

4        MR. CAMPAGNA:  So I'm looking at a stack of

5  documents that's probably two and a half reams of

6  paper.  This is about what?  Eight inches high, would

7  you say?

8        MR. ISON:  I'd say less than eight inches.

9        MR. CAMPAGNA:  Less than eight inches?

10        MR. ISON:  The span of a hand is six inches;

11  right?

12        MR. CAMPAGNA:  I'm just trying to get a sense

13  of how many documents we have here.  You're right.

14  That's about four and a half inches high.

15  BY MR. CAMPAGNA:

16    Q.  And you're saying that these are documents

17  that you've already produced through your attorney,

18  Mr. Ison, in this case?

19    A.  Yeah.

20    Q.  Are they in any particular order?

21    A.  Yeah, they are, but they are just different --

22        MR. ISON:  Wait.  Just answer the question.

23        THE DEPONENT:  Yes.  They are in a different

24  particular order.

25  //

1    BY MR. CAMPAGNA:

2        Q.   Okay.  So I see at the bottom of the stack

3    here there is something that says SEC Venture Group,

4    LLC, general journal transaction, and it has a rubber

5    band around it?

6        A.   Yes.

7        Q.   So that's your SEC Venture Group, LLC docs?

8        A.   No.  The other docs -- these docs pertain to

9    the money that was deposited in the accounts and how

10   much money I deposited personally in the accounts.  It

11   just happens to be the money that I received from

12   India, how much money invested in SEC Venture Group.

13   It's all cash transactions that I have that were given

14   to you.

15       Q.   Okay.

16       A.   I put in six, seven thousand right here and

17   then all the money I put in.

18            MR. CAMPAGNA:  I want to try to keep these in

19   the order.  That's why I took those back and put

20   them --

21            MR. ISON:  Deepak.

22            MR. CAMPAGNA:  Just a moment.

23   BY MR. CAMPAGNA:

24       Q.   So there's another rubber-banded stack here

25   that shows "113 condominium" at the top of this stack

73

```
 1    with the green rubber band.
 2         A.   Yes.   That's regarding 113.
 3         Q.   Okay.   And we're going through the rest here.
 4    There's one with a red -- a stack with a red rubber
 5    band, North Carolina general warranty deed.
 6         A.   That's regarding the $94,000 note.
 7         Q.   Which is part of this lawsuit?
 8         A.   Uh-huh.
 9         Q.   And there's another stack with the beige
10    rubber band that shows an e-mail at the top from Juan
11    Carmona, October 20, 2007, Iqbal Husain, copying
12    dchopra@hotmail.com.
13              What's that stack regarding?
14         A.   That's all the e-mails that we had that day.
15    That's all the e-mails that we had corresponded with
16    Iqbal.   That's why I gave you copies of the e-mail.
17         Q.   Then there's another stack also with a red
18    rubber band around it.   It's an e-mail that says "loan
19    due" from Iqbal, Monday, December 1st, 2008.
20         A.   Let me see that one.   I don't know what that
21    is.
22         Q.   I notice that there's documents that you
23    handed to your attorney.
24         A.   That's not -- that's my personal documents.   I
25    just had them with me.   They have nothing to do with
```

74

1    this document.

2            I think it's just -- I think they all got a

3    little messed up because we were doing them yesterday

4    when we put them together.  But this is pertaining to

5    SearchTech, Inc.

6        Q.   Okay.  There's another stack with a yellowish

7    rubber band around it.  "Bankruptcy filing" in blue ink

8    it says at the top.

9        A.   This is regarding SearchTech Medical.

10       Q.   SearchTech Medical.

11            Okay.  And then there's this final stack aside

12   from the ones you took off the top of it to hand to

13   Mr. Ison.  It says, "Amendment to Settlement Agreement

14   and Mutual General Release."

15            What are those documents generally pertaining

16   to?

17       A.   These are pertaining to the $94,000 loan and

18   the 314 property.

19       Q.   Okay.  When you met with Mr. Ison yesterday

20   for the two hours that you said to prepare for this

21   deposition, was anybody else present at the

22   deposition?

23       A.   No.

24            MR. ISON:  At the deposition?

25            MR. CAMPAGNA:  At the deposition preparation.

Case: 10-05196   Doc#88 FORCRANO SHORTHAND REPORTING 08/06/12 75:07 DEPO Page 5
of 35

1          THE DEPONENT:  No.

2    BY MR. CAMPAGNA:

3          Q.   Now, I presume that you're a college

4    graduate?

