1    they will collect the money from UCSF.  A check would

2    go to UCSF.  A check would go to them.

3         Q.  A check would go where?

4         A.  To UCSF.  It would go to the factoring

5    company.  That's how factoring works.  It goes to the

6    factoring company.

7         Q.  From?

8         A.  From the client.

9         Q.  From your client?

10        A.  From my client it goes to the factoring

11   company.  It comes to us, but usually the factoring

12   company takes the invoice directly and then it charges

13   us for the difference of the days it took them to get

14   paid.

15        Q.  So if I'm understanding this correctly, you

16   placed somebody at a -- say, a medical center like UCSF

17   or a hospital like UCSF.  That person, the nurse,

18   whoever it is, does work there.  They come back and

19   they expect to be paid by SearchTech Medical.

20        A.  Uh-huh.

21        Q.  Because that person expects to be paid by

22   SearchTech Medical, SearchTech Medical then sends an

23   invoice to UCSF?

24        A.  Yes.

25        Q.  SearchTech Medical then presents that invoice

Case: 10-05196   Doc# 105-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 1 of 36

1    to whoever is factoring the invoice?

2         A.   Yes.

3         Q.   Continue explaining what happens after that

4    point.

5         A.   Then they pay you right away.

6         Q.   The person -- the factoring pays you the

7    amount of the invoice?

8         A.   Yes.  Not the amount of the invoice.  They may

9    deduct a certain percentage of it, 1 or 2 percent they

10   can deduct, which is just in the end when UCSF pays

11   them.  So our company, SearchTech Medical, is still

12   responsible for collecting the invoices because the

13   longer they take to pay, the more interest you have to

14   pay.

15        Q.   So I think I'm understanding two factoring

16   arrangements.  There's one where the person or the

17   entity providing the factoring money would get repaid

18   directly by the third party, by the person who received

19   the medical services or the medical services provider.

20   That's one instance.

21             But in the instance of SearchTech Medical, a

22   company like UCSF, your vendor, let's call them a

23   vendor, they would repay -- they would pay SearchTech?

24        A.   No.  They would pay the factoring company.

25        Q.   They would pay -- UCSF would pay the factoring

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196    Doc# 105-5    Filed: 08/10/12    Entered: 08/10/12 15:17:40    Page 2 of 36

1   company?

2     A.   That's one way of working it.  The other way

3   is they would pay us and then we would pay the

4   factoring company, also.  That can also work as a

5   private individual.  You can work it either way.

6     Q.   How did it work with Mr. Husain?

7     A.   Mr. Husain funded the invoices and when we got

8   paid for the invoices Mr. Husain got paid plus his

9   interest.  That's how we worked it with Mr. Husain.

10     Q.   So with Mr. Husain your vendors paid

11   SearchTech Medical?

12     A.   Yes.

13     Q.   Then within a period of time SearchTech

14   Medical --

15     A.   There's no time.  We pay them immediately when

16   we get it funded.  We are just trying to buy the float,

17   so we have the float because I employ the W-2

18   employees.  So they have to get paid right away.

19        So when Mr. Husain funds us he funds us the

20   same day when we bill so we can pay employees and then

21   they fund us, we -- Mr. Husain, and he collects the

22   interest and discounts it.

23        So there was books -- there was separate books

24   kept for Mr. Husain's funding and the accounting

25   funding.  And Gary Wimp and Praveen and -- what's his

TORREANO SHORTHAND REPORTING (866) 769-DEPO

1    name? -- Ahmed were taking care of the books.

2        Q.   You paid your employees weekly?

3        A.   They were paid weekly.

4        Q.   And so when you say the float, the float was

5    really waiting for the vendors to catch up and pay, in

6    the case of Mr. Husain, SearchTech Medical 30 days out,

7    60 days out, 90 days out?

8        A.   That's true.

9        Q.   And there was no lag between when SearchTech

10   received the money from the vendors and Iqbal got paid?

11       A.   That's true.

12       Q.   Now you said that there's a separate account

13   for a private funder such as Mr. Husain?

14       A.   Mr. Husain kept a set of his own books.  He

15   had his own set of his own accounting books.  They

16   should have matched up with the SearchTech Medical

17   books.

18       Q.   Is that what you were referring to earlier?

19       A.   Yeah.  That's how it works.  Factoring company

20   has it own books because they know how much interest

21   they were going to collect and SearchTech has its own

22   books, same books, which when they get the money that

23   doesn't belong to them it goes to Mr. Iqbal because he

24   already funded the company.  That's what I believed and

25   that's how it works.

1    Q.   At the time that Mr. Husain was factoring

2   SearchTech Medical's invoices to its various vendors,

3   how much time were you spending at SearchTech Medical

4   helping to run the company?

5    A.   Hardly any time.  Just doing sales.

6    Q.   What did that entail?

7    A.   Getting new clients.

8    Q.   How would you get new clients?

9    A.   Visit them, call them, nursing homes.

10   Q.   Would you go to trade shows?

11   A.   No, I didn't go to trade shows -- well, I went

12  to a couple of trade shows, but mostly face-to-face

13  meetings.

