1      A.   For our -- our employees working there.

2      Q.   And you said that you don't know whether this

3   particular check was paid to Mr. Husain; is that what

4   you're saying?

5      A.   I don't have that knowledge is what I'm

6   saying.

7      Q.   That's fine.

8      A.   I don't have knowledge.   She handed me a sheet

9   and I don't have knowledge of that.

10          MR. CAMPAGNA:   I have a document that's titled

11   "Deposit Summary."   PL005000 in the bottom right-hand

12   corner.   I'm having the court reporter mark it as

13   Exhibit 8.

14          (EXHIBIT 8 WAS MARKED FOR IDENTIFICATION.)

15   BY MR. CAMPAGNA:

16      Q.   Do you recognize this document?

17      A.   This is the document of payment received from

18   UCSF.   It's a document.

19      Q.   Okay.   You do recognize the document?

20      A.   Yeah, I recognize the document.

21      Q.   How do you recognize it?

22      A.   Because it says UCSF San Francisco.   That was

23   one of the vendors and there's an STM memo here I see

24   on the memo side.

25      Q.   What does the STM memo mean?

Case: 10-05196   Doc# 183-6   Filed: 08/03/12   Entered: 08/10/12 15:17:40   Page 1 of 39

1    A.   I do not know that.  3595fi.  I don't know.  I

2  do not know what that means.

3    Q.   And it's called the deposit summary, and then

4  there's a Bank of America 1?

5    A.   Uh-huh.

6    Q.   Listed at the top?

7    A.   Uh-huh.

8    Q.   Are you familiar with Bank of America 1?

9    A.   No.

10    Q.   If you look in the -- on the right-hand side

11  under the word amount, it says $27,722.50.

12         Do you see that?

13    A.   Yes.

14    Q.   You also mentioned that upon payment by the

15  vendors, SearchTech Medical would keep its own records

16  of that transaction; correct?

17    A.   Keep a record of the transaction, yes.

18    Q.   Is this one of the records of that

19  transaction?

20    A.   I don't know that.  I was not involved

21  directly in the accounting.  So I --

22    Q.   Who was?

23    A.   Gary was.  And Praveen was.  So you are asking

24  a question -- all I can tell you is that this is our

25  client, UC San Francisco, and STM stands for SearchTech

Case: 10-05196   Doc#1834-8  Filed: 08/10/12   Entered: 08/10/12  15:17:40   Page 2
of 39

1    Medical.  That's all I can tell you.  It looks like we

2    received this money from the client.  That's all I can

3    tell you.

4         Q.  And you're saying that it would really be Gary

5    Wimp?

6         A.  Gary Wimp.

7         Q.  And Praveen?

8         A.  Yeah.  Praveen or whoever the accountant was

9    at that time.

10        Q.  Praveen Gill or another accountant?

11        A.  Yeah.

12        Q.  That would know the -- the real information

13   regarding what that document is and what it says?

14        A.  Yeah.  They would know what it says.  I can

15   only tell you this.  UCSF deposit summary with

16   $32,451.52 came in.  That's all I can say.

17            MR. CAMPAGNA:  I have another document, Bank

18   of America -- BofA, excuse me, which is a Bates label

19   000068.  San Jose Medical Center check dated 5/5/2005

20   in the amount of approximately $3,000.  I'm having the

21   court reporter mark it as Exhibit 9.

22            (EXHIBIT 9 WAS MARKED FOR IDENTIFICATION.)

23   BY MR. CAMPAGNA:

24        Q.  Do you recognize this document?

25        A.  It's a check from the vendor.  Check from a

Case: 10-05196   Doc# 434-3   Filed: 03/12   Entered: 03/10/12 15:17:40   Page 3
of 39

TORREANO SHORTHAND REPORTING (866) 765-DEPO

1    vendor.  What do you want me to tell you?  It's a check

2    from a vendor.

3        Q.   This was one of your vendors, San Jose

4    Medical?

5        A.   I'm sure it was.  It says SearchTech Medical.

6    It must have been one of the vendors.

7        Q.   And I understand, Mr. Chopra, that the

8    accountants were the ones who were involved with

9    receiving checks.  I think I understand that now from

10   having spoken with you and it may very well be that I

11   need to talk to the accountants at some point should we

12   be given permission to do that.

13        But for the time being I have you as the

14   Defendant in the adversary proceeding and you with some

15   institutional knowledge.  So what you can identify as

16   vendors, yes, this looks like an account, that's --

17   that's all you can do.

18        A.   All I can tell you is Gary Wimp was in the

19   company.  This looks like it's one of the vendors, San

20   Jose Medical Center.  It looks like it was made to

21   SearchTech, Inc. and the check that was given to

22   SearchTech, Inc. from the vendor.  That's all I can

23   tell you.

24        MR. CAMPAGNA:  I have a document that's

25   entitled "Deposit Summary."  Plaintiff's 005001.  I'm

Case: 10-05196    Doc#196-3  Filed: 08/01/12  Entered: 08/10/12 15:17:40  Page 4
of 39

1  having the court reporter mark it as Exhibit 10.

2       (EXHIBIT 10 WAS MARKED FOR IDENTIFICATION.)

3  BY MR. CAMPAGNA:

4       Q.  Do you recognize this document?

5       A.  It's a deposit for the check you showed me;

6  right?

7       Q.  From your understanding of how SearchTech

8  Medical was run, is this a deposit summary that's

9  corresponding to the check that we marked as Exhibit

10  9?

