1  someone told you -- whether or not it's true we don't
2  know, but someone told you that there was a writ and
3  that's why the check bounced; right?
4      A.  Uh-huh.
5      Q.  Is that a yes?
6      A.  Yes.
7      Q.  We have to have verbal answers --
8      A.  Yes, yes.  Okay.
9      Q.  -- so that the record is clear.
10         Did anyone tell you back then what case that
11 writ came from?
12     A.  No.
13     Q.  Now take a look at Exhibit 4.  And that's a
14 stock purchase agreement; is that correct?
15     A.  Yes.
16     Q.  Is that the agreement you entered?
17         MR. CAMPAGNA:  I'm going to -- I'm just going
18 to object that it calls for a legal conclusion.  Are
19 you asking -- it says "agreement for sale of stock" at
20 the top.  I want to be sure we're talking about the
21 same document; right?
22         MR. ISON:  We are.
23 BY MR. ISON:
24     Q.  In your complaint in 11(b) you claim that
25 Mr. Chopra or SearchTech Medical promised to give you

1  some stock under that agreement; correct?
2      A.  Yes.
3      Q.  Did you ever receive that stock?
4      A.  I'm not sure.
5          MR. CAMPAGNA:  What's the time period that
6  you're asking?
7          MR. ISON:  At any time.
8  BY MR. ISON:
9      Q.  Did you ever receive the stock called for in
10 Exhibit 4?
11     A.  I received some stock, but I don't know
12 whether it referred to this agreement or some prior
13 financial agreement.  I'm not sure.
14     Q.  Okay.  In this complaint you allege that
15 Mr. Chopra or SearchTech Medical never intended to give
16 you that stock?
17     A.  I'm not sure.  He never made the -- I mean the
18 payments, but stock I'm not sure.
19     Q.  You're not sure whether you received it or
20 not?
21     A.  Correct, uh-huh.
22     Q.  Did you in preparing for this case and
23 responding to the Rule 26 discovery, did you ever look
24 to see if you received those stock certificates?
25     A.  Yes.

1  Q. And what did you find?

2  A. I found some stock.

3  Q. Okay. How much stock did you find?

4  A. I don't recall the exact number.

5  Q. Do you remember the approximate number?

6  A. There were some certificates. That's about

7 it.

8  Q. You received some certificates?

9  A. Right.

10  Q. But as you sit here now you're unsure whether

11 those certificates are the certificates called for in

12 Exhibit 4; is that correct?

13  A. Correct, uh-huh.

14  Q. Do you have any reason to believe that the

15 certificates you saw were not the certificates called

16 for in Exhibit 4?

17  A. I'm not sure.

18  Q. Okay. I want you to review paragraph 11(c).

19  A. Which exhibit was this?

20  Q. Oh, yes?

21   MR. CAMPAGNA: Exhibit 2.

22   MR. ISON: Exhibit 2, the complaint, adversary

23 complaint paragraph 11(c).

24   THE DEPONENT: Uh-huh.

25 //

1  BY MR. ISON:
2      Q.  Just take a look at that for a moment,
3  please.
4      A.  Yes.
5      Q.  Now, in this paragraph 11(c) you were
6  complaining about a promissory note that was entered
7  into pursuant to a settlement agreement for $94,512.04
8  approximately?
9      A.  Yes.
10     Q.  And I want you to take a look at Exhibit 122.
11         And Exhibit 122 consists of a settlement
12 agreement and mutual general release, seven pages long,
13 and a promissory note on the end of it three pages
14 long; is that correct?
15     A.  Yes.
16     Q.  Okay.  Now, is that the settlement agreement
17 and mutual general release that is being discussed in
18 paragraph 11(c) of Exhibit 2?
19     A.  Yes.
20     Q.  Now, the exhibit we have here has a number of
21 signature pages on it, but it lacks your signature in
22 any of the signature pages that we have; do you see
23 that?
24     A.  Yes.
25     Q.  Do you believe you signed this agreement?

1   A.  I signed it.
2   Q.  Okay. And the promissory note, the three-page
3   promissory note on the end of this exhibit, did you
4   ever receive the original of that document?
5   A.  I don't know. I don't think so.
6   Q.  Do you ever --
7   A.  Maybe my lawyer may have received it. I don't
8   know. I haven't seen the original yet.
9   Q.  Are you claiming that you never received this
10  promissory note?
11  A.  I received the note. If you mean the
12  original?
13  Q.  Yes.
14  A.  I'm not sure. I haven't seen it.
15  Q.  You did at least receive a copy of the note?
16  A.  Correct.
17  Q.  And you're uncertain whether it was also an
18  original?
19  A.  Uncertain, which is not an original?
20  Q.  Yeah. Although you received -- you're certain
21  that you received a copy of the note --
22  A.  Right.
23  Q.  -- you're uncertain whether that copy was an
24  original or whether you also received an original?
25  A.  Yes, I am uncertain.

