```
1          THE DEPONENT:  I'm sorry.  Your question.

2          THE COURT REPORTER:  "Question:  If I

3     understand your testimony, and correct me if

4     I'm wrong, the complaint you have in paragraph

5     11(c) is that you were not paid the

6     $94,512.04; true?"

7          THE DEPONENT:  Yes.

8  BY MR. ISON:

9     Q.   Okay.  Are you claiming there was any other

10 breach of the settlement agreement other than not being

11 paid the money?

12    A.   Is that a double negative?

13    Q.   Yeah.  I used to be able to ask good

14 questions.  That's before I became old and addled.  So

15 let me rephrase that.

16         The settlement agreement and mutual general

17 release calls for Mr. Chopra or his entities to do

18 certain things.

19    A.   Yes.

20    Q.   Only one of which is to pay you $94,512.04;

21 right?

22    A.   Yes.

23    Q.   You're complaining that you did not get paid

24 the $94,512.04; right?

25    A.   Yes.
```

1    Q.   Are you complaining that they breached in any

2    other way?

3         MR. CAMPAGNA:   I'm going to object again that

4    it calls for a legal conclusion.

5         THE DEPONENT:   I don't know the legal

6    ramifications for it.

7    BY MR. ISON:

8    Q.   Okay.  So is there anything that Mr. Chopra or

9    any of his entities promised to do in the settlement

10   agreement and mutual general release other than paying

11   you $94,512.04 that they did not do?

12   A.   I don't know.

13   Q.   Now, in paragraph 11(c) you claim that

14   Mr. Chopra or his entities entered into the settlement

15   agreement and mutual general release and the promissory

16   note without any intention of performing it; correct?

17   A.   Yes.

18   Q.   On what basis do you claim that Mr. Chopra or

19   his entities had no intention of performing the

20   settlement agreement and mutual general release or the

21   promissory note?

22   A.   Just the foot dragging that we had to go

23   through to get the settlement and valuation of the

24   properties.  They were going down.  We wanted

25   additional collateral, things like that.

TORREANO SHORTHAND REPORTING (866) 1696-DEPO

Case: 10-05196   Doc# 204-2   Filed: 08/16/12   Entered: 08/16/12 15:26:26   Page 2 of 23

1    Q.   You wanted additional collateral other than

2  the collateral called for in the settlement agreement

3  and mutual general release and the promissory note?

4    A.   Yes.

5    Q.   But you never reached such an agreement with

6  Mr. Chopra or his entities?

7    A.   The foot dragging, yeah.

8    Q.   You never reached the agreement because it was

9  just taking too long?

10    A.   Yes.

11    Q.   And you decided to go ahead and enter into the

12  settlement agreement and mutual general release and the

13  promissory note as they exist as Exhibit 2?

14    A.   Yes.

15    Q.   I'm sorry.  As Exhibit 122?

16    A.   Yes.

17    Q.   Any other basis for claiming that Mr. Chopra

18  or his entities had no intention of performing the

19  promises?

20    MR. CAMPAGNA:  I'm going to object that it

21  calls for a legal conclusion and it may get into areas

22  of attorney-client privilege in prosecuting the

23  claims.

24    THE DEPONENT:  Just the events especially with

25  314, the events that happened not just once, a number

Case: 10-05196   Doc TORREANO SHORTHAND REPORTING (866) 159-DEPO Page 3
of 23

1    of times.

2    BY MR. ISON:

3        Q.   And what events are those regarding 314?

4        A.   One was the financing of the property and

5    keeping the money, which was one of the reasons for

6    this agreement.  And then the failure to handle with

7    the deed when asked for which we had to file a lawsuit

8    to get it post-agreement.

9        Q.   And the post-agreement lawsuit, what was the

10   result of that post-agreement lawsuit?

11       A.   Mr. Chopra handed over the deeds for that

12   eventually.

13       Q.   And whatever happened to that unit 314?

14       A.   It's still in my ownership.

15       Q.   You still own it?

16       A.   Uh-huh.

17       Q.   Is that a yes?

18       A.   Yes.

19       Q.   And how much is that property worth today?

20           MR. CAMPAGNA:  Objection.  It's irrelevant and

21   it calls for information that's not reasonably

22   calculated to lead to the discovery of admissible

23   evidence.

