UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FILED

JUL 2 3 2012

CLERK mm
United States Bankruptcy Court
San Jose, California

| | |
|---|---|
| In Re: ) | |
| ) | |
| DEEPAK CHOPRA, ) | Case NO. |
| ) | 10-52819 |
| Debtor. ) | |
| _____ ) | **ORIGINAL** |
| ) | |
| IQBAL HUSAIN, ) | Volume IV |
| ) | PP. 703-834 |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Proceeding No. |
| ) | 10-05196 |
| DEEPAK CHOPRA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

DEPOSITION OF DEEPAK CHOPRA

DATE:                    January 30, 2012

TIME:                    1:03 p.m.

LOCATION:                Berliner Cohen
                         Ten Almaden Boulevard
                         Suite 1200
                         San Jose, CA  95113

REPORTED BY:             Peter D. Torreano, CSR, CRR
                         Certified Shorthand Reporter
                         License Number C-7623

**TORREANO**
SHORTHAND REPORTING, INC.

1999 S. BASCOM AVENUE
SUITE 700
CAMPBELL, CA 95008

MAIN        408.371.0464
FAX         408.371.0402

1                A P P E A R A N C E S:

2    For the Plaintiff:

3            Berliner Cohen
             By:  MARCO M. CAMPAGNA
4            marco.campagna@berliner.com
             Ten Almaden Boulevard
5            Suite 1100
             San Jose, CA   95113
6            (408) 286-5800

7    For the Debtor and Defendant:

8            Ison Law Offices
             By:  NEIL ISON
9            isonlaw@yahoo.com
             P.O. Box 700622
10           San Jose, CA  95170
             (408) 621-6800

11

     Also present:
12
             IQBAL HUSAIN
13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          704

# EXHIBIT INDEX

| EXHIBIT | | MAR |
|---|---|---|
| 133 | E-mail from Carmona to husain@yahoo.com, dated October 18, 2007 | 710 |
| 134 | Complaint to Determine Dischargeability of Debt - Chadha | 717 |
| 135 | Complaint to Determine Dischargeability of Debt - Jindia | 743 |
| 135 | Complaint to Determine Dischargeability of Debt | 743 |
| 136 | Stipulation Re Release of Attached Funds; and Order | 750 |
| 137 | SearchTech Medical, Inc. Amex - Business Platinum - Transaction Detail | 754 |
| 138 | Amex 03001 Statement (AMEX3000425) | 777 |
| 139 | Amex 03001 Statement (AMEX3000431) | 781 |
| 140 | Business Platinum Card Statement 1/16/07 | 785 |
| 141 | E-mail from Carmona to Husain, dated October 31, 2005 | 790 |
| 142 | Oak Glen Closing Fund Control and Disbursement | 793 |
| 143 | JMD Investments Transaction Detail by Account | 799 |
| 144 | Signature Page (PL010546) | 801 |
| 145 | Meetings of the Board of Directors and Shareholders JMD Investments December 28 2007 | 808 |
| 146 | Agreement for Transfer of Ownership in Lieu of Debt for JMD Investments, LLC | 809 |

Case: 10-05196   Doc#105 FORE Filed SHORTHAND 08/26/10 REPORTING Entered (866) 08/26/10 15:36:05 DEP Page 3 of 35

| 1 | EXHIBIT INDEX | |
|---|---|---|
| 2 | | MAR |
| | EXHIBIT | |
| 3 | | |
| | 147  California Secretary of State Statement of Information | 813 |
| 4 | | |
| 5 | 148  ESD Investments, LLC Board Meeting Minutes | 813 |
| 6 | | |
| | 149  Quitclaim Deed | 816 |
| 7 | | |
| | 150  Property Record Information | 820 |
| 8 | | |
| | 151  National Golf Club Lot 322 Statement of Taxes | 824 |
| 9 | | |
| 10 | 152  General Warranty Deed | 827 |
| 11 | 153  Non-Warranty Deed | 828 |

706

Case: 10-05196   Doc#105   Filed 07/23/12   Entered 00/10/12 15:33:05   Page 4 of 35
TORREANO SHORTHAND REPORTING (866) 360-3000

1 San Jose, California                    January 30, 2012

2                P R O C E E D I N G S

3                    **DEEPAK CHOPRA,**

4 called as a witness, after having been duly resworn by

5 the Certified Shorthand Reporter to tell the truth, the

6 whole truth, and nothing but the truth, testified as

7 follows:

8                      **EXAMINATION**

9 BY MR. CAMPAGNA:

10     Q.   Mr. Chopra, we spoke previously about the

11 value of the property settlement with Mr. Husain.  That

12 was a settlement that occurred in 2007.

