1    Q.   In 2009 you gave the plaintiffs about a

2    thousand ounces in silver as collateral for a

3    short-term emergency loan; is that correct?

4    A.   Yes.   It was silver -- it was silver dishes,

5    you know, sterling silver tea sets for a very small

6    amount of money.

7    Q.   What was the reason that you needed the

8    short-term loan?

9    A.   I don't recollect.   Maybe it was negative cash

10   flows because we went through some various problems.

11   Q.   So for sure it wasn't because somebody was

12   threatening to hurt you in any way?

13   A.   No.

14   Q.   Was anybody threatening to hurt you in any way

15   in 2009?

16   A.   I don't recollect anybody threatening my

17   life.

18   Q.   How about Mr. Husain?

19   A.   He only threatened me if I went out of the

20   country and get me shot there.

21   Q.   So there's a total sum here of approximately

22   160,000?

23   A.   It's not true.

24   Q.   He did provide you some small amounts of

25   short-term loans?

Case: 10-05196   Doc #: 2831-1 Filed: 08/10/12   Entered: 08/10/12 15:38:35   Page 1 of 34
TORREANO SHORTHAND REPORTING (866) 1769-DEPO

1      A.   Yes.

2      Q.   But you're saying they didn't add up to

3  $160,000?

4      A.   No.

5      Q.   How much did they add up to?

6      A.   Approximately 25,000 to $30,000.

7      Q.   Then there are these allegations that you gave

8  the plaintiffs a check as security for a loan.

9      A.   Untrue.  I gave the checks for the collateral

10  of the silver which were cashed by Dr. Chadha, but the

11  silver was never returned.

12      Q.   So when Dr. Chadha -- it says plaintiffs

13  here.  When the plaintiffs say that the checks that you

14  gave them were worthless in regards to the short-term

15  loan, that's an untrue statement?

16      A.   Absolutely.

17      Q.   And where it says defendant never paid for the

18  loans, is that also untrue?

19      A.   I paid him a lot of money in cash, over

20  150,000.

21      Q.   Pardon?

22      A.   I owed 150,000 in cash.

23      Q.   You paid him over 150,000 in cash?

24      A.   Yes.

25      Q.   On these short-term loans?

739

1      A.   All the loans he's talking about.   All the
2  loans.
3      Q.   Well, I'm just talking about this particular
4  loan that's identified in paragraph (e).
5      A.   I paid him $25,000 which he cashed the
6  checks.
7      Q.   Is that one single check for 25,000?
8      A.   I think one was for five and one was for
9  twenty.
10     Q.   Was that the value of the short-term loans
11 that he had provided to you in 2009?
12     A.   The value was about 150,000.
13     Q.   Just looking at paragraph (e), he's saying
14 that the total was about 160,000.  So you're saying the
15 value was about 150,000?
16     A.   My collateral was worth 150,000 that I gave
17 him.  He gave me a check for 25,000 which I returned to
18 him, but I never got my collateral back.
19     Q.   You lost all the silver is what you're
20 saying?
21     A.   When I gave him the silver I would give him a
22 check so he could cash my check and return my silver
23 and he would hold my check.  But he cashed my checks
24 but never gave me the silver back.
25     Q.   When did he cash the checks?

740

1    A.   I don't recollect that.  It's in the -- it's

2  in the counterclaim that we filed.  I don't remember

3  the dates.

4    Q.   Do you know whether it was within a short time

5  of having received the checks?

6    A.   Maybe a couple of months.  I'm not sure.

7    Q.   Okay.  Well, they were short-term loans.  So

8  did he cash the checks after he thought the money was

9  due?

10    A.   He was supposed to cash the checks and return

11  my silver, but he cashed the checks and I don't

12  recollect when he cashed my checks.

13    Q.   I'm going to try paragraph (c) again on page 4

14  to clarify that your testimony is that you don't recall

15  entering into a third loan agreement with the

16  plaintiffs for the amount of approximately $60,000.

17    A.   There's so many loans.  I just can't recollect

18  the $60,000.  There was a loan form.  He gave loans for

19  other properties, also.  I don't know if it was 60, 40,

20  50, what it was.  It had a secured deed of trust

21  against it.  I can't remember what -- I'm not able to

22  recollect that.

23    Q.   When you look at the allegations in paragraph

24  (c) and the allegations in paragraph (e), are these

25  issues in any way related in terms of money being

1    borrowed by you or your companies?

2         A.   I -- I can't recollect how much because we

3    gave him a lot of cash.  So if you put -- if you borrow

4    some more money against other properties -- because he

5    did give money against properties, also, not only on

6    the SEC, but there were other properties that he had

7    loaned money against which was secured.

8              So, you know, I can't recollect all the

9    details, but a lot of money was returned to him in cash

10   or checks.  And then he foreclosed the properties.

