1      Q.   In reviewing the charges, what document would

2  you rely on?

3            MR. ISON:  Do you understand the question?

4            THE DEPONENT:  On the credit card statement.

5            MR. ISON:  I'm going to object as being vague

6  and ambiguous because I didn't understand the

7  question.  I'm not sure the witness did.

8  BY MR. CAMPAGNA:

9      Q.   Did you review the credit card charges before

10  they were paid in your personal credit card, this Amex

11  Business Platinum?

12     A.   No.

13     Q.   Did you ever review the credit card charges?

14     A.   Maybe sometimes.  I don't recollect.

15     Q.   Now I'm confused.

16     A.   The charges statements went to the

17  accountant.

18     Q.   Was it up to the accountant then to identify

19  which charges were personal and which ones were

20  SearchTech Medical related?

21     A.   The ones that were SearchTech Medical related

22  were already entered in the Quickbooks.  So he would be

23  able to -- if there was some charges that I did not

24  communicate to him, he would ask me right away because

25  they were not booked in Quickbooks.

Case: 10-05196   Doc# 105-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 1 of 25

1    Q.   If they were personal charges you're saying

2  that they were not booked in Quickbooks?

3    A.   Unless I communicated to him that there were

4  some charges.

5    Q.   So was it up to the accountant to determine

6  which of the charges on your personal Amex Business

7  Platinum Card were SearchTech Medical versus Deepak

8  Chopra related?

9    A.   Yes.

10   Q.   This was your personal credit card; correct?

11   A.   It was a personal credit card guaranteed by

12  me.

13   Q.   Pardon?

14   A.   It was a personal credit card SearchTech

15  Medical -- I mean, it was an American Express credit

16  card issued to me and I was the guarantor of the credit

17  card.  Even though it was issued to SearchTech Medical

18  I was the person guaranteeing the card.

19   Q.   And you allowed SearchTech Medical to use your

20  personal credit card?

21   A.   Yes.

22   Q.   The company SearchTech Medical was receiving

23  the credit card statements; correct?

24   A.   Correct.

25   Q.   The accountant in particular would receive the

Case: 10-05196   Doc# 103-2   Filed: 07/23/12   Entered: 08/16/12 15:33:35   Page 2
of 25
TORREANO SHORTHAND REPORTING (866) 169-3-DEPO

1   credit card statements; correct?

2      A.   Correct.

3      Q.   And the accountant would look at the credit

4   card statements and enter the information into the

5   SearchTech Medical Quickbooks for this credit card

6   statement; is that correct?

7      A.   Incorrect.  He would compare the Quickbooks

8   statements with the credit card.  He already entered

9   the charges that were made because that was

10   communicated to him already.  So he would compare the

11   credit card statement with the Quickbooks and make sure

12   they matched.

13      Q.   To make sure that all the entries on the

14   credit cards were also entered into the Quickbooks?

15      A.   Yes.

16      Q.   Your understanding was that the normal

17   practice was a charge would be made on the credit card

18   and somebody would verbally tell the accountant to

19   update the Quickbooks for the credit card?

20      A.   Yes.  That's what my understanding was.

21      Q.   And that's how you would communicate to the

22   accountant was verbally that you made certain charges

23   and added on the statement?

24      A.   I would communicate or he would find them on

25   the statement and then communicate with me saying those

1    charges were on the credit card and whom he should book

2    those credit card charges to because they were not part

3    of SearchTech Medical.

4        Q.   And you did say that very view of the charges

5    on this Amex Business Platinum card were personal in

6    nature?

7        A.   I don't know how many -- what you mean by

8    "few."  I don't recollect.

9        Q.   I thought that that's what you had said.  So

10   now that you're saying you don't recollect something?

11       A.   It depends on how many --

12            MR. ISON:  Objection.  Argumentative.

13            THE DEPONENT:  Maybe 10, 15, 20 percent was

14   personal.  The rest was to the company.  I don't know

15   the percentage.

