```
1    promissory note against this property.
2         Q.   How much was the promissory note that he had
3    against the property?
4         A.   $250,000.
5         Q.   And what is LDE Group?
6         A.   It's the LLC that owned this property.
7         Q.   Okay.  Did you have an interest in LDE Group,
8    LLC?
9         A.   I did.
10        Q.   What was your interest in LDE Group, LLC at
11   the time that it owned this Molokai -- excuse me,
12   Manila Camp property?
13        A.   I don't remember the percentage, but I think
14   it was like -- it was -- I think it was 100 percent and
15   Ashraf was supposed to own 33 percent, Tharwani, but
16   she didn't really decide if she wanted to own it or not
17   and she had invested in NB $50,000.
18        Q.   That was Ashraf Tharwani you said?
19        A.   Yes.
20        Q.   Was supposed to have 33 percent interest in
21   it, in LDE.  So she put $50,000 --
22        A.   Yes.
23        Q.   -- into LDE Group, LLC to acquire a 33 percent
24   interest?
25        A.   Yes.
```

1  Q. But then she -- what did she do? Did she
2  disclaim her 33 percent interest in LDE?
3  A. She never really gave us a definite answer.
4  She wanted to convert it sometime to a note. Sometimes
5  she wanted 33 percent. She was not paying any
6  negatives that we had on this property. So it was mere
7  land, a piece of land.
8  Q. This is the Molokai property. Manila Camp is
9  Molokai; correct?
10  A. True.
11  Q. And you said "we." Do you mean Chopra
12  Enterprises Corporation as well as LDE Group, LLC?
13  A. This was owned by my name, I think, if I'm not
14  mistaken. LDE was owned by Chopra, Deepak Chopra.
15  Q. 100 percent?
16  A. 100 percent with -- with Tharwani's 33
17  percent, if she wanted to convert that 33 percent,
18  which would have been 67 percent and 33 percent.
19  Q. What happened to Ms. Tharwani's $50,000 that
20  she invested with LDE Group, LLC?
21  A. LDE still owes that money to her.
22  Q. Pardon?
23  A. LDE still owes the money to her.
24  Q. Okay. So who is David Patterson?
25  A. He owned the land.

1  Q. He owned it outright?
2  A. I have no idea if he borrowed money against it
3  or not.
4  Q. And if I'm understanding this correctly, he
5  quitclaimed it to you for a dollar?
6  A. That's just the procedure in Hawaii when they
7  do it. There's a promissory note attached to that.
8  Q. Do you have a copy of the promissory note
9  yourself?
10 A. No. I don't own LDE anymore.
11 Q. Who owns LDE?
12 A. Dilip.
13 Q. Dilip. Gunawardena?
14 A. He's the managing manager of LDE.
15 Q. This is coming back to me. Is this the
16 property that's owned --
17 A. Dilip and Sonia.
18 Q. Dilip and Sonia? Dilip owns LDE Group, LLC
19 100 percent?
20 A. 51 percent.
21 Q. Oh. 51 percent. And Sonia Chopra owns it 49
22 percent?
23 A. Yes.
24 MR. CAMPAGNA: I'm going to mark the next
25 exhibit Exhibit 150.

```
1              (EXHIBIT 150 WAS MARKED FOR IDENTIFICATION.)
2    BY MR. CAMPAGNA:
3        Q.   Do you recognize this document?
4        A.   No, I don't.
5        Q.   The document states the property record
6    information for Bally -- B-A-L-L-Y -- bunion Lane,
7    B-U-N-I-O-N, LN for Lane in the Township of McNeill.
8             Are you familiar with that property?
9        A.   McNeill?  No.
10       Q.   Are you familiar with the Ballybunion Lane
11   property?
12       A.   No.
13       Q.   So it says the owner information is Deepak
14   Chopra and then it says "custodian for."  And then if
15   you look to the right of that, the deed information is
16   National Golf Club Lot 322.  Are you familiar with
17   National Golf Club Lot 322?
18       A.   Yes, I am.
19       Q.   How are you familiar with National Golf Club
20   Lot 322?
21       A.   That was a property we got back from an
22   investment that I had made in a company that went
23   bankrupt and the Trustee gave us properties -- gave
24   each of us properties, a small amount of properties,
25   which are worthless or had had some value.  So this was
```

```
 1  a property that I -- that I owned with two other
 2  people.
 3       Q.   Who did you own it with?
 4       A.   With Farri Ouraie.
 5       Q.   Can you spell that, please.
 6       A.   F-E-R-R-I  O-R-R-I-E.
 7            MR. ISON:  O-U-R-I-E?
 8            THE DEPONENT:  O-U-R-I-E.  Farri Ouraie.
 9  BY MR. CAMPAGNA:
10       Q.   Is Farri F-E-R-R-I or F-A-R-R-I?
11            MR. ISON:  I believe it's F-A-R-R-I.
12            THE DEPONENT:  F-A-R-R-I.
13            And Mr. Cook.  Dr. Cook.
14  BY MR. CAMPAGNA?
15       Q.   Is it Matthew cook.
16       A.   Matthew Cook.
17       Q.   What was the company that you owned with --
18  that went bankrupt -- excuse me.
19            What was the company that you invested in that
20  went bankrupt?
21       A.   Mr. Husain invested with me.  I don't remember
22  the name.  Maybe Mr. Husain can remember the name.
23       Q.   What type of company was it?
24       A.   It was building golf courses.
25       Q.   So that -- the company that was building golf
```

```
 1   courses, you say you invested in it.  Does that mean
 2   that you also owned it?
 3        A.   No.  I just invested like everybody else.  I
 4   was an investor.
 5        Q.   And so it was owned by Farri Ouraie and
 6   Dr. Cook?
 7        A.   It was a company owned by -- it's for the
 8   company owned by -- it was a company owned by who owned
 9   it.  It was a huge company and we all invested in it.
10        Q.   Okay.  You were all investors as was
11   Mr. Husain?
12        A.   Yes.
13        Q.   Okay.  So when that -- after that company went
14   bankrupt you personally received ownership of the
15   National Golf Club Lot 322.  Is that what happened?
16        A.   Me and the two others.
17        Q.   You and the two others shared it?
18        A.   Yeah.
19        Q.   What percentage?
20        A.   I don't remember the percentage, but we all
21   three are on title.
22        Q.   Probably a third each?
23        A.   I don't remember the percentage.  It should
24   have been in the deed.  I don't remember the
25   percentage.
```

