UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FILED
JUL 23 2012
CLERK
United States Bankruptcy Court
San Jose, California
mm

In Re: )
)
DEEPAK CHOPRA, ) Case No.
) 10-52819
        Debtor. )
_____ )  **ORIGINAL**
)
IQBAL HUSAIN, ) Volume 3
) PP. 456-702
        Plaintiff, )
)
v. ) Adv. Proceeding No.
) 10-05196
DEEPAK CHOPRA, )
)
        Defendant. )
)
_____ )

## DEPOSITION OF DEEPAK CHOPRA

DATE:          January 27, 2012

TIME:          8:52 a.m.

LOCATION:      Berliner Cohen
                Ten Almaden Boulevard
                Suite 1200
                San Jose, CA   95113

REPORTED BY:   Peter D. Torreano, CSR, CRR
                Certified Shorthand Reporter
                License Number C-7623

**TORREANO**
SHORTHAND REPORTING, INC.

1999 S. BASCOM AVENUE
SUITE 700
CAMPBELL, CA 95008

MAIN    408.371.0464
FAX     408.371.0402

Case: 10-05196   Doc# 106   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 1 of 17

```
 1              A P P E A R A N C E S:

 2   For the Plaintiff:

 3          Berliner Cohen
            By:   MARCO M. CAMPAGNA
 4          marco.campagna@berliner.com
            Ten Almaden Boulevard
 5          Suite 1100
            San Jose, CA    95113
 6          (408) 286-5800

 7   For the Debtor and Defendant:

 8          Ison Law Offices
            By:   NEIL ISON
 9          isonlaw@yahoo.com
            P.O. Box 700622
10          San Jose, CA    95170
            (408) 621-6800
11
     Also present:
12
            IQBAL HUSAIN
13

14

15

...

25
```

457

EXHIBIT INDEX

| EXHIBIT | | MAR |
|---|---|---|
| 79 | Summary of Deposits to Wells Fargo on 09/20/2005 | 464 |
| 80 | Complete Appraisal of Swanner Property | 465 |
| 81 | Landtech Check Disbursement Statement | 469 |
| 82 | Check Copies of SEC Venture Group LLC | 486 |
| 83 | Regions Bank Statement | 489 |
| 84 | Regions Bank Statement | 492 |
| 85 | SearchTech Medical, Inc. 1555 Loan to Innova Financial Transaction Detail | 496 |
| 86 | Check 19713 | 497 |
| 87 | Check 3175 From Shiva Venture Group, Inc. | 500 |
| 88 | SearchTech Medical, Inc. Find Report | 503 |
| 89 | SearchTech Medical, Inc. Quickbooks - Check 20391 | 505 |
| 90 | Ison Law Offices Transactions re Flowers Case | 510 |
| 91 | Angelina Soria Payroll Account 8/28/2008 | 511 |
| 92 | Check 15724 | 514 |
| 93 | Check 16241 | 516 |
| 94 | Check 16340 | 517 |
| 95 | Check 4889 | 517 |
| 96 | Check 4891 | 518 |
| 97 | Check 1179 from ESC Properties LLC/Hillcrest Motel | 519 |
| 98 | Check 5009 | 521 |

# EXHIBIT INDEX

| EXHIBIT | | MAR |
|---|---|---|
| 99 | Check 458375 from Stanford Hospital & Clinics | 522 |
| 100 | California Bank & Trust Bank Statement dated July 31, 2009 to August 31, 2009 | 523 |
| 101 | California Bank & Trust Statement of Accounts | 525 |
| 102 | SearchTech Medical, Inc. California B&T2 | 528 |
| 103 | Summary of Deposits to Payroll Account | 530 |
| 104 | SearchTech Medical, Inc. Find Report | 531 |
| 105 | SearchTech Medical, Inc. Transactions by Account as of December 31, 2010 | 534 |
| 106 | E-mail from Gill to Husain dated March 10, 2005 and Attachments | 538 |
| 107 | E-mail from Gill to Husain dated March 17, 2005 and Attachments | 540 |
| 108 | E-mail from Wimp to Husain dated March 17, 2005 re Weekly Transfer | 544 |
| 109 | E-mail from Gill to Husain dated March 23, 2005 re Funding Request | 546 |
| 110 | E-mail from Wimp to Husain dated April 7, 2005 | 546 |
| 111 | E-mail from Wimp to Husain dated April 12, 2005 | 548 |
| 112 | E-mail from Chopra to Wimp Husain dated April 12, 2005 | 549 |
| 113 | E-mail from Wimp to Husain dated April 12, 2005 | 559 |
| 114 | E-mail from Ahmed to Husain, Wimp and Serena dated July 31, 2005 | 559 |

