1  question, the answer will be I don't know unless I

2  review it.  All you're doing is asking me the same

3  question again and again and I'm not able to answer

4  that.  And you're trying to pin me down and I'm not

5  going to be pinned down until I know the facts.

6          So all the questions that you have regarding

7  this, Chopra Enterprises, in just going back and forth,

8  I need to research that out to figure out what

9  happened.

10          Just because you see 150,000 minus 400

11  positive, 115 negative, I cannot answer the questions.

12  That's just the timeline for that one thing.  I don't

13  know what happened for 150.  Did he get the money

14  back?  Did he loan it for certain properties?  I don't

15  have an answer for that because I was not running

16  Chopra Enterprises.  An accountant was doing the

17  books.  So you're asking the wrong person.

18  BY MR. CAMPAGNA:

19      Q.  Who should I be asking?

20      A.  You should be asking the accountant.  You

21  should be giving more details.

22      Q.  Who should I be asking?

23      A.  You should be asking the accountant.

24      Q.  The name of the accountant?

25      A.  I told you the name of the accountant.  Mahbub

1    was there.  Donna was there.

2        Q.   Mahbub Alam?

3        A.   Mahbub Alam, Donna Nunez, Juan Carmona.

4        Q.   How about Afzal; was he here at the time?

5        A.   No.  Afzal was not in Chopra Enterprises.

6        Q.   Testimony that a witness doesn't recall

7    something is okay, but it's also okay when there's

8    other evidence that may help a witness recall

9    something.

10           Since it was apparent in our last conversation

11   that you didn't recall the nature of the $400,000

12   deposit, I've now shown you a document from Regions

13   Bank with the corresponding date that shows Chopra

14   Enterprises Corporation and 400,000 in May 2nd of

15   2005.

16       A.   Okay.

17       Q.   I think you've noted that that did refresh

18   your recollection that that money, the $400,000 that

19   we've identified on Exhibit 20, went for the purchase

20   of the Swanner property.

21       A.   $600,000 went for the purchase of the Swanner

22   property.

23       Q.   But that particular 400,000 line item was part

24   of the $600,000; correct?

25       A.   I suppose so.

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 2
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1          MR. ISON:  Don't suppose.

2          THE DEPONENT:  I don't know that information

3   what it was.  I put $600,000.  I'm not aware of the

4   transaction on this page.  I keep telling you that.  I

5   do not know what went where.  I gave 600,000 to SEC

6   plus more cash into the account.  How they booked it,

7   how it went, I'm not aware of that.  Okay?  I'm just

8   letting you know that.

9   BY MR. CAMPAGNA:

10      Q.  When you say that you gave 600,000 to SEC, you

11  mean SEC Venture Group, LLC?

12      A.  Yes.

13      Q.  In fact, you gave the money to Chopra

14  Enterprises Corporation; isn't that right?

15      A.  I gave the money to Chopra Enterprises and

16  Chopra Enterprises gave it to SEC.  That's exactly what

17  it says here.

18      Q.  How do you know that -- from what it says in

19  either of these documents that Chopra Enterprises

20  Corporation gave the money to SEC Venture Group, LLC?

21      A.  I don't know that, but it's showing me that it

22  did.  It's showing Chopra Enterprises, Chopra

23  Enterprises 200, 400,000.  That's the Exhibit 81 that

24  you're showing me.

25      Q.  There's nothing on Exhibit 81 that says SEC

475

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 3
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1    Venture Group, LLC.

2         A.  But you're telling me -- you're putting

3    400,000 here to 400,000 here; right?

4         Q.  Right.

5         A.  So --

6         Q.  I'm juxtaposing two transactions, one in your

7    company's Quickbooks, one in the bank's records.

8         A.  Yes.

9         Q.  $400,000 going out of your company's ledger.

10   It appears that it's going through Regions Bank for

11   some purpose spearheaded by Chopra Enterprises

12   Corporation.  The bottom line is you don't recall it.

13        A.  Regions Bank is an SEC Venture Group account.

14        Q.  So this is Chopra Enterprises Corporation

15   putting money into SEC Venture Group, LLC's account so

16   that SEC Venture Group, LLC can purchase the Swanner

17   properties?

18        A.  Correct.

19        Q.  If you look down six lines from the bottom on

20   the Chopra Enterprises Corporation ledger,

21   Exhibit 20 --

22             MR. CAMPAGNA:  We did this last time.

23             MR. ISON:  I don't have 81.

24   BY MR. CAMPAGNA:

25        Q.  There's a line item 5/6/2005, wire transfer,

1  loan Deepak Chopra, $200,000.  If you compare it to

2  Exhibit 81, 5/6/2005, there's a Chopra Enterprises

3  Corporation transaction noted on the Regions Bank

4  account for SEC Venture Group, LLC for $200,000.

