1    April 7, 2005 to husain@yahoo.com copying Deepak Chopra

2    and Afzal Ahmed.   The subject is regarding funding

3    requests 4/6/2005.

4            Are you familiar with this e-mail?

5       A.   No, but I can just read it and see if I can

6    recollect it.

7       Q.   Okay.  Go ahead and take a look at it and just

8    look up when you're done.

9       A.   It was a problem.

10      Q.   Pardon?

11      A.   It was a problem and I must have discussed

12   this with Gary.  I should have discussed this with

13   Gary.  I'm sure I did.

14      Q.   What is the problem that's being noted here?

15      A.   Invoices are not being paid on time.   There

16   was a miscommunication regarding the --

17      Q.   Can you show -- can you show me in the e-mail

18   what you're referring to?  Is it the invoice for

19   $12,382.50 that's not being paid on time?

20      A.   That's not being paid on time, yeah.  And he

21   promised to get back to Iqbal on the 90-day old

22   invoices.

23      Q.   So this is a time when there is a problem.

24           Would you have looked at the funding sheet at

25   this time?

Case: 10-05196   Doc# 108-5  Filed: 07/23/12  Entered: 08/10/12 15:42:19  Page 1
of 30

1    A.  I would have looked at the -- I would have

2  asked Gary on this stuff and I think I approached him

3  on that.  And he basically told me the invoices would

4  be paid late.  I don't recollect the exact

5  conversation, but I did start talking to him.  I talked

6  to Iqbal because he was having his funding delayed by

7  90 days.  He was charging interest, but it should not

8  be over 90 days.

9    Q.  Do you recall reviewing the funding sheet at

10  this time?

11    A.  I don't recall that.

12    MR. CAMPAGNA:  The next exhibit is

13  Exhibit 111.

14    (EXHIBIT 111 WAS MARKED FOR IDENTIFICATION.)

15  BY MR. CAMPAGNA:

16    Q.  This is an e-mail from Gary Wimp dated

17  Tuesday, April 12, 2005 to husain@yahoo.com copying

18  Deepak Chopra and Afzal Ahmed regarding Deepak's

19  check.

20    Do you recognize this e-mail?

21    A.  No.

22    Q.  It says here:  "Deepak left for vacation for

23  ten days and did not give a check to me nor did I see

24  him prior to his leaving.  Afzal and I have a ten

25  o'clock conference."

1          Okay.  Do you recall a vacation in April

2   2010?

3      A.  2005 you mean?

4      Q.  2005.

5      A.  I must have gone on vacation in 2005.  I'm

6   sure I did.

7      Q.  Do you recall a conversation with Gary where

8   you were to give him a check for Iqbal?

9      A.  No.

10     Q.  So Gary would be the one to ask on that?

11     A.  Yes.

12         MR. CAMPAGNA:  Next is Exhibit 112.

13         (EXHIBIT 112 WAS MARKED FOR IDENTIFICATION.)

14  BY MR. CAMPAGNA:

15     Q.  It's an e-mail from you, Deepak Chopra, dated

16  Tuesday, April 12th, 2005 at 9:40 a.m.  It appears to

17  be about 31 minutes after the e-mail which is

18  Exhibit 111.  It looks like you wrote it to Mr. Husain,

19  Mr. Wimp and copied yourself at IDCTechnologies.com.

20         Do you recognize this e-mail?

21     A.  No.

22     Q.  Do you recall it?

23     A.  No.

24     Q.  It says here:  "I'm in Mexico and I will not

25  be back until the 17th."

Case: 10-05196   Doc# ...   Filed ...   Entered: 08/16/12 15:42:15   Page 3 of 30
TORREANO SHORTHAND REPORTING (866) 1760-DEPO

1    A.   All I can say on this e-mail reading is that

2  Iqbal wanted me to take over the invoices over 90 days

3  old and give him a check and he would only fund 60

4  days.

5    Q.   In April of 2005 were you in Mexico?

6    A.   I'm sure I was.  I don't recall -- I don't

7  recollect.

8    Q.   Where would you have gone in Mexico?

9    A.   I traveled a lot.  We were on a cruise.

10    Q.   Did you have e-mail access when you were in

11  Mexico?

12    A.   The ship had access.

13    Q.   So this was probably a ten-day cruise?

14    A.   I don't recollect.  I can't recollect the 2005

15  vacation.  I took many vacations.

