1    between, yes.

2        Q.   If I understand SearchTech Medical's

3    relationship with Adecco correctly, that relationship

4    was one where Adecco also provided medical employees to

5    their vendors; is that correct?

6        A.   Yes.

7        Q.   At times when Adecco did not have sufficient

8    medical personnel to staff their accounts, they

9    subcontracted with SearchTech Medical; is that

10   correct?

11       A.   Yes.

12       Q.   And at those times SearchTech Medical would

13   use SearchTech Medical's employees to staff vendors on

14   behalf of Adecco?

15       A.   Yes.

16       Q.   After SearchTech Medical's employees performed

17   their work, they would need to be paid; correct?

18       A.   Yes.

19       Q.   They were W-2 employees?

20       A.   Yes.

21       Q.   So they would need to be paid on a regular

22   basis?

23       A.   Yes.

24       Q.   And was that every two weeks?

25       A.   I don't recollect.

1    Q. Or every week?

2    A. It could be two weeks. It could be monthly.

3  It could be weekly. It could be weekly.

4    Q. Did it depend on the employee or was it -- it

5  was either weekly or it was either every two weeks or

6  it was monthly for everybody?

7    A. Yes, the same for everybody.

8    Q. Whatever it was, it was the same for

9  everybody?

10    A. Yes.

11    Q. Some periodic payment arrangement?

12    A. Yes.

13    Q. Okay. In order for SearchTech Medical to pay

14  its employees that were doing work on behalf of Adecco,

15  Adecco would need to pay SearchTech Medical?

16    A. Yes.

17    Q. So at the times when there were overdue

18  invoices that Adecco had not paid, it was incumbent on

19  SearchTech Medical to try to get that money from

20  Adecco; correct?

21    A. Correct.

22    Q. And that was to avoid any problems with, for

23  example, the Labor Board in SearchTech Medical not

24  being able to pay its employees?

25    A. Yes.

578

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:43:19   Page 2 of 31

1    Q.  You may recall from the e-mails that there

2  was -- there were discussions about invoices being more

3  than 90 days late; right?

4    A.  Yes.

5    Q.  And there was a figure in one of the e-mails

6  of about $34,000 --

7    A.  Yes.

8    Q.  -- of the invoices being late from Adecco at

9  one point; correct?

10    A.  Yes.

11    Q.  What efforts did SearchTech Medical make to

12  force Adecco to pay for the services that SearchTech

13  Medical employees rendered on behalf of Adecco?

14    A.  They called Adecco's accounts payable all the

15  way up to the management chains, sent them invoices or

16  timecards showing that the work was performed at

17  Stanford, overtime and went up the chain to find out

18  why it was not paid or it had been delayed.

19    Q.  At the time that the contract between Adecco

20  and SearchTech Medical ended, had Adecco paid all of

21  the money that Adecco, according to SearchTech Medical,

22  owed SearchTech Medical and SearchTech Medical's

23  employees?

24    A.  No.

25    Q.  Do you know approximately how much Adecco had

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/13 15:42:19   Page 3 of 31

1  not paid at that time?

2      A.  I don't remember the number, but there

3  some invoices that were not paid by Adecco.

4      Q.  Do you know whether it was, say, more than

5  $100,000?

6      A.  I think it was close to fifty-eight or

7  seven -- fifty-nine, sixty thousand, seventy thousand.

8  I'm not sure exactly.  It shows up in the balance

9  sheet.

10      Q.  Did the fifty-nine or sixty thousand dollars

11  ever get paid?

12      A.  I don't know that.  I don't recollect that.

13      Q.  Who would be the one who would know that?

14      A.  Balance sheet should reflect that.  The

15  balance sheet should reflect that.

16      Q.  Would Gary Wimp know that?

17      A.  He may.  He could.

18      Q.  He was around at the time?

19      A.  Yes, he was around at that time.

20      Q.  If Adecco had not paid, say, that fifty-eight,

21  fifty-nine or sixty thousand dollars, SearchTech

22  Medical would still have to pay that amount of money to

23  its employees; is that correct?

24      A.  Yes.

25      Q.  In other words, non-payment by Adecco did not

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/13 15:42:19   Page 4
of 31
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    absolve SearchTech Medical's mandate to pay its own

2    employees?

