1    A.   Yes.

2    Q.   And then the date recorded is 8/28/2007?

3    A.   Yes.

4    Q.   Does that coincide with the time frame that

5  you understand to be when Mr. Jindia acquired a

6  security interest in the unit 113 property?

7    A.   Yes.

8    Q.   And Urmil, is that his wife?

9    A.   Yes.

10    Q.   And then I note it says "Rajinder" here.

11        That's the full name of the person we

12  previously called Raj; correct?

13    A.   Yes.

14    Q.   And then it has this original amount of 45,000

15  was the amount that you seem to correctly recall as the

16  security interest --

17    A.   Yes.

18    Q.   -- for Mr. Jindia and apparently for his wife

19  as well?

20    A.   Yes.

21    Q.   So she also gave money to Chopra Enterprises

22  Corporation?

23    A.   Yes.

24    Q.   Does she have a security interest in the other

25  two properties as well?

1   A.   Yes.

2   Q.   When you calculated the remaining equity

3   following the Jindias' security interest in unit 113,

4   did you say it was thirty, thirty-five or forty

5   thousand?  Because you're -- I just want to know.  I

6   don't want to misstate.

7   A.   Juan calculated -- Juan calculated the

8   equity.

9   Q.   And then they told you what the equity was?

10  A.   My calculation is what I felt was about

11  $40,000 equity.

12  Q.   Based on your field study -- I mean based on

13  your going to Molokai and looking at the properties?

14  A.   Yes.

15  Q.   Okay.  Juan and Raj's figure was what?

16  A.   I do not know that.  You need to ask them what

17  the figure was.

18  Q.   I thought you just told me that their figure

19  was thirty something.

20  A.   My figure was thirty to forty thousand.

21  Q.   Your figure was thirty to forty thousand.

22  Okay.

23       And theirs was?

24  A.   They did their own research.

25  Q.   You don't know?

1    A.  I don't know.

2    Q.  Now, when you did this figuring it was

3 sometime after the Jindias' deed was recorded;

4 correct?

5    A.  Before it was recorded.

6    Q.  How do you know it was before it was

7 recorded?

8    A.  Because he asked me to record a deed and he

9 wanted to make sure there was enough equity in the

10 property.

11    Q.  Now I'm confused, Mr. Chopra, because I

12 thought you said that after Raj Jindia's security

13 interest in unit 113 was recorded, there was remaining

14 thirty to thirty-five thousand dollars of equity?

15    A.  Yes.

16        MR. ISON:  Objection.  Misstates the

17 testimony.  He said thirty to forty thousand.

18        MR. CAMPAGNA:  His testimony was thirty to

19 forty.

20 BY MR. CAMPAGNA:

21    Q.  Whether it's thirty or thirty-five or forty,

22 it's --

23    A.  Yes.

24    Q.  The record will show what it is.  It's not

25 necessarily an important piece here.

1    A.  Yes.

2    Q.  I'm trying to get the time frame of when you

3 did that figuring.  So before -- let me just stop for a

4 moment.

5    Before you gave the Jindias a security

6 interest in unit 113, you went to Molokai, observed

7 unit 113; correct?

8    A.  I didn't go to Molokai specifically to observe

9 113.  I used to go there for business trips and I

10 was -- the amount of the -- the other units being sold

11 based on that calculation, I came up with thirty to

12 forty thousand in equity.

13    And when Raj Jindia asked for the lien to put

14 on three properties I gave him a choice of putting it

15 on three properties.  And he and Juan did the due

16 diligence to come up with the properties they wanted to

17 put it on, the three properties that he put it on.

18    Q.  So before Mr. Jindia was given the security

19 interest in unit 113, your calculation was that there

20 was equity of about thirty to forty thousand dollars?

21    A.  Yes.

22    Q.  After you gave the Jindias a security interest

23 in unit 113, how much equity was left in the property?

24    A.  Maybe $40,000.

25    MR. ISON:  Let's take a little break here.

1    We're going to take a break.  Out the door.

2             (Pause in the proceedings.)

3             MR. ISON:  I think that Mr. Chopra is a little

4    bit confused with the second prior question.  So let's

5    go back and ask it or tee it up now.

6             MR. CAMPAGNA:  Yeah.  I'm going to ask the

7    court reporter to read back each of the last two

8    questions.  I think that might do it.  And then give

9    Mr. Chopra a chance to respond individually to each of

10   the questions.  Just the questions.

