1   want to ask the full question and have him answer

2   that.

3           THE COURT REPORTER:  "Question:  It's fair to

4           say that none of those properties were in a

5           real estate closing situation?

6           "Answer:  Sure.

7           "Question:  Just waiting for an escrow agent

8           to transfer money; is that correct?"

9           THE DEPONENT:  No.

10  BY MR. CAMPAGNA:

11      Q.  No what?

12      A.  Escrow agent to transfer the money, no.

13      Q.  So the answer to my question would be yes,

14  it's correct that none of them were in an escrow

15  situation waiting for an agent to transfer money?

16      A.  Correct.

17      Q.  You go on to say, "The rest of the money I

18  will need to sell some more properties which are

19  already in the market to retire the debt."

20          When you state "I will need to sell some more

21  properties," which properties are you referring to

22  there?

23      A.  Other properties.

24      Q.  Which other properties?

25      A.  Hawaii properties, Montgomery properties,

Case: 10-05196   Doc #: 106-7   Filed: 07/23/12   Entered: 08/10/12 15:42:15   Page 1 of 31
TORREANO SHORTHAND REPORTING (866) 169-2 DEPO

1    Biloxi properties, I was trying to sell all the

2    properties.

3         Q.   Pardon?

4         A.   I was trying to sell all the properties.

5         Q.   You say which are already in the market?

6         A.   Yes.

7         Q.   What do you mean by "already in the market"?

8         A.   Agents have been told to sell the properties

9    and find buyers for me immediately.

10        Q.   Who would know the names of the agents

11   handling the sale of the Hawaii properties in November

12   of 2008?

13        A.   Dayna Harris.

14        Q.   Is that the name of the agent or is that the

15   person who would know?

16        A.   That's the name of the agent.

17        Q.   And how about for the Montgomery, Alabama

18   properties?

19        A.   J.M. Harrison.

20        Q.   J, period, M, period, Harrison?

21        A.   Yes.

22        Q.   Do you know what the J and M stand for?

23        A.   No.

24        Q.   And the Biloxi properties?

25        A.   Biloxi properties, I don't remember the name

```
 1    of the agent.  She died of cancer, but I can -- I
 2    can -- I don't remember the name of the agent.  I can
 3    get you the name of the agent.
 4         MR. ISON:  He didn't ask you if you could get
 5    the name of the agent.  He asked you do you know the
 6    name of the agent.
 7         THE DEPONENT:  I don't know the name of the
 8    agent.  I don't recollect the name of the agent.
 9    BY MR. CAMPAGNA:
10         Q.   The Montgomery, Alabama properties that
11    J.M. Harrison was trying to sell for you, did that
12    include the Swanner properties?
13         A.   Including the Swanner properties, also.
14         Q.   Did you have a written agreement with
15    J.M. Harrison to sell the Swanner properties?
16         A.   We had a verbal agreement.
17         Q.   Did you have any written agreement with
18    J.M. Harrison to sell any properties?
19         A.   I don't recollect.  I may have.
20         Q.   In other words, for the Swanner properties
21    there may have been an oral agreement with
22    J.M. Harrison, but on other properties you may have had
23    an actual --
24         A.   I could have.  I'm not --
25         Q.   -- broker's agreement with him?
```

Case: 10-05196   Doc 1062   Filed 08/16/12   Page 3 of 31
FORBERG SHORTHAND REPORTING 18642 DEPO

1    A.   I don't recollect.

2    Q.   Pardon?

3    A.   It was a verbal agreement.  J.M. Harrison and

4  me worked on a verbal agreement.  We worked on so many

5  agreements.

6    Q.   It sounds like you worked on verbal

7  agreements, but sometimes you also had a written

8  agreement?

9    A.   On selling properties in Montgomery,

10  J.M. Harrison was always a verbal agreement.  They

11  would tell me if they found a buyer and we would sign

12  the papers and sell the property.

13         MR. CAMPAGNA:   Okay.  We can take a break.

14         (Recess taken.)