5          A.   Yes.

6          Q.   Where did you graduate from?

7          A.   University of Delhi.

8          Q.   And what's your degree in?

9          A.   Bachelor's in accounting.

10         Q.   When did you receive the bachelor in

11   accounting?

12         A.   1972.

13         Q.   Any graduate work?

14         A.   College of Notre Dame, Belmont.  MBA.  Didn't

15   complete the -- I have four units short.

16         Q.   How many -- how many units did you take

17   towards the --

18         A.   MBA?

19         Q.   -- MBA?

20         A.   It was 60 units.

21         Q.   60 units?

22         A.   60 or 70 units.  I'm not sure.

23         Q.   I'm sure you're going to get those four units

24   sometime soon, huh?

25         A.   I don't know if I need it.

Case: 10-05196   Doc# 384-3 Filed: 11/12 Entered: 08/06/12 15:17:34 Page 6
TORREANO SHORTHAND REPORTING (800) 762-DEPO
of 35

1      Q.   Any other education besides the College of

2   Notre Dame and the University of Delhi?

3      A.   CA, charter accountancy.

4      Q.   What that?

5      A.   Charter accountants, same thing as a CPA.

6      Q.   It's called charter accountancy?

7      A.   Charter accountant.  Right?  It's different

8   here than it is in India.

9      Q.   When did you receive that?

10     A.   I received a diploma in 1974.

11     Q.   That was also in Delhi?

12     A.   Yeah.  Delhi.  I a received charter

13   accountancy.

14     Q.   And that was a certificate?

15     A.   Yes.

16     Q.   How about continuing education; any continuing

17   education in accounting or business?

18     A.   I did two years private school in computer

19   science from San Jose.

20     Q.   You said private school?

21     A.   Private school here.  It's called Condie

22   College.

23     Q.   Spell it.

24     A.   C-O-N-D-I-E, Condie College.

25     Q.   C-O-N-D-I?

Case: 10-05196    Doc# 103-3  Filed: 05/01/12   Entered: 08/10/12 16:17:40   Page 7 of 35

TORREANO SHORTHAND REPORTING (866) 761-DEPO

1    A.   I-E.

2    Q.   I-E.   Condie College?

3    A.   Yeah.

4    Q.   And that's a two-year associate degree?

5    A.   No.   Certification I think it was.

6    Q.   Certification in computer science?

7    A.   Yeah.

8    Q.   Ever take any legal courses?

9    A.   No.

10   Q.   Real estate?

11   A.   No.

12   Q.   Courses in lending?

13   A.   I've taken classes, private classes in real

14   estate and lending.   Not seminars or things like that.

15   Q.   Not seminars?

16   A.   Seminars.

17   Q.   Seminars.   Not classes, but seminars.

18        A day at a time?

19   A.   Day at a time.

20   Q.   Maybe a week at a time?

21   A.   No, not a week at a time.

22   Q.   When did you do the MBA program?

23   A.   1978.

24   Q.   At College of Notre Dame?

25   A.   1978.   '76 to '78.

TORREANO SHORTHAND REPORTING (866) 760-DEPO
Case: 10-05196   Doc# 165-3   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 8
of 35

1    Q.   Shortly upon your arrival here in the US?

2    A.   Yes.

3    Q.   Where do you currently work?

4    A.   I work -- I have my own -- a company called

5 All in One Transportation.

6    Q.   What type of company is your All in One

7 Transportation?

8    A.   It's a transportation company.

9    Q.   Is it an LLC or a corporation?

10   A.   It's a C corporation.

11   Q.   It's a C corp.  Who is on the board?

12   A.   Myself and Dilip.

13   Q.   That's Dilip.  And he's got the last name that

14 Mr. Ison was kind enough to spell for us --

15   A.   Yeah.

16   Q.   -- the other time?  Gunawardena?

17   A.   Gunawardena.

18   Q.   What's your role?

19   A.   I'm the CEO of the company.

20   Q.   You're the C --

21   A.   CEO.

22   Q.   CEO.  And Dilip is what?

23   A.   He's the director.  Board of directors.

24   Q.   Anybody else?

25   A.   No.

79

1     Q.   How long have you owned All in One?

2     A.   Close to two years.

3     Q.   Did you start the company yourself or did you

4  buy it from somebody?

5     A.   I started it myself.

6     Q.   Would you consider yourself the sole owner?

7     A.   No.

8     Q.   Who else is an owner?

9     A.   Dilip.

10    Q.   Any other investors?

11    A.   No.

12    Q.   What does your job entail there with All in

13 One?

14    A.   I run the company.  Day-to-day operations.

15    Q.   You run the day-to-day operations of this

16 transportation company?