14   Q.   Mostly cold calls?

15   A.   Cold calls.  Going and meeting with clients.

16   Q.   You said not that much time.  So was that

17  twenty hours a week?

18   A.   Maybe ten hours a week, five hours a week.

19   Q.   Five to ten hours a week?

20   A.   I was in the same office.  Five to ten hours a

21  week.

22   Q.   This is -- this is in the 2003 time frame for

23  several years?

24   A.   I'd say for a year or year and a half.  When

25  Gary Wimp was there I think he was there for a year and

Case: 10-05196   Doc# 103-5   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 5 of 36

1    a half.

2        Q.   How did you spend your other time since so

3    little of it relatively speaking was with SearchTech?

4        A.   I was doing real estate.

5        Q.   What other companies were you working with

6    doing real estate?

7        A.   I was doing -- I didn't have -- I didn't have

8    too many companies, but I had -- I was doing real

9    estate.  I was doing IT placement, trying to start IT

10   placement, placement of IT staffing.

11       Q.   Were you doing that through SearchTech, the IT

12   placement?

13       A.   SearchTech Solutions.  There's another company

14   called SearchTech Solutions.  SearchTech Solutions.  I

15   was doing several other projects.

16       Q.   Similar business model as SearchTech Medical

17   but in the IT department?

18       A.   IT department.

19       Q.   And that was an inc.?

20       A.   That was an inc.

21       Q.   And who owned it?

22       A.   I owned it.  I started the company.

23       Q.   You started it with whom?

24       A.   With Farri and Jon.  Farri and Jon.

25       Q.   Could you say their full names, please?

Case: 10-05196   Doc#:105-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 6 of 36

1     A.   I don't know the last names.  F-E-R-R-I (sic),

2  and Jon is spelled J-O-N.

3        MR. ISON:  It's Jon Christensen.

4        THE DEPONENT:  Jon Christensen.

5        MR. ISON:  S-E-N.  And Farri Ouraie, O-U-R-I-E

6  (sic).  I think it's F-A-R-I, but I'm not sure about

7  that.

8  BY MR. CAMPAGNA:

9     Q.   And so SearchTech Solutions didn't pan out?

10     A.   You know, you asked -- I don't have the answer

11  for all that because it's so far back, but I was not

12  spending -- Gary Wimp was running the company for me.

13  That was the bottom line for SearchTech Medical.  And I

14  was just -- you know, I got involved in it and I fired

15  Gary Wimp.

16     Q.   Pardon me?

17     A.   Well, not fired him, but when he left,

18  mutually left, I got involved with SearchTech, Inc.

19  with him because we had some problems.

20     Q.   Before you fired him?

21     A.   I didn't fire him.  He mutually left.

22     Q.   So when Angelina Soria was involved after Gary

23  Wimp left, how much time were you spending at

24  SearchTech?

25     A.   After -- after Gary Wimp left there was

Case: 10-05196   Doc# 103-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 7 of 36

1    another CEO called Pamela who just came in temporarily

2    for a few months.  P-A-M-E-L-A, Pamela -- I forget her

3    last name again.  She was there for about four or five

4    months and then Angelina took over.

5        Q.  How much time were you spending at SearchTech

6    Medical when Pamela was the CEO?

7        A.  Just sales.

8        Q.  How many hours per week?  The same?  Five to

9    ten hours per week as when Gary Wimp was running it or

10   less or more?

11       A.  I was spending about 20 hours a week, 15 hours

12   a week in sales because we started doing the nursing

13   business, too.

14       Q.  So the amount of time that you spent when

15   Pamela was acting as CEO was higher not because she

16   needed more coaching but because you were doing more

17   sales?

18       A.  She needed coaching and I was doing more

19   sales.  We were growing the company rapidly.

20       Q.  How about when Soria was CEO?

21       A.  I was spending about 15, 20 hours getting

22   sales, existing clients.

23       Q.  And how much time were you spending running

24   the company?

25       A.  I was not running the company.

Case: 10-05196   Doc# 105-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 8 of 36

1    Q.   Aside from the sales?

2    A.   I was not running the company.

3    Q.   You weren't giving any coaching to Soria?

4    A.   She was running the company.  I was coaching

5    her in the sense -- not coaching her.  She's doing

6    day-to-day running of the company.  She would take care

7    of all the bills.  She would pay everything.  I would

8    just do the sales.

9           MR. CAMPAGNA:  We're going to go ahead and

10   take -- you're okay.  We're going to take just ten

11   minutes.  Are you okay with that?

12          MR. ISON:  Take ten minutes by all means.

13   It's your depo.

14          (Recess taken.)

15          (EXHIBIT 3 WAS RE-MARKED FOR IDENTIFICATION.)

16          MR. CAMPAGNA:  So we're back on the record.

17          Coming back from our break I want to for the

18   record state that we agreed while off the record to

19   re-mark Exhibit 3.  And that has been duly taken care

20   of by our court reporter.