11       A.  All I can tell you is this is STM.  So it's a

12  deposit slip for SearchTech Medical because that's what

13  we used for STM.  This is money deposited.  Where it

14  was deposited, it says Bank of America.  So it's a

15  deposit.

16       Q.  So Gary Wimp and Parveen and others would be

17  the ones to ask about this; is that right?

18       A.  Yes.  Definitely.

19       MR. CAMPAGNA:  I have another check from

20  Stanford Medical.  I'm asking the court reporter to

21  mark it as Exhibit 11.

22       (EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)

23  BY MR. CAMPAGNA:

24       Q.  I'm getting the sense that you won't

25  particularly recognize this check; is that correct?

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1       A.   It's a check from one of our clients.

2       Q.   But you do recognize Stanford Hospital and

3  Clinics as one of your clients?

4       A.   Yes.

5       Q.   And so far as you understand, this is a

6  payment for services that your employees rendered to

7  Stanford?

8       A.   Yes, absolutely.

9            MR. CAMPAGNA:  I have a deposit summary.  I'm

10 asking the court reporter to mark it as Exhibit 12.

11           (EXHIBIT 12 WAS MARKED FOR IDENTIFICATION.)

12           MR. ISON:  Did you say 12?

13           MR. CAMPAGNA:  We're going to mark a

14 non-highlighted version of Exhibit 12 if there's no

15 objection here.

16           THE DEPONENT:  Deposit.

17 BY MR. CAMPAGNA:

18      Q.   So the check from Stanford Hospital and

19 Clinics, Stanford Micro, do you see where it says there

20 under "RCD from"?

21      A.   Uh-huh.

22      Q.   You're the accountant.  I think you can do a

23 quick adding of the 3,060 in the upper right-hand

24 corner and the 1,232 below it.

25      A.   Uh-huh.

Case: 10-05196   Doc#:155-6   Filed: 08/30/12   Entered: 08/30/12 15:17:40   Page 6 of 39

1    Q.  Equals 4,292?

2    A.  Yes.

3        MR. CAMPAGNA:  Okay.  I have another check.

4    It's from UCSF in the amount of $28,000.  I'm having

5    the court reporter mark it as Exhibit 12.

6        MR. ISON:  We just did 12.

7        MR. CAMPAGNA:  13.  I'm having the court

8    reporter mark it as Exhibit 13.

9        (EXHIBIT 13 WAS MARKED FOR IDENTIFICATION.)

10   BY MR. CAMPAGNA:

11   Q.  You don't recognize this check -- right? --

12   but you recognize the vendor, UCSF; is that right?

13   A.  Yes, uh-huh.

14   Q.  $28,000 to SearchTech?

15   A.  Uh-huh.

16       MR. CAMPAGNA:  I have a deposit summary in the

17   amount of 28,849.08.  I'm having the court reporter

18   mark it as Exhibit 14.

19       (EXHIBIT 14 WAS MARKED FOR IDENTIFICATION.)

20   BY MR. CAMPAGNA:

21   Q.  Would that be the deposit summary that

22   corresponds to the check to SearchTech Medical that was

23   marked as Exhibit 13?

24   A.  Uh-huh, yes.

25       MR. CAMPAGNA:  I have a check in the amount of

Case: 10-05196   Doc# 163-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 7 of 39
TORREANO SHORTHAND REPORTING  (866) 760-DEPO

1    $33,000 approximately from UCSF to SearchTech Medical.

2    I'm going to have the court reporter mark it as

3    Exhibit 15.

4            (EXHIBIT 15 WAS MARKED FOR IDENTIFICATION.)

5    BY MR. CAMPAGNA:

6        Q.   Do you recognize UCSF Medical Center as one of

7    your vendors?

8        A.   Yes.

9        Q.   And the check in the amount of $33,598.50

10   payable to SearchTech?

11       A.   Yeah.

12           MR. CAMPAGNA:   I have another deposit summary

13   in the amount of $33,598.50.  I'm going to have the

14   court reporter mark it as Exhibit 16.

15           (EXHIBIT 16 WAS MARKED FOR IDENTIFICATION.)

16   BY MR. CAMPAGNA:

17       Q.   Is this the deposit summary that corresponds

18   to the previously marked exhibit, Exhibit 15?

19       A.   Yes.

20       Q.   You mentioned that you didn't specifically

21   recognize an account that was called Bank of America I;

22   is that right?

23       A.   That's right.

24       Q.   To your knowledge, did SearchTech Medical keep

25   Quickbooks for its bank accounts?

                                                          186

Case: 10-05196   Doc# 105-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 8 of 39

1        A.   Yes.

2        Q.   And how do you know that?

3        A.   Because they entered everything in Quickbooks,

4    the bank account information, the ledger, money going

5    in and money coming in.

6        Q.   How do you know that they entered everything

7    in the Quickbooks?

8        A.   Because I was there when Gary Wimp, the profit

9    and loss showed that.   The monthly reports showed that

10   to us.

11       Q.   What type of monthly report would you

12   receive?

13       A.   Profit and loss.

14       Q.   Was that a profit and loss report that was

15   generated by the Quickbooks?

16       A.   Yes.

17       Q.   Did Angelina Soria also generate a monthly

18   report from the Quickbooks?

19       A.   We had to -- yes.   Yes, she did.

20       Q.   And as well as a profit and loss statement?

21       A.   Yes.

22       Q.   Monthly?

23       A.   Monthly.

24       Q.   What would the monthly report be called other

25   than "monthly report"?