1  Q. When you entered into this settlement
2  agreement you were represented by an attorney?
3  A. Yes.
4  Q. Do you know who drafted this agreement?
5  A. I believe David Pearson.
6  Q. And who is David Pearson?
7  A. My attorney.
8  Q. Did you read this settlement agreement and
9  mutual general release before you signed it?
10  A. Not completely, but generally.
11  Q. Is there anything in this agreement that you
12  did not understand?
13  A. No.
14  Q. And was this settlement agreement and mutual
15  general release a result of a lawsuit you had filed
16  against Mr. Chopra?
17  A. No.
18  Q. Had you filed a lawsuit against Mr. Chopra for
19  the events described in this settlement agreement and
20  mutual general release and the promissory note?
21  A. No.
22  Q. Now, this settlement agreement and mutual
23  general release calls for -- let me start that over.
24  This promissory note attached to the
25  settlement agreement and mutual general release for

1 approximately $94,000, was any of that money ever paid
2 to you?
3     A.  No.
4     Q.  Okay.  Did you receive the security interest
5 in the form of deeds of trust on the six properties
6 described in the promissory note on page 1?
7     A.  Yes.
8     Q.  Did you receive any deeds in lieu of
9 foreclosure from anybody for any of the properties
10 described in the settlement agreement and mutual
11 general release?
12     A.  We got some deeds, but I don't understand the
13 deeds in lieu of foreclosure, the terminology.
14     Q.  I understand that.  I'll try and explain it to
15 you.
16         There is a type of deed called a deed of trust
17 and that's when you loan money or you're owed money and
18 you're taking a security interest to secure payment of
19 that money.  Do you understand that?
20     A.  Right.
21     Q.  There's another kind of deed which is
22 basically deeding you the property.  A deed of trust
23 only gives you a security interest in the property and
24 a deed gives you title to the property or at least the
25 title owned by the person who is giving you the deed.

1  Do you understand that?
2  A. Right. Okay.
3  Q. Now, sometimes people in order to stop a
4  foreclosure or to settle a foreclosure dispute will
5  give the person foreclosing a deed saying, "Don't
6  bother foreclosing. Here's all my interest. I'm
7  giving them to you now." And that's called a deed in
8  lieu of foreclosure.
9  A. Okay.
10  Q. Did you receive any deeds in lieu of
11  foreclosure for any of the properties described in the
12  settlement agreement or the promissory note?
13  A. There were some properties that was
14  transferred outright, which is the 314, but that's
15  not in -- it was just transferred.
16  Q. What do you mean it was just transferred?
17  A. I mean it was quitclaimed, executed and so on
18  and transferred to me.
19  Q. Well, let's take these one at a time. Page 1
20  of the settlement agreement and mutual general release,
21  it talks about unit 12B-4. Do you see that?
22  A. Right.
23  Q. Did you ever receive a deed from anybody,
24  either Mr. Chopra or one of the entities owned by
25  Mr. Chopra, for that unit?

1   A.  Yes.  The quitclaim for that, uh-huh.

2   Q.  It was a quitclaim deed?

3   A.  I believe so.

4   Q.  And what did you ever do with that quitclaim
5   deed?  Did you record that?

6   A.  Yes.

7   Q.  The second one is unit 314.  Do you see that?

8   A.  Yes.  I take it back on the first one.  I
9   don't think we had to record it because the property
10  was already in my name.

11  Q.  Okay.  So you're uncertain whether that
12  quitclaim deed given to you by either Mr. Chopra or one
13  of his entities was recorded by you?

14  A.  That's correct, uh-huh.

15  Q.  Now, the second piece of property that's
16  described in the settlement agreement and mutual
17  general release is unit 314.  Do you see that?