24   BY MR. ISON:

25       Q.   Do you have an estimate of the value of that

1   property today?

2       A.   It's -- I don't know.  Probably 200,000 or

3   something.

4       Q.   Okay.  Are there any other bases that we've

5   not yet discussed upon which you base your claim that

6   either Mr. Chopra or his entities never intended to

7   perform the agreement described in 11(c) of Exhibit 2?

8           MR. CAMPAGNA:  Again, it calls for a legal

9   conclusion.

10          THE DEPONENT:  At that time or now?

11  BY MR. ISON:

12      Q.   What do you believe now?

13      A.   Yeah, they had no intention.

14      Q.   Okay.  And what basis other than what we've

15  already talked about do you make that claim?

16      A.   There were other properties that could have

17  given additional collateral or sold to pay that note.

18      Q.   So we had the -- he could have sold or he or

19  his entities could have sold properties, raised money

20  and paid you?

21      A.   Yes.

22      Q.   Any other basis?

23      A.   No.

24          MR. ISON:  Okay.  I want you to take a look at

25  11(d) on Exhibit 2.

1          MR. CAMPAGNA:  We've been going for about an

2     hour and a half.  Why don't we take about ten minutes.

3          MR. ISON:  Sure.

4          (Recess taken.)

5     BY MR. ISON:

6          Q.  Have you had an opportunity to evaluate that,

7     Mr. Husain?

8          A.  Yes.

9          Q.  In this part of your complaint you allege that

10    you entered into some property purchases with

11    Mr. Chopra or his entities; is that true?

12         A.  Yes.

13         Q.  And these properties we will refer to as the

14    Biloxi condos.  Is that okay?

15         A.  Yes.

16         Q.  How many pieces of property did you jointly

17    buy with Mr. Chopra or any of his entities?

18         A.  Five.

19         Q.  And which properties were those?

20         A.  Do you want the exact address?

21         Q.  Well, just the way we can talk about them so

22    we know what they are.

23         A.  I can go with the unit numbers roughly.

24         Q.  Okay.

25         A.  I don't remember all of them.  So there is

1   unit 48, 17, 80 and 60 and 63 or 62.  I'm not sure.

2       Q.   And that's five?

3       A.   Yeah.

4       Q.   Let's call it unit 63 and, if it's wrong,

5   we'll fix that later.

6       A.   Okay.

7       Q.   Okay.  Unit 48.  Who did you -- who -- strike

8   that.

9            Unit 48.  Who were the purchasers of unit 48?

10      A.   I was on title and SEC was the -- the other 50

11  percent owner or SEC or -- yeah, one of those

12  entities.

13      Q.   And you -- the SEC or another entity was a 50

14  percent owner and you were a 50 percent owner; true?

15      A.   Correct.

16      Q.   And who did you deal with -- which person,

17  individual person, did you deal with in entering into

18  that?

19      A.   Mr. Chopra.

20      Q.   You dealt directly with Mr. Chopra?

21      A.   Uh-huh.

22      Q.   Did you ever deal with Mr. Carmona on that?

23      A.   Yes.  Eventually, uh-huh.

24      Q.   What do you mean "eventually"?

25      A.   When we were closing and so on.  So he would

53

1  be the one sending the documents and stuff like that.

2       Q.   "He" meaning Mr. Carmona --

3       A.   Carmona.

4       Q.   -- was the one dealing with the documents when

5  it got time to close; is that correct?

6       A.   Correct.

7       Q.   Did Mr. Chopra make any representations to you

8  concerning this unit 48?

9       A.   Oh, yes.

10      Q.   Were any of those representations that

11  Mr. Chopra made untrue?

12      A.   I don't know.

13           MR. CAMPAGNA:  I'm going to object that it

14  lacks foundation.

15  BY MR. ISON:

16      Q.   Okay.  Unit 17.  Who became the purchasers of

17  unit 17?

18      A.   I was on title and SEC was the other 50

19  percent.

20      Q.   Was it SEC or one of the other entities or are

21  you sure it was SEC?