13          You recall that settlement; correct?

14     A.   I do.

15     Q.   Do you recall that the approximate settlement

16 amount was $94,512.04?

17     A.   Yes.

18     Q.   I believe your testimony was that the

19 settlement was secured by six properties?

20     A.   Correct.

21     Q.   That's correct?  The settlement and the

22 promissory note was secured by six properties; right?

23     A.   Correct.

24     Q.   And you had testified that the value of the

25 security was two to three hundred percent of the

707

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:32:35   Page 5 of 35

1    94,502.04?

2         A.   200 percent.

3         Q.   200 percent.  And that was a figure that you

4    got from Juan Carmona; correct?

5         A.   Yes.

6         Q.   And he told you that the value of the security

7    properties was one hundred seventy to one hundred

8    eighty thousand; correct?

9         A.   Correct.

10        Q.   And it's your testimony that you didn't have

11   any involvement with coming to the understanding of the

12   property valuation regarding the six properties; is

13   that correct?

14        A.   Correct.

15        Q.   Exhibit 131 previously marked is an October

16   31st, 2007 e-mail from Juan Carmona to Mr. Husain,

17   carbon copied to you and Mr. Pearson.

18             Do you see that exhibit?

19        A.   Yes.

20        Q.   Okay.  If you turn to the second page of the

21   exhibit, there are four properties listed on it.  Do

22   you see that there?

23        A.   Yes.

24        Q.   I don't recall whether you said prior to the

25   settlement agreement that you had a chance to review

1     those figures?

2       A.   I did not.

3       Q.   You did not review those figures?

4       A.   No.

5       Q.   Did you have those figures explained to you by

6     anybody?

7       A.   No.

8       Q.   And you are familiar with those four

9     properties; correct?

10       A.   Yes.

11       Q.   Those are the North Carolina properties?

12       A.   Yes.

13       Q.   Okay.   So it shows here that the total net

14     equity without 224 Broadgait Brae was about $69,000;

15     correct?

16       A.   Yes.

17       Q.   Are you familiar with the 224 Broadgait Brae

18     property?

19       A.   I'm familiar with the property.

20       Q.   Okay.   How are you familiar with it?

21       A.   Because we bought it.

22       Q.   Who's "we"?

23       A.   Chopra Enterprises.   I'm not sure who owned

24     the title on the property.   I'm not sure of title, but

25     I'm familiar with the property.

1     Q.   At the -- at the time of the settlement were

2   you aware that the 224 Broadgait, B-R-A-E, Road

3   property was underwater?

4     A.   No.

5     Q.   So it's your testimony that it wasn't

6   underwater at the time of the settlement?

7     A.   I do not know.

8     Q.   You don't know one way or another?

9     A.   No.

10          MR. CAMPAGNA:   I'm going to mark the next

11   exhibit Exhibit 133.

12            (EXHIBIT 133 WAS MARKED FOR IDENTIFICATION.)

13          MR. ISON:   Do you have a copy?

14   BY MR. CAMPAGNA:

15     Q.   This is an e-mail dated Thursday, October

16   18th, 2007 from Juan Carmona to Mr. Husain and Dave

17   Pearson with a carbon copy to Deepak Chopra.   There

18   appear to be three separate e-mails on this exhibit.

19          Do you recognize this document?

20     A.   No.

21     Q.   Okay.   If you look down at the bottom of the

22   page, there's an e-mail from Juan Carmona October 18th,

23   2007 at 10:15 a.m.   Do you see that there?

24     A.   Yes.

25     Q.   It says:   "Hi Iqbal.   Attached are two

1    mortgages for A102."

2            What property is A102?

3       A.   That was the Molokai property.

4       Q.   Is that a Molokai property that we've

5    previously discussed in this deposition?

6       A.   I don't recollect.

7       Q.   Is it the vacant land?

8       A.   No.

9       Q.   This is a condo unit?

10      A.   Yes.

11      Q.   Then it goes on to say:  "This will help you

12   with the equity available.  Please let me know where we

13   stand as we need to wrap this up."

14           Your testimony is that you don't recall

15   reading this e-mail; is that right?

16      A.   I don't -- I may have read it, but I don't

17   recall reading it.

18      Q.   It's your testimony that you don't recall

19   being involved with the discussions relating to

20   property valuation prior to the settlement agreement?

21      A.   Yes.

22      Q.   That's correct?

23      A.   Correct.

24      Q.   So if you look at the e-mail from the next

25   one, the middle of the page from Iqbal Husain dated

1    October 18, 2007 at 11:21 a.m. to what looks like

2    Mr. Carmona, Mr. Pearson, carbon copied to you.  Do you

3    see that?