11   There's a lot of -- there's a lot of stuff that is --

12   that I can't explain.

13        Q.   So maybe if you had the documents regarding

14   the $60,000 on loan number 3, would that help to

15   refresh your recollection?

16        A.   Yes, of course.

17        Q.   At any time that you borrowed money from the

18   plaintiffs did you not have the intention to pay them

19   back?

20        A.   I always had intention to pay them back.

21        Q.   At any time that you borrowed money from the

22   plaintiffs did you ever not have the ability to pay

23   them back?

24        A.   I had the ability to pay them back.

25        Q.   Is it your testimony that you provided the

1    plaintiffs all of the real property collateral that

2    they were entitled to on any loan that you gave them?

3         A.   Yes.

4         Q.   On any loan that they gave to you?

5         A.   Yes.

6         Q.   And is it your testimony that you provided the

7    plaintiffs every item of personal property pledged to

8    them as security for loans that you received from

9    them?

10        A.   Yes.

11             MR. CAMPAGNA:  We're going to mark the next in

12   order Exhibit 135.

13             (EXHIBIT 135 WAS MARKED FOR IDENTIFICATION.)

14   BY MR. CAMPAGNA:

15        Q.   Do you recognize this document?

16        A.   Yes.

17        Q.   How do you recognize it?

18        A.   It's Rajinder Jindia and Urmil Jindia versus

19   Deepak Chopra.

20        Q.   This is the complaint in the adversarial

21   proceeding filed by Rajinder Jindia and Urmil Jindia

22   against you; is that correct?

23        A.   Yes.

24        Q.   Generally what do you recall about the

25   complaint by the Jindias against you?

1    A.   They loaned us -- loaned CEC money.

2         MR. ISON:  Is it CEC?

3         THE DEPONENT:  Chopra Enterprises.  So I did

4    collect.

5         MR. ISON:  They loaned Shiva money?

6         THE DEPONENT:  I don't recollect.

7         MR. ISON:  Just look at paragraph 11(a).

8         THE DEPONENT:  11(a)?

9    BY MR. CAMPAGNA:

10        Q.   Mr. Chopra, I'm just asking of your

11   recollection.  You're -- it could be right or it could

12   be wrong.  It's okay.  There may be other things in the

13   adversary complaint that leads you to think something

14   else, but right now your understanding is that the

15   Jindias loaned money to Chopra Enterprises?

16        A.   They loaned money to Chopra Enterprises --

17   they loaned money to Chopra Enterprises and maybe to

18   the other entities possibly.  I don't recollect, but

19   the money was loaned.  They loaned the money to us, to

20   the company at different times.

21        Q.   So they loaned money to one of your companies

22   on multiple occasions?

23        A.   Yes.

24        Q.   So if you look at paragraph 11(a), it says:

25   "On or about January 29, 2007 Plaintiffs loaned $25,000

744

Case: 10-05196   Doc# 208-1   Filed: 07/13/12   Entered: 08/16/12 15:33:55   Page 7 of 34

1  to Shiva."

2          That's Shiva Venture Group; correct?

3      A.   Correct.

4      Q.   "In exchange for which Defendant signed an

5  unsecured promissory note on behalf of Shiva."

6      A.   Correct.

7      Q.   This is a true statement?

8      A.   I don't know who signed the promissory note

9  for Shiva.  I don't recollect who signed the promissory

10 note.

11     Q.   Do you recall that in January 2007 the

12 plaintiffs did loan $25,000 to Shiva?

13     A.   I don't recollect, but they did loan the

14 money.  I don't recollect where they loaned the money

15 to.

16     Q.   You don't remember where?

17     A.   Who or where they loaned the money to.

18     Q.   Okay.  So they are saying that they loaned it

19 to Shiva.  You're saying they could have loaned it to

20 Shiva or another company?

21     A.   Yes.

22     Q.   So it could have been to CEC as you were

23 recollecting earlier?

24     A.   True.

25     Q.   And they did receive an unsecured promissory

Case: 10-05196   Doc #: 1   Filed: 01/04/12   Entered: 08/16/12 15:33:35   Page 8 of 34

1   note?

2       A.   True.

3       Q.   You don't know who signed the promissory

4   note?

5       A.   True.

6       Q.   Do you recall that that particular promissory

7   note was unsecured?

8       A.   Yes.

9       Q.   How do you recollect that it was unsecured?

10      A.   Because they combined all the promissory notes

11  into one note for $150,000, as I recollect to the best

12  of my knowledge.

13      Q.   At some point after this unsecured promissory

14  note was given to the plaintiffs they later added that

15  promissory note to others?

16      A.   Made it one --

17      Q.   You aggregated them and made it into one?

18      A.   Yes.

19      Q.   Is it true that you or your companies did not

20  pay plaintiffs on this $25,000 loan?