16   BY MR. CAMPAGNA:

17       Q.   So whether the charge was SearchTech Medical

18   related or personally related, it would appear on the

19   Amex Quickbooks ledger for this credit card unless

20   there was a mistake made; is that correct?

21       A.   I don't know -- I do not know exactly how they

22   would book it, but it's approximately true that

23   everything on the American Express card should have

24   appeared on the SearchTech ledger.  I cannot --

25       Q.   Are there any times when you directed an

Case: 10-05196   Doc# 105-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 4 of 25

1   accountant or CEO or anybody to not put a charge that

2   appeared on the credit card on the Quickbooks?

3       A.  Unless I paid it personally.  Sometimes I

4   would pay it personally from my account, also.  I don't

5   remember how many times, but most of the time it was

6   the accountant would take care of it.

7           MR. CAMPAGNA:  Could you repeat my question.

8           THE COURT REPORTER:  "Question:  Are there any

9           times when you directed an accountant or CEO

10          or anybody to not put a charge that appeared

11          on the credit card on the Quickbooks?"

12          THE DEPONENT:  I don't recollect that.

13  BY MR. CAMPAGNA:

14      Q.  Is it possible?

15          MR. ISON:  Objection.  Calls for speculation.

16          THE DEPONENT:  I have no idea.  You'd have to

17  ask the accountant.  I can give you the names of the

18  accountants.

19  BY MR. CAMPAGNA:

20      Q.  But I'm asking whether you did it.

21      A.  I don't recollect.

22      Q.  Did you in communicating with the accountant,

23  you would tell them, for example, "This is a personal

24  charge.  This goes to me, not SearchTech."  Right?  You

25  would do that much; correct?

TORREANO SHORTHAND REPORTING (866) 769-DEPO

1      A.  I would or he would.

2      Q.  Or the accountant would.  Okay.  The

3 accountant would come to you and say, "Deepak, this is

4 a personal charge to you, isn't it?"

5      A.  Yes.

6      Q.  And then you would say yes or no?

7      A.  Yes.

8      Q.  And the accountant would book it accordingly?

9      A.  Yes.

10      Q.  In the conversations that you had with the

11 accountant about this credit card, is there a time when

12 you would say leave that line item off the Quickbooks?

13      A.  No.

14      MR. CAMPAGNA:  I'm going to mark the next

15 exhibit Exhibit 138.

16      (EXHIBIT 138 WAS MARKED FOR IDENTIFICATION.)

17 BY MR. CAMPAGNA:

18      Q.  Do you recognize this document?

19      A.  No.

20      Q.  It says statement for a credit card ending in

21 number 03001.  And there's some charges on here, for

22 example, 1/13/06, Valley Yellow Pages advertisement.

23      Do you see that charge there?

24      A.  Yes, yes.

25      Q.  Are you familiar with that charge?

1     A.  No.

2     Q.  How about the COMM San Diego Cable Services,

3 1/13/06?

4     A.  No.

5     Q.  And under where it says "New Activity for

6 Avinash C. Chopra," Verizon wireless cell phone,

7 45.31.  Do you see that there?

8     A.  Yes.

9     Q.  Are you familiar with that charge?

10    A.  No.

11    Q.  It appears to be paying your Dad's cell phone,

12 but you don't recall that your personal credit card was

13 being used by your father?

14    A.  Accountants should have booked it rightly.  I

15 don't know.  I don't know.  I don't recall.

16    Q.  Would you agree that there's a difference

17 between whether the accountant is booking something

18 rightly and your father being authorized to use your

19 personal credit card?

20    A.  I don't -- I don't know if my father was

21 authorized to use it or not.

22    Q.  Well, it shows here "New Activity for Avinash

23 C. Chopra."  So somehow his name, the name your father

24 was added to your personal credit card; correct?

25    A.  Correct.

Case: 10-05196  Doc# 105-2  Filed: 07/23/12  Entered: 08/10/12 15:33:35  Page 7 of 25

1       Q.   Did you add your father to your personal

2  credit card?

3       A.   I added a lot of people to this credit card.

4       Q.   Was your father --

5       MR. ISON:  He asked you if you added your

6  father.