1  Q. And it was your -- it was owned by -- in part
2  by you personally or was it owned by one of your
3  companies?
4  A. Personally. I invested personally. I'm not
5  sure. Okay? I think I invested personally, but I
6  don't know. It could have been CEC. I'm not sure. So
7  I can't say who owned it. Either me or CEC owned it.
8  Q. At some point you or CEC transferred the
9  ownership interest to Sonia Chopra; is that correct?
10  A. That's correct.
11  Q. When did you do that?
12  A. 2000 -- I don't remember the date. Maybe
13  2007, 2008. Somewhere in that -- I don't have
14  information.
15  Q. What makes you say 2007 to 2008 as opposed to,
16  say, 2009 or 2010?
17  A. Because 2009 I think because I remember the
18  company went belly up in 2007, early 2008. And then it
19  took them -- I think took the Trustee nine, ten months
20  to decide.
21  Q. That was the golf course company that went
22  belly up in 2007 or 2008?
23  A. Yes.
24  Q. And how much time did it take the Trustee to
25  decide on the ownership?

823

1  A. A long time. Because he -- long time. I
2  would say a year maybe, eight months, a year.
3  Q. Okay. So if the company went belly up in
4  2007, then it would have been 2008. It would have been
5  a year for the Trustee to decide on the ownership of
6  the property?
7  A. I have no idea. Look at the dates. I have no
8  timeline on that.
9  MR. CAMPAGNA: I'm going to mark the next
10 exhibit Exhibit 151.
11 (EXHIBIT 151 WAS MARKED FOR IDENTIFICATION.)
12 BY MR. CAMPAGNA:
13 Q. Do you recognize this document?
14 A. This is the National Golf Club for lot 322.
15 Q. Pardon?
16 A. It's the same document you showed me. This is
17 the golf club document. I recognize the document. I
18 don't recognize what's in it, but I recognize the name
19 on the bottom, National Golf Club Lot 322.
20 Q. You recognize it as the same piece of property
21 that we discussed in relation to Exhibit 150; is that
22 correct?
23 A. Yes.
24 Q. And that essentially is a piece of undeveloped
25 land?