# EXHIBIT INDEX

| EXHIBIT | | MAR |
|---|---|---|
| 115 | E-mail from Husain to Wimp and Chopra dated April 14, 2005 | 564 |
| 116 | Complaint to Determine Dischargeability of Debt | 585 |
| 117 | Complaint | 595 |
| 118 | Chopra Enterprises Corporation Invoice dated 6/1/2006 | 614 |
| 119 | Agreement to Transfer Deed | 616 |
| 120 | Mortgage, Security Agreement, Assignment of Rents and Financing Statement | 622 |
| 121 | Title Search | 636 |
| 122 | Settlement Agreement and Mutual General Release | 643 |
| 123 | Buyer's Final Settlement Statement | 648 |
| 124 | Equity Share Agreement | 649 |
| 125 | Smith Barney Prestige Client FMA Plus Statement | 654 |
| 126 | North Carolina Deed of Trust | 655 |
| 127 | Deed of Trust with Assignment of Rents | 658 |
| 128 | Mortgage, Security Agreement, Assignment of Rents and Financing Statement | 659 |
| 129 | E-Mail from Chopra to Husain dated December 1, 2008 | 660 |
| 130 | Numbers as of 11/7/07 | 680 |
| 131 | E-Mail from Carmona to Husain dated October 31, 2007 | 686 |
| 132 | E-Mail from Carmona to Husain dated February 25, 2008 | 691 |

```
 1   San Jose, California              January 27, 2012
 2                   P R O C E E D I N G S
 3                       DEEPAK CHOPRA,
 4   called as a witness, after having been duly resworn by
 5   the Certified Shorthand Reporter to tell the truth, the
 6   whole truth, and nothing but the truth, testified as
 7   follows:
 8                        EXAMINATION
 9   BY MR. CAMPAGNA:
10        Q.   Good morning, Mr. Chopra.
11        A.   Good morning.
12        Q.   Turning back to Exhibit 78, which was the last
13   exhibit marked, we talked generally about line items on
14   this exhibit which you described as consulting income
15   for Chopra Enterprises Corporation.
16             Do you recall that?
17        A.   Yes.
18        Q.   And what you had stated was that either you,
19   Juan Carmona or David Cagley would have been the ones
20   to generate consulting income for Chopra Enterprises
21   Corporation.  Do you recall that?
22        A.   Yes.
23        Q.   If you turn to the fourth page of the exhibit,
24   September 20th, 2005, there is consulting income in the
25   amount of $100,000.
```

1  A. Uh-huh.

2  Q. If I recall your testimony correctly, and you
3  can correct me if I'm wrong, you don't remember where
4  that consulting income came from; is that correct?

5  A. No.

6  Q. You didn't at the time. And in looking at --
7  it's the fourth page of the exhibit. It's page 30 of
8  the Quickbooks, five lines up from the bottom where it
9  shows consulting income $100,000.

10  You don't recall that?

11  A. No, I don't.

12  Q. Do you recall ever receiving consulting income
13  from Rebecca Solomon?

14  A. Rebecca Solomon asked me to do a project for
15  her for a China deal and we made presentations for
16  her. And she wanted me to go to China to represent her
17  with her investors and we worked on that for about a
18  couple of weeks, me and Juan.

19  Q. What year was that?

20  A. 2005, I think. All the documents I think are
21  in the archives. And I don't know if she gave us
22  100,000 or not, but, if she did, we recorded it in the
23  books and then we asked -- we refused to take the
24  project. We didn't take the project from her.