5       A.  Yes.

6       Q.  Is that the $200,000?

7       A.  I don't know that, but that $200,000 went to

8  SEC.  Did it go to Regions Bank?

9       Q.  That's what I'm asking.

10      A.  Did it go to Regions Bank?  You asked me a

11 question.  You have to note it goes to Regions Bank.

12      Q.  Right.

13      A.  So it went into SEC to purchase the

14 properties.

15      Q.  Is that where it went?

16      A.  It must have.

17      Q.  That's what I'm asking you.

18      A.  I don't know that.

19      Q.  This is your company.  This is $200,000 that

20 your company's Quickbooks are saying went out.  There's

21 a Regions Bank on the same date that Regions Bank is

22 receiving a deposit from your company.

23      A.  So it went out.

24      Q.  Okay.

25      A.  So what's the problem?

1      Q.  My problem is that I'm trying to get you to

2   recall things and you're saying that you don't recall

3   or you just don't want to answer the question and I

4   just want a straight answer.

5      A.  I'm going to give you a straight answer.

6      Q.  Okay.

7      A.  You've been spending four to six hours here

8   asking me questions on this these things that I do not

9   recollect and I can't answer.  Okay?  You spent two

10  days doing that.

11         Bottom line is 600,000 was put into SEC

12  Venture Group by the properties.  I refinanced my house

13  to do that.  It went.  How it went there, what

14  transaction went there is a question that I cannot

15  recollect.  Okay?

16         Same thing with Juan Carmona, 150,000 he

17  loaned to Chopra Enterprises.  Why he loaned it, where

18  it went is all documented.  Okay?

19         So the question is you keep asking the same

20  questions the last two days and I keep giving you the

21  same answer.  Now you're not going to pin me down and

22  say to the best of my recollection.  I do not

23  remember.

24         I gave the money.  It went there.  There's

25  records that it went there and it was my money that

1  went there.  I don't know what you're trying to tell me

2  what I did with the money.  It went there.  How it went

3  there is all in the books.  It's all available for you

4  to look at.  You know, the accountants know that.  Dave

5  Cagley knows that.  I do not know that.  When you ask

6  me questions I cannot answer that because I don't

7  recollect everything in the company.

8        I was the person putting the money in.  How

9  they booked the money I do not know.  That's what I'm

10  trying to tell you, you know.  And Juan -- and Juan

11  gave a lot of money to the company back and forth.

12  Okay?  You're showing me one transaction.  I cannot

13  recollect.

14      Q.  If you look at Exhibit 20, the items between

15  what appears to be a JC Investment & Consulting loan of

16  150,000 and what appears to be a $200,000 wire transfer

17  from Chopra Enterprises Corporation to somewhere,

18  possibly to SEC Venture Group, LLC's bank account in

19  Alabama that you don't recall, but if you look at the

20  items between the 150,000 and the 200,000, do you see

21  those there?

22      A.  Yes.

23      Q.  Okay.  Mary Beth Whyte, minus $2,500.

24        Is that money going out or money coming in

25  from Mary Beth Whyte?  Just from what you know of the

479

Case: 10-05196  Doc# 106-1  Filed: 07/23/12  Entered: 08/10/12 15:42:19  Page 7
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1  Quickbooks.

2      A.   I can't answer that unless I answer a little

3  bit more detail.  If you want to know the answer, I can

4  give you a little bit more detail so we know where it

5  is.  I can't answer the specific questions.

6          There's a lot of properties that Chopra

7  Enterprises was buying back and forth.  If you look at

8  it, we bought some timeshares.  So the money coming in

9  was disbursed to buy other properties, also.  Okay?  So

10  asking me specific questions, you have to look at the

11  whole picture.

12          MR. CAMPAGNA:  Could you ask my question --

13  repeat my question, please.

14          THE COURT REPORTER:  "Question:  Okay.  Mary

15          Beth Whyte, minus $2,500.  Is that money going

16          out or money coming in from Mary Beth Whyte?

17          Just from what you know of the Quickbooks."

18          THE DEPONENT:  I do not know.

19  BY MR. CAMPAGNA:

20      Q.   Okay.  The $10,000, loan Lisa Stark.  There's

21  no negative sign to it.  Is that money coming in or

22  money going out?

23      A.   I do not know.

24      Q.   $727, KeNaniKai, number 109.

25          Money coming in or money going out?

1     A.  I do not know.

2     Q.  Las Vegas Chateau 2, minus $434.

3     A.  I do not know.

4     Q.  Well, there's a negative sign there.  Is it at

5  least fair to say so that we can streamline things that

6  that's money going out?