16    Q.   The second line, it says:  "I will be

17  depositing the money into your account as promised

18  either through Serena or on my return."

19      Do you recall making that promise?

20    A.   No.

21    Q.   Is that something that you may have said to

22  Iqbal at the time when --

23    A.   I could have.

24    Q.   Okay.

25    A.   I see it there.

550

1    Q.   If you look back at Exhibit 110, the bottom

2  half is an e-mail from Iqbal dated Wednesday, April 6th

3  saying:  "Gary, I've got serious problems with the

4  funding this week."

5         Then you've got Gary's response on -- that was

6  at 10:44 p.m. on April 6th.  And then 10:47 a.m. on

7  April 7th, you've got Gary, the last line of his e-mail

8  saying:  "Your holding up on our funding is having a

9  major negative impact on our business."

10   Q.   So this is a serious problem?

11   A.   Absolutely.

12   Q.   "I.e., paying our employees"?

13   A.   Yes.

14   Q.   So five days after Gary's e-mail that you're

15  copied on to Iqbal saying it's causing problems for us,

16  we need to pay our employees, essentially saying please

17  fund us, you're sending an e-mail to Iqbal on

18  April 12th that you don't recall, but it says:  "I'm in

19  Mexico.  I won't be back until the 17th.  I'll be

20  depositing the money into your account as promised

21  either through Serena or on my return."

22   A.   I'll take all 90 --

23        MR. ISON:  Wait a minute.  Wait a minute.

24  That's not a question.

25        THE DEPONENT:  Go ahead.  You're reading part

Case: 10-05196   Doc 248-3 Filed 07/18/12   Entered: 08/16/12 15:42:15   Page 5
of 30

TORREANO SHORTHAND REPORTING (866) 160-DEPO

1  of the e-mail.  So I'm trying to read the whole e-mail.

2          Go ahead.

3          MR. ISON:  You respond to questions.  That

4  wasn't a question.  It was a statement.

5          THE DEPONENT:  Okay.

6  BY MR. CAMPAGNA:

7      Q.  So noting here that there was a serious

8  problem going on with the funding at this time and also

9  noting that you've said when there's a serious problem

10  you've wanted to know about it -- and, in fact, you did

11  know about it; correct?  You did know about this

12  particular serious problem with Iqbal saying that he's

13  not going to fund anymore; is that right?

14      A.  Yes.

15      Q.  Okay.  And here there's a statement that seems

16  to be from you that you don't recall that says, "I will

17  be depositing the money into your account as promised

18  either through Serena or on my return."

19          At this point is your memory any clearer about

20  this particular statement?

21      A.  No.

22      Q.  Is it unusual that you would have made a

23  statement to Iqbal in an e-mail saying that you'll be

24  depositing the money into his account as promised?

25      A.  I could have made the statement.

552

Case: 10-05196   Doc#208-3  Filed: 07/23/12   Entered: 08/10/12 15:42:15   Page 6 of 30

1      Q.   Did anybody have access to your e-mail in

2   April of 2005?

3      A.   Many people did.

4      Q.   Okay.  Any reason to think that somebody other

5   than you wrote this e-mail?

6      A.   I don't know that.  I can't recollect.

7      Q.   Any reason to think that somebody other than

8   you wrote this e-mail?

9      A.   Could have.  On my instructions or themselves

10  because I was on a trip.

11     Q.   Who would you have instructed to write this

12  e-mail?

13     A.   I had a lot of employees working for me that

14  had access to my e-mail.  Serena had access to my

15  e-mail.  A lot of other people had.  I don't remember,

16  but a lot of people had access to my e-mail.

17          MR. CAMPAGNA:  Would you repeat my question,

18  please.

19          THE COURT REPORTER:  "Question:  Who would you

20          have instructed to write this e-mail?"

21          THE DEPONENT:  I do not recollect if I

22  instructed who to write this e-mail to.

23          MR. CAMPAGNA:  I'm not asking you to

24  recollect.  I'm asking -- I want you to repeat the

25  question again, please.  Listen to it carefully.

1    THE COURT REPORTER: "Question: Who would you

2    have instructed to write this e-mail?"