3        A.  No.

4        Q.  Do you recall whether you personally had put

5    money into SearchTech Medical to cover the fifty-eight,

6    fifty-nine or sixty thousand dollar shortfall from

7    Adecco?

8        A.  I had put money in there.

9        Q.  Do you recall how much you put in?

10       A.  It was an ongoing basis.

11       Q.  And you had talked about -- earlier about how

12   you were factoring as Mr. Husain was factoring;

13   correct?

14       A.  I was factoring a very small amount of paper

15   by giving the money to the company for its day-to-day

16   expenses and its growth.  If they asked me for money, I

17   would give it to them.

18       Q.  That was around this time as well?

19       A.  In 2005, 2004, 2006.  Yes, I gave money, as

20   Mr. Husain did.

21       Q.  If I'm hearing you correctly, that's giving

22   money for some of the day-to-day operations?

23       A.  Plus using it for factoring.  I don't know if

24   I had a factoring agreement with SearchTech Medical.  I

25   may have had, but I was funding the company as well.

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/13 15:42:18   Page 5 of 31

1    Q.  Would you agree that the money that Adecco

2  owed to SearchTech Medical is different than just

3  day-to-day funding of SearchTech Medical for its

4  operating and expenses?

5    A.  Yes.  It is a factoring that is different.  It

6  was factored different.

7    Q.  So money that you -- if you had given money to

8  make up the -- to help SearchTech Medical make up the

9  Adecco shortfall, it would have been different than the

10  usual money that you were giving all along to

11  SearchTech Medical?

12    A.  Yeah.  I was also factoring the money.  I was

13  also factoring some accounts.  I was trying to make up

14  the shortfall.  I was trying to make up the shortfall

15  of the money that was short between expenses, the

16  growth of the company and income that was coming in.

17    Q.  You did say that you don't know whether

18  SearchTech Medical ever got paid in full from Adecco;

19  right?

20    A.  I have -- I don't know if they got paid or

21  didn't.  I don't know.  I'm sure they got paid some

22  money, but I'm not sure if they took a loss on that or

23  not.

24    Q.  You think they might have taken a loss?

25    A.  It will show up in Iqbal's funding sheet.

582

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 6 of 31

1    Q.   Is that the only place it would show up?

2    A.   If it was a shortfall and if Adecco was being

3 funded, it would show up in Iqbal's funding sheet that

4 those invoices were not being paid.

5    Q.   Would it show up anywhere else besides Iqbal's

6 funding sheet about whether or not those invoices

7 got -- had ever gotten paid?

8    A.   It would show up in the balance sheet.

9    Q.   In the balance sheet.  For whatever year that

10 relationship ended?

11    A.   I don't know if it ended, how it ended or if

12 it did end at all because we were doing business with

13 them for a long time.

14    Q.   How big of a company is Adecco; do you know?

15    A.   Oh, it's huge.  Multinational, international

16 company.

17    Q.   They have thousands of employees?

18    A.   Thousands, thousands.

19    Q.   Did you ever get a sense that Adecco did not

20 have the ability to pay SearchTech Medical for the

21 invoices that SearchTech Medical sent to it?

22    A.   I have no idea of their finances.  I cannot

23 guess.

24    Q.   What were the reasons that Adecco gave for not

25 paying the full amount of the invoices sent by

583

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 7 of 31

1  SearchTech Medical?

2      A.  It's not that they did not pay, but there were

3  problems maybe on time sheets.  There were problems

4  with Stanford not paying the overtime.

5  Miscommunication.  Just outright incompetency by their

6  accounts department.

7      Q.  Incompetency by Adecco's accounts --

8      A.  They were known --

9      Q.  -- department?

10     A.  Yeah.  They were known not to pay invoices

11  late.  And we were just a small vendor compared to

12  them.  So we had no choice but to go along with them.

13     Q.  They were known to not pay invoices timely?

14     A.  Yeah.  They have a reputation of paying the

15  invoices late.

16     Q.  It sounds like they had questions regarding

17  some of SearchTech Medical's time sheets?

18     A.  They may have because that's one of the

19  reasons they would not pay, you know, because they get

20  paid from Stanford and they make a markup on their --

21  their -- they make a markup between us and Stanford.