11            THE COURT REPORTER:  "Question:  So before

12            Mr. Jindia was given the security interest in

13            unit 113, your calculation was that there was

14            equity of about thirty to forty thousand

15            dollars?"

16            THE DEPONENT:  $80.000.

17            THE COURT REPORTER:  "Question:  After you

18            gave the Jindias a security interest in unit

19            113, how much equity was left in the

20            property?"

21            THE DEPONENT:  $35,000.

22   BY MR. CAMPAGNA:

23       Q.  Do you have records which show your

24   calculations at that time where you drew the conclusion

25   regarding the equity?

642

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 5
of 34
TORREANO SHORTHAND REPORTING  (866) 760-DEPO

1       A.   No, I don't.

2       Q.   So this is based on your memory; is that

3   correct?

4       A.   Based on my memory.

5            MR. CAMPAGNA:   I'm going to mark the next

6   exhibit Exhibit 122.

7            (EXHIBIT 122 WAS MARKED FOR IDENTIFICATION.)

8   BY MR. CAMPAGNA:

9       Q.   Do you recognize that document?

10      A.   Yes.

11      Q.   How do you recognize it?

12      A.   Because I've seen it before.

13      Q.   What is it?

14      A.   Settlement agreement.   Mutual settlement

15   agreement between Husain, Iqbal Husain, Chopra

16   Enterprises, SEC Group, Deepak Chopra.

17      Q.   You can say it.   And you?

18      A.   And me.

19      Q.   Your name is first there?

20      A.   Yeah.

21      Q.   And if you turn to page 7 of the settlement

22   agreement, the mutual general release, is that your

23   signature there?

24      A.   Yes.

25      Q.   If you turn to -- also it looks like --

1   what's another page 7.  It's got SEC Venture Group,

2   LLC, an Alabama limited liability company, signed by

3   two initials and then "Cagley."

4        A.   George D. Cagley.

5        Q.   George D. Cagley.  He goes by "David Cagley";

6   is that right?

7        A.   Yes.

8        Q.   So that's George David Cagley, president and

9   manager, SEC Venture Group, LLC?

10       A.   Yes.

11       Q.   And then Chopra Enterprises Corporation, a

12  California corporation, Juan Carmona?

13       A.   Yes.

14       Q.   Do you recognize that as his signature?

15       A.   Yes.

16       Q.   Do you recognize that as Cagley's signature?

17       A.   Yes.

18       Q.   And then there's -- there's a note for

19  94,512.04.  Do you see that?

20       A.   Yes.

21       Q.   Plaintiff's 000037, November 1st, 2007.

22       A.   Yes.

23       Q.   Do you recognize that promissory note?

24       A.   Yes.

25       Q.   And then on page 3 of the promissory note,

1    Plaintiff's 000039, is that your signature under

2    "borrower"?

3        A.   Yes.

4        Q.   Then turning to another page 3 of the

5    promissory note, PL000040.

6            It looks like it's your signature there along

7    with Chopra Enterprises Corporation, Juan Carmona; is

8    that right?

9        A.   Yes.

10       Q.   What was your understanding of the settlement

11   agreement that's referenced in Exhibit 122, without

12   looking at the exhibit?

13       A.   My settlement was that there was a lot of

14   property that -- that Iqbal and Chopra Enterprises had

15   together, and this would clean up all the past

16   ownership and settle for good.  The amount that we came

17   up with was $94,000 based on the equity that Iqbal

18   wanted, about two or three hundred percent.  So the

19   value of these properties was about $253,000 at that

20   time.

21           Iqbal wanted twice the amount of equity and at

22   that time they requested that we give him the deeds in

23   lieu ahead of time so that in case we were not able --

24   we were not able to pay that money, they would have to

25   foreclose and take the properties.

645

1          That was my understanding, that the agreement

2    Iqbal had was take the deeds in lieu.  And there's

3    enough equity, twice the amount of equity, and he would

4    get the amount of equity for the loan.  So we gave him

5    the deeds with that understanding and all the deeds

6    would be given to Iqbal Husain.  And that's the

7    understanding I had when I went to the office to sign

8    the agreement.

9          Q.  So you gave the deeds -- the deeds in lieu?

10         A.  For all the properties.  In exchange for

11   settling --

12         Q.  When you say "all the properties," what

13   properties are you referring to?