15         MR. CAMPAGNA:   Back on the record.

16  BY MR. CAMPAGNA:

17    Q.   Also referring to Exhibit 129, there's a

18  response e-mail from Iqbal on November 7th, 2008.

19         Do you see that --

20    A.   Yes.

21    Q.   -- e-mail where it says:  "I need to see which

22  properties are in contract.  Please send copies of the

23  sales contract for each one and amount of loan

24  outstanding, including principal and interest owed for

25  each"?

1          Do you recall that e-mail from Mr. Husain?

2     A.   I don't recall that e-mail.

3     Q.   Do you recall sending any copies of sales

4  contracts for the properties?

5     A.   No.

6     Q.   Is that because there weren't any sales

7  contracts for the properties?

8     A.   No.  Yes.

9          Would you repeat the question, please?

10         MR. ISON:  It's a negative and he meant --

11  BY MR. CAMPAGNA:

12    Q.   It's because -- it is because there weren't

13  any sales contracts for the properties?

14    A.   Yes.

15    Q.   And it's also true that you didn't send any

16  documents to Mr. Husain showing the amount of the loan

17  outstanding on each of the properties?

18    A.   Yes.

19    Q.   It's true that you did not send them?

20    A.   True.

21    Q.   You're doing fine.  It may be the way that I'm

22  asking these particular questions.

23         MR. ISON:  It's clearer to ask --

24         MR. CAMPAGNA:  Pardon?

25         MR. ISON:  It's clearer to ask affirmative

1   questions.

2   BY MR. CAMPAGNA:

3       Q.   Okay.   Such as did you send documents which

4   showed the amount of the outstanding loans on

5   properties?

6       A.   No.

7       Q.   Then several weeks later there's an e-mail

8   from Mr. Husain to dchopra@hotmail.com on December 1st,

9   2008 where Mr. Husain states:  "Since I've not heard

10  back from you with a concrete proposal for additional

11  collateral, I'm forced to go ahead with foreclosure of

12  the remaining properties.  I need to see the proposal

13  by close of business Tuesday, the 2nd of December,

14  2008."

15           Do you recall receiving that communication

16  from Mr. Husain?

17      A.   I don't recall.

18      Q.   Do you recall having any communications

19  between Mr. Husain between November 7th, 2008 and

20  December 1st, 2008?

21      A.   Yes.

22      Q.   How were those communications?

23      A.   Through telephone.

24      Q.   Did you make the phone calls or did Mr. Husain

25  make the phone calls?

Case: 10-05196   Doc# 106-1   Filed: 07/23/12   Entered: 08/10/12 15:42:15   Page 6 of 31

1     A.   Both.

2     Q.   About how many times did you speak with

3  Mr. Husain between November 7th, 2008 and December 1st,

4  2008?

5     A.   I don't recollect.

6     Q.   Well, it's a three-week period.  There's 21

7  days.  Did you speak with him --

8     A.   Five, six times.  Maybe ten -- I don't know.

9  Ten times.

10    Q.   So maybe approximately on average every other

11  day?

12    A.   It could be.

13    Q.   Did you ever get to him a concrete proposal

14  for the additional collateral that he's referencing in

15  the December 1st, 2008 e-mail?

16    A.   I discussed with him properties that I was

17  trying to sell and do my best to pay the note.

18    Q.   But you didn't get to him a concrete

19  proposal?

20    A.   No.

21    Q.   Then your e-mail in response, this is in the

22  all lower case with the dashes between sentences

23  instead of periods.  It says: "Sorry, Iqbal.  I was

24  sick and then moving.  I'm trying to find properties I

25  can give you.  So be patient.  There is no reason to

678

1   foreclose.  I will just transfer you -- transfer the

2   title to you.  Regards, Deepak."

3          Do you recall sending that e-mail?

4   A.   I don't recall.

5   Q.   December 1st, 2008 do you recall -- do you

6   recall being sick and then moving?

7          Okay.  December 2008, do you recall that you

8   were moving around that time?