17    A.   Yes.

18    Q.   And what type of transportation?

19    A.   Medical transportation.

20    Q.   Does that require you to receive some type of

21 licensing?

22    A.   No.

23    Q.   To provide medical transportation?

24    A.   No.

25    Q.   Cars, buses?

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 10 of 35

1      A.   Cars.

2      Q.   It's all cars.  You own the cars?

3      A.   No.  Subcontract to drivers.  The drivers own

4  the cars.

5      Q.   Do you have any employees?

6      A.   Yes.

7      Q.   Who are the employees?

8      A.   The names?

9      Q.   Yes.

10     A.   We have Novela, N-O-V-E-L-A.  I don't know her

11  last name.  Solinsky.  I think Solinsky.  Frank Rick.

12  Amrita Singh.  A-M-R-I-T-A.  Amrita Singh.

13     Q.   S-I-N-G-H?

14     A.   S-I-N-G-H.

15          And Kathleen Chopra.

16     Q.   What do they do?

17     A.   One is an accountant.

18     Q.   Which one?

19     A.   Novela, and Kathleen is the office manager,

20  the office managers.

21     Q.   Ms. Solinsky and your ex-wife Kathleen

22  Chopra --

23     A.   Accounting and office manager.

24     Q.   Both?

25     A.   Both.  They both share the responsibility.

81

1       Q.   Okay.  You run this out of the Becky Lane

2   property?

3       A.   Yes.

4       Q.   Frank Rick, what's his role?

5       A.   He's the general manager.  He runs the

6   dispatching group.  Dispatching, hiring.

7       Q.   And Amrita?

8       A.   She does all the dispatching, also.  Same

9   thing, dispatching and hiring.

10      Q.   She's not the general manager?

11      A.   No, no.

12      Q.   Okay.  These -- have these folks been with you

13  though all of those two years?

14      A.   They've been there for two years.

15      Q.   Anyone else?

16      A.   We have Mahbub Alam who works with us on a

17  temporary basis taking care of the accounting.

18      Q.   Does he help --

19      A.   Oh.  Mahbub, M-A-H-B-U-B.  Alam, A-L-A-M.  He

20  works part-time.

21      Q.   He helps Ms. Solinsky and Ms. Chopra with the

22  accounting?

23      A.   Uh-huh.

24      Q.   Did you work for -- I know that you're in

25  business for yourself and you've had various

1  businesses.  Did you work for any other companies aside

2  from being in business for yourself?

3       A.  Oh, in the past?

4       Q.  Yes.

5       A.  I worked for GE.

6       Q.  What did you do for GE?

7       A.  I was in their contracts.

8            MR. ISON:  Counsel, it's 12:30.  12:27.

9            MR. CAMPAGNA:  Let me just finish up with just

10  asking about GE and then we'll take a break and we'll

11  come back.

12           THE DEPONENT:  I was procurement.  Contracts

13  and procurement.  Contract administrator.

14  BY MR. CAMPAGNA:

15       Q.  What is that?

16       A.  That buys products, nuclear devices.

17       Q.  Is that why you're glowing?

18       A.  I don't know if I'm glowing.  It's been 25

19  years since I left the company.

20       Q.  So you were the contract administrator --

21  sounds like an interesting job.  So you procured --

22       A.  Nuclear devices for nuclear plants.

23       Q.  Exclusively?  That's what you did?

24       A.  That's what I did.

25       Q.  And for how long?

1      A.   Eight years.

2      Q.   You did the licensing agreements with various

3 other subcontractors to GE?

4      A.   Yes.

5      Q.   For how long did you say?

6      A.   So 1982 to 1991.

7           MR. CAMPAGNA:  Mr. Ison is eagerly -- eagerly

8 trying to escape from the deposition at this moment.

9 We're going to conclude.  While we're on a break I

10 would like for our office personnel to make copies or

11 scan these documents that you provided today so that

12 you can have them back by the end of the day.

13          THE DEPONENT:  The mixed order doesn't

14 change.

15          MR. CAMPAGNA:  I'm going to give them

16 instructions that they're going to stay in the exact

17 order as they appear.

18          THE DEPONENT:  Okay.  I'm fine with that.

19          MR. CAMPAGNA:  We will not deign to organize

20 them for you in any way, shape or form.

21          We're off the record for our lunch break.

22 We'll be back at 1:30.

23          (Lunch recess taken.)