21          MR. ISON:  That's true.

22   BY MR. CAMPAGNA:

23     Q.   Mr. Chopra, we're loosely talking about

24   Exhibit 3, but I think that we're beyond that at this

25   point.  I'm talking about SearchTech Medical and how

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 185-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 9 of 36

1    the company was run.

2            We were discussing the frequency that you

3    reviewed Quickbooks when Gary Wimp was the CEO and

4    Angelina Soria was the CEO.  We had some discussion

5    about that.  Do you recall?

6        A.   Yes.

7        Q.   What I want to get a sense of now aside from

8    the Quickbooks is on a day-to-day basis what type of

9    reports were you getting from Gary Wimp when he was

10   CEO?

11       A.   None.

12       Q.   No reports on a daily basis.  What reports on

13   a weekly basis were you getting from Gary Wimp?

14       A.   We were discussing together sitting together

15   and discussing the business plan.  Not really getting

16   any reports as such, but I would review them when I got

17   them.  I can't recollect how many times I got the

18   report, but I would sit with Gary and review the

19   company plan, business plan.

20       Q.   How often would you sit with Gary Wimp and

21   review the company plan?

22       A.   It was on an informal basis.  It was not a

23   formal basis.  We didn't really have a formal meeting.

24       Q.   Was it twice a month?

25       A.   We worked in the same office.  So, you know,

152

1  it was maybe twice a month, twice a month.  But we

2  would talk occasionally.  If he had a question, he

3  would ask me in the office.  Sometimes he would just

4  come to me and ask me a question.

5      Q.  Would you go to him and ask him a question

6  like how is the company doing?

7      A.  I would ask him questions, too, and he would

8  ask me questions.

9      Q.  What types of questions would you ask him?

10     A.  If he hired a person, you know, why did you

11 hire the person.  You know, for a contract, you know,

12 how is he going to get the people to fund the contract

13 or to get the people, you know, and, you know, dealing

14 with the regulations of the company, what was the

15 condition of the company of the licensing and that

16 stuff and so on.  Just general condition.

17     Q.  You mentioned that Gary Wimp was spending more

18 than the company was taking in?

19     A.  I found that out at a later stage, yes.

20     Q.  When did you find that out?

21     A.  Two months before I let him go.

22     Q.  And he was operating the company for

23 approximately three years?

24     A.  I don't know three years.  Maybe two years.

25 I'm not sure.

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 11 of 36

1      Q.    Two years?

2      A.    Yeah.  He was getting a salary.

3      Q.    How much was he getting?

4      A.    I don't recollect.

5      Q.    So let's say in that first year, was he

6    spending in the first year more money than he was

7    taking in?

8      A.    I think it slowly gradually built up as he was

9    expanding the company.

10     Q.    During the first year was he spending more

11   money than the company was taking in?

12     A.    Not that much more, but he was spending -- we

13   were at a loss.  We were losing money.  As a start-up

14   company we were losing money.  We were losing money.  A

15   small amount of money, but we were losing money.

16     Q.    What's a small amount of money?

17     A.    Ten, twenty, thirty thousand dollars a year,

18   something like that.

19     Q.    You're saying in the first year that Gary Wimp

20   was CEO, SearchTech Medical lost ten to thirty thousand

21   dollars approximately?

22     A.    I'm going to tell you I don't know the exact

23   amount, but I think that would be about right.  I don't

24   know the exact number.

25     Q.    Did it lose more than $100,000?

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    A.   I do not know.

2    Q.   More than $200,000?

3    A.   I do not know.  I don't have the books.  I

4    don't know.  It was 2001.  I do not know.  I can't

5    answer the question for you.

6    Q.   So Gary Wimp was with the company in 2001 when

7    it started?

8    A.   When it started we didn't have any expenses

9    except for the rent and myself and a couple of people.

10   We didn't have --

11   Q.   You don't recall when Gary started with the

12   company?

13   A.   I think it was 2000 -- I don't recall.  2002,

14   2003.  I'm not sure.

15   Q.   All right.  Do you have any documents that

16   might show when Gary Wimp started the company --

17   started with the company?

18   A.   I'm sure the documents are in the garage.

19   They have to be.  They should be there.

20   Q.   But your understanding is that in the first

21   year that Gary Wimp was CEO of the company, the company

22   operated at a loss?

23   A.   Started operating at a loss.

24   Q.   Started operating at a loss?

25   A.   Because they were hiring more people and

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 103-5   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 13 of 36

1    trying to grow the company, which is a normal

2    progression.

3         Q.   When you say "they"?

4         A.   Gary was hiring new people, new employees.

5         Q.   And your understanding is in the second year

6    that Gary Wimp was running the company, the company was

7    operating -- also operating at a loss?

8         A.   I don't know if operating at a loss, but I was

9    putting money in.  I was personally putting money into

10   the company.

11        Q.   When did you personally start putting in money

12   to take care of the loss?

13        A.   2003, 2004 I put money in the company.

14        Q.   In both years you put money in the company?

15             Approximately how much?

16        A.   Actually, I lost I think about $290,000 for

17   myself on SearchTech Medical.  So I don't know when I

18   put that money in.  I put a lot of money into the

19   company.  I don't know what time.