Case: 10-05196    Doc# 105-6    Filed: 08/10/12    Entered: 08/10/12 15:17:45    Page 9 of 39

1    A.   Profit and loss, balance sheet.

2    Q.   Are those two separate things?

3    A.   Separate things.

4    Q.   So there was a monthly report called a balance

5    sheet?

6    A.   Yes.

7    Q.   And a monthly report called a profit and loss?

8    A.   Profit and loss.

9    Q.   Statement?

10   A.   Statement.

11        MR. CAMPAGNA:  I have a -- a Quickbooks report

12   entitled "SearchTech Medical, Inc. 1000 BofA I

13   Transaction Detail."  It's previously marked as a

14   Plaintiff's exhibit.  It's one, two, three, four, five

15   pages.  I'm handing it to the court reporter to mark as

16   Exhibit 17.

17        (EXHIBIT 17 WAS MARKED FOR IDENTIFICATION.)

18   BY MR. CAMPAGNA:

19   Q.   Do you recognize this document?

20   A.   It looks like a bank report.  Money paid out.

21   Checks that were taken out.

22   Q.   I want to use this just to verify that

23   SearchTech -- SearchTech's procedure that you described

24   was being enacted here meaning that when a -- when a

25   check was paid by a vendor, it would then get

1    deposited, entered into the Quickbooks and then paid to

2    Mr. Husain, the person factoring an invoice.

3        A.   Uh-huh.

4        Q.   Okay.  I'm going to have to use the other

5    exhibits to cross-reference, Mr. Chopra.  So I'm going

6    to make sure here that they are in order, the order in

7    which we identified them.

8            The second column from the left under date on

9    the first page where it says 4/19/2005, the second

10   entry for 4/19/2005, to the left of that it says

11   "deposit."

12           Do you see that?

13       A.   Uh-huh.  Yes.

14       Q.   Further to the right it also says "deposit

15   under memo."

16       A.   Yes.

17       Q.   Then if you follow that line all the way

18   across, it says "split" in capital letters.

19       A.   Yes.

20       Q.   I have a ruler here if you would like to --

21       A.   No, I don't need it.

22       Q.   Okay.  Can you follow it?  I need to use the

23   ruler.  Mr. Ison might need to use the ruler as well.

24   I'll see.

25           And then to the right of the word "split," it

1  has a figure $32,451.52.

2      A.  Uh-huh.

3      Q.  So this Exhibit 17, I'd like you to

4  cross-reference it with Exhibits 7 and 8, which I'm

5  setting forth in front of you here.

6          Do you see that?

7      A.  Yes, I do.

8      Q.  What does the word "split" mean as it appears

9  in that column towards the right-hand side of the line

10 that we are looking at?

11     A.  I don't know what "split" means.

12     Q.  Would Gary Wimp or Ms. Gill be the ones to ask

13 about that?

14     A.  Yes, I think so.

15     Q.  Okay.  Let's turn back to -- we're just

16 looking at the first page.

17     A.  Yes.

18     Q.  We're looking at the second April 19th, 2005

19 entry towards the bottom there where it says

20 32,451.52.

21     A.  Yes, I see that.

22     Q.  Deposit, yes?

23     A.  Yes.

24     Q.  Based on your understanding of how SearchTech

25 was run and how the factoring agreement was to work,

190

1    this Quickbooks entry corresponds to the -- the deposit

2    summary in Exhibit 8; is that correct?

3        A.   Yes.

4        Q.   And how do you know that?

5        A.   Because the money was deposited from here to

6    here.

7        Q.   Okay.  The record doesn't -- I appreciate

8    that, but the record doesn't capture those words.

9             So when you say the money was deposited from

10   here to here, what do you mean?

11       A.   From that check it shows up in this report.

12   This money, 30 -- where is the money?  32,451 showed up

13   here at 32,451 and deposited on 4/19.

14       Q.   I'd like the record to reflect that Mr. Chopra

15   was pointing to Exhibit 8, then stated the $32,000

16   figure that shows as a total on Exhibit 8 and

17   referencing that as the deposit made on 4/19/2005 into

18   the Quickbooks.

19       A.   Yes.

20       Q.   Thank you.  Setting 7 and 8 aside and turning

21   your attention to 9 and 10 -- excuse me, I'm not

22   turning your attention to 9 and 10 just yet.

23            Yes, I am.  Turning your attention to

24   Exhibits 9 and 10 as well as the second page, it's

25   Plaintiff's 000244.  Under 5/10/2005, the first entry,

1   the only entry on 5/10/2005, a deposit of $3,200.40.

2            Do you see that?

3        A.   What date is it?   5/10?

4        Q.   Yes.

5        A.   Yes, I do see that.

6        Q.   And I would ask you to cross-reference it with

7   Exhibits 9 and 10.

8        A.   Okay.   You have 9 -- Exhibit 10 reflects this

9   on this report, $3,200.   And Exhibit 9 reflects that

10  on -- yeah, that reflects it there.   Yes, you're

11  right.   $3,200.

12       Q.   Okay.   Turning your attention to Exhibits 11

13  and 12, the check from Stanford with the reference in

14  the deposit summary, this is the one that you had added

15  up for us earlier, the $4,292?

16       A.   Uh-huh, yes.

17       Q.   And if you turn to the third page of

18  Exhibit 17, the last entry on that page, 6/7/2005 in

19  the amount of $4,378.40.

20       A.   Yes.

21       Q.   Would that be the Bank of America entry that

22  corresponds to the deposit summary identified as

23  Exhibit 12?

24       A.   Yes.   Yes, it does.

25       Q.   Turning your attention to Exhibits 13 and 14,

1    as well as to the fourth page of Exhibit 17, the second

2    line under the date 6/8/2005.