18  A.  Yes.

19  Q.  Did you ever receive a deed for that property
20  of any kind?

21  A.  Eventually, yes.

22  Q.  What do you mean eventually?

23  A.  We had to file a lawsuit to get that.

24  Q.  You filed a lawsuit?

25  A.  Yes.  Post-settlement.

```
 1      Q.   After the settlement agreement?
 2      A.   Correct.
 3      Q.   And you received a -- the deed for unit 314;
 4  is that correct?
 5      A.   Yes.
 6      Q.   Did you record that deed?
 7      A.   Yes.
 8      Q.   The third property is unit C205.  Do you see
 9  that?
10      A.   Yes.
11      Q.   Did you receive a deed for that?
12      A.   Possibly.  Probably a quitclaim because it was
13  already in my name.
14      Q.   Was that before or after the lawsuit that you
15  just talked about?
16      A.   The lawsuit was only for 314.
17      Q.   Okay.  So did you receive the deed for C205?
18      A.   The quitclaim, yes.
19      Q.   Okay.  Did you ever record that?
20      A.   I don't think we had to.
21      Q.   Why?
22      A.   Because it was already in my name.
23      Q.   And the fourth is unit K155.  Did you receive
24  a deed for that?
25      A.   Yes.
```

```
 1      Q.   And did you record that deed?
 2      A.   I'm not sure, but it's in my name now or it
 3 was at that time as well.  I don't know.
 4      Q.   At the present time do you believe that
 5 Mr. Chopra or any of the entities owned or associated
 6 with Mr. Chopra breached the terms of the settlement
 7 agreement and mutual general release?
 8           MR. CAMPAGNA:  Objection.  It calls for a
 9 legal conclusion.
10           THE DEPONENT:  I believe so.  They didn't make
11 the payment.
12 BY MR. ISON:
13      Q.   All right.  They didn't make the payment on
14 the promissory note; is that correct?
15      A.   Yes.
16      Q.   Did they breach it in any other way?
17           MR. CAMPAGNA:  Objection.  It calls for a
18 legal conclusion.
19           THE DEPONENT:  I don't know.
20 BY MR. ISON:
21      Q.   You don't know?
22      A.   No.
23      Q.   There I go asking negative questions again.
24           Do you know whether there were any other
25 breaches?
```

```
 1          MR. CAMPAGNA:  Objection.  It calls for a
 2  legal conclusion.
 3          THE DEPONENT:  I'm sorry.  Was that a
 4  question?
 5          MR. ISON:  Yeah.  I asked a negative question
 6  and I'm unsure whether your "no" was disagreeing with
 7  my question or agreeing with it.  So I'm just clearing
 8  up the record.
 9  BY MR. ISON:
10      Q.  Other than not being paid the approximately
11  $94,000 on the promissory note, were there any other
12  breaches of this settlement agreement and mutual
13  general release?
14          MR. CAMPAGNA:  Objection.  Calls for legal
15  conclusion.
16          THE DEPONENT:  I don't know.
17  BY MR. ISON:
18      Q.  Did Deepak Chopra or any of his entities fail
19  to do something that you believe they were supposed to
20  do on this settlement agreement and mutual general
21  release other than not paying on the promissory note?
22      A.  Not -- not as far as I know.
23      Q.  Did you receive any payment on the
24  approximately $94,000 promissory note?
25      A.  No.
```

1  Q. Any bounced checks?

2  A. None.

3  Q. Were you ever told by anybody why you weren't
4  receiving any payments on this?

5  A. No.

6  Q. Do you believe that either Mr. Chopra or any
7  of the entities associated with Mr. Chopra told you
8  anything that was untrue before you entered into the
9  settlement agreement and mutual general release and the
10 promissory note?

11 A. Yes, I would say so.

12 Q. And what are those things?

13 A. The valuation of the properties and other
14 collateral that I had asked for.

15 Q. Okay. Let's break that down a little bit.
16 You say the valuation of the properties. Are you
17 talking about the properties listed 1 through 4 on
18 pages 1 and 2 of the settlement agreement and mutual
19 general release?

20 A. No. Those -- not those.

21 MR. CAMPAGNA: I just want to make it clear
22 for the record here. Are you referring to the
23 recitals?

24 MR. ISON: In the agreement paragraphs 1
25 through 4.

1      MR. CAMPAGNA: The agreement itself. I
2 thought you were referring to A through D, but you did
3 say 1 through 4.
4      MR. ISON: Yes. They are just duplicating the
5 recitals.
6 BY MR. ISON:
7   Q. But just to make the record clear, the
8 agreement on page 1 to page 2, the properties listed on
9 numbers 1 through 4, you're not talking about any
10 misrepresentation concerning the valuation of those
11 properties; is that correct?
12   A. No, no.
13   Q. That's not correct? I'm asking you if it's
14 correct. Let me make the record clearer.
15      Okay. There are a number of properties, four
16 properties, listed in this settlement agreement and
17 mutual general release on pages 1 and 2.
18      Do you see those?
19   A. Right.
20   Q. You testified that you believe you were
21 misinformed concerning valuations of certain
22 properties; true?
23   A. Yes.
24   Q. Are any of the properties listed on pages 1
25 and 2 of this settlement agreement and mutual general