22      A.   The checks were made out to SEC.

23      Q.   And was it 50/50 again?

24      A.   Right.

25      Q.   And which individual person did you deal with

Case: 10-05196   Doc TORREANO SHORTHAND REPORTING 08/16/12 15:26:28 Desc PO Page 8
of 23

1    in entering into that agreement for unit 17?

2        A.   They were all done at the same time with

3    Mr. Chopra.

4        Q.   We might short-circuit this then.  All the

5    units, 48, 17, 80, 60 and 63, you dealt with

6    Mr. Chopra?

7        A.   Right.

8        Q.   And later on when it came time for the deeds

9    you dealt with Mr. Carmona; is that correct?

10       A.   Yes.

11       Q.   For each one of them?

12       A.   Yes.

13       Q.   Okay.  Were there any representations made by

14   Mr. Chopra to you that you think were untrue before you

15   entered into the agreements to purchase 48, 17, 80, 60

16   and 63?

17       A.   I believe so, uh-huh.

18       Q.   Okay.  And which representations as to which

19   units?

20       A.   Generally they are huge bargains and this is a

21   great deal and so on.

22       Q.   Anything else?

23       A.   No.

24       Q.   And Mr. Chopra told you these things?

25       A.   Yes.

Case: 10-05196   Doc#: 2    Filed: 07/16/12    Entered: 08/16/12 15:26:25    Page 9 of 23

1     Q.  Did Mr. Chopra tell you anything else?

2     A.  Can you be specific?

3     Q.  I can't be specific because I don't know what

4 he allegedly told you.  I asked you if he told you

5 anything that was untrue before you entered into these

6 agreements and you said, well, he told you that they

7 were huge bargains and great deals.  Did he tell you

8 anything else that you believe was untrue?

9     A.  No.  I don't remember anything else.

10    Q.  Okay.  So you entered into these agreements.

11 I'm sorry.

12        You entered into these purchase contracts

13 where you became a part owner.  It was a 50 percent for

14 each one?

15    A.  Yes.

16    Q.  And you did so on the basis of Mr. Chopra

17 telling you that they were great deals and huge

18 bargains; right?

19    A.  Right.

20    Q.  What investigation did you conduct into these

21 properties before you purchased them?

22    A.  None.

23    Q.  Did you ever go out to Biloxi?

24    A.  Never.

25    Q.  Did you have any of your agents or people

Case: 10-05196   Doc#: 184-2   Filed: 07/24/12   Entered: 08/06/12 15:26:38   Page 10 of 23
TORREANO SHORTHAND REPORTING (866) 715-DEPO

1    working for you go out there?

2        A.    No.

3        Q.    Did you discuss any of these properties with

4    the brokers?

5        A.    No.

6        Q.    So your reliance solely was the

7    representations made by Mr. Chopra?

8        A.    Correct.

9        Q.    Did Mr. Carmona make any representations to

10   you before you purchased the properties?

11       A.    I don't remember.

12       Q.    Did anybody other than Mr. Chopra make any

13   representations to you concerning these properties?

14       A.    No.

15       Q.    Now, in this complaint, 11(d) of Exhibit 2,

16   you claim that Mr. Chopra received an undisclosed

17   commission in connection with the purchase of the

18   condos; is that your allegation?

19       A.    Yes.

20       Q.    Okay.  Did Mr. Chopra receive an undisclosed

21   commission on all five of them, to your knowledge?

22       A.    Yes.

23       Q.    And do you know how much those commissions,

24   undisclosed commissions, were?

25       A.    I think we gave an exhibit.  The total

1  commissions was about 130,000.

2      Q.  And do you know what the commissions were

3  for?

4      A.  Facilitating the purchases.

5      Q.  We've read over 11(d) thoroughly; is that

6  correct?

7      A.  Yes.

8      Q.  Were there any other representations that

9  Mr. Chopra or any of his entities made to you except

10 for they were great deals and huge bargains?

11     A.  No.

12     Q.  What became of those five units?

13     A.  We exchanged some and I retained two and the

14 third one shared with another -- another person and

15 that I believe is in foreclosure now.