4         A.   Yes.

5         Q.   It identifies a person by the name of

6    D-A-Y-N-A.  I think that's pronounced "Dayna"?

7         A.   Yes.

8         Q.   Is that the same woman that you were referring

9    to earlier in your deposition?

10        A.   Yes.

11        Q.   That's your Hawaii realtor?

12        A.   Yes.

13        Q.   It says the current value of the A102 Molokai

14   property is approximately 300,000.  Prior to the

15   settlement with Mr. Husain on the various properties

16   were you aware of the approximate value of the Molokai

17   property, A102?

18        A.   One was dealing with the property values of

19   Mr. Iqbal.

20        Q.   When you say "Mr. Iqbal" you mean Mr. Husain;

21   right?

22        A.   Yes.

23        Q.   It goes on to say here:  "After selling costs

24   of 21,000 we are left with equity of about $4,200."

25             Do you see that there?

Case: 10-05196    Doc#: 105    Filed: 07/23/12    Entered: 08/10/12 15:32:35    Page 10 of 35

1    A.   Yes.

2    Q.   So it's your testimony that at this time,

3  October of 2007, you were not aware of any discussions

4  regarding equity in the Molokai property?

5    A.   No.   I was not -- I was not doing the

6  negotiations for the properties.

7    Q.   And that e-mail says:  "I need to see recent

8  mortgage stubs for KNK 129."

9    A.   Yes.

10   Q.   Does that stand for KeNaniKai, capital K-E

11 capital N-A-N-I capital K A I?

12   A.   Yes.

13   Q.   That's also a Hawaii property; correct?

14   A.   Yes.

15   Q.   Next line.  "Total equity pledged so far is

16 31,000 plus 4,200 equals 35,200."

17        Do you see that?

18   A.   Yes.

19   Q.   And I understand you weren't involved in the

20 negotiations, but it does say here in parentheses:

21 "Assuming San Diego is near zero."

22        Now, of the six properties pledged for

23 settlement four were in North Carolina; correct?

24   A.   Correct.

25   Q.   One was a Hawaii property.  One was a Hawaii

1    property?

2        A.   Okay.

3        Q.   Is that your recollection, too?

4        A.   Yes.

5        Q.   And one was a San Diego property?

6        A.   Yes.

7        Q.   Did you have any idea of the valuation of the

8    San Diego property prior to the settlement?

9        A.   I bought it for I think 400,000.

10       Q.   When did you buy it?

11       A.   360 or 400.

12       Q.   When did you buy it?

13       A.   I don't recollect when I bought it.

14       Q.   About how many years prior to October 2007?

15       A.   Year and a half, two years.  I'm not sure of

16   the timeline.

17       Q.   It's approximately a year and a half to two

18   years?

19       A.   I don't know.  I cannot say guess.

20       Q.   It's less than a decade before?

21       A.   I cannot guess.  I don't have the timeline.

22            MR. ISON:  He asked you if it's less than ten

23   years.

24            THE DEPONENT:  Yes.

25   //

1  BY MR. CAMPAGNA:

2      Q.  Less than five years before 2007?

3      A.  Yes.

4      Q.  Less than four years?

5      A.  Yes.

6      Q.  Less than three years?

7      A.  I can't recollect that.  I don't know.  Three

8  years or less.

9      Q.  Three years or less.  I appreciate you going

10  through that exercise in trying to focus in on the time

11  frame.  So sometime less than three years prior.

12          And then -- so what was your understanding of

13  the value of this property in San Diego that you

14  purchased less than three years before for about three

15  hundred sixty to four hundred thousand?

16      A.  That property, somebody was renting it.  I

17  think it was four hundred fifty, four hundred forty

18  thousand at that time.  That's my guess.

19      Q.  450 or 440?

20      A.  Yeah.

21      Q.  So four hundred forty to four hundred fifty

22  thousand was what you would have valued that property

23  at the time?

24      A.  It's my best guess.  My best guess.

25      Q.  Is that your best estimation?

1    A.   Yes.

2    Q.   While Mr. Carmona and Mr. Husain were working

3  out the values of the property it seemed that there's

4  some discussion regarding there being insufficient

5  security pledged for the settlement.

6         Were you aware of that discussion prior to the

7  settlement?

8    A.   No.

9    Q.   So, for example, where it says, "We are

10  nowhere near the 87,000 principal amount," as it states

11  there in that -- in the e-mail that's in the middle of

12  the page?