21      A.   We paid them interest.

22      Q.   Okay.  Did you pay the loan?

23      A.   No.

24      Q.   Did you make any payments?

25      A.   Interest payments.

Case: 10-05196   Doc 1 Filed 08/10/12   Entered: 08/10/12 15:53:35   Page 9 of 34
TORREANO SHORTHAND REPORTING (866) 760-3DEPO

1    Q.  Is that the $3,500 in July 2007?

2    A.  I don't recollect, but we paid a lot of

3 interest payments.  I notice 35.  It's more than that.

4    Q.  It says here that there was $3,500 paid in

5 July of 2007 by a manager of Shiva.  Who would the

6 manager of Shiva have been at that time?

7    A.  I don't recollect.  It could have been Juan

8 Carmona.

9    Q.  Could it have been anybody else?

10    A.  It could have been Ed Nailer.  It could have

11 been me, Deepak Chopra.

12    Q.  "Nailer" is N-A-I-L-E-R.

13    A.  Yes.

14    Q.  The bottom of paragraph -- excuse me.

15    On the bottom of page 3, paragraph (b), it

16 says:  "Beginning on or about January 9th, 2007 and

17 continuing to February 14th, 2007 Plaintiffs issued

18 three checks and performed one wire transfer through

19 which plaintiffs loaned a total of $130,000 to CEC."

20    Do you recall that transaction, these three

21 checks that plaintiffs issued?

22    A.  I don't recollect three checks.  But I do

23 recollect them loaning money to CEC.

24    Q.  Is that the approximate amount, the 130,000?

25    A.  Close.

1    Q.   What's the amount that you recollect?

2    A.   I can't recollect the exact amount.

3    Q.   Well, you said this was close.  So why would

4    you say it's close and not just the amount?

5    A.   Because I can't recollect the exact amount.

6    It could be 125.  It could be 135.  It could be 110.

7    It could be 140.  I don't recollect the exact amount.

8    Q.   It could be 130?

9    A.   It could be, but money was also being paid

10   back to them.

11   Q.   When you say money was being paid back to

12   them, do you mean interest was being paid back to

13   them?

14   A.   Some interest, some principal was being

15   returned to them.

16   Q.   And for this approximately $130,000 or close

17   to $130,000, as you would say it, the plaintiffs

18   received an unsecured promissory note; is that

19   correct?

20   A.   True.

21   Q.   And it says here that defendant never paid

22   plaintiffs on this $130,000 loan.  Is that true, that

23   you did not pay plaintiffs the $130,000 loan?

24   A.   We paid some of it, interest and principal,

25   but most of it was not paid, true.

1    Q.   Can you explain what these CEC loan extension

2  agreements are that are identified in paragraph (c) of

3  page 4?

4    A.   They extended the loan.  They wanted more

5  interest and we gave them more interest and kept --

6  extended the note.  It was a mutual agreement between

7  Raj and CEC that -- in order to extend it to a longer

8  term.

9    Q.   You said Juan?

10   A.   CEC Enterprises and Mr. Jindia agreed mutually

11  to extend the notes.

12   Q.   And those communications were between?

13   A.   Juan Carmona, myself and Raj Jindia.

14   Q.   Were they ever involving Urmil Jindia?

15   A.   No.

16   Q.   Okay.  Then it says here that those loan

17  extension agreements were done solely to obtain the

18  extensions on the CEC loan from plaintiffs at a time

19  when you knew that you were not able to perform your

20  part of the agreement; is that a true statement?

21   A.   No.

22   Q.   I wanted to go back to the complaint that Mary

23  Beth Whyte had filed against you and others.  I believe

24  it was you, Chopra Enterprises, your wife at the time

25  Kathleen Chopra, Neil Ison and Juan Carmona.

1          Do you recall that particular complaint?

2     A.   Yes.

3     Q.   Okay.  Do you recall whether you had paid any

4  money to Ms. Whyte in order to settle that complaint?

5          MR. ISON:  Hold on just a second.

6          (Attorney-deponent conference.)

7          MR. ISON:  Okay.  Objection.  There was a

8  confidential settlement agreement.  We're not going to

9  discuss the terms of settlement.

10         MR. CAMPAGNA:  We'll mark the next exhibit

11  Exhibit 136.

12         (EXHIBIT 136 WAS MARKED FOR IDENTIFICATION.)

13  BY MR. CAMPAGNA:

14    Q.   This is a stipulation re release of attached

15  funds and order.  Do you recall this document?  Excuse

16  me.

17         Do you recognize this document?

18    A.   I don't recognize the document.

19    Q.   Pardon?

20    A.   I don't recognize the document.

21    Q.   Do you recollect any discussions that led to a

22  stipulation releasing attached funds in the Whyte

23  case?