7            THE DEPONENT:  I must have.

8       MR. ISON:  Not if you --

9            THE DEPONENT:  I must have if he appears

10  here.

11  BY MR. CAMPAGNA:

12      Q.   Would anybody else have added your father to

13  your personal credit card?

14      A.   I have no idea.

15      Q.   If it was added, it would have been added by

16  you; is that correct?

17      A.   Or the person that was authorized to add for

18  me.

19      Q.   Which was?

20      A.   It was Angelina, the accountant.

21      Q.   They would have been doing that at your

22  request; is that correct?

23      A.   True.

24      Q.   If you look at the previous exhibit, 137, you

25  see on 12/28/2005.

Case: 10-05196   Doc# 105-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 8 of 25

1          I identified the wrong date.  I'm looking at

2    actually 1/13/2006.  It's these Arrowhead charges on

3    the first page of Exhibit 137.

4          Can you see how those Arrowhead charges

5    correspond to the four Arrowhead charges that appear in

6    the top four lines of the latest exhibit, Exhibit 138?

7          A.   Uh-huh, yes.

8          Q.   Okay.  And then there's the -- also on 1/13/06

9    there's the Valley Yellow Pages for 1,409.78.

10         A.   Yes.

11         Q.   Do you see how it's not listed on the

12   Quickbooks?

13         A.   Yes.

14         Q.   Do you have any personal knowledge of why that

15   statement does not appear on the Quickbooks?

16         A.   I have no idea.

17         Q.   How about for the San Diego Cable Services of

18   718 on 1/16/08?

19         A.   I have no idea.  Ask the accountant.  No

20   idea.

21         Q.   You said no idea and I should ask the

22   accountant; is that correct?

23         A.   Yes.

24         Q.   And 12/28/05 I believe is the date I was

25   alluding to earlier.  You note that that also doesn't

                                                           780

1    appear on Exhibit 137?

2         A.   Okay.

3         Q.   Is that correct?

4         A.   It doesn't appear.  It doesn't appear.  Yeah,

5    that's correct.

6              MR. CAMPAGNA:  The next exhibit is Exhibit

7    139.

8              (EXHIBIT 139 WAS MARKED FOR IDENTIFICATION.)

9    BY MR. CAMPAGNA:

10        Q.   We're also going to compare Exhibit 139 to

11   Exhibit 137.  The first charge there is for CINGWS.

12   Maybe that's Cingular Wireless telephone service for

13   $362.65.  Do you see that there?

14        A.   Yes.

15        Q.   Can you identify that charge on the Quickbooks

16   ledger, Exhibit 137?

17        A.   It's right here.  Cingular Telephone, AT&T

18   Wireless.

19        Q.   362.65?

20        A.   Yes.

21        Q.   So you go down to 1/19/06.  Lexis-Nexis

22   invoice for computer services, 639.90.

23        A.   Yes.

24        Q.   Can you identify that charge on this ledger?

25        A.   I don't see that charge.

1      Q.  So you agree it doesn't appear on the ledger?

2      A.  No.

3          MR. ISON:  Objection.  The document speaks for

4  itself.

5  BY MR. CAMPAGNA:

6      Q.  And the new activity for Avinash C. Chopra,

7  1/28/06.  Do you see that charge on Exhibit 137?

8      A.  No, I don't see that charge.

9          MR. CAMPAGNA:  Previously we may have

10 discussed -- actually, let's take a break.

11         MR. ISON:  How much more do you have?  We are

12 going to finish today.  Right?

13         MR. CAMPAGNA:  We are going to finish today.

14         MR. ISON:  It's one of my fondest dreams is to

15 finish this deposition.

16         (Recess taken.)

17 BY MR. CAMPAGNA:

18     Q.  Before we get to JMD I did have a question

19 about the reimbursements that you mentioned

20 previously.  How were the reimbursements done of your

21 personal charges to SearchTech Medical?

22     A.  They were booked against my loan because the

23 loan -- I had given the company a bridge loan.  They

24 were paid directly and not booked into Quickbooks.