1    A.   Yes.

2    Q.   And that's in North Carolina?

3    A.   Yes.

4    Q.   Before the transfer to Ms. Chopra, what was the value of your interest in the property?

6    A.   I don't recollect. It was three people who owned the property.

8    Q.   What was the total value of the property?

9    A.   About $15,000 maybe. I asked the real estate agent, several of them. Fifteen, ten, fifteen thousand dollars.

12   Q.   Ten, fifteen thousand dollars total?

13   A.   Yes.

14   Q.   What real estate agent did you ask?

15   A.   Brian Brenner.

16   Q.   B-R-E-N-N?

17   A.   E-R.

18   Q.   E-R?

19   A.   And the association who owns this property, the associate -- the golf association, I asked them also.

22   Q.   Did you ever have an appraisal done prior to the transfer to Ms. Chopra?

24   A.   I think Brian had -- Brian may have done the appraisal, I think.

1  Q. Did you ever see an appraisal for the property
2  prior to your transfer of your interest in the property
3  to your daughter Sonia?
4  A. I don't recollect. I'm sure I -- I don't
5  recollect, but I'm sure I have an appraisal on this
6  property.
7  Q. Why are you sure?
8  A. Because I asked him to do an appraisal on the
9  property when we first -- when we were talking to the
10 Trustee and we had put a lot of money and he gave up
11 this property. So I wanted to know how much I got
12 back, me and Farri both.
13 Q. Because of your discussions with the other
14 company, the Trustee that was involved in the golf
15 course company's bankruptcy?
16 A. Yeah. He gave us -- he gave each of us -- we
17 invested a large sum of money and he gave us the small
18 property. So we wanted to know what the property was
19 worth because we were thinking of selling it at that
20 time or keeping it. And we couldn't sell it because
21 it's not worth it. So we had to keep it, both me,
22 Farri and Dr. Cook.
23     MR. CAMPAGNA: We're going to go off the
24 record for about five to ten minutes.
25     (Recess taken.)

1     MR. CAMPAGNA: We're going to mark the next
2  exhibit Exhibit 152.
3     (EXHIBIT 152 WAS MARKED FOR IDENTIFICATION.)
4  BY MR. CAMPAGNA:
5     Q. Go ahead and look at that document and look up
6  when you're done.
7     Do you recognize that document?
8     A. Yes.
9     Q. How do you recognize it?
10    A. It's a transfer, a general warranty deed
11 transfer, from Chopra Enterprises to Sonia E. Chopra.
12    Q. Is that regarding the National Golf Club Lot
13 322 property?
14    A. Yes.
15    Q. If you look on the first page of the document,
16 do you recognize the handwriting "January 25th" where
17 the 2009 is crossed out and 2010 is written above it?
18    A. No.
19    Q. How about in the upper left-hand corner where
20 it says "Van Camp," something to that effect?
21    A. No.
22    Q. And do you see at the top right of the first
23 page where it says "recordation date, February 4th,
24 2010"?
25    A. Yes.

1  Q.  And if you turn to the second page of it,
2  there's a signature that appears to be yours.  Is that
3  your signature on page 2?
4       A.  Yes.
5       Q.  And did you sign this in front of the notary
6  that's identified on the third page?
7       A.  Yes.
8       Q.  Olga Gurevich, G-U-R-E-V-I-C-H?
9       A.  Yes.
10      Q.  Had she notarized things for you in the past?
11      A.  I don't recollect.  I don't recollect.
12      Q.  She's not your employee like Ms. Nunez; is
13 that correct?
14      A.  No.
15      Q.  She was not your employee like Ms. Nunez?
16      A.  No, no.
17          MR. CAMPAGNA:  We'll mark the next exhibit
18 Exhibit 153.
19          (EXHIBIT 153 WAS MARKED FOR IDENTIFICATION.)
20 BY MR. CAMPAGNA:
21          THE DEPONENT:  I think the attorney did it for
22 us in North Carolina.
23 BY MR. CAMPAGNA:
24      Q.  So turning your attention back to Exhibit 152,
25 how did you have this document recorded?

1  A. Through the attorney.

2  Q. Is that an attorney in North Carolina?

3  A. Yes.

4  Q. Now turning your attention to the exhibit
5  that's been marked 153, do you recognize that
6  document?

7  A. Yes.

8  Q. How do you recognize the document?

9  A. It's got this signature that I cannot forget.
10 Thomas A. Seaman, the trustee. His name is very
11 familiar to me.

12 Q. And what is this document?

13 A. It just gives us the part -- it gives us the
14 lot.

15 Q. Pardon?

16 A. It gives us the lot, one of the lots for the
17 investments we made.

18 Q. This is the one that we were talking about
19 previously that you couldn't recollect regarding your
20 investment with Ms. Ouraie and Dr. Cook?