25  Q. What do you mean you didn't take the project?

1  A. We said we're not going to do the project
2  because we were not satisfied with that because she
3  wanted us to fly down to China and represent her and
4  meet with the buyer -- or the investors there. And we
5  decided that we're not going to do that.
6  Q. Did you return the 100,000?
7  MR. ISON: Objection. Irrelevant. Not
8  reasonably calculated to lead to the discovery of
9  admissible evidence.
10  Don't answer the question.
11  MR. CAMPAGNA: You can answer.
12  MR. ISON: No, he can't.
13  MR. CAMPAGNA: It's not a privacy issue and I
14  have the ability to probe into many areas that are
15  relevant. For example, one is your ability to tell the
16  truth in certain areas, in fact, in all areas, your
17  ability to give testimony, your ability to recollect.
18  And this is one of those exact instances.
19  MR. ISON: He's not answering the questions,
20  any more questions regarding Rebecca Solomon. If you
21  want to bring a motion, go ahead and bring a motion.
22  MR. CAMPAGNA: And that's a risk that exists
23  is that in not answering the question, then we can go
24  to the court, tell the court why the testimony is
25  relevant. We can spend time that way or you can answer

```
 1    the question now.
 2            MR. ISON:  I'm instructing the witness not to
 3    answer the question or any other questions having to do
 4    with Rebecca Solomon.
 5    BY MR. CAMPAGNA:
 6        Q.  Are you following the advice of counsel?
 7    You're not going to answer the question?
 8        A.  Yes.
 9            MR. CAMPAGNA:  I'm going to mark next in order
10    Exhibit 79.  This is a deposit summary from Quickbooks,
11    summary of deposits to Wells Fargo on 9/20/2005.
12            (EXHIBIT 79 WAS MARKED FOR IDENTIFICATION.)
13    BY MR. CAMPAGNA:
14        Q.  I'm handing a copy to opposing counsel.
15            Earlier you said that you didn't recall
16    exactly whether that income was -- the 100,000 was from
17    Rebecca Solomon.  Does this refresh your recollection?
18            MR. ISON:  Objection.  Not relevant nor is it
19    reasonably calculated to lead to the discovery of
20    admissible evidence.  I instruct the witness not to
21    answer.  He's not answering any questions regarding
22    Rebecca Solomon.
23    BY MR. CAMPAGNA:
24        Q.  Are you following the advice of counsel?
25        A.  Yes.
```

1  MR. CAMPAGNA: I'll mark next in order
2  Exhibit 80.
3  (EXHIBIT 80 WAS MARKED FOR IDENTIFICATION.)
4  BY MR. CAMPAGNA:
5  Q. Do you recognize this document?
6  A. No, I don't.
7  Q. Generally do you recognize what it is?
8  A. It's an appraisal for the warehouse.
9  Q. Now that you've had a chance to look at the
10 document, now do you recognize the document?
11 A. I don't recognize the document.
12 Q. It says that it's -- there's a date here at the
13 bottom. It says February 3rd, 2006, which is an
14 appraisal date and it says it's for an 87,360 square
15 foot industrial building in Montgomery, Alabama owned
16 by Ronald E. Swanner.
17 Do you see that?
18 A. Yes.
19 Q. In 2006 did you have any ownership interest in
20 this Swanner property?
21 A. Yes.
22 Q. What was your ownership interest?
23 A. It's owned by SEC.
24 Q. SEC. And you owned part of SEC?
25 A. Yes.

1  Q. If there was an appraisal report ordered for
2  that Swanner property, who at SEC would be charged with
3  ordering it?
4  A. Dave Cagley.
5  Q. And is your testimony that you have never seen
6  this appraisal report before?
7  A. Yes.
8  Q. In 2006 were you aware of the value of the
9  Swanner property?
10 A. No.
11 Q. Ever have any discussions regarding the
12 appraised value of the Swanner property in 2006 with
13 David Cagley?
14 A. We had discussions of that because we bought
15 the whole Swanner estate as a whole package. This
16 included the -- this is included in the package. This
17 is included in the package.
18 Q. What was included in the package?
19 A. The homes, the bonds for title, the
20 warehouse. We bought the whole package.
21 MR. CAMPAGNA: Could you repeat my question,
22 please.
23 THE COURT REPORTER: "Question: What was
24 included in the package?"
25 MR. CAMPAGNA: The one before that.

1  THE COURT REPORTER: "Question: Ever have any
2  discussions regarding the appraised value of
3  the Swanner property in 2006 with David
4  Cagley?"
5  THE DEPONENT: Yes.
6  BY MR. CAMPAGNA:
7  Q. What do you recall was the appraised value of
8  the Swanner properties in 2006?
9  A. Maybe -- I recall it being about 750,000.
10  Q. When you look at this one it shows that the --
11  well, do you see where the appraised value is on this
12  particular appraisal?
13  A. Yes.
14  Q. What is it?
15  A. A million dollars.
16  Q. So is your testimony that your understanding
17  of the appraised value of the Swanner property in 2006
18  was different than what this report that David Cagley
19  got?
20  A. Yes.
21  Q. Okay. I'm going to turn your attention back
22  to Exhibit 20. If you turn to the second page of the
23  exhibit -- actually, you can hold off on the exhibit
24  for a moment. I wanted to see -- since we're going
25  back to this exhibit I wanted to -- just hold off on

1  the exhibit. I want to see if you remember what we
2  were talking about.
3          There was a period of time when you had put
4  approximately $600,000 into the purchase of the Swanner
5  properties; correct?
6      A.  Correct.
7      Q.  And that was in 2005?
8      A.  Yes.
9      Q.  I had asked you if Juan Carmona ever put money
10 into the Swanner properties. Do you recall what your
11 testimony was?
12     A.  I don't remember.
13     Q.  You don't remember what your testimony was or
14 you don't remember whether or not Juan Carmona put
15 money into the Swanner properties?
16     A.  Whether Juan Carmona put money into the
17 properties.
18     Q.  Okay. And in looking at Exhibit 20 it's still
19 your position that you don't recall; is that right?
20     A.  Yes.
21     Q.  If you look at the deposit of 629,000 in the
22 middle of that spreadsheet --
23     A.  Yes.
24     Q.  -- when you subtract off the 400,000 on the
25 line where it says "Regions Bank," did that 400,000 go

1  towards the Swanner property?