7     A.  There's nothing to say.  You're asking me a

8  question.  I cannot reply with one page of

9  information.

10    Q.  There's five pages.

11    A.  There are 10,000 pages in Chopra Enterprises.

12  It's six years ago.  I wasn't running the company.  The

13  accountant was running the company.

14    Q.  Mahbub Alam was running the company?

15    A.  Yes.  Everything was documented.  Okay?  And

16  from now on the answer is going to be I do not know

17  because I don't have the information.

18    Q.  Mr. Chopra, I didn't say that you were running

19  the company and I don't think anybody expects you to

20  recall every line item in thousands of transactions.

21  What I was focusing on was a single transaction with a

22  large dollar figure and I understand that you just

23  don't recall the details of the transaction with your

24  company.

25    A.  If I had more information, I would recall it.

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 9
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1    Q.   And the more information that you're saying

2    that you need is 10,000 pages of documents; is that

3    right?

4    A.   What I'm saying to you is, yes, I need more

5    information.  And you just asked me a question.  If I

6    can reply to your question, specifically your

7    question.  You asked me 150,000 went through Juan

8    negative that he put in the company, the loan that he

9    showed me this month.  Right?

10           You are also ignoring this page, if you went

11   about this page, that there are other properties being

12   bought at the same time.  So if he loaned the money, it

13   may have been brought on these other properties that we

14   bought.  Okay.  So there's a lot of times actually --

15   Q.   Well, now we're getting somewhere.  That's

16   what I'm trying to ascertain.

17           So you're saying now that there's a lot of

18   properties?

19   A.   Because it's on the exhibit.

20   Q.   That there's money coming in, there's money

21   going out?

22   A.   But that's not --

23           MR. ISON:  Wait until he finishes his question

24   before you speak.  Okay?  Simple.

25   //

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 10
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1    BY MR. CAMPAGNA:

2        Q.   So that's what you're saying; correct?

3    There's money coming in; there's money going out?

4        A.   Exhibit 20 that you're looking at --

5        Q.   Yes.

6        A.   You're showing me Exhibit 20; right?

7        Q.   Yes.

8        A.   You're asking me specific questions on one

9    line item on Exhibit 20, one or two line items;

10   correct?

11       Q.   More than one or two line items.  We're

12   talking about the 629, the 400, the 150 and the 200 and

13   everything in between.

14       A.   There are over 50 line items on this exhibit,

15   100 line items on this exhibit; right?  If you were to

16   look at this exhibit on 100 line items, you would see

17   that money was going in and out.  Okay?

18           You're asking only four specific questions.  I

19   cannot recall all the money going in and out.  But that

20   money was put -- if you gave me an Exhibit 20, it

21   explains -- if you read the Exhibit 20, it explains

22   which property money went out, which property money

23   came in, who was paid, who was not paid.  Okay?

24           So the question is when you ask me a specific

25   question just on three or four items, when you give me

1    Exhibit 20, which is five pages long, if somebody would

2    read the exhibit, they would know where the money is

3    coming in and going out, what transaction is being

4    done.  So I'm not able to answer the question

5    specifically for you because I don't know.

6         Q.  How can you tell that Exhibit 20 shows that

7    there's money coming in and money going out?

8         A.  Because you look at the entries.

9         Q.  Give me an example.  Whichever one you want to

10   choose.

11        A.  KeNaniKai, 727.

12        Q.  I would need the date.

13        A.  Let me give you the date.  Okay?

14        Q.  The one that you said was fine.  The date is

15   on the left-hand side of the exhibit.

16        A.  5/22/05.

17        Q.  Let me get there.  5/22.

18            I don't have a 5/22.  What's the page on the

19   bottom?  On page 19?

20        A.  19.

21        Q.  Okay.  5 -- May 2nd or May 22nd?

22        A.  May 2nd.  KeNaniKai 109, Code 37, 727.

23        Q.  Okay.  727.  Okay.  I see it.

24        A.  Do you see that?

25        Q.  Yes.

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 12
of 35

1      A.   Okay.  Go to page number 1.

2      Q.   What I want -- what are you showing me on

3  KeNaniKai?

4      A.   I'm showing you that there are a lot of

5  transactions that I do not know about that referred to

6  money going in and out.  I can't recollect all of

7  them.  I'm just giving you specific transactions.

8      Q.   So you're showing me KeNaniKai is an example

9  of a transaction that you don't recollect?

10     A.   Yes, true.

11     Q.   Okay.  My question was how can you tell that

12  this is an exhibit that shows that there's money coming

13  in and money going out?

14     A.   Okay.  Then look at page 1.  2/26/2004.

15     Q.   Where it says "deposit loans from Deepak

16  Chopra"?

17     A.   No.  It says Hawaii Bay Villas, 37 G-1 Code 3,

18  35,300.