3    THE DEPONENT: I do not know.

4  BY MR. CAMPAGNA:

5    Q. Would you have instructed anybody to write

6  this e-mail?

7    A. I do not know. I do not recollect.

8    Q. Have you ever instructed somebody to write an

9  e-mail on your behalf?

10    A. Many times.

11    Q. Have you ever instructed somebody to write an

12  e-mail on your behalf to Mr. Husain?

13    A. I'm sure I have.

14    Q. About how many times?

15    A. I don't recollect.

16    Q. Who would you have instructed to write an

17  e-mail on your behalf to Mr. Husain?

18    MR. ISON: Objection. Asked and answered.

19    THE DEPONENT: I don't recollect.

20  BY MR. CAMPAGNA:

21    Q. Would it have been Gary Wimp?

22    A. Six years ago. I don't remember.

23    Q. I understand six years ago, but you're asking

24  somebody to write something for you and sign it. It's

25  not just something that somebody would do without

554

1    thinking about it.

2          MR. ISON:  Objection.  Argumentative.

3    BY MR. CAMPAGNA:

4       Q.  Isn't that correct?

5          MR. ISON:  Objection.  Argumentative.

6          THE DEPONENT:  When I --

7          MR. ISON:  Wait a minute.  When I object you

8    don't say anything.

9          Objection.  Argumentative.

10         MR. CAMPAGNA:  You can answer.

11         THE DEPONENT:  I don't have an answer.  I

12   don't remember.

13         MR. CAMPAGNA:  This isn't one of the

14   situations where there's a don't remember question.

15         Can you repeat my question back?

16         MR. ISON:  Objection.  Argumentative.

17         THE COURT REPORTER:  "Question:  I understand

18         six years ago, but you're asking somebody to

19         write something for you and sign it.  It's not

20         just something that somebody would do without

21         thinking about it."

22         THE DEPONENT:  I don't recollect.

23   BY MR. CAMPAGNA:

24      Q.  Is it fair to say that if you were having

25   somebody write an e-mail to Mr. Husain on your behalf

                                                        555

Case: 10-05196   Doc # 317   Filed: 07/11/12   Entered: 08/10/12 15:42:15   Page 9 of 30

1    that it would be somebody that you trusted?

2        A.   Not necessarily.

3        Q.   Would it be somebody that you had

4    communication with?

5        A.   Someone who worked for me.

6        Q.   Would you have instructed them in e-mail to

7    write the e-mail to Mr. Husain?

8        A.   No.  It could be by conversation on the

9    telephone.

10       Q.   Do you know whether you deposited money into

11   Mr. Husain's account upon your return from Mexico?

12       A.   I do not recollect that either.

13       Q.   It also says here:  "I will take over 90 days

14   invoices that are and expedite the payment by calling

15   vendors directly."

16            What does that mean?

17       A.   It means anything over 90 days I will take

18   over invoices by paying Mr. Iqbal, although he doesn't

19   fund those anymore, and I will call the vendors

20   personally or through my accountant to expedite the

21   payments.

22       Q.   Upon your return from Mexico, did you pay on

23   the invoices that were 90 days or older?

24       A.   I don't recollect if I paid or not.

25       Q.   If you had, where would the record of those

1  payments be?

2       A.   In Quickbooks.   In the accounting system.

3       Q.   And would they be anywhere else besides the

4  Quickbooks?

5       A.   No.   They would be in the accounting system.

6       Q.   There may be a bank record of it as well; is

7  that correct?

8       A.   I'm sure there would be.

9       Q.   It may be in the funding sheet as well; is

10  that correct?

11       A.   It could be.

12       Q.   But you wouldn't know because you didn't look

13  at the funding sheet; is that correct?

14       A.   That's true.

15       Q.   So I'd have to ask Gary Wimp on that; is that

16  correct?

17       A.   Yes.

18       Q.   Then it says:   "Bear with me.   I am on a

19  cruise ship and communication is very limited.

20  Regards," capital letters, "Deepak."

21            Is it a true statement that communication is

22  very limited when you're on a cruise ship?

23       A.   Yes.

24       Q.   But you did have access to e-mail from the

25  cruise ship; is that right?

557

1    A.   I don't recollect.   I could have.

2    Q.   Would it -- would it have been from your own

3    computer?   Did you bring a computer with you on a

4    cruise?