22  So there were markups.

23         So there could be many reasons why they delay

24  the payments.  They lose the paperwork.  We sent -- fax

25  it to them back again.  It's a big company and the

584

Case: 10-05196   Doc# 106-4   Filed: 07/23/13   Entered: 08/19/13 15:48:11   Page 8 of 31

1   accounting is the East Coast.  So we had a lot of

2   problems with Adecco.  That's why I remember that.

3   There were a lot of problems with Adecco, their

4   payments.  It's just not coming on time.

5           MR. CAMPAGNA:  We're going to mark the next

6   exhibit Exhibit 116.

7           (EXHIBIT 116 WAS MARKED FOR IDENTIFICATION.)

8   BY MR. CAMPAGNA:

9       Q.  Please look at Exhibit 116 and look up when

10  you're finished.

11          Do you recognize this document?

12      A.  Yes.

13      Q.  How do you recognize it?

14      A.  It was a lawsuit filed by Ashraf Tharwani in

15  the bankruptcy court against me personally.

16      Q.  This was one of the cases that you had

17  mentioned settled; is that correct?

18      A.  Yes.

19      Q.  If you turn to the third page of this

20  document, 11(a), it says:  "In or about 2004, Plaintiff

21  invested $54,000, 27,000 as Plaintiff's down payment

22  towards each unit with Defendant for the purchase of

23  two condominiums in North Carolina."

24          Do you recall this condominium transaction

25  that Plaintiff is alluding to on page 3?

1    A.  No, I don't.

2    Q.  Do you recall Plaintiff investing $54,000 with

3  you?

4    A.  No, I don't.

5    Q.  Do you recall Plaintiff investing $54,000 with

6  any of your entities?

7    A.  I don't know.  They may have.  I do not have

8  answers to that.  They could have.

9    Q.  What do you mean they could have?

10    A.  Not with my -- not personally with me.

11    MR. ISON:  He asked you about your entities.

12    THE DEPONENT:  Entities, no.  I don't know

13  that.

14  BY MR. CAMPAGNA:

15    Q.  On page 4 it says:  "In or about 2006,

16  Plaintiff provided 65,000 to Defendant in exchange for

17  which Defendant represented Plaintiff would receive 50

18  percent interest in LDE, LLC."

19    Do you see that there?

20    A.  Yes.

21    Q.  Is that a true statement?

22    A.  No.

23    Q.  How was it not a true statement?

24    A.  It was not $65,000.

25    Q.  How much was it?

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 10 of 31

1    A.   $50,000.

2    Q.   So in or about 2006, Plaintiff provided

3  Defendant $50,000 in exchange for which Defendant

4  represented Plaintiff would receive 50 percent interest

5  in LDE, LLC?

6    A.   That's not true.   33 percent.

7    Q.   So aside from the amount and the percentage

8  being incorrect, is the rest of that true, the rest of

9  that sentence true?

10    A.   The rest of the sentence is true.

11    Q.   Towards the end of that paragraph (c), it

12  says:   "Defendant never provided Plaintiff with her

13  membership interest in LDE, LLC."

14         Is that a true statement?

15    A.   No, that's a false statement.

16    Q.   What makes that statement false?

17    A.   Because they did not -- she did not know if

18  she wants to invest 33 percent or they wanted their

19  money back.

20    Q.   Did plaintiff ever receive a membership

21  interest in LDE, LLC?

22    A.   We gave her a membership interest in LDE of 33

23  percent, but she wanted the money to be as a loan and

24  she never committed to investing the 33 percent.

25    Q.   So Ms. Tharwani did become a 33 percent member

587

1    of LDE, LLC; is that correct?

2         MR. ISON:  Objection.  Calls for a legal

3    conclusion.

4         THE DEPONENT:  Informally.  Not formally

5    because she had not made up her mind.

6    BY MR. CAMPAGNA:

7         Q.  And why do you say "informally"?

8         A.  Because she gave us the money and she did not

9    want to know -- she wanted to make sure -- there's no

10   income in LDE and we negotiated for many months,

11   actually a year before she decided that she wanted her

12   money back.

13        Q.  In paragraph (d) it states:  "In or about

14   October 2007, Defendant represented to Plaintiff that

15   he was taking funds from which Plaintiff had provided

16   to Defendant on prior occasions in the total amount of

17   $42,031."  And then it goes on to say that defendant

18   would secure the amount due against two condominium

19   units near Biloxi, Mississippi.