14         A.  If you go to page 3, there are deeds in lieu

15   of the property.

16         Q.  Okay.  How many priorities?

17         A.  One, two, three, four, five -- six

18   properties.

19         Q.  Okay.  Then you left the office with the

20   understanding that Mr. Husain would receive deeds in

21   lieu for six properties and that --

22         A.  That if he was not able to come up with the

23   $94,000.

24         Q.  In what period of time?

25         A.  The promissory note.  I don't remember the

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 9
of 34
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    promissory note at this time.

2        Q.  Is it by November 1, 2008?

3        A.  Yes.

4        Q.  Where it says:  "Borrower will pay to lender

5    the principal amount of this note and accrued interest

6    on or before November 1, 2008"?

7        A.  Yes.

8        Q.  And the date of the note was November 1st,

9    2007; correct?

10       A.  It is.

11       Q.  So you -- you and Chopra Enterprises

12   Corporation had a year to pay the amount due on the

13   note?

14       A.  Yeah.

15       Q.  Is that correct?

16       A.  And if we did not pay the amount, we would

17   be -- they would take away automatically the eight

18   properties and Chopra Enterprises would lose about

19   $150,000 in equity plus the $94,000.

20       Q.  Is it the six properties that you're referring

21   to?  I think you said eight.  Did you mean these six

22   here?

23       A.  Six properties, yeah.

24       Q.  And then November 1st, 2008, did you or Chopra

25   Enterprises pay the amount of the note?

1    A.   No.

2         MR. CAMPAGNA:   I'll mark the next exhibit

3  Exhibit 123.

4         (EXHIBIT 123 WAS MARKED FOR IDENTIFICATION.)

5  BY MR. CAMPAGNA:

6    Q.   And I'm going to hold on to 123 for a second

7  and take 122.

8         So you had mentioned that there were lots of

9  properties and the purpose of the settlement agreement

10  was to clean up past ownership; was that correct?

11    A.   Yes.

12    Q.   Do you specifically remember which properties

13  and ownerships the agreement was to clean up?

14    A.   It's mentioned in that.

15    Q.   It's mentioned in the agreement?

16    A.   Yes.

17    Q.   So Bay Villas 12B4.   The number 12, capital B,

18  4.  So all one.   It's a unit number.

19         And then unit 314?

20    A.   Yes.

21    Q.   And unit 155 and C205; is that correct?

22    A.   That's correct.

23    Q.   Okay.   Exhibit 123 is a buyer's final

24  statement, settlement date 5/19/2005.

25         Do you recognize this document?

1    A.  I don't recognize it, but I know which units

2 it's for.

3    Q.  Okay.  So do you recall what the arrangement

4 was with Mr. Husain as to unit 314?

5    A.  Mr. Husain refinanced the unit.  It is a

6 refinance.  I don't know if this is a refinancing or

7 not, but we did refinance the unit.

8    Q.  When you say "we refinanced the unit," who is

9 "we"?

10    A.  Chopra Enterprises and Deepak Chopra.

11    Q.  Okay.

12    A.  And Mr. Husain was owed $60,000 on that.  I

13 think he was owed 60,000.  And he put a deed of trust

14 on that property for 60,000 and paid an interest every

15 month on that property.  We have the Quickbooks.  Until

16 we acquired the properties where we could pay the

17 properties to him based on this agreement here.

18    MR. CAMPAGNA:  I'm going to mark the next

19 exhibit Exhibit 124.

20    (EXHIBIT 124 WAS MARKED FOR IDENTIFICATION.)

21 BY MR. CAMPAGNA:

22    Q.  Do you recognize this document?

23    A.  I don't recognize the document.  It's an

24 equity share treatment between Mr. Husain and Chopra

25 Enterprises Corporation.

TORREANO SHORTHAND REPORTING  (866)  760-DEPO

1    Q.  In bold at the bottom of the first paragraph,

2  it says "500 Bay Drive, number 12B4, Lahaina, Hawaii."

3    A.  Yes.

4    Q.  Is that the 12B4 property that was the subject

5  of the settlement agreement?

6    A.  Yes.

7    Q.  And this Deepak Chopra equity share agreement,

8  what is it exactly?

9    MR. ISON:  Objection.  Calls for a legal

10  conclusion.  You can tell him what your understanding

11  is.