9   A.   I think so.

10  Q.   Where were you moving?

11  A.   I don't remember where I was moving, but I was

12  moving, I think, to my sister's house.  I'm not sure.

13  Q.   Were you moving from the Becky Lane property?

14  A.   No, no.  I was moved -- I don't know where I

15  was moving.  Maybe moving the offices or I was moving

16  to my sister's house, but I was moving -- I was on a

17  move.

18  Q.   So you say here:  "I'm trying to find

19  properties that I can give you.  So be patient."

20         What properties in December of 2008 were you

21  trying to find?

22  A.   Find properties that had equity that I could

23  give Mr. Husain.  And there were very few properties

24  with equity left because the market had collapsed.

25  Q.   Which properties had property?

1     A.  I was looking at Biloxi.  I was looking at

2  Montgomery.  I was looking at Hawaii.  Anywhere I could

3  find some property that had equity.

4     Q.  At that time did the Swanner properties have

5  equity?

6     A.  No.

7     Q.  Did any other Montgomery properties have

8  equity that -- that you or your companies had ownership

9  of?

10     A.  I don't recollect.

11     MR. CAMPAGNA:  The next exhibit is

12  Exhibit 130.

13     (EXHIBIT 130 WAS MARKED FOR IDENTIFICATION.)

14  BY MR. CAMPAGNA:

15     Q.  Do you recognize this document?

16     A.  No.

17     Q.  Upper left-hand corner says:  "Numbers as of

18  11/7/07."  Do you see that there?

19     A.  Yes.

20     Q.  And below it says:  "Bay Villas 12B4."

21     Do you see that there as well?

22     A.  Yes.

23     Q.  That's one of the properties that was the

24  subject of the property settlement agreement; correct?

25     A.  Yes.

Case: 10-05196  Doc# 106-7  Filed: 07/23/12  Entered: 08/10/12 15.42.19  Page 9 of 31

1     Q.  Do you recall what your arrangement was with

2  Iqbal Husain regarding your joint ownership of this

3  property?

4     A.  It's 50/50.  And I just gave it to Iqbal for

5  the settlement agreement.  He took over those

6  properties.

7     Q.  Do you recall the time before the settlement

8  agreement that it was your responsibility to pay the

9  negatives on this property?

10     A.  It was joint negatives.

11     Q.  Joint negatives.  Did you pay negatives, your

12  portion of the negatives on this property?

13     A.  I did.

14     Q.  That you recall?

15     A.  I did pay negatives on the property.

16     Q.  Do you recall how this property was initially

17  held with respect to its title?

18     A.  I think it was held in -- title was held with

19  me and then I think Iqbal took over the title based on

20  the settlement agreement.

21     Q.  Unit 314.  Do you recall how title was held on

22  that property prior to the settlement agreement?

23     A.  I think it was held by me and Iqbal had a

24  second on it.  And then Iqbal -- I quitclaimed the

25  title to him based on the settlement agreement.

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1    Q. Do you recall refinancing unit 314?

2    A. Yes.

3    Q. What do you recall about the refinancing of

4    unit 314?

5    A. Refinanced the unit and we had the money that

6    came in. Iqbal had a second deed of trust on that for

7    $68,000 and we furnished -- we gave him interest every

8    month on that $68,000.

9    Q. How was the refinance arrangement -- I'll ask

10   a different question.

11       Before you refinanced unit 314, did you

12   communicate with Mr. Husain about your plan to obtain a

13   refinance of unit 314?

14   A. Yes.

15   Q. Do you recall whether you had any written

16   communications with Mr. Husain regarding your plan to

17   refinance unit 314?

18   A. We should. I'm not sure. I can't recollect

19   that.

20   Q. Did you need Mr. Husain's consent to obtain

21   refinancing on unit 314?

22   A. Yes.

23   Q. Did you obtain Mr. Husain's consent before

24   refinancing unit 314?