24

25

```
 1   San Jose, California            January 18, 2012

 2                    AFTERNOON SESSION

 3         MR. CAMPAGNA:  We can go back on the record.

 4   BY MR. CAMPAGNA:

 5       Q.   Welcome back.  It's about 25 minutes to 2:00.

 6   We're back from the lunch break.  We ended the

 7   deposition prior to breaking discussing your prior

 8   employment with GE.  And I wanted to go back and ask

 9   you a question about SEC since you had a little bit

10   more time to think about it probably over the lunch

11   break.

12         The name of the LLC that you and Dilip owned?

13       A.   I have to get you the name.  I tried to call

14   him and then I couldn't get a hold of him.  It's -- oh,

15   God.

16       Q.   When it comes to mind you can let me know.

17       A.   Okay.

18       Q.   We talked quite a bit about lawsuits that were

19   filed against you.  Flowers was discharged.  Chadha is

20   a friend of yours that settled.  Jindia who's also a

21   friend settled.  Tharwani who's a friend settled.

22   Bains is a friend, settled.

23         Whyte settled.  You didn't recollect the

24   amount.

25       A.   I think it was properties.
```

Case: 10-05196   Doc# 16543   Filed: 08/10/12   Entered: 08/10/12 15:17:48   Page 15 of 35

1     Q.   You thought it was a property settlement.   If

2   it was a significant amount of money, you probably

3   would have remembered?

4     A.   Yes.

5     Q.   So that led me to think about other people who

6   may -- who like some of these other ones may have

7   claimed that you or companies that you're involved with

8   owed them money.

9          So I have some people here and I want to ask

10   of each of them whether you owe -- you or your

11   companies owe them money and, if so, how much.

12          Lisa Stark?

13     A.   110.

14     Q.   Pardon?

15     A.   Over 110,000.

16     Q.   Who is Lisa Stark?

17     A.   She's a very close friend of mine.

18     Q.   How did you meet her?

19     A.   I met her through a mutual friend.

20     Q.   The 110 that you owe to Lisa Stark, how did

21   that debt accumulate?

22     A.   He gave me -- she gave me a note -- I gave her

23   a note, promissory note.

24     Q.   Who gave her the promissory note?

25     A.   I don't recollect that.   It is one of the

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:48   Page 16 of 35

```
 1   companies.  I think CEC.
 2       Q.  She loaned CEC 110,000?
 3       A.  She loaned more, but a lot of money was
 4   returned.
 5       Q.  This is the balance?
 6       A.  It's the balance.
 7       Q.  Okay.  Jason Lappin?  L-A-P-P-I-N.
 8       A.  Jason Lappin loaned a real estate company some
 9   money.
10       Q.  Which company?
11       A.  Innova Real Estate.
12       Q.  I-N-O-V-A?
13       A.  I-N-N-O-V-A, Innova Real Estate.
14       Q.  I-N-N-O-V-A?
15       A.  Real Estate.  Real Estate.
16       Q.  What type of company is Innova Real Estate?
17       A.  It's a brokerage company.  It sells real
18   estate, buys real estate.
19       Q.  Is it an LLC?
20       A.  It's a C corp.  It's no longer in existence.
21       Q.  Jason Lappin loaned money to Innova?
22       A.  Loaned money.
23       Q.  Loaned.  Was Jason Lappin repaid?
24       A.  A lot of it was repaid.
25       Q.  How much was repaid?
```

1    A.   I don't have the exact details, but a lot was

2  repaid.

3    Q.   Approximately how much was loaned?

4    A.   I think he's owed about $60,000.

5    Q.   Pardon?

6    A.   60K.  $60,000.

7    Q.   That he's still owed?

8    A.   Yeah.

9    Q.   Wesley Barling?

10   A.   We don't owe him anything.

11   Q.   Did Wesley Barling ever loan money to you?

12   A.   Yeah.  But it was repaid.

13   Q.   How much did Wesley Barling loan?

14   A.   I don't recollect.  Maybe 20,000.

15   Q.   And loaned it to whom?

16   A.   To one of the companies.  CEC, I think.

17   Q.   And that 20,000 was repaid?

18   A.   According to our records, it was repaid.

19   Q.   Is Wesley Barling a friend?

20   A.   He's a friend.  He talks to me.  Yeah, he's a

21  friend.

22   Q.   How about Jason Lappin?

23   A.   He's a good friend.

24   Q.   He's a good friend?

25   A.   Yeah.

Case: 10-05196    Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:48   Page 18 of 35

1      Q.   Serena Bem?

2      A.   We don't owe anything.

3      Q.   Has Serena Bem ever loaned you or your

4  companies money?