20        Q.   Where does the 290,000 figure come from?

21        A.   From my accounting, what money I put in, how

22   much the company owed me.

23        Q.   That's over what period of time?

24        A.   The life of SearchTech.

25        Q.   So from 2001 until 2009 you put 290,000 of

TORREANO SHORTHAND REPORTING (866) 760-DEPO
Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 14
of 36

1    your own money into SearchTech?

2         A.   Yes, close to that.

3         Q.   To cover the loss?

4         A.   Expansion, loss, whatever you may call it.

5    But most of the money was put in the first four years,

6    five years.  Then after that we were profitable.

7         Q.   So most of the 290,000 was put into the

8    company between 2001 and 2005?  That's the first four

9    years.

10        A.   Yeah.  I can answer that, but it looks like

11   that was the time approximately.

12        Q.   You mentioned that you were familiar with the

13   Quickbooks.

14        A.   Uh-huh.

15        Q.   Because of your accounting background; right?

16        A.   I was familiar with Quickbooks.  My accounting

17   background didn't have Quickbooks in those days.  Just

18   a regular accounting background, but I was familiar

19   with accounting.

20        Q.   With accounting.  And you're also familiar

21   with the Quickbooks?

22        A.   Yes.

23        Q.   So you're familiar with the term "cash flow"?

24        A.   Yes.

25        Q.   And you're familiar with cash flow reports

TORREANO SHORTHAND REPORTING (866) 760 DEPO

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 15 of 36

1     that Quickbooks can generate?

2          A.   No.

3          Q.   How about accounts receivable reports?

4          A.   Yes.

5          Q.   Are you familiar with accounts receivable

6     reports that Quickbooks can generate?

7          A.   No.

8          Q.   At the time you were at SearchTech are you

9     saying that you didn't receive any cash flow report?

10         A.   No.   I was not familiar with the cash flow

11    reports.

12         Q.   You never looked at a cash flow report?

13         A.   No.

14         Q.   On a daily basis, weekly, monthly.

15              So your information regarding SearchTech

16    operating at a loss and particularly when Gary Wimp was

17    running the company was during those periodic informal

18    conversations that you had with Gary Wimp?

19         A.   That's true.

20         Q.   What percentage of the time, if any, did you

21    have documents that you and Gary would be discussing to

22    focus on figures regarding losses?

23         A.   We never figured -- the loss was due -- my

24    understanding -- what Gary explained to me was the loss

25    was due to his hiring people for future profits.   It

Case: 10-05196    Doc# 103-5    Filed: 08/10/12    Entered: 08/10/12 15:17:40    Page 16
of 36
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    was not loss.  He was hiring very competent people and

2    he basically convinced me, rightfully or wrongfully,

3    that these people would bring in a lot of sales.

4           So he would have, "I'm hiring 40 nurses

5    tomorrow.  I want 20 nurses contacted.  I want to get

6    10 employees hired tomorrow."  There was permanent

7    things going through.  You know, all kinds of stuff was

8    told to me and I believed that would happen, you know.

9    There were six permanent placements happening and they

10   would bring in forty, fifty thousand dollars.

11        Q.  Over what period of time would six permanent

12   placements bring in forty to fifty thousand dollars?

13        A.  Three months, two months.  He would show me a

14   projection that would happen and his projections were

15   not coming right.  The projections were all missed.  It

16   never came out to the target.

17        Q.  When SearchTech was spending more money than

18   was coming in, would Gary Wimp inform you of this?

19        A.  Gary Wimp would ask me for money.

20           MR. CAMPAGNA:  My question is would he inform

21   you that there was -- could you repeat the question

22   that I asked.

23           THE COURT REPORTER:  "Question:  When

24           SearchTech was spending more money than was

25           coming in, would Gary Wimp inform you of

1          this?"

2          THE DEPONENT:  He would inform me that -- he

3    would not inform me they were spending more money than

4    he was getting.  He would inform me that the money was

5    coming in to offset the losses because he had a lot of

6    sales in the pipeline.

7          In a staffing business, you have six deals

8    going, and four of them go through.  Two of them

9    don't.  So he always had projections in front of me of

10   what he was bringing in.

11   BY MR. CAMPAGNA:

12      Q.  I get the sense that you're trying to explain

13   to me what was going on, but I'm not sure that I'm

14   quite understanding it.  So --

15      A.  Let me try to explain it to you again.

16          You're asking me a question that I cannot

17   answer your question by yes and no.  The question is he

18   would come to me and he would say, "Listen, I have six

19   placements going on in San Diego.  Finally, two have

20   taken place.  So each placement we're going to get

21   $10,000.  I've hired this fantastic person.  I'm paying

22   her $5,000 a month or $4,000 a month.  And we have six

23   placements coming in, seven placements coming in."

24          And then the final interviews are looking

25   at -- the nurse manager is looking at it.  And then

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  what would happen is that those projections would not

2  come true and I started realizing after some time of

3  employment that some of his -- either his employees he

4  hired were not right or the business he was getting was

5  not coming in.