3         A.   Yes.

4         Q.   Where it shows the deposit of $28,849.08.

5         A.   Yes.  This corresponds with that.

6         Q.   It corresponds with what?

7         A.   14.

8         Q.   With Exhibit 14?

9         A.   Yes.

10        Q.   Turning your attention to Exhibits 15 and 16,

11   as well as to the last page of Exhibit 17, deposit made

12   on April 8th, 2005 in the amount of $33,598.50.

13        A.   16, yeah.  That corresponds with that.

14        Q.   I notice on the -- at the top of the last page

15   of what we've identified as Exhibit 17, it's titled

16   "SearchTech Medical, Inc. 1010 Bank of America II."

17             Are you familiar with the second Bank of

18   America account?

19        A.   No, no.

20        Q.   Is it fair to say that that's a separate

21   account from what was identified on the previous four

22   pages as BofA I?

23             MR. ISON:  Objection.  Calls for speculation.

24             THE DEPONENT:  I don't know.  I'm just looking

25   at it.  I don't know what it means.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 15 of 39

1    BY MR. CAMPAGNA:

2        Q.   Probably Gary Wimp or Praveen Gill or somebody

3    such as that would be the one to ask?

4        A.   Yes.

5        Q.   Is there anything on this Exhibit 17 that's

6    notable to you?  I notice that you've been looking at

7    it a little bit more than the entries that I've

8    identified.

9        A.   I'm just trying to figure it out, what it is.

10   It's just monies in the bank statement.

11       Q.   At the time that those entries were being made

12   into Exhibit 17, were you aware of what was going on

13   with Mr. Husain's factoring repayments?

14       A.   No.  Not at that time, no.

15       Q.   And those entries were all in, I believe,

16   2005.  When did you become aware of what was happening

17   with Mr. Husain's factoring repayment?

18       A.   I think Gary mentioned to me that some of the

19   payments -- the interest was being paid, but his

20   principal was not being returned because I suppose he

21   used some of the money to expand the company.  And

22   that's when I -- and I think -- I don't remember very

23   clearly what happened but Iqbal and me had a discussion

24   about that.  Mr. Husain and me discussed that.

25       Q.   Where were you when you and Mr. Husain

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 16
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 39

1  discussed this notion that you're describing of

2  interest being repaid, but principal not being

3  returned?

4     A.  It was a telephone conversation and I think it

5  was made at the office, SearchTech office.  I don't

6  recollect when.

7     Q.  Was it sometime when Gary Wimp was CEO?

8     A.  It was when Gary Wimp was CEO.

9     Q.  How do you know that?

10    A.  Because I was putting my money into the

11 company, too, at the same time.  We were funding the

12 company.  So I asked Gary point blank what was

13 happening and that's what he mentioned to me.

14    Q.  When you say that you asked him point blank,

15 what do you mean?

16    A.  I just asked him what was happening with the

17 funding because the Iqbal was not getting all the

18 interest back, all his principal back.

19    Q.  Did I ask you how you knew Gary Wimp in the

20 first place?

21    A.  I think I advertised or something or someone

22 introduced me and we hired him.  I don't know how at

23 this time, but -- I don't recollect.

24    Q.  I think you mentioned that he was an

25 experienced accountant; is that -- is that right?

1      A.   I didn't say he was an accountant.  I think he

2  was an experienced manager, salesperson.

3      Q.   Okay.  Do you recall what his background was

4  before he came on board with SearchTech?

5      A.   Not really.  I think he was a salesperson and

6  I think he had sales organization experience.  And I

7  think he had some medical field experience, also.  I'm

8  not sure.

9      Q.   When was the last time you spoke with Gary

10 Wimp?

11     A.   Maybe a couple of months ago.

12     Q.   Why do you say that?

13     A.   Because I spoke to him a couple of months

14 ago.

15     Q.   Sometime before Christmas?

16     A.   Maybe, yes.

17     Q.   Thanksgiving?

18     A.   I don't remember, exactly remember.  I had to

19 speak with him.  Maybe two months ago.

20     Q.   Do you remember what the nature of the

21 conversation was?

22     A.   Something to do with real estate.

23     Q.   Do you have real estate deals with Mr. Wimp?

24     A.   No.  I was just asking him what his -- I need

25 some help and I asked him.  He works in a real estate

Case: 10-05196   Doc# 103-6   Filed: 08/10/22   Entered: 08/10/12 15:17:46   Page 18 of 39
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    company now.

2        Q.   What real estate company does he work for?

3        A.   I don't have that name.  I have his telephone

4    number.

5        Q.   So you called him?

6        A.   I called him.

7        Q.   What type of advice were you seeking from

8    Mr. Wimp?

9        A.   Just general conversation regarding a funding

10   deal.

11       Q.   Were you asking him to help you fund a deal?

12       A.   I don't recollect.  Something to do with real

13   estate.  It's not a very important conversation.  It

14   was just a conversation I had with him.  I don't really

15   recollect exactly what it was.  Something to do with

16   real estate.  Commercial real estate, funding options.

17       Q.   Does he have access to lenders in his real

18   estate company?

19       A.   I do not know that.  Because I've not talked

20   to him -- I've just talked to him once or twice a year.

21       Q.   I understand it's two months ago --

22       A.   I do not know.

23       Q.   -- something prompted you to call Mr. Wimp.

24       A.   Yes.

25       Q.   What was that?

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 19 of 39

1      A.   It was something to do with commercial real

2  estate.  I don't recollect exactly what deal it was,

3  but something to do with commercial real estate.