1  release properties that you believe that the value was
2  misrepresented to you?
3      A.  I lost the thread of the question.
4      Q.  Good.  I'm glad.  I'm sorry.
5          You testified that you were -- strike that.
6          You testified that someone misrepresented to
7  you certain valuations of certain properties; correct?
8      A.  Yes.
9      Q.  Are those properties that were misrepresented
10 to you the properties listed on pages 1 and 2 of the
11 settlement agreement and mutual general release?
12     A.  No.
13     Q.  Are those properties that were misrepresented
14 to you the properties listed on the first page of the
15 promissory note numbers 1 through 6?
16     A.  Yes.
17     Q.  All of them?
18     A.  Some of them, yes.
19     Q.  Which ones?
20     A.  I can't identify exactly which ones, but there
21 was one that had actually a negative value.
22     Q.  Which one was that?
23     A.  One of the North Carolina ones.
24     Q.  Do you know which one?
25     A.  Not exactly.

1    Q.   You claim that these properties were
2  misrepresented to you as to their valuation, the ones
3  in 1 through 6 -- right? -- at least some of them?
4    A.   Some of them, uh-huh.
5    Q.   And which ones were misrepresented?
6         MR. CAMPAGNA:  Objection.  Asked and
7  answered.  You can answer again.
8         THE DEPONENT:  I mean, this is a while ago,
9  but generally they were kind of given with more than
10 what they are -- the value was.  At that time the
11 values were going down.
12 BY MR. ISON:
13   Q.   Prior to entering into the promissory note and
14 the settlement agreement and mutual general release,
15 did you yourself conduct any investigation as to the
16 values of the properties listed on the first page of
17 the promissory note?
18   A.   I talked to the --
19        MR. CAMPAGNA:  Could you repeat the question
20 or have the court reporter repeat the question.
21        THE COURT REPORTER:  "Question:  Prior to
22            entering into the promissory note and the
23            settlement agreement and mutual general
24            release, did you yourself conduct any
25            investigation as to the values of the

44

1    properties listed on the first page of the
2    promissory note?"
3    THE DEPONENT: Yes. I talked to the broker
4 who was referred to by Mr. Chopra.
5 BY MR. ISON:
6    Q.    And how many brokers did you talk to?
7    A.    I believe two, one in North Carolina, one in
8 Hawaii. For San Diego I don't think I talked to
9 anybody. Just those two.
10   Q.    And you did this personally?
11   A.    Yes.
12   Q.    And were you satisfied with what the brokers
13 told you?
14   A.    Yeah, approximately.
15   Q.    And based upon your investigation and your
16 discussions with the brokers, you decided to enter into
17 the settlement agreement and mutual general release and
18 the promissory note; is that true?
19   A.    Not just the brokers. Because we got worn out
20 by the delays in getting an agreement.
21   Q.    Okay. So it wasn't the only factor in your
22 decision to enter into the settlement agreement and
23 mutual general release, but it was a factor; is that
24 fair to say?
25   A.    Yes.

1    Q.   Another factor was you were just getting tired
2 of the delays in entering into the agreement; is that
3 true?
4    A.   Yes.
5    Q.   Anything else?
6    A.   No.  That's it.
7    Q.   Now, you say in paragraph 11(c) of Exhibit
8 2 --
9    A.   Yes.
10   Q.   -- that by entering into this promissory note
11 and the settlement agreement Mr. Chopra or any of his
12 entities never had any intention of performing the
13 agreement; is that correct?
14   A.   Let me reread.
15        MR. CAMPAGNA:  I object that the document also
16 speaks for itself.
17        THE DEPONENT:  Yes.
18 BY MR. ISON:
19   Q.   On what basis do you claim -- well, strike
20 that.  Let me break this down.
21        If I understand your testimony, and correct me
22 if I'm wrong, the complaint you have in paragraph 11(c)
23 is that you were not paid the $94,512.04; true?
24        MR. CAMPAGNA:  Objection.  It calls for a
25 legal conclusion.