16     Q.  All right.  Let's break this down a little

17 bit.  There were five units?

18     A.  Uh-huh.

19     Q.  And you say you kept two?

20     A.  Yes.

21     Q.  What do you mean you kept two?

22     A.  So we traded our part ownerships.  So I

23 retained unit 17 and 48.

24     Q.  When you say "we" who do you mean "we"?

25     A.  Myself and whoever owned the other half.

Case: 10-05196   Doc#1042-2   Filed: 07/24/12   Entered: 08/18/12 15:26:22   Page 12
of 23
TORREANO SHORTHAND REPORTING (916) 760-2400 DEPO

1     Q.  So as to unit 48 and 17, the entity, whichever

2  one it was, SEC or one of the other entities --

3     A.  Right.

4          MR. CAMPAGNA:  Objection.  It misstates

5  testimony.  He said whoever owned the other half.

6          MR. ISON:  Right.  Okay.  Let me start over.

7  I thought that's what I said, but let me start over.

8  BY MR. ISON:

9     Q.  As to units 17 and 48, whoever it was that

10  owned the other half deeded it to you?

11     A.  Correct.

12     Q.  Was that an agreement that you reached?

13     A.  Yeah.

14     Q.  And what did you give in return for the half

15  that was deeded to you?

16     A.  My half of the other two, which is 60 and 63.

17     Q.  So you entered into an agreement where whoever

18  it was that owned the other half gave you full

19  ownership of 17 and 48 and you in return gave whoever

20  it was that owned the other half of 60 and 63 to them?

21     A.  Uh-huh.

22     Q.  Correct?

23     A.  Right.

24     Q.  Was that pursuant to a written agreement?

25     A.  No.  I think we just did quitclaim deeds.

1    Q.   Okay.  And were you represented by an attorney
2  when you entered into this agreement to exchange these
3  four units?
4    A.   No.
5    Q.   And who did you negotiate those terms with?
6    A.   Mr. Chopra and Mr. Carmona.
7    Q.   And other than the exchange of the two and
8  two, were there any other terms of that agreement?
9    A.   I think there was a net money owed to me which
10  was paid back.
11    Q.   And how much was that approximately?
12    A.   $6,000, I think.
13    Q.   And did you receive that 6,000?
14    A.   Yes.
15    Q.   That takes care of four of the units.  Then
16  what happened to unit 80?
17    A.   80, I co-owned it with another person.  So I
18  believe --
19    Q.   Originally you co-owned with another person?
20    A.   I don't know -- I mean, originally it was
21  SEC.  So SEC may have given it to this other person.
22    Q.   Was the other person an entity or an
23  individual?
24    A.   An individual, Doug McGraw.
25    Q.   Doug McGraw?

Case: 10-05196   Doc#284   Filed: 07/21/12   Entered: 08/10/12 15:26:25   Page 14 of 23

TORREANO SHORTHAND REPORTING (866) 1560-DEPO

1     A.   Uh-huh.

2     Q.   And you owned 50 percent of 80?

3     A.   Right.

4     Q.   And eventually in some manner -- you're unsure

5 how -- Doug McGraw became the other person holding the

6 other 50 percent; true?

7     A.   Correct, uh-huh.

8     Q.   And that one is the one that's now in

9 foreclosure?

10    A.   I believe so.

11    Q.   When did you first discover this alleged

12 undisclosed commission received by Mr. Chopra?

13    A.   Sometime -- I think sometime after Mr. Chopra

14 filed for bankruptcy.

15    Q.   And how did you find this out?

16    A.   I talked to Mr. McPhail who was the seller.

17    Q.   Was he the seller of all five units?

18    A.   Yes, I believe so.

19    Q.   And what did Mr. McPhail tell you?

20    A.   He said yes, commissions were paid.

21    Q.   Paid to whom?

22    A.   To Mr. Chopra's entity.

23    Q.   Paid to Mr. Chopra's entities?

24    A.   Yes.

25    Q.   Not paid to Mr. Chopra?

Case: 10-05196   Doc#284-2 Filed: 07/14/12   Entered: 08/10/12 15:28:28   Page 15 of 23

TORRANO SHORTHAND REPORTING (866) 1560-DEPO

1    A.   No.  I think to the entity.

2    Q.   Do you know which entity?

3    A.   I believe it is JMD Enterprises or something.

4    Q.   And was this commission a percentage or a flat

5    fee; do you know?