13    A.   They were discussing to come to a mutual

14  agreement of how much it should be.  I was aware of

15  that, that they were discussing one and Mr. Iqbal --

16  Mr. Husain.

17    Q.   So you were aware of the discussions?

18    A.   I was aware they were trying to come to a

19  compromise of how much they were worth and the

20  settlement agreement, but I was not involved with both

21  of them talking on a day-to-day basis.

22    Q.   How about this idea here in the e-mail at the

23  top of the page:  Dayna, we need to have a conference

24  call with Dayna because she is telling us two different

25  stories."

Case: 10-05196   Doc#:105   Filed: 07/23/13   Entered: 08/01/12 15:37:35   Page 14 of
35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Do you recall any issue regarding Dayna

2 telling the parties here --

3    A.  No.

4    Q.  -- two different stories?

5    A.  No.

6    MR. ISON:  Wait until he finishes his

7 question.

8    MR. CAMPAGNA:  I'm going to mark the next

9 exhibit Exhibit 134.

10    (EXHIBIT 134 WAS MARKED FOR IDENTIFICATION.)

11 BY MR. CAMPAGNA:

12    Q.  This is a copy of a complaint in adversary

13 proceeding filed by Pawan Chadha and Nutan Chadha,

14 N-A-T-U-N, Chadha versus Deepak Chopra.

15    Do you recognize this document?

16    A.  Yes.

17    Q.  Are you generally familiar with the complaints

18 that Pawan Chadha and Nutan Chadha had against you in

19 this adversary proceeding?

20    A.  Yes.

21    Q.  What were those?

22    A.  I can't recollect all of them, but they were

23 basically disputes about properties, money owed, money

24 taken, you know.

25    Q.  If you turn to page 3 of this document,

1   paragraph 11(a) talks about a loan agreement.  It

2   states that there is a loan agreement in which

3   plaintiffs provided $120,000 to defendant in exchange

4   for which defendant agreed to provide plaintiffs with

5   certain personal property collateral and certain real

6   property liens.

7            Do you recall that loan agreement that the

8   Chadhas are referring to in this paragraph, 11(a)?

9       A.   I recall that there was a loan agreement, yes,

10  I do.

11      Q.   Is the statement true that the plaintiffs

12  provided $120,000 to you in that loan agreement?

13      A.   I don't know if it's to me or to another

14  company.  I'm not certain about that.

15      Q.   What other company may it have been?

16      A.   CEC.

17      Q.   And it says:  "In exchange for which Defendant

18  agreed to provide Plaintiffs with certain personal

19  property collateral and certain real property liens."

20           Is it true that in exchange for the 120,000

21  either you or CEC, whichever one it was, agreed to

22  provide the plaintiffs with personal property

23  collateral and real property liens?

24      A.   Yes.

25      Q.   And then there was an agreement to pay back

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  the loan on an interest schedule?

2      A.  Yes.

3      Q.  With interest on the set schedule, as it says

4  here on the page.  So that's a true statement; right?

5      A.  Yes.

6      Q.  At the top of page 4, the top line, it says:

7  "Defendant never provided either the personal property

8  collateral or the real property liens."

9          Is that correct?

10     A.  What?  No.  It's wrong.

11     Q.  That is incorrect?  Which part of it is

12  incorrect?

13     A.  Both parts.

14     Q.  So you provided personal property collateral

15  for that $120,000 loan?

16     A.  Property collateral.  I don't know what you

17  mean by "personal."  Property collateral.

18     Q.  Any idea what they are talking about here,

19  "personal property collateral"?

20     A.  They took my watches and jewelry and things

21  like that.  That's personal property collateral and --

22  and property.

23     Q.  What do you mean they took your watches?

24     A.  Took my watches and personal items as

25  collateral, also.

Case: 10-05196  Doc#: 105  Filed: 07/23/12  Entered: 98/10/12 15:33:35  Page 17 of
TORREANO SHORTHAND REPORTING (666) 760-DEPO
35

1    Q.  You handed them over?

2    A.  Yes.

3    Q.  To the Chadhas?

4    A.  Yes.

5    Q.  Was there other personal property pledged

6  besides the watches?

7    A.  Yes.  It's in the loan document.

8    Q.  Did you provide all of the personal property

9  that was identified in the loan document?

10    A.  Yes.

11    Q.  Is there any personal property identified in

12  the loan document that you promised to provide that you

13  did not?

14    A.  No.

15    Q.  How about the real property liens?

16    A.  Provided to them.

17    Q.  All the real property liens that were

18  identified in the loan document you provided?