24    A.   It was an exchange of properties and money

25  owed against the properties -- yeah.

Case: 10-05196   Doc# 185-4   Filed: 07/24/12   Entered: 08/10/12 15:33:35   Page 13
of 34

1          MR. ISON:  Listen to the question.

2          THE DEPONENT:  Okay.

3          MR. CAMPAGNA:  Can you repeat the question.

4          THE DEPONENT:  Can you repeat the question?

5          THE COURT REPORTER:  "Question:  Do you

6          recollect any discussions that led to a

7          stipulation releasing attached funds in the

8          Whyte case?"

9          THE DEPONENT:  No.

10   BY MR. CAMPAGNA:

11       Q.  Do you recall that there were funds attached

12   in the Whyte case?

13       A.  Could have been.  I don't recollect.

14       Q.  So if you look at page 2 under "recitals,"

15   paragraph (b) says:  "On or about May 22nd, 2007 the

16   Los Angeles County Sheriff levied the writ of

17   attachment at Wells Fargo Bank attaching the sum of

18   $33,462.06.  The Sheriff is holding funds in that

19   amount."

20          Does that refresh your recollection regarding

21   whether or not there were funds attached in the Whyte

22   case?

23       A.  I cannot recollect that.

24       Q.  Then paragraph (c) says:  "The parties have

25   reached a settlement which includes a provision for

Case: 10-05196   Doc #: 163-1  Filed: 07/30/12   Entered: 08/10/12 13:33:33  Page 14 of 34
TORREANO SHORTHAND REPORTING (866) 1360-DEPO

1   release of the attached funds to Denwill, Inc. pursuant

2   to the stipulation."

3       A.   I don't recollect that.

4       Q.   And the Wells Fargo Bank, of your companies

5   which bank account would that have been?

6       A.   I have no idea.  Juan was running the

7   companies.

8       Q.   When you say Juan was running the companies,

9   which companies are you referring to?

10      A.   CEC.

11      Q.   The one that's identified in the complaint,

12  Chopra Enterprises Corporation?

13      A.   Yes.

14      Q.   Could this have been CEC's bank account?

15      A.   I have no idea.

16      Q.   Well, okay.  So your testimony is that Chopra

17  Enterprises Corporation, which is a company wholly

18  owned by you --

19      A.   True.

20           MR. ISON:  Let him finish the question.

21  BY MR. CAMPAGNA:

22      Q.   -- had a bank account that you don't know the

23  location of?

24      A.   I had several bank accounts.

25      Q.   CEC had several bank accounts?

TORRANCE SHORTHAND REPORTING (866) 1-760-DEPO

1     A.   I don't know, but I'm sure they did.

2     Q.   Why are you sure that your company had several

3   bank accounts?

4     A.   Because I saw sometimes Bank of America, Wells

5   Fargo.

6     Q.   Did you see more than one Bank of America

7   account for your Chopra Enterprises Corporation?

8     A.   I don't recollect that.

9     Q.   Did you see more than one Wells Fargo account

10   for your Chopra Enterprises Corporation?

11     A.   I don't recollect that.

12     Q.   Any other bank accounts besides BofA and Wells

13   Fargo that you're now recollecting you may have seen

14   associated with Chopra Enterprises Corporation?

15     A.   No. That's the two -- two I recollect.  Those

16   are two I recollect.

17     Q.   So the Wells Fargo Bank account that's

18   identified in paragraph (b) is the Wells Fargo Bank

19   account for Chopra Enterprises Corporation?

20     A.   I do not know that.

21     Q.   And you don't recall the sum of 33,462.06

22   being released to Ms. Whyte?

23     A.   I remember the case being settled.  I don't

24   recollect this.

25          MR. CAMPAGNA:  I'm going to mark the next

1   exhibit Exhibit 137.

2           (EXHIBIT 137 WAS MARKED FOR IDENTIFICATION.)

3   BY MR. CAMPAGNA:

4       Q.   Do you recognize this document?

5       A.   No.

6       Q.   It says at the top that it's an Amex Business

7   Platinum transaction detail for SearchTech Medical,

8   Inc.  Do you see that?

9       A.   Yes.

10      Q.   Do you recognize this generally as a

11  Quickbooks printout?

12      A.   I don't know.

13      Q.   Page 4 is part of a previous exhibit.  So I'm

14  bringing your attention to page 4 again.  Page 4 is

15  written in the bottom right-hand corner of Plaintiff's

16  000916.  Are you on that page?

17      A.   Yes.

18      Q.   We previously discussed transactions on

19  6/5/2006?

20           MR. ISON:  I don't have a page 4.

21           Off the record.

22           (Pause in the proceedings.)