25     Q.  They were what?

Case: 10-05196   Doc# 103-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 11 of 25

1    A.  Paid directly by the individual, by me, for

2  example, and were not booked into Quickbooks, some of

3  them.  Like if I paid a direct bill directly from my

4  account into American Express, then he would just

5  ignore that because it would not show up in the

6  ledgers.

7    Q.  How about the one, for example, that $1,500

8  charge that was for the Yellow Pages?  That wasn't

9  booked into Quickbooks.  Was that for you?

10    A.  No, it was not for me at all.  We advertise in

11  the Yellow Pages, SearchTech Medical did, all the

12  time.

13    Q.  But that would have been -- that's an example

14  of a charge appearing on a credit card statement, but

15  not being booked into Quickbooks?

16    A.  That could have been reversed next month.  So

17  then he didn't book it.

18    Q.  Pardon?

19    A.  It could have been refunded.  So he didn't

20  book it maybe.  I don't know why he wouldn't book it.

21    Q.  So I want to put the reimbursements sort of in

22  colloquial terms because you've given money to

23  SearchTech through a bridge loan and other loans;

24  correct?

25    A.  Correct.

Case: 10-05196   Doc# 105-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 12 of 25

1    Q.  And so when you then made charges on your

2   personal credit card that SearchTech paid, you would

3   essentially be running up a tab on or against the loan

4   or loans previously given to SearchTech?

5    A.  Or just paid directly through my checking

6   account to American Express.  In that case the charge

7   would not appear on the Quickbooks.  That depended upon

8   the accountant at that time.

9    Q.  How would it be different from one accountant

10  to another?

11   A.  It would not be different.  I would write a

12  check directly into American Express and mail directly

13  that check.  It would not show up in the Quickbooks.

14  It depended -- if you booked it against my loan, it

15  would show up in the Quickbooks or I could reimburse it

16  with a check.

17       You'd have to go into the Quickbooks to find

18  out, you know.  There was a lot of ways that it was

19  done.  Those costs were all accounted for.

20   Q.  Pardon?

21   A.  It was accounted for.

22   Q.  Right.  But the way that it was accounted for,

23  was that directed by the particular accountant at the

24  time or was that directed by you?

25   A.  It was a joint effort.  If I elected to pay a

TORREANO SHORTHAND REPORTING (866) 760-DEPO
Case: 10-05196   Doc# 105-2   Filed: 07/23/12   Entered: 08/10/12 15:33:35   Page 13
of 25

1  bill, then he would not book it in Quickbooks.

2      Q.  Pardon?

3      A.  If I elected to pay the bill directly, I saw

4  something and wrote a check to him to send to American

5  Express, he would not book it in Quickbooks.  But if we

6  did not pay a check, it would show up in Quickbooks or,

7  if the entry was reversed, it wouldn't show up in

8  Quickbooks.  If somebody was charged and then removed,

9  it would not show up in Quickbooks.

10     Q.  The parts that were reimbursed to you, they

11 went against monies you had previously loaned?

12     A.  Monies previously loaned.  It was my personal

13 account or he would ask me for a check.  I don't know

14 how it would work.  You have to look in the

15 Quickbooks.

16         MR. CAMPAGNA:  We're going to mark the next

17 exhibit Exhibit 140.

18         (EXHIBIT 140 WAS MARKED FOR IDENTIFICATION.)

19 BY MR. CAMPAGNA:

20     Q.  Do you recognize this document?

21     A.  Yes.

22     Q.  This is the account statement, a series of

23 account statements for the business platinum credit

24 card that we've been talking about; is that correct?

25     A.  Yes.

1    Q.   And you've testified that this is the type of

2    statement that went directly to the accountant;

3    correct?

4    A.   Correct.

5    Q.   SearchTech Medical received this at its

6    office?

7    A.   Yes.

8    Q.   You did not receive this at your residence?

9    A.   Correct.

10   Q.   And it's also your testimony that you didn't

11   review these credit card statements themselves; is that

12   correct?