21 A. Yes.

22 Q. Okay. And so this is the non-warranty deed
23 dated December 19th, 2007 between Mr. Seaman,
24 S-E-A-M-A-N, as the court-appointed receiver for the
25 Carolina Development Company, Inc., a Nevada

1 corporation.

2     Do you see that there?

3   A. Yes.

4   Q. So is the Carolina Development Company, Inc.
5 the company -- does that refresh your recollection
6 about the company that was the golf course development
7 company?

8   A. Yes.

9   Q. They are the ones that filed for bankruptcy
10 protection; correct?

11   A. Yes.

12   Q. Are you the one who had this document recorded
13 on January 7, 2008?

14   A. This particular?

15   Q. Yes.

16   A. I don't think so. I think they recorded it
17 for me.

18   Q. They being Ms. Ouraie or --

19   A. Thomas A. Seaman, I think.

20   Q. Seaman? Okay.

21     And it says here Grantee Chopra Enterprises
22 Corporation had a 66.6 percent interest; correct?

23   A. Correct.

24   Q. And that refreshes your recollection about
25 Chopra Enterprises' interest in that particular

1  property?
2      A.   Yes.
3      Q.   And then the remaining 16.7 percent interest
4  to Ms. Ouraie and 16.7 percent to Matthew Cook?
5      A.   Yes.
6      Q.   And you personally didn't have any ownership
7  interest that you were aware of; correct?
8      A.   Correct.
9      Q.   But at the time you were the sole owner of
10 Chopra Enterprises Corporation; is that correct?
11     A.   Correct.
12          MR. CAMPAGNA:  Mr. Chopra, thank you for
13 participating in your deposition.  There were a couple
14 times through the deposition where it seemed that
15 additional documents were identified and I had asked if
16 you would look for the documents that you identified
17 and supplement your previous production in that
18 regard.
19          That's something that Mr. Ison and I will work
20 out hopefully together in an amicable fashion with your
21 help in looking for the documents.
22          My preference is to keep your deposition open,
23 which means that I would have the ability to bring you
24 back for the purpose of questioning you on the
25 supplemental production of the documents that you

1  identified and which we'll pull out from the
2  transcript.
3        I understand that it's Mr. Ison's stance that
4  this deposition is concluded.  So Mr. Ison and I will
5  also need to work that out and hopefully we also do
6  that in an amicable fashion.
7        Does that encapsulate the respective point of
8  views sufficiently?
9        MR. ISON:  I just want to add that a
10 deposition is not a methodology for obtaining
11 additional documents.  So any cooperation we give on
12 this point will be voluntary.  And we'll try to work it
13 out, but from my point of view this deposition is over
14 and is not open.
15       MR. CAMPAGNA:  Right.  And from the
16 Plaintiff's point of view the disagreement would be
17 that the documents Mr. Chopra identified on the record
18 through this deposition were documents that he should
19 have produced earlier on in the case which he did not
20 produce earlier on in the case.
21       THE DEPONENT:  I don't know if I have the
22 documents or not.  I'd have to go check.
23       MR. ISON:  And I'm not agreeing that there are
24 ones he should have produced, but here we are.
25       MR. CAMPAGNA:  So for now we'll conclude and

```
 1  Mr. Chopra can go on to other matters.
 2          (Whereupon, the deposition of DEEPAK CHOPRA
 3  was adjourned at 5:02 p.m. this date.)
 4
 5                      ---oOo---
 6
 7  I certify under penalty of perjury that the foregoing
 8  is true and correct.
 9
10  Date _____    _____
11                              DEEPAK CHOPRA
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    REPORTER'S CERTIFICATE

 2         I, Peter Torreano, duly authorized to

 3   administer oaths pursuant to Section 2093(b) of the

 4   California Code of Civil Procedure, do hereby certify:

 5         That the witness in the foregoing deposition

 6   was administered an oath to testify to the whole truth

 7   in the within-entitled cause; that said deposition was

 8   taken at the time and place therein cited; that the

 9   testimony of the said witness was reported by me and

10   was thereafter transcribed under my direction into

11   typewriting; that the foregoing is a full and

12   accurate record of said testimony; and that the witness

13   was given an opportunity to read and correct said

14   deposition and to subscribe the same.

15         Pursuant to Federal Rule 30(e), transcript

16   review was not requested.

17         I further certify that I am not of counsel nor

18   attorney for any of the parties in the foregoing

19   deposition and caption named nor in any way interested

20   in the outcome of the cause named in said caption.

21         Dated:  February 13, 2012

22         _____
23         PETER TORREANO, CSR NO. 7623
```