2      A.   I don't recall.

3          MR. CAMPAGNA: I'm going to mark next in order

4  here Exhibit 81.

5          (EXHIBIT 81 WAS MARKED FOR IDENTIFICATION.)

6  BY MR. CAMPAGNA:

7      Q.   This appears to be a statement from Regions

8  Bank dated May 31st, 2005.

9          Do you recognize this document?

10     A.   No.

11     Q.   Do you recognize any of the transactions on

12 the document?

13     A.   The 600,000.

14     Q.   When you say "the 600,000," what are you

15 referring to?

16     A.   Money we put cash into the property.

17     Q.   On the exhibit where does it say 600,000?

18     A.   It says 400,000 and 200,000.

19     Q.   You're referring to the first two line

20 items --

21     A.   Yes.

22     Q.   -- on the exhibit?

23     A.   Yes.

24     Q.   Which shows the date 5/2/2005, Chopra

25 Enterprises Corporation, 400,000?

1    A.   Yes.

2    Q.   And then underneath that on four days later,
3  May 6th, 2005, Chopra Enterprises Corporation, 200,000;
4  is that correct?

5    A.   Yes.

6    Q.   Okay.  In comparing Exhibit 80 to the lines
7  that we are looking at on Exhibit 20, does that refresh
8  your recollection of whether the 400,000 went to the
9  purchase of the Swanner properties?

10   A.   I don't recollect, but this document says the
11 400,000 went towards -- I suppose so.

12   Q.   Were you involved in that transaction
13 personally?

14   A.   No.

15   Q.   Who would be the one to ask about this
16 transaction?

17   A.   Dave Cagley.

18   Q.   How about Juan Carmona?

19   A.   No.

20   Q.   Why Dave Cagley?

21   A.   Because he did the whole deal for us.

22   Q.   Then the question is did Juan Carmona put any
23 money into the property.  And you don't recall?

24   A.   I don't recall.

25   Q.   Okay.  So in looking at Exhibit 20, JC

1  Investment is Juan Carmona's company; correct?
2      A.   Yes.
3      Q.   And it looks like he puts $150,000 into Chopra
4  Enterprises Corporation; is that right?
5      A.   I don't know.
6      Q.   When you look at the line item deposit
7  5/2/2005, JC Investment, deposit loan, JC Investment &
8  Consulting, 150,000?
9      A.   Yes, yes.
10     Q.   What does that mean to you?
11     A.   I don't know.  It could be put the money in
12 there, the loan, and then take it out for properties.
13 He may have loaned the money, 150,000, to Chopra
14 Enterprises.
15     Q.   This is showing that Juan put -- Juan Carmona
16 put 150,000 into Chopra Enterprises Corporation;
17 correct?
18         MR. ISON:  Objection.  Misstates the
19 document.  It says JC Enterprises, not Juan Carmona.
20         MR. CAMPAGNA:  You can answer.
21         THE DEPONENT:  I can -- let me explain to
22 you.  Okay?  You give me a piece of information.  You
23 have over 10,000 pieces of information and you give me
24 one page and you ask me question to answer.  I cannot
25 answer this question unless I have everything in front

1   of me.  Nobody can recollect five years back.
2   BY MR. CAMPAGNA:
3       Q.  Mr. Chopra, what I'm actually asking you --
4           MR. ISON:  Let him finish his answer.
5           THE DEPONENT:  Can I finish my answer?
6   BY MR. CAMPAGNA:
7       Q.  You can, but I want to be clear.  I'm asking
8   you a specific question about a company that you owned
9   exclusively --
10      A.  Yes.
11      Q.  -- with a $150,000 transaction.  That's what
12  I'm asking.
13          Go ahead.
14          MR. ISON:  Quit talking until he's done with
15  his question.
16          THE DEPONENT:  There are over three to four
17  million dollars that have been through Chopra
18  Enterprises in the last five years.  You're taking one
19  page and asking me a question.  I cannot answer the
20  question until I review everything about what
21  happened.  You show me one thing which is negative, one
22  thing which is positive, you bring up all these things,
23  and you ask me to specifically answer the question.  I
24  cannot answer the question.
25          For the next few hours, if you keep asking the