19     Q.   Yes, I see it.  I was looking one line down.

20     A.   That's money going out or coming in?  I don't

21  know if it's coming in or going out.  It's a negative

22  sign; right?  So the negative sign means going out.  We

23  bought a property and the money went down.  All right?

24     Q.   We could have done that ten minutes ago,

25  Mr. Chopra, and saved ourselves both a little bit of

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 13
of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  time, quite frankly.

2      A.  Okay.

3          MR. CAMPAGNA:  Thank you.  I'm going to mark

4  the next exhibit Exhibit 82.  These are documents from

5  Regions Bank.

6          (EXHIBIT 82 WAS MARKED FOR IDENTIFICATION.)

7  BY MR. CAMPAGNA:

8      Q.  There are lots of pages to Exhibit 82,

9  Mr. Chopra.  If you would just page through and verify

10 that those are your signatures on the signature lines.

11     A.  They are.

12     Q.  Please let me know if you come across a

13 signature that is not yours that is purporting to be

14 yours.  I'm not saying that there are any.  I just want

15 to verify.

16         Are those your signatures --

17     A.  Yes.

18     Q.  -- on those copies of checks?

19     A.  Yes.

20     Q.  I just want to confirm that because I think

21 you said it earlier that you received a management fee

22 for your work with SEC Venture Group, LLC; is that

23 correct?

24     A.  Yes.

25     Q.  So there is a check.  It's -- it's the fifth

1   page of the exhibit, check number 1277.

2       A.   Yes.

3       Q.   For a thousand dollars.

4       A.   Uh-huh.

5       Q.   Do you see that check?

6       A.   Yes.

7       Q.   Could you flip the exhibit open so I can see

8   that we're looking at the same one.

9           So it says "management fee" here?

10      A.   Yes.

11      Q.   Is that what that's referring to?

12      A.   Yes.

13      Q.   So generally speaking when -- so we don't go

14  through all of these checks, generally speaking, if a

15  check says something to the effect of management

16  fees --

17      A.   Management fee.

18      Q.   -- that's a management fee that you got paid

19  for work that you did on behalf of SEC?

20      A.   Yes.

21      Q.   And I want to compare that to, let's say,

22  check 3179.  And I can find it for you maybe a little

23  bit more easily because I found it on my exhibit.

24          I want to compare that to this -- the note on

25  this $3,700 check says "warehouse payment."

1      A.   Yes.

2      Q.   What does that mean?

3      A.   It means the warehouse payment.  Sometimes we

4  had to wire the money to the warehouse because Regions

5  Bank would not be able to wire the money for us because

6  the payments were late and the loan would go to

7  default.  So we had to wire the money.  The only way I

8  could wire the money is to bring it back to San Jose to

9  my account and wire it from there.

10     Q.   So this $3,700, 8/10/2010, check number 3179,

11 that's not a payment to you?

12     A.   No.

13     Q.   That's you putting $3,700 into your personal

14 account?

15     A.   I don't know which account it is.

16     Q.   I don't want to put words in your mouth.  I'm

17 just trying to figure out the nuts and bolts.

18     A.   It's from an account here locally.

19     Q.   So a local account.  Because it could have

20 been the Chopra Enterprises Corporation account.

21          Did you do wires from that?

22     A.   No.  No.  Not from Chopra.  It was most likely

23 from my personal account.

24     Q.   Okay.  So that you can -- okay.

25          So that you can then send the money to

1  wherever it needed to go to get paid?

2      A.  Because Regions could not wire from us because

3  Regions doesn't wire money because I was sitting right

4  here.  So there were many occasions when I was late on

5  the payments.  So I had to take them because my tenants

6  would not make the payments and then he would -- the

7  payment on the 8th.  I had to make a payment.  So I had

8  to get the money from there and wire it from here.

9  It's all documented.

10      MR. CAMPAGNA:  Thank you.  That was

11  Exhibit 82.

12      We'll mark the next exhibit Exhibit 83.  This

13  is a series of bank statements and checks from Regions

14  Bank.

15      (EXHIBIT 83 WAS MARKED FOR IDENTIFICATION.)

16  BY MR. CAMPAGNA:

17      Q.  Do you recognize these statements?

18      A.  I don't recognize the statements, but they are

19  statements from Regions Bank.

20      Q.  Okay.  I know it's a lot of paperwork.

21      Any reason to think that this is not the SEC

22  Venture Group, LLC statement that it purports to be?

23      A.  SEC statement.

24      Q.  Is that yes?

25      A.  Yes.

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 17
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1    Q.   I mean it's no.  There's no reason to think

2  that this is not the document that it purports to be;

3  is that correct?