5    A.   No.

6    Q.   Ever?

7    A.   In 2005?

8    Q.   Ever.

9    A.   I've not taken a cruise for three years.   So,

10   no, I haven't.   I haven't got a computer on a cruise

11   ship.

12   Q.   Pardon?

13   A.   No, I haven't.

14   Q.   You have never brought a computer, your own

15   computer with you on a cruise ship?

16   A.   No, I haven't.

17   Q.   So if you had had e-mail access, it would have

18   been on the ship's computers; correct?

19   A.   Correct.

20   Q.   Or maybe at a port where you stopped?

21   A.   I don't recollect using the port ever.

22   Q.   So it would have been on the cruise ship?

23   A.   Uh-huh.

24   MR. CAMPAGNA:   The next exhibit is

25   Exhibit 113.

Case: 10-05196   Doc#188-9   Filed: 07/25/12   Entered: 08/10/12 15:42:15   Page 12 of 30

TORREANO SHORTHAND REPORTING (866) 769-DEPO

1             (EXHIBIT 113 WAS MARKED FOR IDENTIFICATION.)

2  BY MR. CAMPAGNA:

3     Q.  The top line is an e-mail from Gary Wimp dated

4  Tuesday, April 12th, 2005 to Iqbal Husain copied to

5  Deepak Chopra and Afzal Ahmed.  The subject is "forward

6  Deepak's check."

7         Do you recognize this e-mail?

8     A.  No, I don't.

9     Q.  What is the e-mail from Gary referring to?

10     A.  Adecco's amount over 90 days old.  It's

11  $34,888.28.

12         MR. CAMPAGNA:  The next exhibit is Exhibit

13  114.

14         (EXHIBIT 114 WAS MARKED FOR IDENTIFICATION.)

15  BY MR. CAMPAGNA:

16     Q.  Before we get to Exhibit -- excuse me -- 114,

17  do you -- do you recall how this issue with Adecco in

18  April of 2005 ultimately got resolved, if at all?

19     A.  Adecco was a slow payor.  They would pay late,

20  and I think we ended up not collecting some money from

21  them.  That's the best of my recollection.  Some of the

22  money was never collected from Adecco.

23     Q.  Going back to Exhibit 112, when you or

24  somebody that you instructed wrote to Mr. Husain saying

25  that you were going to deposit money to his account

1    when you got back from your cruise, any idea where the

2    money was going to come from?

3        A.   It says "escrow."  Maybe escrow, closing a

4    property, financing my house.  It says right there,

5    first line.

6        Q.   What is the escrow -- it says "MT," and then

7    escrow appears to be misspelled.  "MT escrow scheduled

8    for last Friday."

9            What is that referring to?

10       A.   Escrow closing, some properties closing or

11   money being taken out of a personal account.

12       Q.   Is this supposed to be my escrow scheduled or

13   is MT particular initials for something?

14       A.   I don't recollect -- I don't recollect that.

15       Q.   But at the time, April 12th, when this e-mail

16   was written, there was some escrow scheduled for the

17   previous Friday that you were thinking was going to

18   close on Wednesday, April 13th?

19       A.   That's what the e-mail says.

20       Q.   If you can look at Exhibit 113 and referring

21   to Adecco, do you know why the money from Adecco was

22   not collected?

23       A.   Because they always paid late.  We always had

24   problems with payment with Adecco.

25       Q.   That's the only reason, because they paid

560

1  late?

2      A.  They always paid late.  That was not the only

3  reason, but they had also problems with disputing

4  amounts that we billed.  It was just a mess.  Their

5  accounting system was a disaster.

6      Q.  Can you explain those problems?

7      A.  Adecco used to place people with Stanford and

8  we had to bill Adecco to work with Stanford.  So there

9  was always problems with Adecco, accounting problems,

10  Stanford paying overtime to Adecco, and Adecco not

11  paying us overtime.  So Adecco was a very difficult

12  account for us.  It required a lot of handholding.

13      Q.  Were you involved in the handholding?

14      A.  I was involved in not the handholding, but I

15  was involved in the negotiations with -- with Adecco in

16  the beginning and then talking to Gary with the

17  frustrations he was having trying to collect the money

18  and disputes arising on the money.