20        A.  It's totally untrue.  It's not true.

21        Q.  Is any of this statement true?

22        A.  They are all -- they are half true, half not

23   true.  It's just -- we settled with it's not true.

24        Q.  Pardon?

25        A.  It's not true.

Case: 10-05196   Doc#: 106-4   Filed: 07/23/12   Entered: 08/10/12 15:43:19   Page 12
of 31
TORREANO SHORTHAND REPORTING (866) 760-1860

1    Q.  So is it true you never recorded a deed of

2  trust against the Biloxi condos as it states on page 5,

3  at the top of page 5?

4    A.  Because they never gave me the $42,000.  Why

5  record a deed of trust?

6         MR. ISON:  The question was did you record the

7  deed of trust?

8         THE DEPONENT:  No.

9         MR. ISON:  Good answer.

10        MR. CAMPAGNA:  Just so we keep the record

11 clear, can you repeat my question back, please.

12        THE COURT REPORTER:  "Question:  So is it true

13             you never recorded a deed of trust against the

14             Biloxi condos as it states on page 5, at the

15             top of page 5?"

16        THE DEPONENT:  No.

17 BY MR. CAMPAGNA:

18    Q.  My question was is it true that you never

19 recorded the deed of trust against the Biloxi condos?

20    A.  Yes.  Sorry.  Yes.

21    Q.  Paragraph (e).  "In or about October 2007,

22 Defendant represented to Plaintiff that he was taking

23 funds from which Plaintiff had provided the Defendant

24 in March of 2007 in the amount of $100,000."

25             And then it goes on to say:  "Defendant would

589

1    secure the amount due against real property located in

2    Montgomery, Alabama."

3         Is any of that true?

4    A.  No.

5    Q.  It goes on to say:  "Would secure the amount

6    on two condominium units at the real property located

7    at 50 Kepuhi Place, Maunalua, Hawaii, referred to

8    herein as units 109 and 113."

9    A.  I don't recollect that.

10   Q.  Is it true that you never recorded deeds of

11   trust against the Alabama property or against units 109

12   and 113?

13   A.  Yes.

14   Q.  Is it true that you did not pay plaintiff the

15   amount that plaintiff claimed was due under what the

16   plaintiff called a second clarification agreement?

17   A.  I don't recollect this.

18   Q.  At the time that this complaint was filed?

19   A.  I don't recollect that.  I don't know what the

20   second agreement is.

21   Q.  Paragraph 8 states:  "On or about July 3rd,

22   2007, Defendant represented to Plaintiff that he was

23   taking funds which Plaintiff had provided to Defendant

24   or to companies on prior occasions in the total amount

25   of approximately $87,000."

590

1          This is on page 5 of the complaint.

2   A.   Page 5?

3   MR. ISON:  5(f).

4  BY MR. CAMPAGNA:

5   Q.  Paragraph 5(f) says essentially that defendant

6  represented to plaintiff that defendant or the

7  companies in the amount of 87,000 was going to be paid

8  back in 60 days.

9   A.  I never committed to that.

10   Q.  It references a promissory note, the July 2007

11  note. Are you familiar with the July 2007 note?

12   A.  The only one note I'm familiar with is for

13  $100,000.

14   Q.  You're saying that there's only one note

15  relating to Ms. Tharwani and that was for $100,000?

16   A.  That I'm familiar with.

17   Q.  Is that mentioned earlier in the complaint?

18   MR. ISON:  The document speaks for itself.

19   Are you asking him to read the complaint to

20  see what it says?

21   THE DEPONENT:  It should be mentioned

22  somewhere in there.

23  BY MR. CAMPAGNA:

24   Q.  In (e) it mentioned the amount of $100,000 in

25  the context of there being a written agreement and

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 15
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 31

1  clarification of collateral on previous promissory

2  note.

3          Do you see that paragraph (e) on page 5?

4      A.  Yes.

5      Q.  Was there a promissory note for that

6  $100,000?

7      A.  Yes.

8      Q.  And that's the promissory note that you were

9  referring to?