12    THE DEPONENT:  It's just that -- that we find

13  the properties and we give Iqbal Husain, an investor, a

14  50/50 percent interest in it and share 50/50 percent of

15  the property -- of income or expenses.  And once we

16  sell it we take the 50 percent gain and losses and each

17  50 percent into the property.

18  BY MR. CAMPAGNA:

19    Q.  Is this a similar arrangement as you had with

20  unit 113?  Did you have one of these equity sharing

21  agreements?

22    A.  I don't remember if we had it or not, but it

23  was -- 113 the ownership was -- I think unless the deed

24  was not in Iqbal's name or my name, whoever.  113 the

25  deed was there.  The deed was transferred 50/50.

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 13

1    In this I don't think the deed was transferred

2  ever.  This deed was held either in my name or Iqbal's

3  name.  I'm not sure whose name it was.  It's a little

4  different here.  The deed was not -- the other one the

5  deed was transferred.  It's just not --

6    MR. ISON:  Go ahead.

7    THE DEPONENT:  I don't know.  I don't think

8  it's the same, to my understanding.

9  BY MR. CAMPAGNA:

10    Q.  Okay.  And I appreciate your clarification.

11  There's some type of 50/50 ownership.  At times it may

12  be that there's 50 percent ownership recorded on a

13  deed.  At other times it may be just one party whose

14  name is on the deed, but the rest of the ownership is

15  50/50.

16    A.  That's right.

17    Q.  But at the end of the day, there's 50 percent

18  share and expenses and 50 percent share of proceeds.

19    A.  That's right.

20    Q.  At the bottom left-hand corner of this page,

21  there appears to -- of the first page of the equity

22  share agreement, there appears to be two sets of

23  initials.

24    Do you know whose those are?

25    A.  No.

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 14

1    Q.   There's a JC -- maybe that's Juan Carmona?

2    A.   It could be.

3    Q.   So look at the page 4, page 4 of 4.  You've

4  got what appears to be Iqbal Husain's signature and

5  Juan Carmona's signature.

6         You said before you recognize -- you would

7  recognize their signatures; right?

8    A.   Yes.

9    Q.   Appear to be their signatures.  Okay.  Those

10  may be their initials.  That's all.

11         On the third page there -- there's three

12  numbers, one, two and three, and there's lines to the

13  left of each.  What are those lines referring to?

14    A.   That's the assignment fee in case there was a

15  gain for the property.  I think -- "the following sums

16  as chosen by Owner by initialing the line before

17  chosen."  I don't know what they are really.  I have to

18  read.

19         MR. ISON:  When you read something from a

20  document, read it slowly and distinctly.  Otherwise,

21  read it to yourself.

22         THE DEPONENT:  "There was a 10,000 assignment

23  fee from Owner's gain as defined above.  Second, a sum

24  of 5,000 assignment fee from the Owner's gain as

25  defined above.  And third was zero assignment fee

1    payable now and the Owner's gain defined above."

2         Iqbal signed the third one.

3    BY MR. CAMPAGNA:

4         Q.   No assignment fee?

5         A.   No assignment fee.   That's what it looks

6    like.

7         Q.   And this agreement is a Chopra Enterprises,

8    Inc. agreement; is that correct?

9         A.   That's correct.

10        Q.   And do you know who prepared this agreement?

11        A.   I don't know who prepared it.

12        Q.   When I say "this agreement" I mean the form of

13   this agreement.

14        A.   No.  I don't know.

15        Q.   You didn't prepare it?

16        A.   I didn't prepare it.

17        Q.   Juan Carmona didn't prepare it?

18        A.   I do not know who prepared it.

19        Q.   Maybe Mr. Ison prepared it?

20        A.   Maybe Iqbal prepared it.

21        Q.   Okay.  Maybe Iqbal prepared it.

22        A.   Yeah.

23        Q.   Do you recognize this as an equity share

24   agreement that you generally used in multiple

25   transactions?

1    A.  No.  I don't -- there was a different kind of

2  equity share agreement.  This was unusual.  This is

3  different.

4          MR. CAMPAGNA:  The next exhibit is Exhibit

5  125.

6          (EXHIBIT 125 WAS MARKED FOR IDENTIFICATION.)

7  BY MR. CAMPAGNA:

8    Q.  You mentioned that the settlement agreement

9  was for properties and to clean up past ownership of

10  the properties; correct?