25   A. I think he was aware of it.

1    Q.  Well, there's a difference between you think

2  him being aware of something and you obtaining

3  consent.  So my question is did you obtain Mr. Husain's

4  consent before refinancing unit 314?

5    A.  Juan Carmona would be the best person to

6  answer that question.

7    Q.  Pardon?

8    A.  Juan Carmona would be the best person to

9  answer that question.

10    Q.  So the answer to the question is?

11    MR. ISON:  He asked you if you received

12  consent.  He didn't ask you who the best person to ask

13  the question is.

14    THE DEPONENT:  Yes, we received consent.

15  BY MR. CAMPAGNA:

16    Q.  When you say "yes, we conceived consent," who

17  are you referring to?

18    A.  Juan.

19    Q.  How do you know that Juan received consent

20  from Mr. Husain prior to you refinancing unit 314?

21    A.  Because he discussed it with me.

22    Q.  Was this a face-to-face discussion with

23  Mr. Carmona?

24    A.  Yes.

25    Q.  And what was the purpose of the refinance?

1    A.   To lower the interest rate.

2    Q.   And where did the proceeds of the refinance

3  go?

4    A.   The proceeds went to Chopra Enterprises

5  Corporation and a deed of trust for 68,000 was Iqbal's

6  share went -- was returned to the property on the

7  second deed of trust with the interest paid to him

8  every month.

9    Q.   Was the deed of trust recorded?

10    A.   Yes.

11    Q.   How do you know that there was a deed of trust

12  recorded?

13    A.   Because we gave it to Iqbal to record it.  And

14  I think it was recorded because we paid interest on

15  that.  I'd have to ask Juan Carmona on that.  But we

16  were paying interest on that deed of trust.

17    Q.   The bottom of the first page says unit 155.

18       Do you recall how the title was held for

19  unit 155?

20    A.   No, I don't.

21    Q.   This was either in your name or Iqbal Husain's

22  name; correct?

23    A.   I think this was Iqbal's Husain's name, if I'm

24  not mistaken, but I can't recollect.

25    Q.   And this same arrangement that each of you was

684

Case: 10-05196   Doc# 704-4   Filed: 07/23/12   Entered: 08/10/12 15:42:15   Page 13 of 31

1  to share in paying the negatives?

2      A.  Yes.

3      Q.  Is it true that you didn't pay your share of

4  the negatives on this property?

5      A.  I don't recollect.

6      Q.  If it was true that you were not paying your

7  share of the negatives on this property, where would

8  that information be recorded?

9      A.  In Quickbooks.

10     Q.  Would Juan Carmona be the one to ask on this?

11     A.  Yes.

12     Q.  Unit C205, do you recall how that title was

13  held?

14     A.  No.

15     Q.  It could have been held by you; it could have

16  been held by Mr. Husain?

17     A.  Yes.

18     Q.  Is it true that you didn't pay your portion of

19  the negatives on unit C205?

20     A.  I can't recollect.

21     Q.  Would it be Juan Carmona to ask regarding

22  that?

23     A.  Yes.

24         MR. CAMPAGNA:  The next exhibit is

25  Exhibit 131.

1          (EXHIBIT 131 WAS MARKED FOR IDENTIFICATION.)

2     BY MR. CAMPAGNA:

3          Q.   You've had a chance to look at Exhibit 131?

4          A.   Yes.

5          Q.   Do you recognize this document?

6          A.   No.

7          Q.   Okay.  Well, this is an e-mail from Juan

8     Carmona dated Wednesday, October 31st, 2007 to Iqbal

9     Husain, dchopra@hotmail.com and David Pearson, and then

10    there's two fax attachments -- excuse me.  There's one

11    fax attachment also dated October 31st, 2007.  And the

12    e-mail appears to be from Juan.  And it says:  "Here is

13    the information on the liens."

14          October 31, 2007, so this is a day before you

15    entered into the property settlement agreement; is that

16    correct?