5      A.   No.

6      Q.   Mahbub Alam?

7      A.   He's my accountant.  He's -- he's owed some

8  money.  I don't know how much it is.  It's not a very

9  big amount.

10     Q.   Less than $25,000?

11     A.   Yeah.  I would say.

12     Q.   Less than 10,000?

13     A.   No.  Over 10,000.

14     Q.   How about Khurshid Alam?

15     A.   None.

16     Q.   Who is Khurshid Alam?

17     A.   He's an accountant, my CPA.

18     Q.   Is he also a friend?

19     A.   Yeah.

20     Q.   Along with his brother Mahbub?

21     A.   Yeah.

22     Q.   In talking about SEC Venture Group, LLC you

23  mentioned that Juan Carmona is a member and an owner?

24     A.   Uh-huh.

25     Q.   How did he acquire an ownership interest in

Case: 10-05196    Doc# 103-3    Filed: 08/10/12    Entered: 08/10/12 15:17:46    Page 19 of 35

1  SEC Venture?

2      A.  I don't recollect, but he was the -- he was

3  given ownership and Dave Cagley.  Both had the

4  ownership to run the company.  I put the money down,

5  the cash money down.

6      Q.  How much did you put down?

7      A.  600,000 cash.

8      Q.  And how much did David Cagley put down?

9      A.  I don't think they put any money down.  Just

10  stock was given for their services.

11      Q.  Juan Carmona, also?

12      A.  Yeah.

13      Q.  Would that be in the operating agreement?

14      A.  It should be all there.

15      Q.  When you say stock was given, you mean a

16  percentage of membership ownership?

17      A.  Yes.

18      Q.  You said for their efforts?

19      A.  Yeah.  I don't recollect now what -- if

20  they -- I'm not sure how it worked out at that time.

21  It's over five years ago.  I don't have a recollection

22  of how the stock was distributed.  That is all in the

23  operating agreement.

24      Q.  It's all spelled out in the operating

25  agreement?

1      A.   Yes.

2      Q.   That resides with Dr. Chadha at this time?

3      A.   Yes, yes.

4      Q.   So he may be the one to ask on that?

5      A.   To get the books back, yes.  To get the books

6  back from him.

7           MR. CAMPAGNA:  I have in my hand a document

8  that's entitled "Updated Notice of Taking Deposition of

9  Deepak Chopra."  I'm going to have Mr. Torreano mark

10 this as Exhibit 1.  And then we will attach it to the

11 deposition for the record.

12          (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

13 BY MR. CAMPAGNA:

14     Q.   Do you recognize this document?

15          MR. CAMPAGNA:  Do you want to go off the

16 record for a moment?

17          (Pause in the proceedings.)

18 BY MR. CAMPAGNA:

19     Q.   So do you recognize this document?

20          How do you recognize it?

21     A.   Yeah.

22     Q.   How do you recognize it?

23     A.   It says my name.

24     Q.   Have you reviewed it?

25     A.   I may have.

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 21 of 35

1    Q.   Prior to today?

2    A.   I may have reviewed it a long time ago.

3    Q.   It was served around September 9th, 2011?

4    A.   Uh-huh.

5    Q.   What I just want to verify is that you had an

6    opportunity to review the document, in particular the

7    documents to be produced section.

8         MR. ISON:   It starts on page 5.

9         THE DEPONENT:   Okay.

10   BY MR. CAMPAGNA:

11   Q.   You had had an opportunity to review that

12   prior to today's deposition?

13   A.   Yes.

14   Q.   Many of the records are bank records.  I'd

15   like to fast-forward to ones that are called

16   communications starting with number 18, communications

17   with Grant McPhail, Juan Carmona, Gary Wimp, Afzal

18   Ahmed, Parveen Gill, Mahbub Alam.

19        MR. ISON:   You're looking at 18?

20        MR. CAMPAGNA:   I'm moving through them from 18

21   on.

22   BY MR. CAMPAGNA:

23   Q.   You're with me, aren't you, Mr. Chopra?

24   A.   Yes.

25   Q.   Okay.  Mahbub Alam, Angelina Soria.

1      Have you had the opportunity to look for

2  communications, the communications that these document

3  requests are seeking?

4      A.   I have had an opportunity to look at them.

5      Q.   To your knowledge, have you produced all of

6  the communications that were in your possession --

7      A.   Yes.

8      Q.   -- custody or control?

9      A.   Yes.

10      Q.   If you -- if you look down to number 36, any

11  and all Quickbooks or electronic files relating to

12  Caroline, which is Caroline Clayton, LLC.

13      Did you have an opportunity to look for

14  those?