6       So my funding the company was due to the fact

7  that I really believed that the business was going to

8  come in because he had the right people, the right

9  words.  He was dressed up nice and he did -- he told me

10 all the right things in a start-up company.

11      So my money going in was more of an investment

12 that the company would go bigger and some of those

13 things did not happen.

14      Does that answer your question?

15      Q.  Where was your money going?

16      A.  To expand the company.  Salaries, marketing.

17      Q.  Is there an accounting of where your money was

18 going?

19      A.  I'm sure there's an accounting in Quickbooks.

20 It's all there.

21      Q.  When you say your -- when we say your money

22 because I think you had mentioned that you had put

23 $290,000 of your own money, most of which was in the

24 first four to five years, where was that money coming

25 from?

TORREANO SHORTHAND REPORTING (866) 769-DEPO

1    A.   Coming from my money.  I had money to put in.

2  I had a house.  My house cost me 800,000.  I owed

3  3 million on it.  I refinanced my house and took money

4  out.  I put it into investments and I was putting the

5  money in.

6    Q.   So part of the $290,000 came from you

7  refinancing your house; is that right?

8    A.   I don't know where it came from.  I had a lot

9  of other things going on.  You're asking me questions I

10 don't have answers for.  So I don't know where it came

11 from.  It came from when I had money, you know.

12   Q.   Your other investments that you had going on,

13 were those with SEC Ventures?  Would that be a source

14 of other investments, money coming in?

15   A.   Okay.  I came into this country in 1975.  In

16 2001 we started.  I had a lot of money between 2001.  I

17 built a house.  I had a lot of money and all the money

18 is gone in my investments.  That's what happened.

19        Now you're asking me where it came from.  We

20 can go back 15 years and dig where it came from.  You

21 know that.  If I'm a tax attorney, everything is

22 there.  I had money, a lot of money that I lost.

23 Okay?  So what I'm trying to tell you is you're asking

24 me questions where did it come from.  I do not remember

25 where it came from.  It's been 15 years, 16 years.

162

Case: 10-05196   Doc# 103-5   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 20 of 36

1   Q.   Okay.  So what I'm hearing is between 1975

2   when you came into this country and 2001 when you

3   started SearchTech, you had money and assets?

4   A.   Yes.

5   Q.   From 2001 through 2009, did you also have

6   money and assets?

7   A.   Yes.

8   Q.   And what I'm understanding is that some of

9   that money and assets that you acquired prior to 2001

10  went into funding SearchTech.

11  A.   And buying a lot of properties.

12  Q.   And buying properties?

13  A.   Yes.

14  Q.   Okay.  So some of that money -- in buying

15  properties -- when you say you bought properties, you

16  would have bought them through what companies?

17  A.   Bought them through real estate.

18  Q.   You would have bought the properties through

19  SEC Ventures?

20  A.   No.  I bought properties on my own.  Before I

21  didn't have any --

22  Q.   Individually?

23  A.   Yes.

24  Q.   At some point you would then buy properties

25  through SEC ventures?

163

Case: 10-05196   Doc# 103-3   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 21 of 36

1      A.   Let me explain to you again.

2      Q.   It's just a yes -- that one you can do yes or

3   no.

4      A.   Yes.   I put close to a million dollars in SEC

5   Venture Group.

6      Q.   And at some point you also put money into

7   CEC?

8      A.   Yes.

9      Q.   You also purchased properties through CEC?

10     A.   Yes.

11     Q.   While SearchTech Medical was operational from

12   2001 to 2009, which other companies would you say were

13   your other means for investing besides SEC and CEC?

14     A.   I invested in a lot of start-up companies.  I

15   can give you 30, 40 companies I invested in in 2001.  I

16   made a lot of money in start-up companies invested.

17     Q.   Name one.

18          MR. ISON:  Objection.  This is going offline.

19   This is not an OEX.  You don't have to tell him about

20   your personal financial affairs.  Objection.

21   Confidentiality.

22          MR. CAMPAGNA:  Are you instructing him not to

23   answer?

24          MR. ISON:  Yes.

25   //

Case: 10-05196   Doc# 103-5   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 22
of 36

```
 1    BY MR. CAMPAGNA:

 2         Q.   Okay.  So getting back to the $290,000 --

 3         A.   Approximately.  I don't know the exact

 4    figure.

 5         Q.   Approximately $290,000.

 6         A.   Uh-huh.

 7         Q.   You've said that the money came from you

 8    personally?

 9         A.   Yes.

10         Q.   From your personal investments.

11         A.   Yes.

12         Q.   And then you put it into SearchTech.

13         A.   Yes.

14         Q.   Okay.  You're saying that Gary Wimp didn't

15    tell you that the company was running at a loss;

16    right?

17              MR. ISON:  Objection.  Misstates the

18    testimony.

19    BY MR. CAMPAGNA:

20         Q.   You can correct me.  I'm trying to understand

21    what the testimony is.  So you can correct me.

22              Are you saying that --

23         A.   Gary Wimp told me that he had business coming

24    in.  There's a lot of business coming in the next six

25    months.  We had a lot of contracts going on.  There was
```

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    a lot of activity that we were supposed to be getting

2    the money.