4      Q.   What state was the commercial real estate in?

5      A.   California.

6      Q.   Were you interested in buying commercial real

7  estate?

8      A.   I don't recollect.  I get about 50 to 60 calls

9  a day.  I have a real estate business now.

10     Q.   You make 50 to 60 calls?

11     A.   I get 50 to 60 calls a day.

12     Q.   Well, this was a call that you had made.

13     A.   I know, but I don't recollect what I told him

14  what deal it was.  I'm not sure what it was.

15     Q.   Okay.  Do you recall whether Gary Wimp is

16  involved in a commercial real estate deal with you?

17     A.   No, he's not involved.

18     Q.   Was he helpful in the conversation?

19     A.   It was just there.  He didn't do anything for

20  me.  I didn't get any money from him or anything like

21  that.

22     Q.   So you were trying to get money from him?

23     A.   I was trying to have a conversation with him

24  about a commercial deal.  I don't recollect that.  I

25  mean, you just keep asking me.  I don't remember.  I

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 13:17:40   Page 20 of 39

1    don't remember what exactly it was.

2         MR. CAMPAGNA:  I have a document that's

3    entitled "Iqbal's Funding Sheet" and it has certain

4    pages that are marked Plaintiff's 000965, 000970,

5    000971, 000972, 000973.  It's the first page of the

6    funding sheet with a gap intentionally to the relevant

7    part of the funding sheet for this discussion.  The

8    full funding sheet was produced with the corresponding

9    Bates numbers.  I'm having the court reporter mark this

10   as Exhibit 18.

11        (EXHIBIT 18 WAS MARKED FOR IDENTIFICATION.)

12   BY MR. CAMPAGNA:

13        Q.  Do you recognize this document?

14        A.  I don't recognize this document.

15        Q.  Pardon?

16        A.  I don't.

17        Q.  Well, other than it being called Iqbal's

18   funding sheet, I think you recognize the vendors in the

19   right-hand corner; right?

20        A.  Yes, I do.

21        Q.  If you look at the first page, it has some

22   titles along the top.  Company, invoice number, amount

23   of invoice, invoice date, amount funded from Iqbal,

24   date Iqbal wired money, amount transferred paid by

25   client, funding paid back by STM, difference between

Case: 10-05196   Doc #: 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:45   Page 21 of 39

1    amount funded by Iqbal and funding paid back by STM.

2              Do you see that there?

3         A.   Uh-huh.

4         Q.   In your experience as somebody who had

5    individuals or companies factor SearchTech Medical's

6    invoices, do those titles seem to correspond to a

7    typical spreadsheet that a party factoring would

8    create?

9         A.   Different factoring companies have different

10   spreadsheets.  They have interest rates, how many dates

11   the invoices are hold.  This is a very simplified

12   sheet.  And they have days invoice is behind, 60 days,

13   70 days.  It's computerized.  It's a very detailed

14   sheet of a factoring company.

15             This is a very simplified sheet.  This is

16   basically invoice date, amount funded, date wired,

17   money amount transferred paid by the client.  It's

18   missing a lot of the data that a lot of the factoring

19   companies have.

20        Q.   Would this seem to correspond to the type of

21   factoring arrangement that SearchTech Medical had with

22   Mr. Husain?

23        A.   If you get the relevant information, I suppose

24   it would.

25        Q.   Okay.  Turning your attention to Exhibits 15

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 22 of 39

1  and 16, in particular Exhibit 16 where it says in the

2  memo "STM 3560." Do you see that there?

3      A.  Uh-huh.  Yes, I do.

4      Q.  And then looking down on the second page of

5  the funding sheet, which is the 970, towards the bottom

6  of the page where it shows UCSF, it's under Willow

7  Tree."  It's beneath the Willow Tree entry.  It shows

8  UCSF STM 3560fi, 16,796.

9          Do you see that there?

10     A.  STM 3543?

11     Q.  No.  It's a -- it's UCSF.  It's one, two,

12  three, four, five -- about eight lines up from the

13  bottom on the left-hand side.

14     A.  Yeah.  Okay.  I see that.

15     Q.  So UCSF, STM.  And that's the invoice number?

16     A.  Uh-huh.  Yes, I do.

17     Q.  And the amount of the invoice is 16,796?

18     A.  Yes.

19     Q.  The invoice date February 9th, 2005?

20     A.  Yes.

21     Q.  Amount funded from Iqbal, 16,796.  Do you see

22  that there?

23     A.  Yes.

24     Q.  Then if you go over to the column that says

25  "paid by client," 15,665.

Case: 10-05196   Doc# 163-6   Filed: 08/10/12   Entered: 08/10/12 15:17:40   Page 23 of 39

1      A.  Yes.

2      Q.  Any idea what the client would be?  Is that

3  your client?

4      A.  Could be our client, yes.  I'm not sure what

5  this is.  I've not seen this before.  So I don't know

6  what it is.  You're asking the wrong person.  I don't

7  know what the report is.  This is not a funding

8  report.  Funding report has everything else, interest,

9  markups.  It has days aging.  You know, it's got --

10     Q.  Right.  This has the invoice number.  It has

11  the amount of the invoice, the invoice date, amount

12  paid by the client and then funding paid back by STM.

13     A.  Yes.  So you should ask the person who created

14  the report.  I don't know what this in context is.  It

15  should mean money received by the client, but I don't

16  know what context it supported.  I don't know if this

17  is Mr. Husain's report or this is STM's report.  Whose

18  report is this?