6    A.   It was based on some percentage, I believe.

7    I'm not absolutely certain.

8    Q.   Did you ever see any written confirmation that

9    such payments were made?

10   A.   Yes.

11   Q.   What did you see?

12   A.   I got some documents from Mr. McPhail and I

13   saw the Quickbooks entry for JMD.

14   Q.   What documents did you see from Mr. McPhail?

15   A.   He sent me some documents which has basically

16   his accounting sheet or something of that for each

17   property sold.

18   Q.   And did you produce those in the Rule 26

19   disclosure?

20   A.   Yes.

21   Q.   And the Quickbooks were for -- the entries

22   that you saw of evidence of this were for JMD?

23   A.   JMD, right.

24        MR. CAMPAGNA:  D as in David?

25        MR. ISON:  Yeah.

1      MR. CAMPAGNA:  I believe there's an exhibit.

2      THE DEPONENT:  Right.

3      MR. ISON:  What number is it?

4      MR. CAMPAGNA:  It's Exhibit 143.

5  BY MR. ISON:

6      Q.  Okay.  That's the Quickbooks.  Did you use as

7  an exhibit for the deposition of Mr. Chopra the

8  documents you received from Mr. McPhail?

9      A.  Yes.  This is 142.

10     Q.  142.

11     A.  142 is just one, one of four, yeah.  Or five.

12     Q.  I'm sorry?

13     A.  It's just one page of the whole.  Not all the

14  production for -- from McPhail.

15     Q.  Let me take a look at this.

16         And Mr. McPhail told you what concerning the

17  nature of this payment to JMD?

18     A.  I'm sorry.  Could you repeat it?

19     Q.  Yeah.  What did Mr. McPhail tell you

20  concerning the nature of the payment to JMD?

21     A.  I mean, there were commissions that he said

22  based on the number of units sold and so on.

23     Q.  He used the word "commissions"?

24     A.  Yeah.

25     Q.  Do you know if Mr. McPhail has any real estate

63

Case: 10-05196   Doc #: 104-2   Filed: 07/12/12   Entered: 08/10/12 15:26:26   Page 17 of 23

 1   license?

 2       A.   Yes.  He was the developer.

 3       MR. ISON:  Okay.  Let's take a five-minute

 4   break here.

 5       (Recess taken.)

 6   BY MR. ISON:

 7       Q.   You're unaware of whether he had a real estate

 8   license; is that true?

 9       A.   Yes.

10       Q.   Did you ever own any properties where Juan

11   Carmona had individually an interest in any of the

12   properties?

13       A.   I don't believe so.

14       Q.   Now, you said that these properties, the five

15   properties we talked about, 48, 17, 80, 60 and 63, were

16   owned half by you and half by an entity, but you're

17   unsure of what the entity is; right?

18       A.   Right.

19       Q.   I don't want you to speculate or guess, but I

20   want you to consider whether that entity that owned

21   those properties joining with you was JMD?

22       A.   Possibly.

23       Q.   Although you're unsure whether it was JMD or

24   some other entity, was the other entity the same entity

25   for all five properties?

1     A.   I believe so with the exception of unit 80,

2  which was owned by McGraw.

3     Q.   Eventually it became owned by McGraw, but

4  before that it was owned by some entity; correct?

5     A.   Yeah.  My assumption was SEC because that's

6  who I wrote the checks to.

7     Q.   When you say that's who you wrote the checks

8  to, what do you mean "the checks"?  The ones for the

9  purchase price of the properties?

10     A.   Yeah.

11     Q.   So you wrote the checks for all five

12  properties to SEC?

13     A.   Right.

14     Q.   And eventually the properties were owned 50

15  percent by you and 50 percent by some entity, could

16  have been SEC, could have been JMD or it could have

17  been some other entity associated with Mr. Chopra;

18  true?

19     A.   Yes.

20     Q.   That's the best your recollection is right

21  now; correct?