19    A.  Yes.

20    Q.  When you say you provided you mean either you

21  or Chopra Enterprises Corporation; correct?

22    A.  Yes.

23    Q.  Then it says you never paid plaintiffs for the

24  loan.  Is it true that you never paid the plaintiffs

25  for the loan?

Case: 10-05196  Doc#: 105  Filed: 07/23/12  Entered: 08/10/12 15:33:35  Page 18 of 35

1      A.   I paid them interest on the loan.

2      Q.   But you didn't pay -- you didn't pay them for

3  the loan?

4      A.   I did not pay back the loan, no.

5      Q.   Pardon?

6      A.   I did not pay back the loan.

7      Q.   Paragraph (b), it talks about a second loan

8  agreement for $200,000.

9      A.   I don't remember the exact amount.

10     Q.   Do you recall entering into a second loan

11 agreement with the Chadhas?

12     A.   I did.

13     Q.   Was it for approximately $200,000?

14     A.   I can't recollect.

15     Q.   Could it have been for more than 200,000?

16     A.   No, no.

17     Q.   You did say that you recall.  You're just not

18 sure for how much it was for?

19     A.   True.

20     Q.   Okay.  Then it says that you were to provide

21 the plaintiffs with the real property liens.  Did you

22 provide the real property liens that were identified in

23 the loan documents?

24     A.   Yes.

25     Q.   And I said it that way because, as to loan

Case: 10-05196   Doc#: 105   Filed: 07/23/12   Entered: 08/10/12 15:33:25   Page 19 of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    number 1, you stated that there were personal property

2    items and real property liens identified in those loan

3    documents; correct?

4        A.  Yes.

5        Q.  So I was making the assumption -- maybe I

6    shouldn't have -- that there were also real property

7    liens identified in the loan documents for the second

8    loan agreement.  But it's safe to say that there were

9    real property liens identified in the second loan

10   documents?

11       A.  Yes.

12       Q.  And the real property liens were against your

13   Monte Sereno residence?

14       A.  Yes.

15       Q.  As well as the property in Manila Camp,

16   Hawaii?

17           MR. ISON:  Do you want to talk with me?

18           (Attorney-deponent conference.)

19           MR. ISON:  Just answer the question.

20   BY MR. CAMPAGNA:

21       Q.  After conferring with your attorney are you

22   able to answer the question?

23       A.  Yes.

24       Q.  Do you need the question repeated back?

25       A.  No.  The liens put on the Monte Sereno

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:25   Page 20 of
35
TORREANO SHORTHAND REPORTING (866) 769-DEPO

1 residence and the lien was put on Molokai, but never

2 recorded because Mr. Chadha changed it -- Dr. Chadha

3 changed it to be for Caroline Clayton, against the

4 Caroline Clayton property.

5     Q. I want to make sure that I understand it.

6 There were liens drafted against the Monte Sereno

7 property?

8     A. And recorded.

9     Q. And recorded against the Monte Sereno

10 property?

11     A. Yes.

12     Q. And then there was a deed of trust prepared

13 for the Molokai property that was not recorded?

14     A. Correct.

15     Q. Your testimony is that it wasn't recorded

16 because Mr. Chadha wanted security and a different

17 property rather than the Molokai property; is that

18 right?

19     A. True.

20     Q. Was it his idea to have the security changed

21 from Molokai to the Caroline Clayton properties?

22     A. I don't recollect whose idea it was. It was a

23 mutual discussion.

24     Q. How did that mutual discussion arise?

25     A. We discussed a lot of things together because

1    he was involved in a lot of properties.

2        Q.   So you had -- you had the deed prepared on the

3    Molokai property?

4        A.   And notarized.

5        Q.   And notarized?

6        A.   Yes.

7        Q.   And then what did you do with it?

8        A.   I didn't record it.

9        Q.   Why didn't you record it?

10       A.   Dr. Chadha said we would like to go into

11   another properties, some other properties.

12       Q.   Did he just volunteer that he wanted to go

13   into some other property?

14       A.   We discussed it and that's what he wanted.

15       Q.   Did you offer -- before that was what he

16   wanted did you offer him the security in the other

17   properties rather than the security that he already had

18   but unrecorded in the Molokai property?

19       A.   He asked.

20       Q.   Do you need the question repeated?

21       A.   No.  He asked that he be given collateral in

22   other properties.

23       Q.   Did he state why?

24       A.   No.

25       Q.   And then the lien was recorded on the Caroline

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 22 of 35

1  Clayton properties?

2      A.  Yes.

3      Q.  Caroline Clayton was an LLC; correct?

4      A.  Correct.

5      Q.  So did he also get an interest in Caroline

6  Clayton or just a lien on the properties?

7      A.  Lien on the properties.

8      Q.  And you agreed to pay back the loan as it

9  states here with interest by a set date?