23  BY MR. CAMPAGNA:

24      Q.   Okay.  So looking at the credit card charged

25  here, 6/5/2006 for Southwest Airlines, travel nurses.

Case: 10-05196   Doc# 103-1   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 17 of 34

1    A.    Yes.

2    Q.    If you turn to page 6 -- and so that's in June

3  of 2006.  Then you turn to 7/17/2006.  There's two

4  charges of 254.60 on 6/5/06, travel nurses, minus

5  509.20.  Do you see that there?

6    A.    Yes.

7    Q.    I understand that you're not the one entering

8  information into Quickbooks at this time for

9  SearchTech.  That's been established; correct?

10    A.    Correct.

11    Q.    For most of the time?

12    A.    Correct.

13    Q.    Or for any -- now I don't even remember.  Did

14  you ever do Quickbooks entries for SearchTech Medical?

15    A.    Only in the very beginning.

16    Q.    Only in that first year?

17    A.    First six months or a year.

18    Q.    Okay.  So did you have occasion to look at the

19  Quickbooks for credit card statements such as this Amex

20  Business Platinum credit card?

21    A.    No.

22    Q.    Are you familiar with this particular notation

23  here where there are these two charges of $254.60 on

24  6/5 for those travel nurses and then them getting

25  returned 509.20, minus 509.20?

Case: 10-05196   Doc# 103-1   Filed: 07/25/12   Entered: 08/10/12 15:33:35   Page 18 of 34

1       A.   509.20, the minus sign?

2       Q.   Yes.

3       A.   It's returned.

4       Q.   Pardon?

5       A.   It look like it's returned.

6       Q.   Right.  It looks like it was a credit card

7    charge on 6/5/2006.  It's identified here.  This is --

8    this is the running total of the Amex Business Platinum

9    credit card; right?  You've got all these charges on

10   here.

11      A.   Okay.

12      Q.   And then you see two charges getting taken off

13   the credit card?

14      A.   True.

15      Q.   Okay.  Are you familiar with the memo section

16   here that this would have been a disputed charge the

17   way it's written here?

18      A.   No.

19      Q.   Do you recall ever disputing Amex Business

20   Platinum charges?

21      A.   Not me personally.

22      Q.   Do you recall anybody at SearchTech disputing

23   the Amex Business Platinum charges?

24      A.   I'm sure they did.

25           MR. CAMPAGNA:  Could you repeat my question.

```
 1              THE COURT REPORTER:  "Question:  Do you recall
 2              anybody at SearchTech disputing the Amex
 3              Business Platinum charges?"
 4              THE DEPONENT:  How many years?
 5              MR. ISON:  Just answer the question.
 6              THE DEPONENT:  Yes.
 7   BY MR. CAMPAGNA:
 8        Q.   Who do you recall disputing charges on the
 9   Amex Business Platinum --
10        A.   Accountant.
11        Q.   Credit card?
12             By name.
13        A.   I don't recollect the name.
14        Q.   But it could have been an accountant?
15        A.   CEO, accountant.  People looked at the cards.
16        Q.   At the times that you recalled the CEO, a CEO
17   or an accountant disputing a charge on the Amex
18   Business Platinum card, do you recall ever giving them
19   direction to dispute a particular charge?
20        A.   If they brought it to my attention, I would.
21             MR. CAMPAGNA:  Could you repeat my question,
22   please.
23             THE COURT REPORTER:  "Question:  At the times
24             that you recalled the CEO, a CEO or an
25             accountant disputing a charge on the Amex
```

TORREANO SHORTHAND REPORTING (866) 1360-DEPO

1        Business Platinum card, do you recall ever

2        giving them direction to dispute a particular

3        charge?"

4        THE DEPONENT:  Yes.

5   BY MR. CAMPAGNA:

6        Q.   When do you recall giving direction to a CEO

7   or an accountant to dispute a charge?

8        A.   I don't recall the time.

9        Q.   Do you recall giving direction to a CEO or an

10  accountant to dispute Southwest Airline charges that

11  were made on 6/5/06?

12       A.   I don't recall.

13       Q.   In what types of situations would you give

14  direction to a CEO or an accountant to dispute a charge

15  on the Amex Business Platinum card?

16       A.   If they brought it to my attention there was a

17  charge unauthorized and somebody charged it.  Also a

18  refund that we were owed.

19       Q.   If what?

20       A.   If there was a refund we were owed.  Somebody

21  charged some things and was not authorized to charge

22  it.

23       Q.   So it would be the CEOs and the accountant

24  telling you that there were charges that appeared to be

25  unauthorized?

1    A.   When they did tell me I would give them

2  advice.   Sometime they wouldn't tell me and dispute

3  it.