13   A.   Correct.

14   Q.   Unless the accountant brought something to you

15   to your attention; is that correct?

16   A.   Correct.

17   Q.   Okay.  And if you look at what's marked in the

18   bottom center of one of the pages marked 1250 -- it

19   looks like a Bates label, page 1250.  Are you on that

20   page?

21   A.   Yes.

22   Q.   It says "prepared for Deepak Chopra," under

23   that "SearchTech, Inc."

24        Do you see that there?

25   A.   Yes.

1        Q.   And then down in the bottom half of this page

2   it says "card member snapshot" and then there's a list

3   of ten people.

4        A.   This one.

5        Q.   Do you see that list of ten people?

6        A.   Yes.

7        Q.   You mentioned that there were a lot of people

8   who had copies of your personal credit card?

9        A.   Yes.

10       Q.   So it would be you, your wife, your father.

11  That's you, Mr. Chopra, then Kathleen Chopra, your

12  father Avinash Chopra, Flora Ng, Michele Archuleta,

13  Gary Wimp, Serena Bem, Randeep Singh Rand, Jeanette

14  Munoz, Angelina Soria?

15       A.   Yes.

16       Q.   Did Flora Ng work for SearchTech Medical?

17       A.   I don't know if she did, but I think she was

18  not there for too long, but it was removed.  She may

19  just be initially there, but I don't think she was

20  there at all.  I don't think there were too many --

21  there were no charges against her.

22       Q.   Well, if you go over to the right-hand column,

23  it shows new activity for each of the cardholders.

24  There's $150 against Flora Ng.

25       A.   That's a charge for joining the program;

Case: 10-05196   Doc# 103-2   Filed: 07/23/12   Entered: 08/10/12 15:33:33   Page 16 of 25

TORREANO SHORTHAND REPORTING (866) 760-DEPO

```
 1   right?

 2        Q.   I'm not sure what that charge is for.

 3        A.   Well, let me go ahead and look at this.

 4        Q.   Mr. Chopra?

 5        A.   It's a $150 yearly fee, I think.

 6        Q.   Is that the same firm, Michele Archuleta?

 7        A.   I think so.

 8        Q.   That's the Michele that you referred to

 9   earlier in the deposition; correct?

10        A.   Yes.

11        Q.   And Gary wimp?

12        A.   Yes.

13        Q.   Did Ms. Archuleta and Mr. Wimp have the credit

14   card for a short period of time as Flora Ng did?

15        A.   Yes.

16        Q.   Do you recall the circumstances?

17        A.   They were part of the company.  She was HR

18   manager.  He was the CEO.

19        Q.   And so if you look at the charges for you,

20   12,297.93.  Looking back to page 1250.

21        A.   Which page is it?

22        Q.   1250.

23        A.   1250?

24        Q.   And it shows the closing date 12/15/07 and it

25   has a figure for you of about $12,000?
```

788

Case: 10-05196   Doc# 105-2   Filed: 07/25/12   Entered: 08/10/12 15:33:35   Page 17 of 25

1     A.   Yes.  Yes.

2     Q.   Any idea whether those charges would be for

3  you personally or for SearchTech Medical?

4     A.   You'd have to look at the detail to find out.

5     Q.   And so when we look at the detail we expect to

6  see the percentage of about 15 to 20 percent personal

7  that you had mentioned earlier?

8     A.   I'm sure.

9     Q.   JMD Investments is a company that has come up

10  in the course of this deposition.  That's Juan

11  Carmona's company; correct?

12     A.   Correct.

13     Q.   Could you approximate the time when JMD

14  Investments started?

15     A.   No, I can't approximate.

16     Q.   Now we know it was involved with the Biloxi

17  properties; is that correct?

18     A.   I have no idea.

19     Q.   At any time did you personally have ownership

20  in JMD Investments?

21     A.   I did at the beginning.  We talked about

22  having some ownership and some documents exchanged, but

23  it never went through.  He has all the ownership.  The

24  documents were cancelled and it was just not -- it was

25  his company.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Q.   So it was just all Juan Carmona from the

2  beginning?