4    A.   That's correct.

5    Q.   Okay.  The deposits here on the first page, it

6  says "deposit, thank you," on 9/4.  The statement --

7  what month is this?  This is a 2009 -- September 2009,

8  14,000 deposit.

9        Is that from the warehouse folks?

10    A.   Uh-huh.

11    Q.   Your tenants?

12    A.   Yes.

13    Q.   And then there are copies of checks throughout

14  this, many of which were in the previous exhibit.  We

15  made a distinction between the management fees and

16  warehouse payment.

17        I see a check here.  It's on the very last

18  page of the exhibit.  Check number 1273 to Mahbub

19  Alam.  It says "consulting."

20        Is that his payment for being the accountant?

21    A.   Or making the taxes out.  Doing the tax work.

22    Q.   He may have done that as well?

23    A.   Yeah.  He did the taxes.

24    Q.   If you look at -- on that same page, there's a

25  check number 1271 that was written on 12/3/2009 for a

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 18
of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  thousand dollars.  Can I just see that real quick.

2      A.  Okay.

3      Q.  Check number 1271.

4      A.  Uh-huh.

5      Q.  Do you see that?

6      A.  Yes.

7      Q.  There's nothing in the memo section.

8      A.  Which one is that?  This one?

9      Q.  This one.

10     A.  Okay.

11     Q.  When there's not a reference in the memo

12  section, how -- how do we know what that payment was

13  for?  Was that for warehouse payment or management

14  fees?

15     A.  Have you looked at the tax returns?  Because

16  Mahbub would do the tax returns.

17     Q.  Pardon?

18     A.  All of this is the tax return which was paid

19  out.  If it's management fee, it would show in my 2009

20  tax returns how much it --

21     Q.  Did this also correspond to the Quickbooks for

22  SEC?

23     A.  It should.  It should.

24     Q.  If Mahbub was doing his job correctly, it

25  would also correspond in there?

1      A.   He would book it correctly.

2           MR. CAMPAGNA:   Okay.   I'll mark the next

3 exhibit Exhibit 84.

4           MR. ISON:   I didn't get 83.

5           (EXHIBIT 84 WAS MARKED FOR IDENTIFICATION.)

6 BY MR. CAMPAGNA:

7      Q.   Generally speaking, do you recognize this as

8 the Regions Bank statements --

9      A.   Yes.

10     Q.   -- for 2010?

11     A.   Yes.

12     Q.   If you turn to page 3 of the exhibit, and I

13 think you're on it now, there's check 1278, thousand

14 dollars, management fees, 1279, management fees.

15     A.   Yes.

16     Q.   It looks like there's a couple others here or

17 there's 1280, also management fees.

18          Do you see that there?

19     A.   Yes.

20     Q.   We've already determined if it says

21 "management fees," it's for management fees.

22     A.   Yes.

23     Q.   If it says "warehouse," it's for the warehouse

24 payment.   If it's to Mahbub, it might be for his salary

25 or it might be for doing taxes or something like that.

1    A.   Yes.

2    Q.   And then there's one that says "expenses,"

3  $200, check 1286?

4    A.   Yes.

5    Q.   I don't expect you to know what those specific

6  expenses were.

7         What type of expense might it be?  Is it you

8  flying out to see the property?  Is it -- I -- just

9  generally what might it be?

10    A.   It could be stationery.  It could be checks

11  ordered.  It could be various sort of things.

12    Q.   Again, this should all be in the Quickbooks?

13    A.   Quickbooks.

14    Q.   Mahbub would keep it up to date?

15    A.   Yes.

16    Q.   If you look at the first page of the statement

17  for February 27, 2010 through March 31st, 2010, there

18  is two deposits.  One is for 7,975 and one is for

19  1,200.

20    A.   Uh-huh.

21    Q.   Are those from your tenants; do you know?

22    A.   One is from the warehouse.  7,975.

23    Q.   Okay.

24    A.   And one is from the tenants.  He only gave us

25  $1,200, I think.

1    Q.  Then on the next page it identifies a few

2   checks there that are then on page 3 of that

3   statement.  You can flip to the third page.

4        We've got essentially management fees;

5   correct?

6    A.  Yes.

7    Q.  What's this middle check here, the 1292?  I

8   don't understand what it says there.

9    A.  It says a draw, March 1st to March 15, which

10   is the same as the management fee.

11   Q.  Pardon?

12   A.  It's the same as the management fee.

13   Q.  Same as the management.  Okay.

14        If you turn to the next statement.  So you've

15   got $8,000 deposit probably from the warehouse?

16   A.  Yes.

17   Q.  And then the 4,500.  Is that also from

18   tenants?