19          It was just -- there was -- it was an

20  in-between.  Adecco was an in-between company, a

21  billing company.  You would not go directly through

22  Stanford.  So it had to go through Adecco.  We had to

23  bill Adecco.  Adecco billed Stanford.  Stanford paid

24  Adecco.  So it was always slow payment.  Always slow

25  payment.

Case: 10-05196   Doc# 100-3   Filed: 07/25/12   Entered: 08/10/12 15:42:19   Page 15 of 30

1     Q.  Focusing back to 114, Exhibit 114, this is an

2     e-mail from Afzal Ahmed dated Sunday, July 31st, 2005

3     to Iqbal Husain, Gary Wimp and Serena.

4          Do you recognize this e-mail?

5     A.  No, I don't.

6     Q.  Do you recognize the content of the e-mail

7     where it says, "We received a check via Riviera Finance

8     for $4,740.73"?

9     A.  That's -- Riviera was a funding company for

10    us.

11    Q.  Pardon?

12    A.  Riviera was a funding company for us, for

13    STM.  So we received a check for 4,740.73.

14    Q.  They were a funding source such as?

15    A.  Mr. Husain.

16    Q.  Mr. Husain.  It says here:  "I've still not

17    found the $20,000 difference yet."

18         Do you know what that was referring to in July

19    of 2005?

20    A.  No.

21    Q.  If there was $20,000 of a difference that

22    Afzal is looking into, he's writing it to Mr. Husain.

23    This is probably a $20,000 difference between what

24    Iqbal was paid and what he was supposed to be paid.

25    A.  Uh-huh.

1          MR. ISON:  Objection.  Calls for speculation.

2    BY MR. CAMPAGNA:

3        Q.  If there was a $20,000 difference that Afzal

4    Ahmed was looking into regarding Iqbal Husain, is

5    this -- is this a difference that you would want to be

6    informed about?

7        A.  If it -- I would be informed about it, but the

8    e-mail was not sent to me.  So basically they were

9    still figuring out the accounting where the difference

10   was.  He's looking at his numbers and finding out the

11   difference for us.

12       Q.  This is the type of problem that you would

13   want to be informed about; is that correct?

14       A.  This is a type of problem that happens in a

15   factoring company which can be resolved between the

16   accountant and the factoring company by looking at

17   numbers.

18          MR. CAMPAGNA:  Could you repeat my question,

19   please.

20          THE COURT REPORTER:  "Question:  This is the

21          type of problem that you would want to be

22          informed about; is that correct?"

23          THE DEPONENT:  Yes.

24   BY MR. CAMPAGNA:

25       Q.  When you look at the attachment line, it

1   says:  "Attachments:  Non-performing 7/29/05."  Subject

2   of the e-mail is also non-performing 7/29/05, and then

3   attached is a color-coded funding sheet for Iqbal.

4   It's called Iqbal's funding sheet and it has green and

5   yellow lines on it.

6        A.   Uh-huh.

7        Q.   It also has purple numbers.

8             Do you recall ever seeing a color-coded

9   funding sheet for Mr. Husain?

10       A.   No.

11       Q.   So information relating to this I'd have to

12  ask Afzal Ahmed or Gary Wimp; is that correct?

13       A.   Yes.

14       Q.   And also maybe Serena Bem?

15       A.   Yes.

16            MR. CAMPAGNA:  The next exhibit is

17  Exhibit 115.

18            (EXHIBIT 115 WAS MARKED FOR IDENTIFICATION.)

19  BY MR. CAMPAGNA:

20       Q.   Go ahead and look at Exhibit 115.  Look up

21  when you're done.

22            You've had a chance to look at Exhibit 115?

23       A.   Yes.

24       Q.   The top of the exhibit, it says it's an e-mail

25  from Iqbal Husain dated Thursday, April 14th, 2005 to

TORREANO SHORTHAND REPORTING (866) 760-DEPO

Case: 10-05196   Doc# 100-3   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 18 of 30

1   Gary Wimp and Deepak Chopra copying Serena Bem and

2   Afzal Ahmed regarding the funding for SearchTech

3   Medical.

4          Do you see that there?

5      A.   Yes.

6      Q.   Do you recognize this e-mail?

7      A.   No.

8      Q.   April 14, 2005 apparently you would have been

9   on the cruise in Mexico; is that right?