10      A.  Yes.

11      Q.  That's the only one that you recollect --

12      A.  Best of my recollection.

13      Q.  -- relating to Ms. Tharwani?

14      A.  Yes.

15      Q.  And is that the only promissory note that you

16  recollect regarding Ms. Tharwani as to you personally?

17      A.  That was -- that note was not to me

18  personally.

19      Q.  It was between Ms. Tharwani and --

20      A.  That was between Ms. Tharwani and Chopra

21  Enterprises Corporation, to the best of my

22  recollection.

23      Q.  Thank you.  Well, it says here at the bottom

24  of the page, last line:  "Defendant never paid

25  Plaintiff the amount due under the July 7, 2000 note."

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 03/10/12 15:42:19   Page 16
of 31
TORREANO SHORTHAND REPORTING (866) 766-DEPO

1       A.   False.

2       Q.   How is it false?

3       A.   Because I paid interest on that note.

4       Q.   On the July 2007 note?

5       A.   I think that's the $100,000 note.  We paid

6  interest every month.

7       Q.   Well, this is saying the July 2007 note is an

8  $87,000 note.

9       A.   It's false.

10      Q.   So your understanding is on the $100,000 note

11 between Ms. Tharwani and Chopra Enterprises Corporation

12 that Chopra Enterprises Corporation paid the interest

13 on the note?

14      A.   Paid a lot of interest on that note.

15      Q.   Paid a lot of?

16      A.   Paid about $60,000 in interest on that note.

17      Q.   How do you know that?

18      A.   Because I remember the note and the amount

19 being paid.

20      Q.   Over what period of time?

21      A.   Approximately two years.

22      Q.   Paragraph (g).  In or about May 2006,

23 plaintiff and defendant entered into what the plaintiff

24 calls here an equity share agreement or an equity

25 agreement relating to some Ocean Springs, Mississippi

1    property, unit 71.

2              Do you recall that?

3        A.   Yes.

4        Q.   Do you recall the agreement?

5        A.   Yes.

6        Q.   Is it true that plaintiff paid you $23,000 --

7        A.   Yes.

8        Q.   -- as 50 percent of the down payment for

9    unit 71?

10       A.   Yes.

11       Q.   Did you represent to plaintiff that you would

12   give her a note and deed of trust to secure the

13   repayment of the $23,000?

14       A.   No.

15       Q.   So it's safe to say that you never provided

16   the deed of trust?

17       A.   Yes.

18       Q.   Did you ever repay the $23,000 payment?

19       A.   It's still owned by both of us.  It's still

20   there.  The property is still there.

21       Q.   So you didn't repay the $23,000?

22       A.   It's an equity sharing agreement that's still

23   in force.

24       Q.   There was no buyout of the equity share

25   agreement?

594

1     A.   No.

2         MR. CAMPAGNA:  The next exhibit we're going to

3   mark is Exhibit 117.

4         (EXHIBIT 117 WAS MARKED FOR IDENTIFICATION.)

5   BY MR. CAMPAGNA:

6     Q.   Do you recognize this document?

7     A.   Yes.

8     Q.   How do you recognize it?

9     A.   It's a lawsuit from Mary Whyte and Chopra

10  Enterprises and Deepak Chopra and Kathleen Chopra, Neil

11  Ison and Juan Carmona.

12     Q.   On page 4 of this complaint, paragraph 10, it

13  says:  "Beginning on or about mid December of 2004,

14  Denwill, Inc. agreed to purchase four timeshares with

15  Deepak to be solely in the name of Deepak based on the

16  promises by Deepak that the properties would be sold

17  within two weeks."

18         Was that true?

19     A.   False.

20     Q.   Then it says:  "To date the properties have

21  not sold."  I guess that's the date of the complaint,

22  August 22nd, 2006.

23         Was that true, that those properties hadn't

24  sold?

25     A.   Yes.

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 19
TORREANO SHORTHAND REPORTING (866) 760-DEPO
of 31

1    Q.  On or about August of 2005, Deepak agreed to

2  purchase Denwill, Inc.'s interest in the properties; is

3  that true?

4    A.  No.

5    Q.  So this is the statement:  "To date, Denwill,

6  Inc. has not been paid for the money expended and used

7  by Deepak to acquire the interest in the timeshares."