11    A.  Yeah.  Cleaning up the properties, yes.

12    Q.  Were there other monies involved besides money

13  involved in properties that needed to be cleaned up?

14    A.  I don't recollect.

15    Q.  Okay.  For example, showing you what's been

16  marked as Exhibit 125, there is an entry here from a

17  Smith Barney account for Iqbal and Sharmin Husain on

18  May 4th, 2006, what appears to be an amount to Chopra

19  Enterprises of $50,000.

20          Do you recall that --

21    A.  No.

22    Q.  -- transaction?

23    A.  No.

24          MR. CAMPAGNA:  The next exhibit is Exhibit

25  126.

1          (EXHIBIT 126 WAS MARKED FOR IDENTIFICATION.)

2    BY MR. CAMPAGNA:

3        Q.  Do you recognize this document?

4        A.  It's a deed for Husain.  What's that say?

5        Deed of trust.  North Carolina deed of trust.

6        Q.  Okay.  Do you recognize the document?

7        A.  I don't recognize it, but I know what it is by

8    looking at it.

9        Q.  Do you know what North Carolina property this

10   deed of trust is in reference to?

11       A.  This is regarding the settlement agreement

12   that we made.

13       Q.  How do you know that?

14       A.  It says the amount $94,500 right there.

15       Q.  Is it true that there were four North Carolina

16   properties securing the -- the note?

17       A.  I don't recollect.  May I have a look at the

18   second page?

19       Q.  Well, if you look at page 4 of this North

20   Carolina deed of trust, which is entitled "attachment,"

21   it's Plaintiff's 009035, there appear to be four

22   properties there.

23       A.  Okay.  There are four properties.

24       Q.  Were they -- is that your understanding, too,

25   that these were sort of properties in the same area,

1    like, for example, being all of lot 63 and lot 85, lot

2    82, lot 50?

3         A.   Same area.

4         Q.   And you are familiar with the properties.

5    It's not as if this was a property that was foreign to

6    you --

7         A.   No.

8         Q.   -- at the time that it was being pledged.

9         A.   No.

10        Q.   Okay.   Is that correct?

11        A.   It's correct.

12        Q.   So if you look at the next page, which is the

13   notary page, it says on 2/13/08 before me Armida.

14             Do you know the last name here?

15        A.   No.

16        Q.   Bird?

17        A.   Bird.

18        Q.   Do you know who Armida Bird is?

19        A.   No.

20        Q.   A notary public?

21        A.   No.

22        Q.   But do you recall signing this document?

23        A.   Yes, I do.

24        Q.   Is that your signature that appears at the

25   top?

656

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 19
                              of 34
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1      A.   Yes.

2      Q.   Right-hand corner?

3      A.   Yes.

4      Q.   Across from -- actually, no.  Above the word

5   "Deepak Chopra."

6           And then this is your signature here as well

7   underneath "Chopra Enterprises Corporation"?

8      A.   Yes.

9      Q.   And this is your wife Kathleen Chopra's

10  signature here?

11     A.   Yes.

12     Q.   How do you know that's your wife's signature?

13     A.   That's how she signs usually.  That's my

14  wife's name, Kathleen Chopra.

15     Q.   That's what I'm saying.  It looks like her

16  signature.  You'd be able to recognize her signature if

17  you saw it?

18     A.   I should be able to.

19     Q.   Do you?

20     A.   She signs, yeah.  I think I should.

21     Q.   Do you recognize your wife's signature on this

22  document?

23     A.   I recognize my wife's signature on this

24  document.

25     Q.   And it appears above the name "Kathleen

Case: 10-05196   Doc# 106-6   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 20
TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Chopra"; correct?

2         A.   Yes, yes.

3              MR. CAMPAGNA:  Mark the next exhibit

4    Exhibit 127.

5              (EXHIBIT 127 WAS MARKED FOR IDENTIFICATION.)

6    BY MR. CAMPAGNA:

7         Q.   Do you recognize this document?

8         A.   No, I don't.  I'll look at it.

9         Q.   Go ahead and look it over and look up when

10   you're done when you've had a chance.

11        A.   Yes, I do.

12        Q.   How do you recognize it?

13        A.   It's a San Diego property.

14        Q.   Was this a San Diego property that was used to

15   secure the promissory note?

16        A.   Yes.

17        Q.   $94,000 promissory note?

18        A.   Yes.

19        Q.   And is that your signature on the third page

20   of this exhibit?