17          A.   Could be.

18          Q.   If you look at Exhibit 22, does that refresh

19    your recollection if the e-mail, Exhibit 131, is the

20    day before you entered into the property settlement

21    agreement?

22          A.   Yes.

23          Q.   So it was the day before?

24          A.   It was the day before.

25          Q.   Okay.  If you look at the first page of that

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1   exhibit -- excuse me, if you look at the first page of

2   the attachment, there's -- there are four properties

3   listed. Have you seen this document before?

4      A. No.

5      Q. So this is an e-mail that appears to be sent

6   from Juan Carmona -- correct? -- on the first page of

7   the exhibit?

8      A. Yes.

9      Q. And he's attaching what's called a pFax from

10   color copier (408) 379-4276.

11      Do you recognize that fax number?

12      A. No.

13      Q. If you look at Exhibit 120, that has a fax

14   number that shows from color copier (408) 379-4276.

15      Does that help you to know where that fax

16   number is coming from?

17      A. No.

18      Q. They do appear to be the same?

19      A. Yes.

20      Q. Do you know what this spreadsheet is referring

21   to when it identifies two properties on Broadgait Brae

22   Road, one property on Ruby Walk Drive and one property

23   on Kinellan Lane, K-I-N-E-L-L-A-N, and the word "Lane"?

24      A. The equity on those properties that Juan gave

25   him with all the appraisals. That's what I think that

Case: 10-05196   Doc# 108-7   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 16 of 31

1    is.

2        Q.   So the day before the settlement agreement

3    there's total net equity without 224 Broadgait Brae,

4    69,349?

5        A.   Yes.

6        Q.   Were you privy to this equity figure before

7    you entered into the settlement agreement?

8        A.   Juan and Iqbal worked on this for several

9    weeks coming up with an equity -- equity agreement for

10   the settlement.   I was not involved with that.

11       Q.   If I recall correctly, you testified that

12   Mr. Husain was given equity in properties that -- that

13   was two to three hundred percent of the amount of the

14   note; is that correct?

15       A.   That was correct.

16       Q.   So the note was approximately $94,000?

17       A.   That's correct.

18       Q.   So your testimony is that the equity that you

19   gave Mr. Husain was at least 188,000?

20       A.   True.

21       Q.   Or whatever three times approximately $94,000

22   is?

23       A.   True.

24       Q.   Did this calculation that you said Mr. Carmona

25   and Mr. Husain worked on together factor into your

1    understanding of how much equity Mr. Husain was getting

2    as security for the $94,000 note?

3         A.   I was told about 180, 170 to 180.

4         Q.   You were told 170?

5         A.   To 180.

6         Q.   To 180.  By whom?

7         A.   By Juan.

8         Q.   When were you told by Juan Carmona that there

9    was equity of 170 to 180 in the properties that were

10   being pledged as security for the note to Mr. Husain?

11        A.   When they were discussing the properties, they

12   both were discussing the properties.

13        Q.   Do you know whether -- let me ask this

14   question.

15             Are you familiar with the terms "gross equity"

16   and "net equity"?

17        A.   No.

18        Q.   Would you know the difference between the term

19   "gross equity" and "net equity"?

20        A.   No.

21        Q.   Okay.  So do you know whether the equity that

22   Juan Carmona told you, 170 to 108,000 -- 170 to

23   188,000, included the amounts that would be paid to

24   brokers for their efforts in selling the pledged

25   properties?

1      A.   No.

2      Q.   Pardon?

3      A.   I don't remember telling him that.

4      Q.   So you don't know whether this was an amount

5   that would be a net amount?  You're familiar with net

6   amount?  We talked about the sales, the profit and loss

7   statements earlier in your testimony -- in your

8   deposition.

9      A.   Yes.

10      Q.   Do you recall that?  And then there were net

11   profits and gross profits?

12      A.   Yeah.

13      Q.   Do you remember -- so you don't remember

14   having any discussions with Juan Carmona about what

15   the net equity may have been in those properties

16   following paying commissions and other sales costs like

17   that?