15      A.   Yes.

16      Q.   Did you produce those?

17      A.   I don't have any.

18      Q.   Who has those?

19      A.   Dr. Chadha.  They foreclosed, the company.  He

20  foreclosed.  He took all the properties away from me.

21      Q.   If you look at number 39, MB Investments?

22      A.   Uh-huh.

23      Q.   Does the MB stand for Narinder Bains?

24      A.   Yes.

25      Q.   Did you have an opportunity to look for

Case: 10-05196   Doc# 163-3   Filed: 08/10/12   Entered: 08/10/12 15:27:46   Page 23 of 35

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    documents, the statements that they are asking for

2    pertaining to MB Investments?

3        A.   Yes.

4        Q.   Did you produce any?

5        A.   I don't have any.

6        Q.   Narinder Bains would have those, I presume?

7        A.   I suppose so.

8             MR. CAMPAGNA:  I have in my hand a copy of the

9    adversary proceeding, the complaint to determine

10   dischargeability of debt.  I'm going to have

11   Mr. Torreano mark it as Exhibit 2.

12            (EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)

13   BY MR. CAMPAGNA:

14       Q.   Do you recognize this document?

15       A.   Yes.

16       Q.   How do you recognize it?

17       A.   My name is there and I should have -- I most

18   likely read this.

19       Q.   If you look on page 5, the numbered paragraph

20   15, this is without going through all the other

21   particulars of the complaint.  It says:  "As a result

22   of Defendant's false pretenses, false representations,

23   and/or actual fraud, Plaintiff has suffered damages in

24   an amount in excess of 400,000 plus interest,

25   attorneys' fees and costs."

1          Is that a true statement?

2          MR. ISON:  Objection.  Calls for a legal

3   conclusion.

4          MR. CAMPAGNA:  You can answer.

5          THE DEPONENT:  I don't think so.

6   BY MR. CAMPAGNA:

7      Q.   There was -- there was discussion earlier

8   about amounts owed to various people, and they had sued

9   you.  You settled with many of them.  Others you had

10  property exchanges.

11         Mr. Husain through this adversary proceeding

12  has sued you.  If you were to think about the

13  transactions involving you and Mr. Husain and think

14  about this complaint as an adversary proceeding, is

15  there an amount that you feel is owed to Mr. Husain as

16  a result of those transactions?

17         MR. ISON:  Objection.  Calls for a legal

18  conclusion.

19         THE DEPONENT:  I don't owe him anything.

20  BY MR. CAMPAGNA:

21     Q.   When you say that you don't owe him anything,

22  you mean you personally, Deepak Chopra?

23     A.   That's true.

24     Q.   If you turn to page 2 of the complaint,

25  paragraph 6, there are some entities that are listed.

```
 1    I want to turn your attention to these entities for a

 2    couple reasons.

 3           One, I'd like you to identify as best you can

 4    information about their incorporation or the beginning

 5    of these particular entities and secondarily whether

 6    you -- in your estimation these companies owe

 7    Mr. Husain any money.

 8           So let's take the first part.  SearchTech

 9    Medical, Inc.

10       A.   Mr. Husain owed money for SearchTech Medical,

11    Inc.

12       Q.   Pardon?

13       A.   He's owed money for SearchTech Medical, Inc.

14           MR. ISON:  Objection.  Calls for a legal

15    conclusion.

16           Did SearchTech Medical, Inc. file for

17    bankruptcy?

18           THE DEPONENT:  No.

19           MR. ISON:  Oh.

20    BY MR. CAMPAGNA:

21       Q.   So getting back --

22           MR. ISON:  SearchTech Medical did not file

23    bankruptcy?  Chapter 11 bankruptcy?

24           THE DEPONENT:  It did, but then it came out of

25    it.
```

Case: 10-05196   Doc# 105-5   Filed: 08/10/12   Entered: 08/10/12 15:27:45   Page 26 of 35

1          MR. ISON:  Right.

2          THE DEPONENT:  It filed bankruptcy.  It came

3    out of it.

4    BY MR. CAMPAGNA:

5          Q.  SearchTech Medical, Inc., when did that

6    company start?

7          A.  I don't know.

8          Q.  Approximately?

9          A.  2001, 2002.

10         Q.  And who owned SearchTech Medical, Inc.?

11         A.  There were ten investors.

12         Q.  Were you one of them?

13         A.  Yes.

14         Q.  What percentage ownership did you have?

15         A.  It kept changing as new investors came in.  I

16   don't know the exact persons in right now.  You see the

17   stock ledger that I provided you.