3            So he was not running a loss.  He believed

4    that he was going to make the money for the company

5    because all the money was coming in for the startup

6    company.  That did not happen.  It went into a loss.

7       Q.  Did Gary Wimp ever tell you that SearchTech

8    Medical was operating at a loss?

9       A.  According to him, it was not a loss.

10   According to him, it was investment in building a

11   company.  There's a difference.

12           MR. CAMPAGNA:  Could you repeat my question.

13           THE COURT REPORTER:  "Question:  Did Gary Wimp

14           ever tell you that SearchTech Medical was

15           operating at a loss?"

16           THE DEPONENT:  Gary Wimp did not tell me that

17   it was running at a loss.  He told me that he was --

18   the money that was being put into the company was an

19   investment for the future.  Now you can take it any way

20   you want.  That's exactly his words.

21           And he hired the employee for $5,000 a month.

22   He expected to make $150,000 off the employee.  That's

23   what he told me.

24   BY MR. CAMPAGNA:

25       Q.  In your own words, was SearchTech Medical ever

1    operating at a loss?

2        A.    They lost money every year.  Many years it

3    lost money.  But I was under the assumption it was

4    losing -- it lost money because it was in a startup

5    environment, but it's an investment you put in and you

6    always lose money the first few years.  So it would not

7    be something unusual for me to see a company losing

8    money.

9        Q.    So from your perspective you were investing in

10   the future?

11       A.    Absolutely.

12       Q.    So you were buying into Gary Wimp's plan?

13       A.    Yes, I was.

14       Q.    And in order to do that, you infused

15   SearchTech with your own money?

16       A.    Yes, I did.

17       Q.    Did you infuse SearchTech with money from

18   other sources other than your own money?

19       A.    In the beginning I did.  I invested.  I did.

20       Q.    How about after the beginning?

21       A.    From Rani -- Gary took money from Rani

22   Hilyar -- I mean from Flowers.

23       Q.    Hilyar was the one that you were talking about

24   this morning who loaned $6 million to various

25   businesses and it turns out that Rani was loaning

1  Mr. Flowers's money?

2      A.  Gary was the CEO when he borrowed money from

3  Rani Hilyar.  He signed a note and he borrowed money

4  from Rani Hilyar in which he gave it to him.

5      Q.  Was that a decision that you were involved

6  with?

7      A.  I was on the board.  So I knew that -- I was

8  involved in the decision of getting the money from --

9  and Gary was the person responsible for allocating the

10  money to make the company go.

11      Q.  That was the $250,000 and the $100,000 that we

12  discussed this morning?

13      A.  No.  That $100,000 had nothing to do with

14  SearchTech Medical.

15      Q.  So it was just the 250,000?

16      A.  250,000.

17      Q.  Was there a corporate resolution that

18  memorialized the decision to borrow the 250,000 from

19  Hilyar?

20      A.  Yes.  She was very much involved in that

21  decision.

22      Q.  Who was very much?

23      A.  Hilyar, Rani Hilyar was part of the decision,

24  the corporate decision.  There were lawyers involved.

25  There were meetings.  A lot of things happened.

1  There's plenty of documentation.

2      Q.  What I was asking is was there a corporate

3  resolution by SearchTech?

4      A.  Yes.

5      Q.  Who signed off on that?

6      A.  Gary Wimp signed off on that, on the loans.

7          MR. CAMPAGNA:  I have a document entitled

8  "Agreement for the Sale of Stock."  It's dated

9  May 30th, 2007.  It appears to be signed by Mr. Husain

10 and Deepak Chopra.  I'm going to have the court

11 reporter mark it as Exhibit 4.

12          (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.)

13 BY MR. CAMPAGNA:

14      Q.  Do you recognize this document?

15      A.  I do.

16      Q.  How do you recognize it?

17      A.  I do recognize it.

18      Q.  Yes.  I said how do you recognize it?

19      A.  Because I issued him the stock.

20      Q.  Pardon?

21      A.  I issued him the stock.

22      Q.  Okay.  So what is this document essentially?

23      A.  I got him -- I gave him 200,000 shares.

24      Q.  When you say you gave him 200,000 shares --

25 just for the record, the record doesn't pick up the

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 16349   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 27 of 36

1    pronouns so well.  You gave --

2        A.   Iqbal 200,000 shares.

3        Q.   -- Mr. Husain the 200,000 shares?

4        A.   Mr. Husain, yes.

5        Q.   How did this agreement come about?

6        A.   I don't recall this.  I think it was -- I

7    think it was for the 15,000 or the 30,000 he gave us.

8    I'm not sure how this came out, but I showed the

9    200,000 shares.  That's in the stock ledger.

10            MR. CAMPAGNA:  You can hand that exhibit

11   back.

12            I have in my hand a document that's entitled

13   "Promissory Note" with SearchTech Medical, Inc. as the

14   borrower and Iqbal Husain as the lender, $294,831,

15   signed by Deepak Chopra.  I'm having the court reporter

16   mark this as Exhibit 5.