19     Q.  Well, it's called Iqbal's funding sheet.

20     A.  But who generated it?

21     Q.  As far as you know, nobody in your company at

22  SearchTech Medical prepared this; is that right?

23     A.  I have no idea.

24     Q.  Okay.

25     A.  I was not running that side of the house.  I

1    don't know what it is.

2         Q.   You weren't running that side of the what?

3         A.   That side of the accounting.  You're asking

4    the wrong person.

5         Q.   Again, this would be Mr. Wimp or Praveen

6    Gill?

7         A.   Afzal or whoever the person was doing it.

8              MR. CAMPAGNA:   I'm going to go off the record

9    for one moment.

10             (Off-the-record discussion.)

11   BY MR. CAMPAGNA:

12        Q.   If you flip to page 971, also UCSF under STM

13   3580, which is the invoice number.  Do you see that?

14        A.   Which page is it?

15        Q.   It's Plaintiff's 000971.

16        A.   Yes.  Which one are you looking at?

17        Q.   UCSF.  It's the first UCSF entry on that

18   page.

19        A.   Okay.  I see that.

20        Q.   Maybe twelve or so lines down from the top.

21        A.   I see that.

22        Q.   It has STM 3580.

23        A.   Yes.

24        Q.   And it says amount of invoice is $18,336.50.

25        A.   Yes.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Q.   With the invoice date 12/16/05.

2    A.   Yes.

3    Q.   The amount funded from Iqbal.

4    A.   Uh-huh, yes.

5    Q.   And then there's no other entries to the right

6    of that?

7    A.   Yes.

8    Q.   What I'd like you to do is look at Exhibits 15

9    and 16.

10        Exhibits 15 is a check in the amount of

11   $33,598.50.

12   A.   Yes.

13   Q.   Exhibit 16 is the deposit summary of

14   $33,598.50.

15   A.   Yes.

16   Q.   In the memo section on the deposit summary it

17   says STM 3560fi and STM 3580fi.

18        Do you see that?

19   A.   Yes.

20   Q.   Turning back to Plaintiff's 000970, which is

21   the previous page, that entry that we were looking at,

22   UCSF STM 3560fi.

23   A.   Where is that?  Okay.  Uh-huh, yes.  Okay.

24   Q.   Would you agree that that STM invoice number

25   corresponds to STM's Quickbooks deposit summary for

1    this invoice number?

2         A.   I suppose so.

3         Q.   Okay.  Turning to the next page, the other

4    UCSF STM 3580fi, would you agree that it corresponds

5    with SearchTech Medical's invoice 3580fi on the deposit

6    summary?

7         A.   It looks, yes.  The numbers are the same.

8         Q.   Okay.  And that adding STM 3560 to 35 -- to

9    STM 3580 would give you the $33.598.50 that was paid by

10   UCSF to STM.

11        A.   Yes.

12        Q.   In check number 352521?

13        A.   Okay.

14        Q.   That's as Exhibit 15.

15        A.   Uh-huh.

16        Q.   Irrespective of who created this funding

17   sheet, that's something that would need to be

18   established.  That's not the question I have for you.

19             Assuming that we can establish that this is

20   Iqbal's funding sheet and looking at the record that is

21   here, going to 970, identifying and cross-referencing

22   the invoice number, noting that Iqbal funded an invoice

23   and was paid back an invoice, is that the typical

24   situation that you were describing how it was supposed

25   to happen with Mr. Husain?

TORREANO SHORTHAND REPORTING (866) 760 DEPO

1       A.   Yes.

2       Q.   Okay.  And so we see it -- would you agree

3   that, assuming that this is what it purports to be,

4   that that would be an accurate representation of the

5   normal funding and repayment?

6       A.   It should be.

7       Q.   Okay.  So in looking at Plaintiff's 000971

8   where you have the invoice amount, STM 3580fi, funded

9   in the amount of $18,336.50 on February 16th, 2005,

10  without any coaching from Mr. Ison --

11           MR. ISON:  Objection.  Colloquy of counsel.

12  You better start the question over again.

13           MR. CAMPAGNA:  Would you repeat -- you really

14  want me to do that again?

15           MR. ISON:  Yeah.  You're throwing in stuff

16  that I'm coaching him.

17  BY MR. CAMPAGNA:

18      Q.   So on the previous page we saw that the amount

19  that was factored, part of it at least was repaid?

20      A.   Yes.

21      Q.   Going to 971, SearchTech Medical invoice

22  number 3580 in the amount of $18,336.50, invoice date

23  February 16th, 2005 in the amount of $18,336.50, amount

24  paid by client.  And that's blank.

25      A.   Okay.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 103-6   Filed: 08/10/12   Entered: 08/10/12 15:17:46   Page 28
of 39

1          MR. ISON:  Are you asking him if it's blank?

2          MR. CAMPAGNA:  I just want to know that we're

3   on the same page.

4          THE DEPONENT:  Blank.

5   BY MR. CAMPAGNA:

6      Q.  So what would that tell you?

7      A.  I don't know.  I don't know whether it was

8   reported, if they corrected the report, it's a

9   mistake.  I don't know.  You're sending me a piece of

10  paper five years old and you're doing it as a report.

11         Was there another report ready to put that

12  money in there?  Was it received by the client?  I

13  don't know.  You're asking the wrong person.  You're

14  asking the wrong person.

15     Q.  Okay.  Well, you've been saying that I should

16  be asking Gary Wimp or Parveen Gill or we have at least

17  agreed that Gary Wimp would know -- should know or

18  Parveen Gill should know.

19     A.  Should know.  I mean, it's missing.  It's

20  blank.  I agree with you it's blank.  That's all I can

21  tell you.  It's blank.