22     A.   Yes.

23     Q.   How much did you deal with Juan Carmona in

24  these transactions regarding these five properties?

25          MR. CAMPAGNA:  Objection.  Vague and

Case: 10-05196   Doc#: 42  Filed: 03/18/11  Entered: 03/18/11 17:20:29  Page 19 of 23

TORRANCE SHORTHAND REPORTING (818) 757-2DEPO

1  ambiguous.

2       THE DEPONENT:  Do you want hour, minutes,

3  percentage?

4  BY MR. ISON:

5       Q.  What role did Juan Carmona play in the

6  acquisition of these properties?

7       A.  I mean, he was in the closing -- he would be

8  the one sending me the -- the closing statements and

9  any money that was needed and so on.

10      Q.  Okay.  And what role did Deepak Chopra play in

11 the purchase of these five properties?

12      A.  He was the initial -- what's the word for it?

13 You know, he introduced -- he basically sold the idea.

14      Q.  He basically came to you and said these are

15 great deals?

16      A.  Yes.

17      Q.  Did Mr. Chopra say that he had been dealing

18 with this McPhail guy on other properties?

19      A.  No, not at that time.

20      Q.  At any time?

21      A.  No.

22      Q.  So your memory is that Mr. Chopra came to you

23 and said, "Hey, there's some properties in Biloxi,

24 really good deals, great bargains, huge bargains.  You

25 ought to invest in them"?

Case: 10-05196   Doc#: 28   Filed: 08/18/11   Entered: 08/18/11 15:26:25   Page 20 of 23

TORREANO SHORTHAND REPORTING (866) 1560-DEPO

1    A.   Correct.

2    Q.   Did Mr. Chopra do anything else?

3    A.   I mean, he would, you know, talk periodically

4    that these are good deals and so on.

5    Q.   And did Mr. Chopra refer you to Juan Carmona

6    at any point to complete the transactions?

7    A.   Yeah.  It didn't refer to that some -- some

8    meetings Juan Carmona was there and basically he was

9    doing all the nitty-gritty of getting it closed and so

10   on.

11   Q.   During this deposition we went over a lot of

12   things.  I asked you a lot of questions and I told you

13   at the beginning of the deposition I was going to ask

14   you if there's anything you want to change or clarify

15   in any of your previous testimony.

16   A.   No.

17   MR. ISON:  Okay.  I don't have any other

18   questions.

19   THE COURT REPORTER:  Do you want a copy?

20   MR. CAMPAGNA:  Yes.

21   //

22   //

23   //

24   //

25   //

1          MR. ISON:  Yes.

2          (Whereupon, the deposition of IQBAL HUSAIN was

3    adjourned at 12:09 p.m. this date.)

4                         ---oOo---

5

6    I certify under penalty of perjury that the foregoing

7    is true and correct.

8

9    Date _____    _____

10                         IQBAL HUSAIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 10-05196   Doc# 104-2   Filed: 07/24/12   Entered: 08/10/12 15:26:38   Page 22 of 23
TORREANO SHORTHAND REPORTING (866) 1760-DEPO

1  REPORTER'S CERTIFICATE

2      I, Peter Torreano, duly authorized to

3  administer oaths pursuant to Section 2093(b) of the

4  California Code of Civil Procedure, do hereby certify:

5      That the witness in the foregoing deposition

6  was administered an oath to testify to the whole truth

7  in the within-entitled cause; that said deposition was

8  taken at the time and place therein cited; that the

9  testimony of the said witness was reported by me and

10 was thereafter transcribed under my direction into

11 typewriting; that the foregoing is a full and

12 accurate record of said testimony; and that the witness

13 was given an opportunity to read and correct said

14 deposition and to subscribe the same.

15      Pursuant to Federal Rule 30(e), transcript

16 review was not requested.

17      I further certify that I am not of counsel nor

18 attorney for any of the parties in the foregoing

19 deposition and caption named nor in any way interested

20 in the outcome of the cause named in said caption.

21  Dated:  February 11, 2012

22  _____

23  PETER TORREANO, CSR NO. 7623

24

25

TORREANO SHORTHAND REPORTING (866) 760-DEPO