10     A.  Yes.

11     Q.  And it says here that you never provided the

12  lien against the property in the Manila Camp property.

13  That's a true statement; right?

14     A.  True.

15     Q.  Did you ever pay plaintiff for the loans?

16     A.  Paid interest.

17     Q.  You didn't pay him for the loan --

18  correct? -- the second loan.

19     A.  No.

20     Q.  You paid interest?

21     A.  Yes.

22     Q.  Only?

23     A.  Only.

24     Q.  In paragraph (c) there is a third loan

25  agreement that's mentioned.  It says that plaintiffs

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 23 of 35

1   provided defendants $60,000 to you and CEC.

2       A.   I don't recollect that.

3       Q.   You don't recollect any of this?

4       A.   There are so many loans being provided and

5   money being paid back.  I don't recollect that.  Some

6   of the stuff I don't agree on this -- this -- this

7   action that he filed.

8       Q.   So is your testimony you don't agree that

9   there was this third loan agreement for $60,000 given

10  to you and CEC?

11      A.   I don't recollect.  There was so many issues

12  that were not right in this action that we found the --

13  no.  I don't agree with a lot of stuff.  A lot of facts

14  stated in that by Dr. Chadha I don't believe are true.

15      Q.   Okay.  So it's your testimony that you don't

16  believe that it's true that the plaintiffs loaned you

17  and CEC this additional $60,000 that they are talking

18  about in loan agreement number 3.

19      A.   I don't recollect.  I can't recollect what was

20  loaned.  So many documents going back and forth.  So

21  it's all just -- part of the -- part of the facts were

22  just pulled out and put in this paper.  There are lots

23  of things that happened behind the scenes that

24  Dr. Chadha is aware of.

25      Q.   The reason why I'm still on this point is

1  because I've heard two different things.  There's a

2  difference between not recollecting something and not

3  agreeing with something.

4     A.  I do not agree with a lot of facts on this

5  action item.

6     Q.  When you say "this action item" are you

7  referring to paragraph (c)?

8     A.  I'm referring to paragraph (c) and I'm

9  referring to the way this was put together is not -- I

10  do not agree to the whole action item that he put

11  together.  I do not.  And we -- and my attorney and me

12  filed a response to that and you can look at the

13  response.

14     Q.  So when you say you don't -- you don't agree

15  with the whole action item, you mean you don't agree

16  with the entire adversary complaint?

17     A.  I don't agree to all of it.  There's a lot of

18  things that are not true that I believe and we filed an

19  answer, counter -- counter -- what's it called?

20  Counter.

21        MR. ISON:  Counterclaim.

22        THE DEPONENT:  Counterclaim.  Disputing these

23  items, some of these items.

24  BY MR. CAMPAGNA:

25     Q.  Okay.  Okay.  Is paragraph (c) on page 4 one

1    of the items that -- for which you had a cross-claim?

2        A.   You need to look at the cross-claim.  I don't

3    remember the cross-complaint.  It was very long.  It's

4    on the record.

5        Q.   So I'm still not sure what your testimony is,

6    but I'm going to give it a shot.  And I understand

7    you're overall disputing claims that appeared against

8    you in an adversary proceeding.

9        A.   Yes.

10       Q.   That's the background.  I understand where

11   you're coming from.  You were able to identify and

12   recollect the loans that were mentioned in paragraphs 1

13   and 2.

14       A.   Yes.

15       Q.   Excuse me.  Paragraphs (a) and (b)?

16       A.   Yes.

17       Q.   But when we came to paragraph (c) you said a

18   couple times you don't recollect and you said a couple

19   of times that you don't agree and I still don't know if

20   you're talking about whether you don't agree with

21   paragraph (c) or just the general statements that are

22   made in the adversary proceeding.  And I haven't asked

23   a question yet.  So I'm going to try it one more time.

24            Is your testimony that you do not recollect

25   loaning the plaintiffs --

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 26 of
35

1           MR. ISON:  Do you want to start over?

2           MR. CAMPAGNA:  Yes.

3     BY MR. CAMPAGNA:

4        Q.   Is your testimony that you do not recollect

5     loaning --

6           MR. ISON:  Borrowing?

7           MR. CAMPAGNA:  Pardon?

8           MR. ISON:  Borrowing?  He didn't loan the

9     plaintiffs any money here.

10          MR. CAMPAGNA:  I'm going to try it one more

11    time.