4    Q.   Sometimes they would dispute it on their own.

5  Sometimes they'd bring the charge to your attention and

6  then you'd give them direction as to whether or not to

7  dispute it?

8    A.   Yes, true.

9    Q.   And the only time that you would give

10  direction to dispute a charge is if you thought the

11  charge was unauthorized?

12    A.   If they brought it to my attention and it was

13  not authorized.

14    Q.   Is that yes?

15       Can you repeat the question, please?

16       THE COURT REPORTER:   Question:   And the only

17       time that you would give direction to dispute

18       a charge is if you thought the charge was

19       unauthorized?"

20       THE DEPONENT:   Yes.

21  BY MR. CAMPAGNA:

22    Q.   If you turn to page 7 of this exhibit, it's

23  the third page -- it's the fourth page, excuse me, but

24  it's page 7 of the Quickbooks.   There's a Target credit

25  card charge 8/4/2006 by Kathleen Chopra.

1          Do you see that charge there?

2      A.   Yes.

3      Q.   $124.90?

4      A.   Yes.

5      Q.   I don't recall whether you said previously

6  because we did talk about a similar exhibit earlier in

7  your deposition.  I do not recall if you said that

8  Kathy Chopra had signatory authority for this Amex

9  Business Platinum card for SearchTech Medical.

10     A.   I have no idea.

11     Q.   Do you know if she was authorized to use the

12 card?

13     A.   No idea.

14     Q.   Who would know that?

15     A.   Accountants.

16     Q.   Who else?

17     A.   The CEO, the person who ran the company.

18     Q.   So in 2006, August of 2006, the CEO would have

19 been Pamela or Angelina; is that right?

20     A.   Yes.

21     Q.   And the accountant would have been Mahbub

22 Alam?

23     A.   Maybe Mahbub.  Mahbub Alam, Mary, Chris.

24     Q.   Then if you look down it's 11/6 -- 8/11/2006,

25 another Target charge for $55.

1          Do you see that there?

2      A.   11/6 you said?

3      Q.   8/11/2006.  Target charge, Kathleen Chopra,

4  $55.97.

5      A.   Yes.

6      Q.   You don't recall Ms. Chopra using the Target,

7  using the card to pay for things at Target; is that

8  correct?

9      A.   This is not an authorization for the card.

10  This is a Quickbooks entry.  This is not an American

11  Express for the business -- I don't know if she's

12  authorized to use the card or not, if she used it for

13  company use.  I don't know where they booked the

14  account.  I have no idea.  You're asking me a question

15  I have no idea.  You go could into the Quickbooks and

16  look at them in detail.

17      Q.   Did you ever authorize Kathleen Chopra to use

18  a SearchTech Medical credit card --

19      A.   I don't recollect.

20      Q.   -- to -- did you ever authorize Kathleen

21  Chopra to use a SearchTech Medical credit card to make

22  charges at Target?

23      A.   I don't recollect.

24      Q.   Do you recall whether you ever authorized

25  Kathleen Chopra to use any SearchTech Medical credit

1    card for any reason?

2        A.   Company -- maybe for company expenses.  It

3    could be.  I don't recollect, but it could be.

4        Q.   On 8/22/2006, which is about two and a half

5    months after those Southwest Airline tickets in June of

6    '06, there's a rebilling of the previous credit

7    $509.20.  Do you recall that rebilling?

8        A.   No.

9        Q.   I'd have to ask one of the CEOs or one of the

10   accountants; correct?

11       A.   Yes.

12       Q.   Towards the bottom of this page there appear

13   to be four Southwest Airlines charges on 8/25/2006.

14            Do you recall those charges?

15       A.   No.

16       Q.   It says, "Trip to Florida, Deepak Chopra"?

17       A.   I have no idea.

18       Q.   Do you recall taking a trip to Florida in

19   August of 2006?

20       A.   I don't know.  I did -- we did take a trip to

21   Florida.

22       Q.   Who is "we"?

23       A.   The family.

24       Q.   When you say "the family" you mean you,

25   Kathleen Chopra, your daughter Sonia, and your son --

Case: 10-05196   Doc# 103-1   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 25 of 34

1      A.   Evan.

2      Q.   -- Evan.

3           Do you recall who booked that travel?

4      A.   No.

5      Q.   Would it have been you?

6           MR. ISON:  Objection.  Calls for speculation.

7           THE DEPONENT:  You have to look at the

8    booking, the Quickbooks detail how they booked this.  I

9    have no idea.

10   BY MR. CAMPAGNA:

11     Q.   If you look to 12/16/2006 there's a charge --

12   Kathleen Chopra -- charges by Kathleen Chopra for

13   $219.15?

14     A.   Yes.

15     Q.   Is that one of the types of charges that you

16   were referring to earlier when you said that Kathleen

17   Chopra may have made charges on behalf of the company?

18          MR. ISON:  Objection.  Calls for speculation.

19          MR. CAMPAGNA:  For something such as office

20   supplies.