3    A.   In the beginning there was some documents

4  exchanged between Juan and myself.  And I don't

5  recollect, but it was all Juan Carmona, you know.  It

6  was never initiated.  He owned it.  In the beginning we

7  decided to have some ownership interest.  I think it

8  was discussed and some documents were there, but it

9  never happened.

10    Q.   And then it turned out that in discussions

11  with Mr. Carmona that you wouldn't, in fact, have

12  ownership in JMD Investments; is that your testimony?

13    A.   True.

14    Q.   And do you know what the purpose of JMD

15  Investments was?

16    A.   I have no idea.

17    Q.   Do you know what it did?  In other words, did

18  it own property?  Did it serve as a broker, as you've

19  mentioned regarding one of your own personal entities?

20    A.   I think he owned properties.

21    MR. CAMPAGNA:  Okay.  I'm going to mark the

22  next exhibit Exhibit 141.

23    (EXHIBIT 141 WAS MARKED FOR IDENTIFICATION.)

24  BY MR. CAMPAGNA:

25    Q.   This is an e-mail dated Monday, October 31st,

TORREANO SHORTHAND REPORTING (866) 760-DEPO
Case: 10-05196   Doc# 185-2   Filed: 07/25/12   Entered: 08/10/12 15:33:35   Page 19
of 25

1   2005 from Juan Carmona to Mr. Husain.  The subject is

2   Biloxi project invoice.  I know it doesn't appear that

3   you're on this e-mail.  Do you recognize this e-mail at

4   all?

5        A.   No.

6        Q.   Are you familiar with the term "Marc Resort"?

7        A.   No.

8        Q.   If you turn to the second page of this exhibit

9   it says "Iqbal Husain" in the upper left-hand corner.

10  And then in the table there are five units, unit 17,

11  unit 60, unit 80, unit 63 and unit 48.

12            Are you familiar with those units?

13       A.   No.

14       Q.   If you look at the e-mail October 31st, 2005,

15  that's a time when SEC Venture Group, LLC was owned by

16  whom?

17       A.   Juan, Dave Cagley and me, myself.  And Chopra

18  Enterprises.

19       Q.   How much did you own?

20       A.   I think 25 percent or 26 percent -- 25

21  percent, I think.

22       Q.   How about Mr. Cagley?

23       A.   17 percent.

24       Q.   How about Mr. Carmona, Juan?

25       A.   17 percent, close to.

1    Q.  And how about Chopra Enterprises?

2    A.  25 percent or 26 percent, I think.  They owned

3    25 percent, 24, 25 percent each.  I'm not sure of the

4    numbers.  Me and Chopra Enterprises owned 50 percent

5    and they owned 50 percent, I think, something like

6    that.  That was the ratio.

7    Q.  In the middle of this page it says:  "Make

8    check payable to SEC Venture Group, total due

9    53,666.20, includes closing costs."  Do you see that?

10       It's still on the second page.  You're on the

11   fourth page.

12   A.  Yes.

13   Q.  Do you have any understanding of what this

14   $53,000 figure was for?

15   A.  No.

16   Q.  You don't recall this transaction?

17   A.  No.

18   Q.  So if there was a check being payable to SEC

19   Venture Group in October of 2005, who would be handling

20   that check for SEC Venture Group?

21   A.  Juan Carmona and Dave Cagley.

22   Q.  Okay.  And I am asking because if you turn to

23   page 3 you can see that there's a check in the amount

24   of $50,000 signed by what appears to be Iqbal Husain on

25   10/4/05 to SEC Venture Group.

1          A.   Yes.

2          Q.   And then if you look at page 4, there's

3     another check that appears to be written by Mr. --

4     signed by Mr. Husain dated 11/08/05 for $41,166.20.

5               Do you see that there?

6          A.   Yes.

7          Q.   Since you're not familiar, Mr. Carmona and

8     Mr. Cagley would be the ones to ask about this

9     particular transaction?