19   A.  Yes.

20   Q.  And I don't know if I heard who the tenants

21   were.

22        When you say "the tenants," are those on the

23   real property, the single homes tenants?

24   A.  Single home tenants and the bonds for title.

25   Q.  And the bonds.  Okay.

1            That was the same for the $1,200 on the

2    previous statement; right?

3        A.   Yeah.

4        Q.   That was for the homes?

5        A.   I paid it, yes.   Sometimes 1,200, sometimes

6    12,000.   It depends every month.   It changes.

7        Q.   The 8,000 was pretty consistent.   Is that --

8    the other one is a little bit less than 8,000.

9        A.   Yes.

10       Q.   And then let's turn to the checks page, page 3

11   of 3.

12            Check number 1300.   There's no memo.   So

13   that -- maybe that's stated in the Quickbooks.   It

14   could be management.   It could be warehouse.   It could

15   be expenses.

16       A.   It could be any one of them.

17       Q.   Any one.

18            And then 3151.   2,500.   Warehouse payment.

19   That may be a similar situation where you needed to get

20   the money over to San Jose so you can wire it; right?

21       A.   Yes.

22       Q.   How about the 3152 also for $2,500?

23       A.   That could be the warehouse.

24       Q.   Could that be management or consulting?

25       A.   No.   That -- I don't know.   It could be a

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 23
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 35

1  warehouse.  It looks like the warehouse.  It was a

2  $5,400 payment.  So again we wired the money from the

3  account to the warehouse.

4          MR. CAMPAGNA:  Mr. Chopra, unless there's

5  anything you want to say about this, we can set it

6  aside.  I didn't think that you did want to say

7  anything about it.

8          Let's mark the next exhibit Exhibit 85.

9          (EXHIBIT 85 WAS MARKED FOR IDENTIFICATION.)

10  BY MR. CAMPAGNA:

11      Q.  This is a Quickbooks for Innova Financial

12  2007.  It shows here a $15,000 short-term loan from the

13  Bank of America I account.  This appears to be

14  SearchTech Medical's -- Medical, Inc.'s Quickbooks for

15  this loan, Innova Financial.

16          Do you recognize this document?

17      A.  No.

18      Q.  Are you familiar with that short-term loan

19  from SearchTech Medical to Innova Financial?

20      A.  No.

21      Q.  Innova Financial was your -- that was what?

22  Your lending company?

23      A.  It was a real estate company.

24      Q.  Real estate company.

25          What did it do?

496

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 24
of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1      A.  It bought -- it basically was a brokerage

2  company buying and selling real estate on a commission

3  basis.

4      Q.  Is that similar to what Chopra Enterprises

5  Corporation was doing?

6      A.  No.  Similar to -- similar to Alain Pinel or

7  Intero.  It doesn't buy properties.  It just --

8      Q.  So this is like a real estate agent?

9      A.  Agent.

10      MR. CAMPAGNA:  Okay.  Let's mark the next in

11  order Exhibit 86.

12      (EXHIBIT 86 WAS MARKED FOR IDENTIFICATION.)

13  BY MR. CAMPAGNA:

14      Q.  This is -- well, this appears to be a check

15  from SearchTech Medical, Inc., check number 19713 on

16  February 2nd, 2007, which is the same date as the line

17  item that we were talking about on the previous

18  exhibit, Exhibit 85.

19      Do you recognize this check?

20      A.  No.

21      Q.  Is that your signature on the check?

22      A.  Yes.

23      Q.  Is that your handwriting on the check where it

24  says "Innova Financial Group"?

25      A.  No.

1    Q.    Whose handwriting is that?

2    A.    I don't know.

3    Q.    And it says that cash -- "Innova Financial

4    Group" is crossed out, and it says "cash."

5          Is that your handwriting where it says

6    "cash"?

7    A.    No.

8    Q.    Do you know whose handwriting that is?

9    A.    No.

10   Q.    How about before that?  There's some

11   initials.  It says "okay."  It looks to be "w/Deepak."

12   A.    It's not my handwriting.

13   Q.    Do you know whose handwriting that would be?

14   A.    No.

15   Q.    It says 2007.  Might it be one of the

16   accountants?

17   A.    It could be.

18   Q.    And who would that be?  It would it be Mahbub

19   Alam?

20   A.    Yes.  It could be Mahbub Alam.  It could be

21   Donna Nunez or Cathy.

22   Q.    And any -- any sense that there are statements

23   on this check that are not true?

24   A.    I can't answer the question.

25   Q.    Any reason to suspect that there was something

1  going on with SearchTech or Innova Financial in

2  February of 2007 where a check for $15,000 would not be

3  what it purports to be?