10     A.   I suppose so.

11     Q.   Okay.  Do you recall Iqbal being upset?  It

12  says here on the first line, "I am upset."

13     A.   I recall the funding not going according to

14  plan.  There were delays in payments and Gary asked me

15  to help out because Iqbal didn't want to fund.  I

16  remember partially what happened and we would be shut

17  down if no money came in.  That's what I remember.  And

18  Gary promising me that he's going to look into this and

19  clear this up right away and make sure everything is on

20  board.

21          That's what I remember.  That's exactly what I

22  remember.  Gary promising me to take care of it, asking

23  me to help out in funding the company so that he can

24  pay his people.  And Iqbal unwilling to fund.  Yes, I

25  remember some of the conversation.  Not all of it, but

1    I do remember some of it.

2         Q.   And what conversations are you referring to

3    exactly?

4         A.   That there was something wrong with the

5    funding, that Iqbal's money was stuck and not being

6    paid on time.

7         Q.   Okay.  So this is a -- this is a call between

8    you and Gary?

9         A.   I don't know if it's a call or it was made in

10   person, but we had a very clear conversation that we

11   should find out what's wrong with Iqbal's funding and

12   Gary promised me that he would take care of it himself

13   and clean everything up.  In the meantime, he wanted me

14   to fund the invoices to SearchTech Medical and pay

15   Iqbal off on the 90-day-old invoices.

16        Q.   When you say that he wanted you to fund the

17   invoices, who are you referring to?

18        A.   Gary Wimp wanted me to fund.

19        Q.   There's a conference call mentioned here in

20   Iqbal's e-mail.

21             Do you recall whether you were on that

22   conference call?

23        A.   No, I don't recall.

24        Q.   So it seems that this is a fairly tense time

25   around this funding problem; is that fair to say?

1    A.   It was a tense time.  It's a miscommunication

2  which has to be resolved between Iqbal, Gary, Afzal and

3  me, and me being an outsider I'm trying to figure out

4  what was happening.  And I confronted Gary about it,

5  and he told me that he wanted everything cleaned up,

6  and in the meantime he wanted me to help fund some of

7  the invoices and then take over the invoices that were

8  over 90 days old for Iqbal.  I don't know if it's 90

9  days or 60.  I think 90 days old.

10    Q.   When you say that you were an outsider, was

11  that because you were on a cruise ship?

12    A.   No.  Because I'm not running the company.  I

13  was just -- Gary is doing all the expenses.

14    Q.   Is this the type of conversation that you

15  would have remembered if you were standing on a cruise

16  ship having to interrupt your vacation to take it?

17    A.   I don't know if I had it in the cruise ship.

18  I had a conversation with Gary.  I never said on a

19  cruise ship.

20    Q.   When was the conversation in relation to the

21  April 14th e-mail?

22    A.   I don't recollect the dates.

23    Q.   Was it more than a week before?

24    A.   I have no idea.  I wouldn't go guessing

25  there.

567

1    Q.  I don't want you to guess.  I'm just trying to

2    narrow the time frame.

3    A.  I told you I don't remember.

4    Q.  Sometime in April of 2005?

5    A.  I have no idea.  Around that time.  And when

6    all this thing was happening we had a conversation with

7    Gary.

8    Q.  Would it have been as early as February of

9    2005?

10    A.  I have no idea.  I cannot guess.  Sorry.  I

11    can't give you that answer.  I cannot guess.

12    Q.  I don't want you to guess.  We're just trying

13    to narrow down the time frame here of your conversation

14    with Gary.

15         I'd have to ask him about that; is that right?

16    A.  Absolutely.

17         MR. ISON:  It's 12:15.

18         MR. CAMPAGNA:  Okay.  Let me just finish up

19    with this exhibit and then we'll make an adjustment on

20    the lunch hour.

21         MR. ISON:  Yeah.  But I've got somebody

22    waiting for me.

23    BY MR. CAMPAGNA:

24    Q.  If you look at the second page of the e-mail,

25    it's from Deepak Chopra, Thursday, April 14th, 2005 to

568

Case: 10-05196   Doc#1884   Filed: 07/17/12   Entered: 08/10/12 15:42:13   Page 22 of 30

1    Serena at IDCTechnologies.com, Husain and Deepak at

2    IDC.

3              Okay.  Do you recognize that part of this

4    e-mail chain?