8        It's true that you didn't pay Denwill, Inc.

9  this money that Denwill says they expended to acquire

10  interest in the timeshares?

11    A.  I don't recollect that part.

12    Q.  I was thinking that maybe you didn't pay it

13  because you didn't think it was owed.

14    A.  This case was settled.  I don't have the

15  details of this case.  It goes back three or four

16  years.  So I can't remember all the details.

17    Q.  We'd have to ask Mary Beth Whyte about that?

18    A.  Yes.

19    Q.  In paragraph 12 it says:  "On or about

20  January 26, 2005 and February 25th, 2005, Defendant

21  Chopra Enterprises borrowed 40,000 and 60,000 directly

22  from Ms. Whyte's IRA."

23        Is that true?

24    A.  I don't recollect.  I think it's false, but I

25  cannot recollect.

Case: 10-05196   Doc#: 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 20
of 31
TORREANO SHORTHAND REPORTING (866) 760-1DEPO

1    Q.   Why do you think it's false?

2    A.   Because I don't know if it's from an IRA

3  account or not, Ms. Whyte's IRA account.

4    Q.   If you set that part aside, is it true that

5  Chopra Enterprises borrowed 40,000 and 60,000 from

6  Ms. Whyte or some account or entity owned by

7  Ms. Whyte?

8    A.   It's false.

9    Q.   Chopra didn't borrow $100,000 between January

10  and February?

11    A.   It's a mutual agreement.  It's a mutual

12  investment.  We put in money.  They put in money.  It's

13  not borrowed money.  I don't think -- I can't

14  recollect.

15    Q.   Pardon?

16    A.   I cannot recollect all the details.

17    Q.   You said there was an agreement?

18    A.   I recollect it being a mutual agreement of

19  buying properties.

20    Q.   Was it a written agreement?

21    A.   It was deeds of trust we both owned on it.

22    Q.   Then it says:  "Deepak is agent for Chopra

23  Enterprises" -- let me go back.

24       Do you recall whether there was a written

25  agreement?

597

1       A.   I do not recall this lawsuit that much.

2       Q.   No.   I'm talking about the -- the ownership.

3  I think you said it's a joint ownership.   I don't

4  remember your exact words.   I think you said you bought

5  something together.

6       A.   I think we bought things together.

7       Q.   Okay.   So Ms. Whyte or her entities put in

8  40,000 into something together with you or Chopra

9  Enterprises?

10      A.   Something like that.

11      Q.   And then put in another 60,000 into a

12  different property?

13      A.   I don't know.

14      Q.   But you think that there was a mutual

15  agreement?

16      A.   There was an investment that we did together

17  as friends.

18      Q.   As friends?

19      A.   Very good friends, yes.

20      Q.   So are you saying that you never agreed to pay

21  any money back to Mrs. Whyte on these investments?

22      A.   What I'm saying is I do not recollect this

23  lawsuit.   It has been settled to both mutual agreement,

24  both of us, and it was filed in 2006.   I don't have the

25  details of what happened.   We settled.   That's all I

Case: 10-05196   Doc# 106-4   Filed: 07/23/12   Entered: 08/10/12 15:42:9   Page 22
of 31
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1   can tell you.

2       Q.  It mentions here that there was a personal

3   guarantee that you gave that secured a loan to Neil

4   Ison.

5           Do you recall that?

6       A.  No.

7       Q.  Do you recall ever giving a personal guarantee

8   to secure another party's -- a loan to another party?

9       A.  I may have.  I don't recall.

10      Q.  Well, Ms. Whyte certainly sued you claiming

11  that you had a -- had a debt to her as a guarantor for

12  another party here.

13      A.  I didn't agree with the facts on this

14  lawsuit.  It's absolutely misleading.

15      Q.  How is that piece misleading?

16      A.  This is not true what she says in the

17  lawsuit.  So we came to terms and settled the lawsuit.

18  I claimed some facts, she claimed some facts and, you

19  know, we both had our own facts and we settled.

20      Q.  Do you recall any conversations with Ms. Whyte

21  regarding her request on numerous occasions for you to

22  pay money to her as a guarantor for Neil Ison?

23      A.  No.

24      Q.  Unit 113 is a condominium unit in Hawaii; is

25  that correct?