21        A.   Yes.

22        Q.   On 2/13/2008 in front of Armida Bird?

23        A.   Yes.

24        Q.   Is Armida Bird a notary that you used

25   regularly?

1          A.   I don't recollect.

2          Q.   Would she have come to Chopra Enterprises'

3     office?

4          A.   Yes.

5               MR. CAMPAGNA:   Next exhibit is Exhibit 128.

6               (EXHIBIT 128 WAS MARKED FOR IDENTIFICATION.)

7     BY MR. CAMPAGNA:

8          Q.   Do you recognize this document?

9          A.   Yes, I do.

10         Q.   How do you recognize it?

11         A.   It's a deed of -- it's a mortgage security

12    agreement.

13         Q.   This is a mortgage security agreement that you

14    gave to Mr. Husain to secure the $94,000 settlement

15    agreement; is that correct?

16         A.   That's correct.

17         Q.   This is your signature that appears in the

18    bottom right of page 16?

19         A.   Yes.

20         Q.   And you recall signing this in front of Armida

21    Bird?

22         A.   Yes.

23         Q.   On 2/13/2008?

24         A.   Yes.

25         Q.   It looks like you were almost going to sign

1    for the notary herself?

2        A.   I know.

3        Q.   On page 17?

4        A.   Yes.

5        Q.   Are you also a notary?

6        A.   No.

7             MR. CAMPAGNA:  It could come in handy

8    sometime.

9             That was Exhibit 128;  correct?

10            THE COURT REPORTER:  Yes.

11            MR. CAMPAGNA:  We'll mark the next exhibit

12   Exhibit 129.

13            (EXHIBIT 129 WAS MARKED FOR IDENTIFICATION.)

14   BY MR. CAMPAGNA:

15       Q.   When you've had a chance to review

16   Exhibit 129, please look up.

17            Do you recognize this e-mail?

18       A.   No, I don't recognize it, but I see it now.

19       Q.   The $94,000 note was due on November 1st,

20   2008; correct?

21       A.   That's true.

22       Q.   And you stated that you did not pay on the

23   note; correct?

24       A.   That's true.

25       Q.   Following the non-payment on November 1st,

1   2008 of the note, were you involved in trying -- in

2   trying to work with Mr. Husain to make arrangements on

3   getting that note paid?

4        A.  I was trying to get the note paid, yes.

5        Q.  Do you recall having any communications with

6   Mr. Husain over the phone regarding that note?

7        A.  Yes.  Mr. Husain said that he had deeds of

8   trust, deeds of trust that he would foreclose on.  Yes,

9   I agreed.  I did.

10       Q.  Do you recall having e-mail communications

11  with Mr. Husain?

12       A.  I don't recollect how many e-mails.

13       Q.  Pardon?

14       A.  I don't recollect how many e-mails.  I may

15  have.  I may have.

16       Q.  I didn't ask you how many e-mails.

17       A.  Yes.

18       Q.  I asked you if you recall having e-mail

19  communications with Mr. Husain regarding the

20  non-payment of the note.

21       A.  Yes.

22       Q.  If you turn to the second page of that exhibit

23  on November 6th, 2008, there appears to be an e-mail

24  from husain@colira.com to dchopra@hotmail.com.

25            Is that your e-mail address,

1    dchopra@hotmail.com?

2        A.   Yes.

3        Q.   And it's copied to Carmona, G-E-M-I-N-I

4    @yahoo.com and attorney@mac.com?

5        A.   Yes.

6        Q.   Do you recognize that carmonagemini@yahoo.com

7    e-mail address as Juan Carmona's?

8        A.   Yes.

9        Q.   How about attorney@mac.com; whose address is

10   that?

11       A.   I have no idea.

12       Q.   And you'd agree that in this e-mail Mr. Husain

13   is asking you to pay on the note that was due several

14   days before; is that correct?

15       A.   Yes.

16       Q.   Okay.  And then on the same day there's an

17   e-mail -- turn to the first page of this exhibit.

18   There's an e-mail that appears to be from you in lower

19   case letters, sentences separated by dashes.

20            Do you see that there?

21       A.   Yes.

22       Q.   It says:  "Iqbal, I will do what I can.  I

23   also received some documentation on the San Antonio

24   property."

25            Does that appear to be a statement that would

1  have come from you?