18      A.   No.

19      Q.   If you turn to a page that's further down in

20   the exhibit.  And it's -- it says that it's page 6 of

21   42 in the upper right-hand corner.

22      A.   Uh-huh.

23      Q.   There's a picture of a gentleman in the upper

24   right-hand corner.

25           Is that the Brian that you were referring to?

                                                        690

1          A.   Yes.

2          Q.   And it shows to the left of him Brian Brenner,

3   B-R-E-N-N-E-R?

4          A.   Yes.

5          Q.   He's the Brian whose last name you didn't

6   quite recall previously; is that right?

7          A.   Yes.

8               MR. CAMPAGNA:   The next exhibit will be

9   Exhibit 132.

10              (EXHIBIT 132 WAS MARKED FOR IDENTIFICATION.)

11  BY MR. CAMPAGNA:

12         Q.   Do you recognize this exhibit?

13         A.   No, I don't.

14         Q.   Are you familiar with the unit 117 that's

15  referenced in the e-mail?

16         A.   No.

17         Q.   And I note here that this is an e-mail from

18  Juan Carmona to husain@yahoo.com dated Monday,

19  February 25th, 2008.

20              And you've testified previously that you don't

21  recognize the color copier fax number (408) 379-4276;

22  is that correct?

23         A.   I don't recognize the number.  I don't

24  remember the number.

25         Q.   Pardon?

Case: 10-05196   Doc# 106-7   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 20 of 31

1    A.  I don't remember the number.

2    Q.  Mr. Chopra, you're aware that there are

3  allegations against you and your entities regarding

4  transactions that took place around properties in the

5  Mississippi area?

6    A.  No.

7    Q.  Are you aware that Mr. Husain in the adversary

8  proceeding has brought allegations against you and your

9  various companies regarding Biloxi, Mississippi

10 properties?

11   A.  Yes.

12   Q.  What's your understanding of those

13 allegations?

14   A.  I did not buy any property with Mr. Husain

15 together in Mississippi.  I put my own money in the

16 property I bought by myself.  And that's it.  That's

17 what I understand.

18        MR. ISON:  No.  He asked you what your

19 understanding of what the allegations against you are.

20        THE DEPONENT:  That they are not true.

21        MR. ISON:  I didn't ask you -- he didn't ask

22 you if they are true.  He said what is your

23 understanding of those allegations.

24        THE DEPONENT:  My understanding is that -- I

25 don't understand the allegations.

1       MR. ISON:  All right.  He has no

2  understanding.

3       THE DEPONENT:  No understanding.

4  BY MR. CAMPAGNA:

5     Q.  Turning back to Exhibit 2.

6       MR. ISON:  2?

7       MR. CAMPAGNA:  Which is in the binder.

8       MR. ISON:  Now we're going to march through

9  each one.

10  BY MR. CAMPAGNA:

11     Q.  Which is a copy of the complaint in this

12  adversary proceeding.  If you turn to page 4 of the

13  complaint and look at subparagraph (d).

14       "In or about November 2005, Plaintiff provided

15  money to one of the companies" --

16       MR. ISON:  I'm sorry.  Page 4?

17       MR. CAMPAGNA:  Yes.

18       MR. ISON:  Okay.  You don't have to read it.

19  You want him to read it.  Read it.

20       THE DEPONENT:  Do you want me to read it?

21       MR. ISON:  To yourself.

22       THE DEPONENT:  Okay.

23  BY MR. CAMPAGNA:

24     Q.  Do you see that it starts with:  "In or about

25  November 2005, Plaintiff provided money to one of the

693

1  companies"?  Do you see that there?

2      A.  Yes.

3      Q.  Okay.  Go ahead and look at that paragraph

4  that continues on page 5.

5          Did you have a chance to look at those

6  allegations?

7      A.  This particular one, yes.

8      Q.  Yes.  Have you read them previously?

9      A.  Yes.

10      Q.  Okay.  What's your understanding of the

11  allegations against you by Mr. Husain as it relates to

12  the Mississippi properties?