18         Q.  What was the highest amount of ownership that

19   you had?

20         A.  You mean when I started it?

21         Q.  Yes.

22         A.  Maybe 80 percent.

23         Q.  And then when you continued?  Did you ever own

24   more than 80 percent?

25         A.  No.

```
 1        Q.   What was the least amount that you owed --
 2   that you owned?
 3        A.   I cannot answer that.  I don't know.
 4        Q.   Was it less than 10 percent?
 5        A.   No.
 6        Q.   Less than 50 percent?
 7        A.   It could be.  It could be.
 8        Q.   Less than 40 percent?
 9        A.   No.  Between 14 and 15 percent.  At one time
10   it went up and then down as investors came in.
11        Q.   Who were the -- who were the board members for
12   SearchTech?
13        A.   When we started?
14        Q.   Yes.
15        A.   Myself.
16        Q.   What was your role?
17        A.   I was the chairman of the board.
18             Gary Wimp was the CEO.  There were several
19   other people that go in and out and I can't recollect
20   that far back.
21        Q.   So it would be mainly you and Gary Wimp?
22        A.   Me and Gary Wimp.
23        Q.   How about Angelina Soria?
24        A.   She came in later.
25        Q.   What was her role when she came in?
```

1      A.   She came in as a recruiter and then she was --

2  I think she was a CEO or president running that company

3  with me.

4      Q.   Did Gary Wimp leave at that time?

5      A.   Yeah.  Gary Wimp left.

6      Q.   Why did he leave?

7      A.   He couldn't run the company.  He had a

8  problem.  It was not profitable.

9      Q.   He couldn't run it because of his ability?

10     A.   I do not know, but we were not making much

11 money and he left.

12     Q.   Did he leave voluntarily?

13     A.   Yeah.  It was a mutual understanding.

14     Q.   Does that mean that you fired him?

15     A.   No, we never fired him.

16     Q.   Are there incorporation documents for

17 SearchTech Medical?

18     A.   Yes.

19     Q.   Have you produced them in this matter?

20     A.   Yes.

21     Q.   Where are the originals kept?

22     A.   In the garage.

23     Q.   Which garage?

24     A.   15091 Becky Lane.

25     Q.   You said at the beginning that SearchTech

Case: 10-05196   Doc# 163-3   Filed: 08/31/12   Entered: 08/31/12 15:17:40   Page 29
of 35
TORREANO SHORTHAND REPORTING (866) 750-DEPO

1  Medical owes in your estimation Iqbal Husain money.

2        How much was that?

3        MR. ISON:  Objection.  Calls for a legal

4  conclusion.

5        THE DEPONENT:  I don't know because Gary Wimp

6  was the person who took the money from Iqbal and ran

7  the companies.  He sued me for a certain amount, but I

8  don't know how much is owed.

9  BY MR. CAMPAGNA:

10     Q.   Okay.  You said that Gary Wimp took the money

11  from Iqbal when he was running the company.  What do

12  you mean by that?

13     A.   He was responsible for the money coming in at

14  that time, money that he was spending and taking money.

15     Q.   What period of time was Gary Wimp running

16  SearchTech?

17     A.   I don't recollect.  2005, maybe.  2004, '05.

18  '06, maybe.

19     Q.   Until when?

20     A.   I don't recollect.  2007 maybe.  2006.

21     Q.   Gary Wimp was running the company somewhere

22  maybe between 2004 and 2007?

23     A.   Yeah.

24     Q.   Was Gary Wimp running the company when Iqbal

25  Husain got involved with SearchTech?

1      A.   Yes.

2      Q.   And Gary Wimp you're saying was responsible

3  for transactions involving Iqbal?

4      A.   Transactions involving SearchTech Medical, all

5  transactions.

6      Q.   All transactions, whether it was with

7  Mr. Husain or with other people as well?

8      A.   Yes.   Including myself.

9      Q.   You had said that Iqbal sued you for -- or

10  Mr. Husain had sued you and SearchTech for money that

11  he claimed was owing.

12           Was it over $400,000?

13      A.   For SearchTech Medical?

14      Q.   Yes.

15      A.   No.

16      Q.   Was it over $300,000?

17      A.   No.

18      Q.   Over 200?

19      A.   Yes.

20      Q.   I'm just trying to help your recollection

21  because you said you didn't recollect.