17            (EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.)

18   BY MR. CAMPAGNA:

19       Q.   Do you recognize this document?

20       A.   I do.

21       Q.   How do you recognize it?

22       A.   I signed it.

23       Q.   And what is it?

24       A.   It's a promissory note to pay Iqbal $294,831.

25            MR. ISON:  Do you have a copy of that?

Case: 10-05196   Doc# 163-5   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 28 of 36

1          MR. CAMPAGNA:  Did I not give you a copy?  If

2     I did not, here you go.

3     BY MR. CAMPAGNA:

4          Q.   What is your understanding of this promissory

5     note?

6          A.   That he was owed some money in SearchTech

7     Medical and interest, put everything together, and this

8     was the money SearchTech promised to pay him, $291,831.

9          Q.   That is your signature at the bottom of

10    page 3?

11         A.   Yes.

12         Q.   Do you recall whether this promissory note was

13    signed on or about the same date that you signed the

14    agreement for sale of stock?

15         A.   I don't recollect that.

16         Q.   Which was -- go ahead and take a look at

17    Exhibit 4 again, the signature page.

18         A.   I'm sure it was.  I'm not -- I don't know.

19         Q.   If you turn back to the agreement for sale of

20    stock, Exhibit 4.  Under recitals it says:  "Whereas,

21    this Agreement is entered into in conjunction with the

22    promissory note (the 'note') between the same

23    parties."

24         A.   Uh-huh.

25         Q.   Is it your understanding that Exhibit 5 is the

TORREANO SHORTHAND REPORTING (866) 769-DEPO
Case: 10-05196   Doc# 1034   Filed: 08/10/12   Entered: 08/10/12 13:17:40   Page 29 of 36

1  promissory note that's referenced in this agreement for

2  sale of stock?

3       A.   Could be.  It should be.  Yes, I think so.

4       Q.   At the time that SearchTech entered into this

5  agreement for the sale of stock in the promissory note

6  who was the CEO?

7       A.   Angelina.

8       Q.   What was your role at that time?

9       A.   As a chairman of the board and doing the sales

10  for the company.

11       Q.   Who were other officers, if any?

12       A.   I think it was Angelina and myself.  Angelina

13  and myself.

14       Q.   She was the CEO and you were the chairman?

15       A.   I was the president/chairman of the board,

16  yeah.  She was running the company and I was doing all

17  the sales.

18       Q.   Was there a COO or CFO?

19       A.   I don't recollect.  She had someone named Mary

20  who did the accounting for her, Mary and Chris.

21       Q.   Those are the two individuals that you talked

22  about earlier?

23       A.   Yeah.

24       Q.   They were accountants or they were data entry

25  people?

Case: 10-05196   Doc# 103-3   Filed: 06/20/12   Entered: 08/10/12 15:17:45   Page 30 of 36

```
 1        A.   Accountants.   Afzal was also there.   Afzal

 2   Ahmed was there.

 3        Q.   You were about to say something?

 4        A.   No.   I just said -- that's what --

 5        Q.   What is your understanding of how much, if

 6   any, of the 294,831 was paid to Iqbal Husain?

 7        A.   The first payment was paid $3,204.

 8        Q.   Any other payments between -- besides the

 9   $3,204?

10        A.   Maybe second payment.   I'm not sure.

11        Q.   How about a third payment?

12        A.   No.

13        Q.   You mentioned Praveen Gill?

14        A.   Uh-huh.

15        Q.   Someone who was helping Gary Wimp?

16        A.   Yes.

17        Q.   Was Praveen -- was this male or female?

18        A.   Female.

19        Q.   Was she an accountant?

20        A.   She was an accountant.

21        Q.   Did she work with you in any of your other

22   companies?

23        A.   I don't think so.   I don't recall if she did.

24   I'm not sure.

25        Q.   Who brought Praveen on board to SearchTech?
```

Case: 10-05196    Document No. 12    Filed: 08/16/12    Page 31 of 36
TORREANO SHORTHAND REPORTING 1607 DEPO

```
1        A.   Gary Wimp.

2        Q.   That was his contact from somewhere else?

3        A.   I think he interviewed.  I'm not sure.  I'm

4   not sure who brought her in.

5        Q.   What type of employee was -- was Ms. Gill?

6        A.   I think a W-2, I think.

7        Q.   And was she skilled at what she was doing?

8   Did you have any problems with her?

9        A.   Her hand gave up.  She had carpal tunnel

10  syndrome.  She couldn't work.

11       Q.   Did that end her employment?

12       A.   Yeah.

13       Q.   Before that, I mean in terms of her

14  competency level, did she seem to know what she was

15  doing?  This is really just background because I don't

16  know anything about Ms. Gill.

17       A.   I think she was fine.  I don't know her

18  competency level because Gary was supervising her.

19       Q.   Did you have any interaction with her?

20       A.   I talked to her.

21       Q.   You were all at the same office space?

22       A.   Yeah.

23       Q.   At the time?

24       A.   I think she was -- she was a good employee.

25            MR. CAMPAGNA:  I have a document that is an
```