22         MR. ISON:  It's one of the few times that a

23  document speaks for itself.

24         THE DEPONENT:  I cannot tell you why it's

25  blank.

                                                    207

BY MR. CAMPAGNA:

Q. You agree that if the funding and repayment scheme was working the way that SearchTech Medical envisioned it with Mr. Husain, that that wouldn't be blank?

A. I don't know. There may be a corrected report after this. Or this is a original report. I don't know. I'm sure Mr. Husain had a conversation with Praveen and got a report to find out what was happening. I don't know the whole story about it. All I know is it's blank. That's what I can tell you. You showed me a sheet of paper and it's blank.

Q. When you're -- when you were at SearchTech Medical, did you ever see any report --

A. Not the --

Q. Did you ever see any report that showed factoring that was funded by Mr. Husain that was not repaid according to the scheme that was agreed to?

A. Mr. Husain told me that he was short paid on the factoring and some of the money was not paid to him. And I confronted Mr. Gary about that. Mr. Husain told me that he was not paid the amounts that he was supposed to be paid and that's when I confronted Mr. Gary and that's the reason some of the money in that note is -- maybe that money I don't know that.

Case: 10-05196   Doc# 103-6   Filed: 08/10/22   Entered: 08/10/12 15:17:45   Page 30 of 39
TORREANO SHORTHAND REPORTING (866) 760-DEPO

```
 1    But that would be that money, but Mr. Husain confronted
 2    me and told me about it.
 3         Q.   Do you recall when that was?
 4         A.   I don't recall, but we had a conversation that
 5    his money was not paid back.
 6         Q.   You had a phone conversation?
 7         A.   I don't know.  I used to meet him -- we used
 8    to meet him all the time.  I don't remember what the
 9    conversation was.  Yes, we had a conversation.
10         Q.   And your response to Mr. Husain was what?
11         A.   I talked to Mr. Gary about it.  I talked to --
12    I talked to Gary Wimp and I said what happened and he
13    was non-committal and that was his response.  He is no
14    longer there.  I said, "We can't work together like
15    this."
16         Q.   How many times do you recall speaking with
17    Mr. Wimp about Mr. Wimp not funding -- excuse me, not
18    repaying the factored invoices by Mr. Husain?
19         A.   Maybe one or two times because I was funding,
20    also.  I was paying my money to him, too.  I was
21    putting money into the company.
22         Q.   Was your factoring getting paid, repaid?
23         A.   No, I'm owed $290,000, too.
24         Q.   Was your $290,000 all factoring money?
25         A.   Some was factoring.  Some was a loan.  At that
```

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1   time the company was growing.  So in my case, you know,

2   I didn't say much, but, yes, Mr. Husain did ask this

3   question at that time.

4        Q.   At what time?

5        A.   That he was not paid some of his money back.

6        Q.   You don't recall when, though?

7        A.   I don't recall the exact date.

8        Q.   But the invoices that we've talked about here

9   in the time period 2005, do you recall talking to him

10  back in 2005?

11       A.   I'm sure I must have talked.  I don't -- I

12  know I had a conversation with Mr. Husain.  He had a

13  conversation with me.  And I was surprised like he

14  was.  We both were surprised.  That's exactly how it

15  happened.

16       Q.   And you -- let's say -- do you recall the

17  first time you confronted Gary Wimp on Mr. Husain's

18  factoring not being repaid?

19       A.   Yes, I did.  And he gave me --

20       Q.   When was that?  You said you don't remember

21  the time period, but do you remember the first time you

22  confronted Mr. Wimp?

23       A.   No, not exactly.  Because I did -- I didn't

24  confront him.  I talked to him saying that that money

25  in the factoring agreement is not being paid and what

1   was the reason for that.

2       Q.   So you asked Mr. Wimp what the reason is?

3       A.   Yes.

4       Q.   Did you ask him or did you tell him make sure

5   that Mr. Husain gets paid?

6       A.   Yes.

7       Q.   Or "I'm going to can you" or something like

8   that?  I'm just trying to understand what was --

9       A.   No.  I don't use the word "can."  I just told

10  him to make sure that the thing is right and talk to

11  the accountant and get it paid.

12      Q.   At the time that you first learned that

13  Iqbal's factored invoices were not getting paid,

14  repaid, what was your understanding of where the money

15  could possibly have come from to get that -- to get

16  them paid?

17          MR. ISON:  Objection.  Calls for speculation.

18          THE DEPONENT:  I think it was a mistake by the

19  accountant for not putting the money in there.

20  BY MR. CAMPAGNA:

21      Q.   Every time you thought it was just a mistake?

22      A.   Not every time.  I think after we found out I

23  think the factoring agreement was terminated.  We got a

24  new factoring agreement and Mr. Husain claimed that he

25  was owed a certain amount of money that was not paid

Case: 10-05196   Doc #: 165-4 Filed: 05/21/12  Entered: 08/16/12 15:17:45  Page 33 of 39

1    back to him.

2            MR. CAMPAGNA:  Okay.  I'm going to go off the

3    record for one moment.  It is five o'clock.  We're

4    going to conclude shortly, but I want to look at my

5    notes and I want to see that we're at a logical place.

6    And I think that we are.  And I also want to ask

7    Mr. Husain a question.

8            So let's go off the record for three minutes.

9            (Recess taken.)

10           MR. CAMPAGNA:  We can go back on the record.

11           We've agreed to reconvene on Tuesday, next

12   Tuesday at nine o'clock in this office here and the

13   deposition will be on the 11th floor.