12    BY MR. CAMPAGNA:

13       Q.   Is it your testimony that you do not recall

14    borrowing $60,000 from the plaintiffs as they've

15    identified here as loan agreement number 3?

16       A.   There was a lot of money borrowed back and

17    forth from Dr. Chadha.  This could be one that was

18    borrowed, but there's so much of stuff in this

19    complaint that the facts are misleading.  So we've -- I

20    can't answer all the questions.  There's so many things

21    that they have written here which are either not true

22    or away from the facts.

23          So to answer your questions, money was

24    borrowed from Dr. Chadha.  Some of them are duplication

25    he put in here.  We answered with a cross-complaint.

1    We talked to Dr. Chadha and we settled the case.

2         So it's not a question if I do not recollect.

3    The question is there's so much of information here

4    which is, you know, borrowed -- paragraph (a), (b), (c)

5    (d), we didn't borrow all that money.  We borrowed some

6    of the money, paid the interest, but I can't recollect

7    all the facts.

8         So you keep asking the question.  I will have

9    to give you the same answer that this is all -- we do

10   not agree -- I do not agree to this adversary complaint

11   that was filed against us.  Some of the part of the

12   money borrowed we have been through, but the way it has

13   been put together is completely offbase in my view and

14   we filed a counterclaim response to them.

15        So I can't -- it a very huge complaint that is

16   not factual, according to me, not truly factual.

17        Q.  Paragraph (d) it says in or about 2008

18   defendant -- that's you -- and SEC Ventures entered

19   into two promissory notes, one in the amount of 250,000

20   and one in the amount of 180,000 relating to loans

21   provided by the plaintiffs to you for the purchase of

22   property in Montgomery, Alabama.

23        Do you recall those promissory notes?

24        A.  He loaned us the money against the property in

25   Montgomery, Alabama, that is true.

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:25   Page 28 of
35
TORREANO SHORTHAND REPORTING (866) 780-DEPO

1      Q.   Are those figures approximately true, that the

2   Chadhas loaned you 250,000 and 180,000?

3      A.   It's true.

4      Q.   And each of those amounts were set forth in a

5   separate promissory note; is that true?

6      A.   There were four promissory notes.

7      Q.   So they said that you entered into two

8   promissory notes?

9      A.   They were -- as I recall, there were four.

10     Q.   Maybe these are two of them?

11     A.   Those are 250 or I think 100,000, 150,000.

12   And the 180 was 100,000, 80,000.

13     Q.   What were the value of the last two promissory

14   notes that you stated?

15     A.   80,000 and 100,000.

16     Q.   Your recollection is that there were four

17   notes that approximately add up to the amounts that

18   they've stated in the complaint?

19     A.   True.

20     Q.   So you think they were mistaken on how many

21   promissory notes there were?

22     A.   Yes.

23     Q.   And those were for the purchase of the

24   property in Montgomery, Alabama?

25     A.   They were -- they were money borrowed against

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 29 of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    the Alabama properties.  Properties had already been

2    purchased.

3         Q.   Okay.  So they are saying that this was for

4    the purchase of the property.  They are incorrect.

5    Your testimony is that they are mistaken about that?

6         A.   True.

7         Q.   Because you had already purchased those

8    properties in Montgomery, Alabama?

9         A.   True.

10        Q.   Were those the Swanner properties?

11        A.   True.  Not all of them, twenty of them.  The

12   rental homes are Swanner properties.  The other one is

13   Caroline Clayton, vacant lots.

14        Q.   So there's twenty vacant lots in Alabama

15   loaned by Caroline Clayton?

16        A.   They were not twenty.  They were less.  They

17   were maybe twelve or fourteen vacant lots.

18        Q.   You had already purchased property in

19   Montgomery, Alabama and you put the property that you

20   had already purchased through SEC Venture Group;

21   correct?

22        A.   And Caroline Clayton.

23        Q.   And Caroline Clayton?

24        A.   Yes.

25        Q.   So you were putting those up for collateral to

Case: 10-05196   Doc# 105   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 30 of 35

1  get additional money in the amount of 250,000 and

2  180,000?

3      A.   True.

4      Q.   So Caroline Clayton consisted of twelve to

5  fourteen vacant lots?

6      A.   True.

7      Q.   And the other property consisted of

8  approximately twenty rental homes?

9      A.   True.

10     Q.   Those were the Swanner properties?

11     A.   I don't remember how many, but approximately

12  twenty rental homes.

13     Q.   Approximately twenty.  And those were the

14  Swanner properties that we've previously discussed; is

15  that correct?