21          MR. ISON:  Objection.  Calls for speculation.

22          (Attorney-deponent conference.)

23          MR. ISON:  Your job here is to answer the

24   questions.  Okay?  Not argue your case.  Okay?  Just

25   answer the question.

763

Case: 10-05196   Doc# 105-1   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 26
of 34

1          THE DEPONENT:  Go ahead ask me the question.

2          MR. CAMPAGNA:  Could you repeat the question,

3   please, Peter.

4          THE COURT REPORTER:  "Question:  Is that one

5               of the types of charges that you were

6               referring to earlier when you said that

7               Kathleen Chopra may have made charges on

8               behalf of the company?"

9          MR. ISON:  Objection.  Calls for speculation.

10         THE DEPONENT:  I have no idea.

11         MR. ISON:  Just answer the questions.

12   BY MR. CAMPAGNA:

13      Q.  And I want to correct something that I said

14   earlier.  It's actually when you follow the line over

15   on 12/16/2006, it says "Kathleen E. Chopra."  Then

16   under "memo" it says, "charges by Kathleen Chopra."

17   And then under the word "split" it says "Deepak Chopra"

18   and then it's actually $795.48.

19         Your testimony is the same, though, that you

20   have no idea what that's about; is that correct?

21      A.  True.

22      Q.  Is the same true for the charge here when you

23   look at 12/24/2006, Kathleen E. Chopra, charges by

24   Kathleen Chopra, Deepak Chopra, $138.91?

25      A.  True.

1      Q.   You have no idea --

2      A.   No idea.

3      Q.   -- what that's about?

4           Is it your understanding that the only time

5    that Kathleen Chopra would have made charges on the

6    SearchTech Medical credit card were if they were for

7    office expenses?

8      A.   I have no idea.

9      Q.   Okay.  Then 1/27/07 there's a DirecTV charge

10   here, charge for Chopra Enterprises, $83.98.

11          Are you familiar with that?

12     A.   From the DirecTV in the office, in the

13   SearchTech office.

14     Q.   And then 1/28/07 Verizon Wireless Avinash

15   Chopra.  Deduct from A.C. Chopra's loan payable account

16   49.14.  Was that for your father's cell phone?

17     A.   I have no idea.

18     Q.   February 2nd, 2007, Kathleen Chopra, charges

19   by Kathleen Chopra, Deepak Chopra, 57.47.  I understand

20   you're going to say that you have no idea about that

21   one either; is that correct?

22     A.   True.

23     Q.   Then there's a February 8th, 2007 Air India.

24   Ticket number is identified there.  Deepak Chopra,

25   $3,251.90.

1          Do you recall making that credit card

2    purchase?

3          A.   I could have.

4          Q.   Why do you say you could have?

5          A.   Because I've been to India.

6          Q.   In February of 2007 you flew to India?

7          A.   Yes.

8          Q.   Why did you fly to India in February of 2007?

9          A.   I had business, nursing, trying to get nurses,

10   open an office.

11         Q.   So it's your testimony that that flight to

12   India was related to the SearchTech Medical business?

13         A.   Business and personal both.

14         Q.   How long were you in India?

15         A.   Seven days maybe.

16         Q.   2/28/2007 there's another Verizon Wireless

17   charge for what appears to be Avinash Chopra, 49.14.

18   Is that paying his cell phone?

19         A.   I have no idea.

20         Q.   Do you have an arrangement with your father

21   that SearchTech Medical is going to pay for his cell

22   phone?

23         A.   No.

24         Q.   3/9/2007.

25              MR. ISON:  How many of these are we going to

Case: 10-05196   Doc#1051-4 Filed: 07/23/12  TORRANO SHORTHAND REPORTING  Entered: 08/18/12 15:00:35 DEPO Page 29 of 34

1  go over?

2        MR. CAMPAGNA:  Not too many more.

3        THE DEPONENT:  Can I educate him on these

4  statements?

5        MR. ISON:  No.  You're not here to educate

6  him.  Let him ask you the questions.

7        THE DEPONENT:  I want to educate him so he

8  will stop asking me the questions.

9        MR. ISON:  No.  Let him stop asking you

10  questions.

11        MR. CAMPAGNA:  You can educate me as to the

12  credit card charges if you feel that that's going to

13  help us to streamline the inquiry in this regard.

14        MR. ISON:  Go ahead.  Have a good time.

15        THE DEPONENT:  This credit card is my personal

16  card, American Express, which I gave the company to use

17  whenever they needed it and I used it for my personal

18  accounts, also.  And they were reimbursed to SearchTech

19  by me.