10         A.   Yes.

11              MR. ISON:   Okay.  I need to take a short break

12    here.

13              MR. CAMPAGNA:   That's fine.

14              (Recess taken.)

15    BY MR. CAMPAGNA:

16         Q.   In 2005 what was the relationship between SEC

17    Venture Group LLC and JMD Investments LLC?

18         A.   I cannot recollect.

19              MR. CAMPAGNA:   We're going to mark the next

20    exhibit Exhibit 142.

21              (EXHIBIT 142 WAS MARKED FOR IDENTIFICATION.)

22    BY MR. CAMPAGNA:

23         Q.   This is a document with "Oak Glen" written at

24    the top, G-L-E-N, closing fund control and disbursement

25    for unit 48.

1              Do you recognize this document?

2      A.    No.

3      Q.    Do you recognize this general form --

4      A.    No.

5      Q.    -- of the document?

6      A.    No.

7      Q.    Do you recognize the handwriting on this

8   document?

9      A.    No.

10     Q.    Previously you had testified that you didn't

11  purchase any property in Biloxi, Mississippi jointly

12  with Mr. Husain; is that correct?

13     A.    I don't recollect.  I don't recollect

14  purchasing any properties.

15     Q.    Pardon?

16     A.    I don't recollect purchasing any properties.

17     Q.    I thought that you said previously that you

18  for sure didn't buy any property with Mr. Husain, that

19  you bought the properties with your own money.

20     A.    True.

21     Q.    Which part is true?

22     A.    I bought the properties with my money.

23     Q.    And so your testimony is that you don't recall

24  whether you purchased any Biloxi, Mississippi

25  properties with Mr. Husain; is that correct?

1      A.  Correct.

2      Q.  There are initials at the bottom center of

3 this -- this spreadsheet.  Do you recognize those

4 initials?

5      A.  No.

6      Q.  Could they be for Grant McPhail?

7      A.  I have no idea.

8      Q.  Are you familiar with Grant McPhail?

9      A.  I'm familiar with Grant McPhail.

10      Q.  How are you familiar with Grant McPhail?

11      A.  Because he was a developer of the properties

12 in Oak Glen Marina, Oak Glen Marina.

13      Q.  How do you know that Grant McPhail was the

14 developer of the properties in -- did you say Oakland

15 Glen Marinas?

16      A.  Oak Glen Marina.

17      Q.  Oak Glen Marina?

18      A.  I think so.  It's spelled Oak Glen Marina.

19      Q.  O-A-K?

20      A.  I have -- It's Oak, Oak Glen.  I don't know --

21 I don't know how to spell it.

22      Q.  It's probably as it is at the top of the page

23 here?

24      A.  Yes.

25      Q.  Okay.  Oak Glen Marina.  How do you know that

Case: 10-05196   Doc #185-2 Filed 07/23/12 Entered 08/10/12 15:33:35   Page 24 of 25

 1   Mr. Grant McPhail was the developer of the Oak Glen

 2   Marina properties?

 3        A.   Because I talked to Dave Cagley, Juan.  They

 4   went to Biloxi.  And I talked to Grant myself a couple

 5   of times.

 6        Q.   What did you talk about?

 7        A.   He was developing a project out there and he

 8   was selling his project to investors.  I never met the

 9   guy.  I just talked to him on the telephone.

10        Q.   What was your role in the development?

11        A.   None.

12        Q.   If any?

13        A.   None.

14        Q.   Did you have any role in getting investors for

15   the property?

16        A.   He wanted us to.

17        Q.   Who is "he"?

18        A.   Grant.

19        Q.   Grant McPhail wanted who?

20        A.   He wanted investors.  He wanted people to buy

21   his project.  He was selling his properties.

22        Q.   He was selling his properties and he wanted

23   investors; is that correct?

24        A.   I don't know about investors.  He wanted

25   people to buy his properties.

Case: 10-05196   Doc 105-2  Filed 07/23/12  Entered 08/10/12 15:33:35   Page 25 of 25

TORREANO SHORTHAND REPORTING  (866)  760-DEPO