4       MR. ISON:  Objection.  Vague and ambiguous as

5  to the term "going on."

6       MR. CAMPAGNA:  But you can answer the

7  question.

8       MR. ISON:  Do you understand the question?

9       THE DEPONENT:  No.

10       MR. CAMPAGNA:  Can you repeat the question,

11  please.

12       THE COURT REPORTER:  "Question:  Any reason to

13       suspect that there was something going on with

14       SearchTech or Innova Financial in February of

15       2007 where a check for $15,000 would not be

16       what it purports to be?"

17       THE DEPONENT:  I don't know.  I don't think --

18  I don't know.

19       MR. ISON:  Do you understand the question?

20       THE DEPONENT:  His question is was there

21  something suspicious going on.

22       MR. ISON:  Well, he didn't say "suspicious."

23  He said "going on."  Do you know what that means?

24       THE DEPONENT:  No.

25       MR. ISON:  Okay.  Do you understand the

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 27
of 35

1    question?

2            THE DEPONENT:  No.

3    BY MR. CAMPAGNA:

4        Q.  Was there anything suspicious going on at

5    SearchTech in February of 2007 that might lead you to

6    think that this check is not what it purports to be?

7        A.  I don't think so.

8        Q.  And you did say you don't know whose writing

9    this is where it says "cash"; is that right?

10           MR. ISON:  Objection.  Asked and answered.

11           THE DEPONENT:  I don't -- I don't -- that's

12   not my writing.

13           MR. CAMPAGNA:  Pardon?

14           THE DEPONENT:  That's not my writing.

15           MR. CAMPAGNA:  Let's mark the next in order

16   Exhibit 87.  This is also a check dated February 2nd,

17   2007.  This is from Shiva Venture Group, Inc. doing

18   business as Innova, I-N-N-O-V-A, Financial Group paid

19   to SearchTech in the amount of $10,000.  I'll have the

20   court reporter mark it as Exhibit 87.

21           (EXHIBIT 87 WAS MARKED FOR IDENTIFICATION.)

22   BY MR. CAMPAGNA:

23       Q.  Do you recognize this document?

24       A.  No.

25       Q.  Is that your signature on the bottom

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 28
of 35

1  right-hand corner of the document?

2      A.  Could be.

3      Q.  I notice that there's -- there appears to be

4  two signatures above the word "authorized signature."

5          You're saying that the one where it appears to

6  say "Deepak Chopra" may be your signature?

7      A.  It should be my signature.

8      Q.  Should be?

9      A.  Should be my signature.

10      Q.  It probably is or --

11      A.  Probably is.

12      Q.  Any reason to think that it wouldn't be your

13  signature?

14      A.  Cathy signed it.  Cathy was an accountant.

15      Q.  Who's Cathy?

16      A.  Cathy was one of our accountants.

17      Q.  What --

18      A.  She was an accountant.

19      Q.  What's Cathy's full name?

20      A.  I forget her last name, but she was an

21  accountant also at that time.

22      Q.  If you go back to the Quickbooks -- and I

23  think at this time we're talking about Mahbub Alam

24  would be the one managing the Quickbooks for SearchTech

25  in 2007?

501

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 29
of 35
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1     A.   Mahbub Alam, I think, yeah.

2     Q.   If you look at the line items on Exhibit --

3   this exhibit, 85, when you compare it to -- to

4   Exhibit 86 and Exhibit 87, on February 2nd, 2007, check

5   number 19713, 15,000 short-term loan from SearchTech to

6   Innova Financial.

7          Do you see that?

8     A.   Yes.

9     Q.   Do you see where it -- and then below that,

10  February 5th, 2007, Innova Financial Group return of

11  short-term loan to Innova Financial minus $10,000.

12    A.   Yes.

13    Q.   Check number 3175.

14          You don't recall this particular transaction;

15  is that correct?

16    A.   No.

17    Q.   Then on September 5th, 2007 under the memo, it

18  says:  "Charge off Innova loan receivable to Deepak

19  Chopra $5,000."

20          Do you recall receiving a charge off of that

21  SearchTech loan to Innova for $5,000?

22    A.   No, I don't.

23    Q.   Any idea what this would be referring to?

24    A.   This would be basically charging off against

25  my loan for SearchTech Medical.  Reducing my loan

1   balances.

2       Q.   Is there a particular loan?

3       A.   Loan is -- many of them to SearchTech Medical

4   which is offsetting that journal entry.   That's what I

5   would say.

6       Q.   Was that the bridge loan that you talked about

7   in your prior testimony?

8       A.   I don't know.   I can't -- it's a very simple

9   transaction.   I can look at it.   Money was borrowed.