5        A.  I recognize it, but I don't remember sending

6    it or I don't remember the e-mail in particular.  I can

7    read it and tell you what it says.

8        Q.  Okay.  What does it say?

9        MR. ISON:  No.

10   BY MR. CAMPAGNA:

11       Q.  No, not what it says.  What is it referring

12   to?

13       A.  It's referring to the problem with the

14   funding.  That's a need to audit all the invoices to

15   see where the money is going.  I'm on a ship or I'm on

16   a vacation.

17       Q.  Well, it says here:  "I had told Iqbal I would

18   take care of it on my return."

19       A.  Yes.

20       Q.  So this means that you told it to him

21   directly?

22       A.  I don't remember.  I told Iqbal I'll take care

23   of it on my return.  Find out what the problem was,

24   what invoices with Gary, where the money was going.

25       Q.  It also says, "I will pick up the invoices on

569

1   my return"; right?

2        A.   Yeah.   I --

3        Q.   Just a minute.   Does that mean --

4        MR. ISON:   Wait a minute.   You're not letting

5   him finish his question, and you're answering before he

6   finishes his question.

7        Let's take a break.   I want to take a break.

8        MR. CAMPAGNA:   Let me ask him one more

9   question.

10        MR. ISON:   I have somebody waiting for me.

11   It's an imposition.

12        MR. CAMPAGNA:   Mr. Ison, let me ask him one

13   more question and then we'll break.

14        MR. ISON:   One more question.

15        MR. CAMPAGNA:   I'm trying to get through a

16   certain section here and you're interrupting an

17   important part of your client's testimony.

18        MR. ISON:   I'm not interrupting the

19   testimony.   You're interrupting the testimony.   You're

20   cutting him off when he's giving an answer, but go

21   ahead and ask your one more question.

22   BY MR. CAMPAGNA:

23        Q.   Mr. Chopra, my apologies if I was speaking

24   over you, and it seems like we -- neither of us --

25        A.   No problem.

1     Q.   -- was letting the other respond, but we're

2   working out that kink.

3        Okay.  It says here:  "I will pick up the

4   invoices on my return."  Do you see that in your

5   e-mail?

6     A.   Where is that?

7     Q.   The e-mail that we were just looking at.

8     A.   Yes.

9     Q.   What does that mean that you will pick up the

10  invoices on your return?

11    A.   I will pick up the invoices on my return and

12  review the invoices to see what's wrong, where the

13  invoices are and do a complete investigation on what

14  was happening.

15    Q.   Does that mean that you will pay the invoices

16  on your return?

17    A.   No.  It doesn't mean I would pay the invoices

18  on my return.  It means I will investigate the invoices

19  on my return.  Depending on the outcome we'll see what

20  we can do.

21        MR. CAMPAGNA:  We can go off the record.

22        (Lunch recess taken.)

23

24

25

1    San Jose, California                January 27, 2012

2                    AFTERNOON SESSION

3          MR. CAMPAGNA:  We can go back on the record.

4    BY MR. CAMPAGNA:

5      Q.  We were talking about Exhibit 115, this e-mail

6    chain that starts with an e-mail from Iqbal Husain

7    dated Thursday, April 14th, 2005.  And when I say it

8    starts with that e-mail from Iqbal Husain, I just mean

9    that that's what appears on the top of the first page

10   of the exhibit.

11         I'd like to go over this now rather than doing

12   it at a later time because there -- I'll tell you what

13   this is in a moment.  Because there was a discussion or

14   comments on your part that you didn't know whether you

15   sent these particular e-mails, Exhibit 112 and the one

16   that's in Exhibit 115.  Okay?

17         So I want to put Exhibit 112 in front of you.

18   That's mine actually.  The actual exhibit is here.

19         Exhibit 112 and Exhibit 115.  And when you

20   look at Exhibit 112, an e-mail that's at the top of the

21   page looks like it has a pretty distinct character to

22   it, all lower case, dashes between what appear to be

23   sentences.

24         Do you see that there?

25      A.  Yes.

                                                        572

1    Q.   Would you agree that it seems to have a pretty

2  distinct character to it?

3    A.   It's an e-mail.

4    Q.   Let's compare it to the e-mail in Exhibit 115

5  that seems to be from you that you didn't recall

6  sending.  It's on the second page there.