1    A.   Yes.

2    Q.   Where is that exactly in Hawaii?

3    A.   Molokai.

4    Q.   Molokai.  What do you recall about unit 113

5  and any transactions that you or your entities may have

6  had with Mr. Husain?

7    A.   Three of us bought it.

8    Q.   Okay.  Just a moment because I want to make

9  sure I keep the facts straight because this is one of

10  the subjects of the lawsuit, what happened with unit

11  113.

12        Who bought it?

13    A.   Mr. Husain, Mr. Shergill.

14    Q.   Can you spell the name, please.

15    A.   S-H-E-R-G-I-L-L.

16    Q.   And?

17    A.   And Chopra Enterprise Corporation and myself,

18  Deepak Chopra.

19    Q.   "Or" or "and"?

20    A.   The loan was in my name.  So it was Deepak

21  Chopra and then transferred to Chopra Enterprises.

22    Q.   So you personally, Deepak Chopra, purchased

23  unit 113 with Mr. Husain and Mr. Shergill?

24    A.   Yes.

25    Q.   The loan was in your name?

1   A.  Yes.

2   Q.  And then after the loan was in your name, you

3 transferred your interest to Chopra Enterprises

4 Corporation?

5   A.  Yes.

6   Q.  How did you transfer your interest to Chopra

7 Enterprises Corporation?

8   A.  A quitclaim deed.

9   Q.  And then after you transferred your interest

10 via quitclaim deed to Chopra Enterprises Corporation,

11 what happened to the quitclaim deed?

12   A.  It's in the form that was there under Chopra

13 Enterprises Corporation, and the deal was 33 percent

14 was owned by Shergill, 33 percent owned by Iqbal, and

15 then we bought -- me and Iqbal bought Shergill's

16 interest.

17   Q.  So at the outset Shergill owned 34 percent?

18   A.  One third, one third, one third.

19   Q.  So it was 33 and a third each?

20   A.  Yes.

21   Q.  I was trying to account for that extra one

22 percent.  They were equal shares.

23   A.  Yes.

24   Q.  It wasn't as if one person or entity had one

25 percentage point more.

601

1        So 33 percent is -- the quitclaim deed, I

2   presume it got recorded; correct?

3        A.   Yes.

4        Q.   Who recorded the quitclaim deed?

5        A.   I don't recollect.

6        Q.   Who may have been charged with recording a

7   quitclaim deed for Chopra Enterprises Corporation?

8        A.   It could be one of the Hawaii attorneys.  I'm

9   not sure.

10       Q.   What year was this?

11       A.   I don't recollect the years.  I have -- I sent

12   you all the documentation when you asked for those.

13       Q.   We can look at documents in a moment.  I was

14   just trying to ascertain what you remember about this.

15            And then you were stating that you and

16   Mr. Husain purchased Mr. Shergill's 33 percent?

17       A.   Yes.

18       Q.   Okay.  When you say -- when I said "you and

19   Mr. Husain," it's really Chopra Enterprises Corporation

20   and Mr. Husain?

21       A.   Yes.

22       Q.   Purchased Shergill's piece of it?

23       A.   Yes.

24       Q.   So that left you and -- and that left Chopra

25   Enterprises Corporation and Mr. Husain with 50 percent

1   interest each?

2      A.  Yes.

3      Q.  Then where did this joint ownership go from

4   here?

5      A.  Then we refinanced the property.

6      Q.  Okay.  How much was owed on the property at

7   the time that you and Mr. Husain each owned 50

8   percent?

9      A.  I don't recollect the details.  It's all --

10      Q.  Approximately.  Is this a $500,000 condo in

11   some luxurious resort in Molokai?

12      A.  I think it's 150,000 or 140,000.

13      Q.  Okay.  Then you -- then Chopra Enterprises

14   Corporation and Mr. Husain refinanced?

15      A.  I refinanced.

16      Q.  Okay.

17      A.  I refinanced the condo.

18      Q.  Chopra Enterprises refinanced it?

19      A.  Deepak Chopra -- Chopra Enterprises

20   quitclaimed it to Deepak Chopra.  Mr. Husain

21   quitclaimed it to Chopra Enterprises so I could

22   refinance the property, to the best of my knowledge.

23      Q.  Okay.  Chopra Enterprises Corporation and

24   Mr. Husain both quitclaimed their interest to you so

25   that you can refinance.