2      A.  Yes.

3      Q.  Okay.  Do you recall making such a statement

4  to Mr. Husain?

5      A.  In this e-mail that I sent.

6      Q.  You did send this e-mail?

7          And the San Antonio property, does that really

8  mean San Antonio property?

9      A.  Yes.

10     Q.  Would that be in Texas?

11     A.  Yes.

12     Q.  Then you go on to say:  "Can you tell me what

13  this is all about?  We have several properties in

14  escrow in North Carolina which should bring in

15  40,000."

16         Do you see that there?

17     A.  Yes.

18     Q.  Okay.  On November 6, 2008, did you have

19  several properties in escrow in North Carolina which

20  should bring in 40,000?

21     A.  We were trying to sell it, yes.

22     Q.  Were they in escrow at the time, November 6,

23  2008?

24     A.  I don't recollect.  I don't recollect.

25     Q.  Do you have a file on those North Carolina

1    properties?

2        A.  I'm -- I may have.  I don't recollect.

3        Q.  Do you recollect what North Carolina

4    properties you were referring to that may have been in

5    escrow?

6        A.  Some of the properties that are listed on that

7    agreement, and there were other properties that we had,

8    other -- that there were other properties we were

9    trying to sell.

10       Q.  So it says:  "We have several properties in

11   escrow in North Carolina."

12           What does "in escrow" mean to you?

13       A.  It means that we are trying to sell properties

14   and we have asked agents to sell properties.

15       Q.  You said you had -- that means you have

16   agents?

17       A.  Agents.  Agent or agents trying to sell the

18   properties.

19       Q.  What are the names of the agents you would

20   have been working with in North Carolina to try to sell

21   North Carolina properties?

22       A.  Brian.

23       Q.  What's Brian's last name?

24       A.  I think it's Brenner.  I don't remember his

25   last name.  Brian Brenner or -- I forget his last

1   name.

2        Q.   Do you have any communications with Brian

3   Brenner via e-mail?

4        A.   Not anymore.

5        Q.   Do you have any past communications that were

6   in e-mail form with Brian?

7        A.   I don't recollect.

8        Q.   Do you ever communicate with Brian over

9   e-mail?

10       A.   Not really.

11       Q.   Okay.  Would Juan Carmona have information

12   about Brian?

13       A.   He may.

14       Q.   Was Juan Carmona involved in the North

15   Carolina properties?

16       A.   No.

17       Q.   Who besides you may have been involved with

18   the North Carolina properties?

19       A.   I was involved.

20       Q.   Just you?

21       A.   Yes.

22       Q.   And you said that some of the North Carolina

23   properties would have been the ones on the agreement.

24   So turning to the promissory note, Exhibit 122, there

25   are four North Carolina properties listed as 3, 4, 5

1    and 6 in the middle of this document.

2         Are those among the North Carolina properties

3    that were in escrow?

4         A.  We were trying to sell all of them.

5         Q.  That you were trying to sell?

6         A.  Yes.

7         Q.  Are you familiar with the general term "in

8    escrow"?  Are you familiar with what that means?

9         A.  No, not really.

10        Q.  How many real estate transactions have you

11   been involved in in -- over the last twenty years,

12   approximately?

13        A.  Personally maybe twenty, fifteen.

14        Q.  Did any of those transactions involve working

15   with an escrow officer that you recall?

16        A.  Working with the agent.

17        Q.  What do you mean by "agent"?

18        A.  Selling agent, buying agent.

19        Q.  So in communicating with the agents, did you

20   ever use the term "in escrow" in reference to a

21   property being in escrow, for example?

22        A.  I know the word "escrow."

23        Q.  Okay.

24        A.  But what I meant in the e-mail --

25        Q.  No, I'm not asking you what you meant.  I'm

1    asking you if you know what the word "escrow" means.

2        A.   No, I don't.

3        Q.   You said "not really" before and now you say

4    "no, I don't."

5        A.   "Escrow" means an officer who is taking care

6    of the property and disbursing the funds.

7        Q.   So your understanding is that an escrow

8    involves an agent who in some way is disbursing funds?

9        A.   Working with a title company to disburse

10   funds.

11       Q.   How many times have you worked with an agent

12   in an escrow that involved a title company and a

13   disbursement of funds?

14       A.   Five or six times, six times maybe.

15       Q.   Have you ever yourself received funds that

16   were paid out of an escrow?