13      A.  They are not true.

14      Q.  I understand what your position is, but do you

15  understand what the allegations are?

16      A.  Yes.

17      Q.  Okay.  What are the allegations?

18      A.  That I did not put any money, I received -- we

19  received commissions.  We didn't have a real estate

20  license.  The allegations that I read there.

21      Q.  Pardon?

22      A.  The allegations are that we bought properties,

23  and I -- I did not put any money in that, my share of

24  the 50 percent.  We got commissions, undisclosed

25  commissions that we did not disclosed and we didn't

1   have a real estate license.  That's what the

2   allegations are.

3        Q.  Okay.  Is it true that in or about November

4   2005, Plaintiff gave money to you or one of your

5   companies that was to be used for down payments on the

6   purchase of the condos in Mississippi?

7        A.  I'm not aware of that.

8        Q.  Okay.  SEC Ventures is identified here.

9            Who would be aware of whether or not

10  Mr. Husain gave money to you or your companies for the

11  purchase of these condos?

12       A.  Juan Carmona.

13       Q.  Mr. Husain alleges that you represented that

14  you or one of your other companies would be putting up

15  money equal to the amount that Mr. Husain was putting

16  up so that you would be 50/50 owners of the Mississippi

17  properties.

18           Is that a true statement --

19       A.  Yes.

20       Q.  -- that you told him that you or one of your

21  companies was going to put up an amount of money equal

22  to the amount that he was putting up?

23       A.  I never told him that, no.  The answer is no.

24       Q.  Is it true that in or about September 2007,

25  you and Mr. Husain came to an agreement whereby you

1    were going to separate out your interests in the

2    Mississippi properties?

3        A.   I don't recall.

4        Q.   You're sure that you didn't have a 50/50

5    ownership in the properties with Mr. Husain?

6        A.   I personally did not.

7        Q.   You or one of your companies?

8        A.   I don't know about the companies.  I did not.

9        Q.   Tell me in general how transactions involving

10   these Biloxi condos came about.

11       A.   Juan Carmona and Dave Cagley found a builder

12   in Biloxi who was building condominiums.

13       Q.   What's his name?

14       A.   His name was Mr. Grant.

15       Q.   Is that Mr. Grant McPhail?

16       A.   I don't know his last name.  And we all went

17   and bought properties.  I personally brought properties

18   there.  I put money in there.  Some I bought 100

19   percent.  Some I bought with some other investors, but

20   not with Mr. Iqbal.

21            And Mr. Husain worked with Juan Carmona and

22   put money that -- I'm sure he put in money and bought

23   properties with him or with another entity.  I do not

24   have any knowledge of that.  Mr. Juan Carmona has

25   knowledge of it.

1    Q.  At the time that Mr. Husain was working with

2  Juan Carmona on purchasing Biloxi properties with one

3  of the entities, did you have any knowledge that

4  Mr. Husain and Mr. Carmona were working together on

5  those transactions?

6    A.  I had knowledge they were working together.

7    Q.  What was your knowledge?

8    A.  They are working together.

9    Q.  Did you know how many properties were in

10 question?

11   A.  No.  I don't recall that.

12   Q.  Did you understand the value of any of the

13 properties?

14   A.  The ones I bought I did.

15   Q.  The ones that Mr. Husain was involved with?

16   A.  No.

17   Q.  Did you personally find buyers for any of

18 those Mississippi properties?

19   A.  I had friends invest in the properties with

20 me.  My friends.

21   Q.  Did you find those friends and encourage them

22 to invest in the properties?

23   A.  No.

24   Q.  Did you identify properties for these friends

25 that could possibly be investments for them?

1    A.   Yes.

2    Q.   Give me an example of a friend that you told

3  this investment to?