22      A.   I don't recollect how much he sued me for.

23      Q.   Approximately?

24      A.   I think 240 or 260.  I'm not sure exactly how

25  much he sued us for.

```
 1        Q.   Chopra Enterprises Corporation?

 2        A.   Yes.

 3        Q.   Also known as CEC?

 4        A.   Yes.

 5        Q.   When did that company begin?

 6        A.   2001 or '02.

 7        Q.   Who owned it?

 8        A.   I owned it.

 9        Q.   Completely?

10        A.   Yes.

11        Q.   Do you still own the whole company?

12        A.   The company is no longer in existence.

13        Q.   CEC is no longer in existence.  As of when?

14        A.   Maybe a year and a half.

15        Q.   What was the purpose of CEC?

16        A.   To buy real estate and manage -- manage

17   properties.

18        Q.   Who helped in the running of CEC?

19        A.   Juan Carmona was the CEO of CEC.

20        Q.   He was the CEO?

21        A.   Yes.

22        Q.   Did he ever have an ownership interest in it,

23   in CEC?

24        A.   I don't recollect.  I don't think so.

25        Q.   Are there incorporation documents for CEC?
```

Case: 10-05196   Document No. 112   Filed: 08/30/12   Page 32 of 35

1    A.   There should be.

2    Q.   What do you mean there should be?

3    A.   There are.  There are incorporation documents

4  for CEC.

5    Q.   When was the last time you saw the

6  incorporation documents for CEC?

7    A.   Six months ago, a year ago.

8    Q.   Where were they?

9    A.   They were in the garage.

10   Q.   Would the -- would the -- would the other

11  corporate documents say anything about the ownership

12  interest that Juan Carmona may or may not have had in

13  CEC?

14   A.   Yes.

15   Q.   Have you seen any corporate documents that

16  describe ownership interest in CEC?

17   A.   Not lately.

18   Q.   Within the last six months?

19   A.   No.

20   Q.   Or six months ago?

21   A.   No.

22   Q.   When was the last time you saw CEC documents

23  that described ownership interest in it?

24   A.   I think I produced some records on that the

25  last time I saw it.  I need copies of the records.

103

1       Q.   You produced them in this lawsuit?

2       A.   I could have or other lawsuits.  I'm not

3   sure.  I have not been to CEC for six months to a year

4   and I've not seen the documents.  They are sitting in

5   the garage.  It's a suspended corporation.

6       Q.   You said that CEC was no longer in existence,

7   hasn't been in existence for a year and a half

8   approximately?

9       A.   It's been -- no transactions have been done by

10  CEC because the company has closed.  The company

11  doesn't have -- all the properties are foreclosed or

12  are in the process of being foreclosed.

13      Q.   Who's foreclosing on the properties?

14      A.   Banks.

15      Q.   SEC Venture Group.  We talked about that a

16  little bit more.  So let me just make sure that I have

17  my facts straight here.  This was a company that you

18  started with David Cagley and Juan Carmona.  David

19  Cagley was the manager.  Juan Carmona was running it.

20      A.   Helping out.

21      Q.   Helping to run it.  I don't remember whether

22  they had ownership interest in SEC Venture.

23           Did David Cagley have ownership interest in

24  SEC?  And I'm sorry if I'm going back.  I just don't

25  recall.

Case: 10-05196   Doc 1832   Filed 09/10/12   Entered 09/10/12 15:17:40   Desc
TORRANO SHORTHAND REPORTING (866) 760-7470   Page 34
of 35

1      A.  Yes, yes.

2      Q.  What ownership did he have?

3      A.  I don't recollect.

4      Q.  How about Juan; did he have an ownership

5 interest?

6      A.  Yes, he did.

7      Q.  How did Juan acquire his ownership in SEC

8 Venture Group?

9      A.  I have -- I do not recollect, but it was done

10 either for working there or he was for his -- for his

11 services.  I'm not sure if he put any money in or not.

12 I don't think he put any money in.  I'm not sure.

13      Q.  Dave Cagley, he also was working there?

14      A.  He used to own the corporation.

15      Q.  So did he put money in?

16      A.  I don't recollect.

17      Q.  So far as you can recollect, you're the only

18 one that put money into SEC Venture Group?

19      A.  My recollection I put a lump sum of money into

20 SEC.

21      Q.  How much was it?

22      A.  Close to a million dollars.

23      Q.  And that was to initially purchase the Swanner

24 properties?

25      A.  The Swanner properties were purchased for

Case: 10-05196   Document No. 13   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 35
TORDEANO SHORTHAND REPORTING  (866) 760-DEPO
of 35