Case: 10-05196   Document: 2  Filed: 08/16/12  Page 32 of 36
TORREANO SHORTHAND REPORTING DEPO

```
 1    e-mail from Parveen Gill to Iqbal Husain copying

 2    Serena.  I think that might be Serena Bem.  Michele.  I

 3    think you mentioned a Michele earlier.  There's no last

 4    name.  Gary Wimp and Deepak Chopra.  It's attaching a

 5    report for AR Funding for a particular week.  I'm

 6    having the court reporter mark this as Exhibit 6.

 7              (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)

 8    BY MR. CAMPAGNA:

 9         Q.  Do you recognize this document?

10         A.  It's a standard funding agreement.

11         Q.  It's a what?

12         A.  It's a funding agreement.

13              MR. ISON:  Do you recognize this?

14              THE DEPONENT:  Do I recognize this exhibit?  I

15    don't recognize this.  I don't.  I mean I don't

16    recollect this.

17    BY MR. CAMPAGNA:

18         Q.  Okay.  That's fine.  That's the -- if that's

19    true, you don't have to.  I'm just trying to see.  It

20    appears to be an e-mail from Ms. Gill to Iqbal.  You're

21    copied on it.  And you're saying you don't recall

22    seeing it; right?

23         A.  I don't recall seeing this one.

24         Q.  Okay.

25         A.  I assume there are hundreds of e-mails going
```

1  through.  So I don't recall this particular one.

2      Q.  You mentioned that Mr. Husain kept -- as the

3  person factoring, kept his own spreadsheet of the

4  factoring of the factored invoices; is that right?

5      A.  I suppose he did.

6      Q.  Okay.  If you look at page 2, second page of

7  this document, there's a document that's entitled

8  "Iqbal's Funding Sheet."

9          Do you recognize that document?

10     A.  No.

11     Q.  Do you generally recognize it as a funding

12  sheet for Mr. Husain?

13     A.  No.  I recognize it as a bunch of numbers in

14  it, and it has accounting.  And when I read the e-mail,

15  this basically is to receive money from the vendor.

16  She's asking for part of the money back, and she would

17  deposit the money on Monday.  That's what it says.  So

18  it's a funding sheet.

19     Q.  Is what -- is what Ms. Nunez is describing how

20  the factoring is to work when she says attached --

21  excuse me.  "Please see attached report for AR Funding

22  for week ending 2/25/05 and transfer 34,626.81 to STM

23  account as soon as possible."

24     A.  Uh-huh.

25     Q.  What does that mean?

Case: 10-05196   Doc #: 03-5   Filed 08/10/12   Entered 08/10/12 15:17:40   Page 34 of 36

1    A.   That means that she billed $34,000 to the

2  customer and she's asking for 34,000 from Iqbal to come

3  back.   And she's also saying that whatever -- what she

4  received from the client in blue, she's depositing in

5  his account.   That's what it means.

6    Q.   And Donna Nunez, who is she?

7    A.   She worked there for -- she was I think

8  helping Praveen out.   She was an accountant, also --

9  well, not accountant, but she was helping Praveen out,

10  Donna Nunez.

11    Q.   And these companies here when you look at the

12  left-hand side of the funding sheet, Cordillerra,

13  Adecco, UCSF?

14    A.   Those are clients.

15    Q.   Those are generally your clients?

16    A.   Yes.

17    MR. CAMPAGNA:   I have a document that's Bates

18  labeled BofA000063.   It appears to be a check from UCSF

19  Medical Center dated April 18th, 2005 in the amount of

20  approximately $27,000.   I'm having the court reporter

21  mark it as Exhibit 7.

22    (EXHIBIT 7 WAS MARKED FOR IDENTIFICATION.)

23  BY MR. CAMPAGNA:

24    Q.   Do you recognize this document?

25    A.   It's a check.   It's a check from UCSF from a

1    client.

2        Q.   You had mentioned earlier that the way that

3    the factoring worked with Mr. Husain was a client at

4    some point would pay SearchTech Medical?

5        A.   Yes.

6        Q.   For the services that were rendered by

7    SearchTech Medical's medical staff?

8             All right.  With that background, is it fair

9    to say that this is a payment check from UCSF to

10   SearchTech for just that?

11       A.   It looks like it.

12       Q.   Paying on an invoice that SearchTech had

13   previously sent?

14       A.   I do not know that.

15       Q.   To UCSF?

16       A.   I have no information on that.  I don't know

17   if this was funded or not.

18       Q.   You don't know if this was funded or not?

19       A.   I don't know that.  I just see a check.

20       Q.   Okay.  So this is a check from a vendor that

21   you recognize as one of your vendors; right?

22       A.   Yes.

23       Q.   In 2005?

24       A.   Yes.

25       Q.   What would this payment be for?

Case: 10-05196   Doc# 1035   Filed: 08/10/13   Entered: 08/10/12 15:17:40   Page 36 of 36