14           A few more questions for you and they we'll

15   conclude for the day.

16   BY MR. CAMPAGNA:

17       Q.   When you and Gary Wimp parted ways, you said

18   that it was mutual; right?

19       A.   Yes.

20       Q.   Did Gary Wimp go into real estate work after

21   that time?

22       A.   I don't know what he did after that time.

23       Q.   But that's what he's doing currently?

24       A.   I think he's working for a commercial real

25   estate company.

1      Q.   When you -- when you parted with Gary Wimp,

2  what kind of terms were you on?

3      A.   It's just parting terms.  He couldn't run the

4  company.  He's not capable of running it.  And he said,

5  "I'll go and do something else."

6      Q.   Is Gary Wimp still a friend of yours?

7      A.   Yes.

8      Q.   Would you do business with him in the future?

9      A.   I wouldn't -- I wouldn't invest money with

10 him.  I would just be his friend.

11     Q.   Would you bring him on board to run one of

12 your companies?

13     A.   As long as he's not in charge of profit and

14 loss I could.

15     Q.   As long as what?

16     A.   He's not in charge of profit and loss I

17 could.  Pure sales.

18     Q.   Okay.  Did you have conversations with any

19 people other than Mr. Ison about this case prior to

20 this deposition?

21     A.   No.

22     Q.   So, in other words, Juan Carmona, have you

23 talked with him about this case?

24     A.   No.

25     Q.   David Cagley, have you talked with him about

213

TORRANO SHORTHAND REPORTING (866) 760-DEPO

1   this case?

2       A.   I've not talked to Dave Cagley.   I told him

3   I'm going for a depo today.

4       Q.   When did you tell him that?

5       A.   Yesterday.

6       Q.   What else did you talk about?

7       A.   Dogs.   Serious.   He runs a dog place.

8       Q.   Pardon?

9       A.   He grooms dogs.   I take the dogs there.   We

10  have two dogs.

11      Q.   So you haven't spoken with Carmona about this

12  case.   You haven't talked with Cagley about this case.

13           Have you spoken with Gary Wimp about this

14  case?

15      A.   No.

16      Q.   Have you spoken with Pawan Chadha about this

17  case?

18      A.   No.

19      Q.   Anybody else?

20      A.   Last week you said?

21      Q.   In the last months, the last year?

22      A.   Akbar, Akbar.

23      Q.   Who is that?

24      A.   Akbar.   He's the guy -- he's kind of a mutual

25  friend of both of us.

Case: 10-05196   Document No. Filed 09/10/12 Entered 09/10/12 15:17:40   Page 36 of 39
TORRANO SHORTHAND REPORTING (866) 786-DEPO

1      Q.  Does he go by "Alex"?

2      A.  Yes.

3      Q.  Can you spell his name?

4      A.  A-K-B-A-R.  Akbar.

5      Q.  What's Akbar's last name?

6      A.  Matani, M-A-T-A-N-I.

7      Q.  What did you and Akbar talk about?

8      A.  We talked about it in front of Iqbal.  He was

9 in his office with me and Iqbal.  Mr. Husain, me and he

10 were together.

11     Q.  Pardon?

12     A.  Mr. Husain and me were in the same office

13 talking about this case.

14     Q.  Is Akbar Tharwani's brother?

15     A.  Yes.

16     Q.  Is Akbar somebody that ever sued you?

17     A.  No.

18     Q.  Because his sister did; right?  We talked

19 about that already.

20     A.  Yes.

21     Q.  Is there anything else that we should know

22 before we conclude for the day?

23     MR. ISON:  Objection.  It will probably take

24 me an hour to think of all the objections on that one.

25     MR. CAMPAGNA:  That's your client's

1  prerogative.

2          THE DEPONENT:  No, no.  Nothing.

3          MR. CAMPAGNA:  Okay.

4          THE DEPONENT:  I'll be here bright and early

5  Tuesday.

6          MR. CAMPAGNA:  See you Tuesday.  Have a safe

7  flight to Texas.

8          THE DEPONENT:  9:30?

9          MR. CAMPAGNA:  Nine o'clock.

10          (Whereupon, the deposition of DEEPAK CHOPRA

11  was adjourned at 5:18 p.m. this date.)

12                   ---oOo---

13  I certify under penalty of perjury that the foregoing

14  is true and correct.

15

16  Date _____   _____

17                          DEEPAK CHOPRA

18

19

20

21

22

23

24

25

Case: 10-05196   Document 03-6   Filed 08/10/12   Entered 08/10/12 15:17:40   Page 38 of 39

1                REPORTER'S CERTIFICATE

2        I, Peter Torreano, duly authorized to

3  administer oaths pursuant to Section 2093(b) of the

4  California Code of Civil Procedure, do hereby certify:

5        That the witness in the foregoing deposition

6  was administered an oath to testify to the whole truth

7  in the within-entitled cause; that said deposition was

8  taken at the time and place therein cited; that the

9  testimony of the said witness was reported by me and

10  was thereafter transcribed under my direction into

11  typewriting; that the foregoing is a full and

12  accurate record of said testimony; and that the witness

13  was given an opportunity to read and correct said

14  deposition and to subscribe the same.

15        Pursuant to Federal Rule 30(e), transcript

16  review was not requested.

17        I further certify that I am not of counsel nor

18  attorney for any of the parties in the foregoing

19  deposition and caption named nor in any way interested

20  in the outcome of the cause named in said caption.

21      Dated:  February 2, 2012

22

23      PETER TORREANO, CSR NO. 7623

24

25

217