16     A.   Could have been Swanner.  Could have been some

17  more properties added to it.  So I don't recollect.  It

18  could be Swanner.

19     Q.   It could have been a combination of Swanner

20  properties and other rentals that SEC owned but which

21  were not part of the Swanner estate?

22     A.   True.

23     Q.   And it says here defendant recorded some of

24  the liens against the real property but not all of

25  them.  Is that a true statement?

1      A.   Untrue.

2      Q.   Which part is untrue?

3      A.   Everything was recorded.

4      Q.   What properties, according to the loan

5 documents, were supposed to be recorded?  Excuse me.

6           What liens were supposed to be recorded,

7 according to the loan documents?

8      A.   The homes.

9      Q.   Pardon?

10      A.   The twenty approximate homes and all the

11 fourteen lots, or twelve to fourteen lots for Caroline

12 Clayton.

13      Q.   And your testimony is that they were all

14 recorded; correct?

15      A.   Yes.

16      Q.   How do you know that they were all recorded?

17      A.   Because Dr. Chadha had all the liens recorded

18 and -- and it was -- the lawyers recorded the deeds.

19      Q.   Is it true that the rental homes never

20 generated any income to the plaintiffs?

21      A.   Generating income to SEC.  The loan document

22 never provided that we pay them the money every month,

23 with a balloon payment.

24      Q.   Say that again.

25      A.   It was a balloon payment loan, not a monthly

1  payment loan.

2     Q.  All of the promissory notes were.  Whether it

3  was two or four it was a balloon payment?

4     A.  And we paid some interest in cash to him.  In

5  the beginning when the loan was taken we paid them a

6  substantial amount in cash.

7     Q.  Was that the arrangement?

8     A.  That's what Dr. Chad demanded.

9     Q.  Was?

10    A.  That he be paid in cash.

11    Q.  So you made rental payments -- excuse me, you

12 made interest payments initially?

13    A.  When Dr. Chadha gave a loan to us he would

14 take thirty, forty, fifty thousand, whatever it was, up

15 front in cash, in cash, and discount and give it to

16 us.  That was one his conditions.

17    Q.  Then he used the cash to pay against the

18 principal?

19    A.  No.  The cash was never disclosed.

20    Q.  So your understanding is that Dr. Chadha was

21 complaining against you that you weren't paying the

22 rental income to him in order to pay on the note?

23    A.  No.  Untrue.  The note had a balloon payment

24 in the end of the loan.  There was no rental income

25 paid every month.

1    Q.   It's your understanding that Dr. Chadha was

2  complaining that he was -- according to his

3  understanding, he was supposed to be getting rental

4  income all along?

5    A.   No, that's not my understanding.

6         MR. ISON:   He's not asking what your

7  understanding of the deal was.  He's asking your

8  understanding of what Chadha is saying the deal was.

9         THE DEPONENT:   I don't know what Dr. Chadha's

10  understanding was.  I have no idea.  You'd have to ask

11  Dr. Chadha.

12  BY MR. CAMPAGNA:

13    Q.   Paragraph (e).  "In or about 2009 Defendant

14  repeatedly represented to Plaintiffs that he needed

15  emergency short-term loans to avoid having disaster

16  befall him such as being shot and killed by a person or

17  persons who claimed to be owed money by Defendant."

18         Is it true that in or about 2009 you told the

19  plaintiffs that you needed a short-term loan or

20  somebody was going to shoot or kill you?

21    A.   No.

22    Q.   Any idea why this claim would be stated like

23  this?

24         MR. ISON:   Objection.  Calls for speculation.

25         THE DEPONENT:   No idea.

1    BY MR. CAMPAGNA:

2        Q.   There's no part of that that's true?

3        A.   What part?

4        Q.   Any of it.

5        A.   In total -- on all of paragraph (e)?

6        Q.   Just the first part that we've identified,

7    first three lines.

8        A.   No.  Nothing is true.

9        Q.   So you never stated to plaintiffs in or about

10   2009 -- is it that the date is wrong?  Was this in

11   2008, 2007?

12       A.   I have no idea what he's talking about.

13       Q.   Okay.  So at no time did you ever state to the

14   plaintiffs that you needed an emergency short-term loan

15   for any reason?

16       A.   I did get an emergency loan from him on a

17   short-term basis, but it was not a loan.  It was a

18   collateral.

19       Q.   Pardon?

20       A.   It was a collateral I got.

21       Q.   I don't know what that means.

22       A.   I gave him a lot of silver, about 200 -- 1,000

23   ounces of silver.

24       Q.   How much?

25       A.   1,000 ounces of silver.