20        If you look at the books, it will all show

21  up.  If you look at the Quickbooks, it should show

22  up -- everything should show up as being reimbursed

23  back to SearchTech.

24        SearchTech didn't have a credit card.  I had

25  the credit card.  American Express was my credit card.

1    I was the signer on the credit card.  I was the

2    guarantor on the credit card.  I let SearchTech Medical

3    use it.  But anything you see that you asked me was

4    reimbursed to SearchTech Medical in the Quickbooks.

5         So I just wanted to educate you on that

6    because you asked me those questions and I don't even

7    know it.  That's how it works.  So if you were take

8    down in Quickbooks and open the Quickbooks, get the

9    accountant or who put it in and did the extra work,

10   these questions will have been answered.

11   BY MR. CAMPAGNA:

12        Q.  So charges you permitted SearchTech Medical to

13   make on your personal credit card could be reimbursed

14   to you?

15        A.  A credit card was used by me and SearchTech

16   Medical.  That charges that SearchTech Medical made for

17   themselves they reimbursed credit card payments.  They

18   made the payments.  Some of the charges may be my

19   personal charges that I used that was reimbursed to

20   SearchTech by me.

21        So if you look at the Quickbooks in a little

22   bit more detail, you'll find all of those entries in

23   there.  You're asking me questions that I'm just trying

24   to educate you so you know exactly what's happening.

25        I don't have to do that.  I mean, you're

768

1    asking me very few details.  I'm telling you how it

2    worked.  An accountant will come and tell you the same

3    if you ask them the same questions.  Everything will be

4    the same thing.

5             So if you look at the entries, you see that in

6    the Quickbooks.  Reimbursements are coming in and going

7    out.  Everything is documented.

8             Sorry.  They are asking me these questions.

9             MR. ISON:  We'll see how that works out.

10   BY MR. CAMPAGNA:

11        Q.  Since you and SearchTech were using the same

12   credit card, how was SearchTech to differentiate

13   between your personal charges and charges that were

14   made on behalf of the company?

15        A.  I did not have any -- too many personal

16   charges, but, if I did, I would let the accountant

17   know.

18        Q.  Okay.  So it would be whichever accountant was

19   on the payroll at the time?

20        A.  Yes.

21        Q.  So it could have been any one of the six or so

22   accountants that you've mentioned throughout this

23   deposition?

24        A.  Yes.

25        Q.  Communicated with Afzal Ahmed about that,

Case: 10-05196   Doc 195-1 Filed 07/23/12 Entered 08/10/12 15:33:35  Page 32
TORREANO SHORTHAND REPORTING (866) 763-DEPO
of 34

1  Mahbub Alam, Mary, Chris?

2       A.   Yes.

3       Q.   And a couple others as well?

4       A.   Yes.

5       Q.   Which are the ones that I missed?

6       A.   I -- maybe -- I don't know.  Donna Nunez may

7  be there.  Afzal, Praveen, Chris, Mary, Mahbub.

8       Q.   So if, for example -- if, for example, your

9  wife used a credit card to buy things at Target for

10 herself or the family, you would have told the

11 accountants that SearchTech Medical would be

12 reimbursed?

13      A.   Can I explain to you the procedure so you can

14 follow how it was done?

15           MR. ISON:  Let's take a short break.

16           THE DEPONENT:  Okay.

17           Yes, yes.

18           MR. ISON:  No.  We're going to take a short

19 break.  I'm going to talk to you for a moment.

20           (Recess taken.)

21           MR. CAMPAGNA:  We're back on the record.

22 BY MR. CAMPAGNA:

23      Q.   Mr. Chopra, after having an opportunity to

24 confer with Mr. Ison do you need the question repeated

25 back?

Case: 10-05196   Doc #: 195-1   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 33 of 34

1   A. Yes.

2     MR. CAMPAGNA: I thought that you had answered

3 the question, but let's see what the record reflects.

4     THE DEPONENT: Okay.

5     THE COURT REPORTER: "Question: So if, for

6     example -- if, for example, your wife used a

7     credit card to buy things at Target for

8     herself or the family, you would have told the

9     accountants that SearchTech Medical would be

10     reimbursed?"

11     THE DEPONENT: Yes.

12 BY MR. CAMPAGNA:

13   Q. And if, for example, you had used the Amex

14 credit card to pay for airfare for yourself, your wife

15 and your children to Florida, you would have instructed

16 SearchTech -- you would have instructed that SearchTech

17 Medical was to be reimbursed?

18   A. Yes.

19   Q. And you personally would have communicated

20 those reimbursements to the accountant?

21   A. Yes.

22   Q. And is it your understanding in looking at

23 this exhibit that this is sort of a running tab of the

24 charges made on your personal credit card?

25   A. Yes.

TORREANO SHORTHAND REPORTING (866) 780-DEPO