10  Money was paid back.

11      Q.   And charged off to some loan that you had to

12  SearchTech?   It could have been the bridge loan, it

13  could have been another loan; correct?

14      A.   It's very similar.

15          MR. CAMPAGNA:   We'll mark the next exhibit

16  Exhibit 88.

17          (EXHIBIT 88 WAS MARKED FOR IDENTIFICATION.)

18  BY MR. CAMPAGNA:

19      Q.   Do you recognize this document?

20      A.   No.

21      Q.   I just wanted to bring your attention to the

22  last line item there, 1/15/2008 where it says "Silver

23  Creek Valley initiation fees, $995."

24      A.   Yes.

25      Q.   It looks like this is paid by SearchTech

1  Medical?

2      A.  Yes.

3      Q.  Do you recall SearchTech Medical paying

4  initiation fees for Silver Creek Valley?

5      A.  No.

6      Q.  Any idea who that might be for?

7      A.  No.

8      Q.  Did you use Silver Creek Valley?

9      A.  No.

10     Q.  Did Angelina Soria use Silver Creek Valley?

11     A.  I have no idea.

12     Q.  Who do you think might know based on this

13  journal entry?

14     A.  Angelina.

15     Q.  Angelina Soria?

16     A.  An accountant.

17     Q.  Or the accountant.  There's lots of

18  accountants.  So please bear with me when I ask who

19  they are again at various times.

20         This would be Mahbub Alam maybe?

21     A.  Yes, Mahbub Alam.

22     Q.  For sure or just possibly?

23     A.  For sure.  2010 was Mahbub Alam.

24     Q.  This is 2008.

25     A.  Oh, this is 2008?

1    Q.  Yes.

2    A.  It could be Mary Jane, Chris.

3    Q.  You don't remember Chris's last name; right?

4    A.  No.

5    Q.  And so Silver Creek.  So the initiation fees

6  in 2008, would that still have been maybe for Angelina

7  Soria?

8    A.  I don't know.  It could be for a travel

9  nurse.  I have no idea.

10    Q.  What do you mean?

11    A.  Sometimes we give travel nurses bonuses to

12  join our company, just give it to a travel nurse.

13    Q.  Like a signing bonus?

14    A.  Signing bonus.  They all want signing

15  bonuses.

16    Q.  I guess they are the next major league

17  baseball player.

18    A.  They are very difficult to come by.

19        MR. CAMPAGNA:  Let's mark the next exhibit

20  Exhibit 89.  This is a Quickbooks statement of checks

21  it appears from March 15th, 2007.

22        (EXHIBIT 89 WAS MARKED FOR IDENTIFICATION.)

23  BY MR. CAMPAGNA:

24    Q.  I want to turn your attention to the three

25  line items that appear in the top third of the page.

1   Each of them is for $320.

2          Do you see that there?

3      A.  Yes.

4      Q.  Are you familiar -- first off, are you

5   familiar with this document?

6      A.  No.

7      Q.  Under the memo line it says an STM filing fee

8   for case against the company for the Flowers case.

9          Do you recall what that's about?

10     A.  The Flowers case, the filing on STM.

11     Q.  When did they do that?

12     A.  I don't recollect the date.

13     Q.  And so the filing fees -- so that -- are for

14  the answer to the complaint; is that what that is?

15     A.  I don't know.  It could be.

16     Q.  I can back up a little bit.

17         So Flowers sued SearchTech Medical?

18     A.  Yes.

19     Q.  Along with who else?

20     A.  I don't recollect.

21     Q.  Okay.  If you look at the next line item, it

22  says Chopra Enterprises filing fee for case filed

23  against the company for the Flowers case.

24         Is that the same case?

25     A.  Yes.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Q.  And then the next one, Deepak Chopra filing

2  fees for case filed against the company for the Flowers

3  case.

4    A.  Yes.

5    Q.  So do you recall SearchTech Medical paying the

6  filing fees for SearchTech Medical, Chopra Enterprises

7  and Deepak Chopra after Flowers sued --

8    A.  No.

9    Q.  -- these entities?

10    A.  No.

11    Q.  Who would be the one to ask about the paying

12  of the filing fees by SearchTech for SearchTech, Chopra

13  Enterprises and Deepak Chopra?

14    A.  It depends on the date of the check.  It could

15  be -- it could be one of the accountants.

16    Q.  Could it be one of the CEOs as well?

17    A.  No.  That would be the accountant.

18    Q.  We would just have to compare it to when the

19  Flowers case was filed; is that right?

20    A.  They just issued one check on this and the

21  other two checks were reimbursed hopefully back to

22  SearchTech Medical.  They issued one check from

23  SearchTech Medical.

24    Q.  I'm not sure what you're saying when you say

25  that something was reimbursed.