7        Here's another e-mail that seems to have a

8  distinct character to it.  It's all lower case with

9  dashes between sentences.

10       In looking at the character of that e-mail and

11 comparing it to the character of the e-mail,

12 Exhibit 112, does that jog your memory at all regarding

13 whether or not you sent these e-mails?

14   A.   I don't recall that far back.  I don't recall

15 that far back.  I'm not saying I didn't send it.  I'm

16 saying I don't recall if sent it or who sent it.

17   Q.   Do you have a habit of writing e-mails in

18 lower case letters?

19   A.   I just write e-mails in lower case.  I do.

20   Q.   Do you have a habit of putting dashes between

21 your sentences?

22   A.   Not really.  Not anymore.  Maybe I did

23 before.

24   Q.   At that time?

25   A.   I can't recollect.  I can't recollect that far

573

1    back.

2        Q.  Do you know of anybody else -- do you know of

3    anybody else in 2005 that you may have instructed to

4    send an e-mail who had this character of writing

5    e-mails in all lower case and dashes between

6    sentences?

7        A.  No, I don't recollect.  I don't think so.  I

8    don't recollect.

9        Q.  Well, there's two things.  There's "I don't

10   think so" and "I don't recollect."  So --

11       A.  I don't recollect.

12       Q.  Well, let's go back to the part where you said

13   you didn't think so.  Why would you say you didn't

14   think so?

15       A.  I don't know what -- I -- frankly, all I said

16   was I don't recollect these e-mails.

17       Q.  What I was trying to do is point out they seem

18   to have a pretty distinct character.  You mentioned in

19   part in response to that that at the time you were

20   writing e-mails in lower case.

21       A.  I was writing e-mails.  Maybe I was writing

22   e-mails in lower case, but I was writing e-mails at

23   this time.

24            MR. ISON:  Speak up.

25            THE DEPONENT:  I was writing e-mails.

Case: 10-05196   Doc# 106-3   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 28
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 30

1    BY MR. CAMPAGNA:

2        Q.   But you don't remember at the time that you

3    were writing e-mails in lower case?

4        A.   I don't recollect the e-mails and I don't

5    remember writing in lower case.

6        Q.   Do you write e-mails in lower case now?

7        A.   I've improved my e-mail skills now.

8        Q.   In what regard?

9        A.   I'm more precise.   I can type faster.

10       Q.   Do you now use upper case letters at the

11   beginning of sentences?

12       A.   I don't know if I do or not.   I'll have to

13   look at my new e-mails and see.   I've never noticed

14   that.   I just send the e-mails out.

15       Q.   Do you notice whether you use periods at the

16   end of sentences now?

17       A.   I use periods.   I try and use periods.

18       Q.   Is that one of the improvements that you were

19   referring to in the quality of your e-mails?

20       A.   Yes.   I have improved the quality of my

21   e-mails, I think.

22       Q.   And you're still not able to say that you sent

23   these e-mails?

24       A.   I don't recollect these e-mails.   I didn't say

25   I did not send them.   I don't recollect the e-mails.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  That's what I'm saying.  My recollection is not that I

2  did not send it.  I can't remember if I sent it or not

3  or if I instructed someone else to send it or not.

4     Q.  And your testimony is also that you don't know

5  whether the form of the e-mail, lower case with dashes

6  in between sentences, is the form of an e-mail that you

7  would have been sending at the time?

8        MR. ISON:  The question is argumentative.

9  He's basically said that he sent it or he authorized

10 someone to send it, which is the same as him sending

11 it.  And he doesn't recollect doing either one of

12 them.  And the document speaks for itself and you're

13 free to argue whatever you want from that conclusion

14 should it be deemed to be relevant.

15        MR. CAMPAGNA:  Could you repeat my question.

16        THE COURT REPORTER:  "Question:  And your

17              testimony is also that you don't know whether

18              the form of the e-mail, lower case with dashes

19              in between sentences, is the form of an e-mail

20              that you would have been sending at the time?"

21        THE DEPONENT:  I would be sending an e-mail

22 with lower cases at that time.

23 BY MR. CAMPAGNA:

24    Q.  With the dashes between the sentences?

25    A.  The way I send the e-mails could be dashes in