1        Did you refinance?

2    A.  I think we refinanced.

3    Q.  Pardon?

4    A.  We did refinance.

5    Q.  For approximately how much did you refinance?

6    A.  I do not recollect the numbers.

7    Q.  Was it approximately the 140,000 or so that

8 was already owed on it?

9    A.  No, more.  I took money out of it, I think.

10    Q.  A lot more or a little more?

11    A.  I do not recollect how much it was.  I have

12 the number -- I have the whole thing --

13    Q.  Okay.

14    A.  You have the same documentation I have.

15    Q.  I probably do.  We'll probably look at it in a

16 moment.  Again, I'm just trying to get the backdrop

17 here and then we can fill in the specifics.

18    A.  I can give you the money backdrop, but I

19 cannot give you the numbers.

20    MR. ISON:  Deepak, wait until he finishes his

21 question.

22 BY MR. CAMPAGNA:

23    Q.  That's fair enough.  So the backdrop is you

24 refinanced, you get some money out of this, and you got

25 maybe forty, fifty, sixty, seventy thousand?

1      A.   I can't give you the numbers.

2      Q.   Roughly?

3      A.   I cannot guess.

4      Q.   More than $200,000?

5      A.   No, I cannot guess.  It's in the paperwork

6  that you and I have and we can look at it together.

7      Q.   So you don't want to estimate how much you

8  refinanced this for?

9      A.   No.

10     Q.   Okay.  So you refinanced for some figure.

11          And then what happens?

12     A.   The money gets distributed.

13     Q.   How does the money get distributed?

14     A.   It's in the Quickbooks.  Mr. Husain and me had

15  20, 30 properties all over the place.  It all got

16  adjusted all in the Quickbooks.  I have the Quickbooks

17  where the money got distributed.

18     Q.   Have we looked at those Quickbooks at all in

19  your deposition so far?

20     A.   You have a copy of the Quickbooks.

21     Q.   Have we looked at those particular Quickbooks

22  at any time during this deposition?

23     A.   This deposition?  I don't think so.

24     Q.   So you're saying that there are Quickbooks --

25  Quickbook reports about how the money following

1  refinance got distributed?

2     A.  Yes.

3     Q.  Okay.  In general, do you recall whether it

4  got distributed 50/50 since you -- you owned 50

5  percent, 50 percent; correct?

6     A.  Yes.

7     Q.  You refinanced.  Then there's a distribution.

8     A.  Yes.

9     Q.  50/50?

10    A.  Yes.  But there was other entries also in the

11 Quickbooks that Mr. Husain got a second deed of trust

12 for the balance of the money owed to him.

13    Q.  So after -- after the initial distribution

14 from the refinance, part of Mr. Husain's share was

15 through a second deed of trust?

16    A.  Second deed of trust.

17    Q.  Which was secured by unit 113?

18    A.  Yes.

19    Q.  Who prepared the second deed of trust for the

20 balance?

21    A.  I don't have it, but I have the second deed of

22 trust with me.  I don't know who prepared it.  I can

23 find -- it's on the deed.

24        MR. ISON:  He asked you who prepared it.

25        THE DEPONENT:  I do not know.

1          MR. ISON:  Good answer.

2     BY MR. CAMPAGNA:

3          Q.  Did you prepare the second deed of trust?

4          A.  Me personally?  No.

5          Q.  Juan Carmona was the CEO of Chopra Enterprises

6     Corporation at this time, wasn't he?

7          A.  Yes.

8          Q.  Did he prepare the second deed of trust?

9          A.  Personally himself?

10         Q.  Yes.

11         A.  No.

12         Q.  Would it have been either you or Juan Carmona

13    who would have gotten the second deed of trust

14    prepared?

15         A.  Yes.

16         Q.  Okay.  You just don't remember which one it

17    was.  It could have been you or it could have been

18    Mr. Carmona?

19         A.  Mr. Carmona is the one who did all the deeds

20    of trust.  It would be Mr. Carmona.

21         Q.  Oh, he did.  Okay.  He did all of the deeds of

22    trust.  So it would have been him?

23         A.  Yes.

24         Q.  He would have gotten the deed of trust.  He

25    wouldn't necessarily have typed the thing up?