17       A.   For my house I have.

18           MR. CAMPAGNA:  Would you repeat my question.

19           THE COURT REPORTER:  "Question:  Have you ever

20           yourself received funds that were paid out of

21           an escrow?"

22           THE DEPONENT:  Yes.

23   BY MR. CAMPAGNA:

24       Q.   When?

25       A.   When I refinanced my house.

1    Q.   So how did that refinance of your house

2  occur?

3    A.   I borrowed money against my house.

4    Q.   You borrowed money from where?

5    A.   From the equity on my house.

6    Q.   From -- from an individual or from an

7  institution?

8    A.   From a bank.

9    Q.   What bank?

10    A.   Chase.

11    Q.   Okay.  So when you borrowed funds from Chase

12  on your house, where -- where did the funds from Chase

13  go?

14    A.   To the title company.

15    Q.   And then where -- where did the title company

16  put them?

17    A.   Gave it to me.

18    Q.   How did the title company give it to you?

19    A.   Wired the money into my account.

20    Q.   From where?

21    A.   From -- from wherever they got the money

22  from.

23    Q.   The title company got the money from the bank

24  and the title company put the money where?

25    A.   Into my account.  Right into my account.

1    Q.  The title company -- where did the title

2  company put the money -- before the -- before the money

3  was directly in your account, how did the title company

4  hold the bank's funds?

5    A.  I don't know that.

6    Q.  Did they hold the funds in the bank's account

7  itself or did the title company hold it in a separate

8  account?

9    A.  I don't know that now.

10    Q.  Could it have been at the title company held

11  those funds in an escrow account?

12    A.  I have no idea.

13    Q.  So you say here:  "We have several properties

14  in escrow in North Carolina which should bring in

15  $40,000."

16       It's fair to say that at this time you did not

17  have several properties that were actually in an escrow

18  situation; is that correct?

19    A.  Describe what the word "escrow" to mean, then

20  I can tell you.  My understanding of "escrow" may be

21  different than your understanding of "escrow."

22    Q.  No.  I would like it from your understanding

23  of what you described that -- where there's an agent

24  who has money being distributed.

25    A.  The agent advised me that there were buyers

1  interested in buying the properties.  He mentioned

2  these four properties and they were making offers on

3  these properties.

4          And I had told him to sell all the

5  properties.  So I said I need the money right away.  So

6  he had said there would be over forty or fifty thousand

7  dollars.  Once we sell the properties, we can get forty

8  or fifty thousand dollars out of the properties.

9      Q.  So at the time that you told Mr. Husain that

10 you have several properties in escrow in North

11 Carolina, your agent had told you that the agent was

12 trying to sell several properties?

13     A.  We had buyers who were ready -- who would buy

14 those properties.  He had found, located buyers who

15 would buy those properties.

16     Q.  How many buyers had he found, this Brian?

17     A.  He had buyers for four, five properties.  I

18 don't recollect how many buyers he found.

19     Q.  Were there ever any purchase and sale

20 agreements drafted at this time?

21     A.  Not to my knowledge.

22     Q.  Is your understanding that there were not

23 purchase and sale agreements drafted at this time?

24     A.  There was one that was sold, one of the

25 properties -- no.  One agreement was -- one property

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    was sold.  Mr. Iqbal signed off on on that

2        Q.   Okay.  At the time that you sent the

3    November 6th, 2008 e-mail to Mr. Husain and you made

4    this statement:  "We have several properties in escrow

5    North Carolina."  At the time you made that statement

6    one of the properties had already been sold?

7        A.   Or was in the process of being sold.  I don't

8    remember the exact timeline.

9        Q.   It's fair to say that none of those properties

10   were in a real estate closing situation?

11       A.   Sure.

12       Q.   Just waiting for an escrow agent to transfer

13   money; is that correct?

14       A.   There were buyers located for those properties

15   and I was told by the agent that we could sell these

16   properties and get about forty to fifty thousand in

17   equity.

18            MR. CAMPAGNA:  Could you repeat my question.

19            THE COURT REPORTER:  "Question:  Just waiting

20            for an escrow agent to transfer money; is that

21            correct?"

22            THE DEPONENT:  No.

23            MR. CAMPAGNA:  Now I'm confused.  Let's go

24   back to the beginning of the question before he

25   answered part of it because at the end of the day I