4    A.   Ashraf Tharwani.

5    Q.   Is that Ms. Ashraf?

6    A.   Ms. Ashraf.

7    Q.   Tharwani.  How did you communicate to

8  Ms. Tharwani a possible investment opportunity in

9  Biloxi, Mississippi?

10    A.   I just said I was investing in Biloxi and met

11  with a -- I had gone and seen the properties and -- and

12  I was planning to invest in those properties that I

13  thought was a good value and I was going to put my own

14  money in to do it.  And she wanted to put some money

15  with me.

16    Q.   Did you go to her and tell her, "Ms. Tharwani

17  or Ashraf, there's an investment opportunity for you.

18  Would you like to go in on it?"

19    A.   No, I didn't.

20    Q.   So how did it -- how did you broach the issue

21  with Ms. Tharwani about an investment property and her

22  possible participation in it?

23    A.   Her husband and myself are very good tennis

24  players.  We played tennis together, and he asked me

25  his wife was looking for investments, and if you could

1  find some investments for her or if we could find some

2  properties for her to invest in.  So she came to my

3  office and we discussed the properties that I was

4  investing in.  She said, "If you are investing in the

5  properties, I'd like to invest in them, too."  Just

6  like that.

7      Q.  Did you say you're a very good tennis player?

8      A.  I'm a good tennis player.

9      Q.  Are you meaning to say that you and the

10  husband were very good friends?

11      A.  Yes, we're very good friends.

12      Q.  And you're also a very good tennis player?

13      A.  Both of them are very good tennis players.

14      Q.  Okay.  So you were trying to help your friend

15  out in finding some investments for his wife.

16      A.  He approached me on the tennis court.

17      Q.  He approached you.  And then he sent her to

18  your office at a time when you had a possible

19  investment in the property?

20      A.  Exactly.

21      Q.  Did she invest with you in a property?

22      A.  Yes, she did.

23      Q.  Did you own something jointly with her?

24      A.  Yes, I did.

25      Q.  How many properties did you own jointly with

Case: 10-05196   Doc #: 196-7   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 28 of 31

TORREANO SHORTHAND REPORTING (866) 760-DEPO

1  Ms. Tharwani?

2      A.    Two or three.

3          MR. ISON:   It's 5:15 now and I have to run.   I

4  have a ride.

5          MR. CAMPAGNA:   We can conclude the deposition

6  for the day here.   And do you want to go on the record

7  for what we're going to do next or do you want to go

8  off the record?

9          MR. ISON:   No.   We can go off the record.

10          MR. CAMPAGNA:   We can go off the record.

11  That's fine.

12          (Off-the-record discussion.)

13          MR. CAMPAGNA:   We've agreed to continue

14  Mr. Chopra's deposition on January 30th, next Monday,

15  at 1:00 p.m. at the office of Berliner Cohen.   And then

16  thereafter, maybe February 1st depending on our

17  schedules, we'll proceed with the deposition of

18  Mr. Husain at a location to be announced by Mr. Chopra

19  and his attorney.

20  //

21  //

22  //

23  //

24  //

25  //

1        MR. ISON:  Got it.

2        (Whereupon, the deposition of DEEPAK CHOPRA

3  was adjourned at 5:22 p.m. this date.)

4        ---oOo---

5  I certify under penalty of perjury that the foregoing

6  is true and correct.

7

8  Date _____  _____

9                 DEEPAK CHOPRA

## REPORTER'S CERTIFICATE

      I, Peter Torreano, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify:

      That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause; that said deposition was taken at the time and place therein cited; that the testimony of the said witness was reported by me and was thereafter transcribed under my direction into typewriting; that the foregoing is a full and accurate record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

      Pursuant to Federal Rule 30(e), transcript review was not requested.

      I further certify that I am not of counsel nor attorney for any of the parties in the foregoing deposition and caption named nor in any way interested in the outcome of the cause named in said caption.

Dated:  February 16, 2012

_____
PETER TORREANO, CSR NO. 7623

Case: 10-05196   Doc# 106-7   Filed: 07/23/12   Entered: 08/10/12 15:42:19   Page 31 of 31
TORREANO SHORTHAND REPORTING  (886)  760-DEPO