1  FRANK R. UBHAUS, CA STATE BAR NO. 46085
   MARCO M. CAMPAGNA, CA STATE BAR NO. 246633
2  BERLINER COHEN
   TEN ALMADEN BOULEVARD
3  ELEVENTH FLOOR
   SAN JOSE, CALIFORNIA 95113-2233
4  TELEPHONE: (408) 286-5800
   FACSIMILE: (408) 998-5388
5  frank.ubhaus@berliner.com
   marco.campagna@berliner.com
6
   ATTORNEYS FOR PLAINTIFF IQBAL HUSAIN
7

8               UNITED STATES BANKRUPTCY COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No.  10-52819 |
| DEEPAK CHOPRA, | Chapter 7 |
| Debtor. | Adv. No. 10-05196 |
| IQBAL HUSAIN, | |
| Plaintiff, | PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | Ctrm:      3070 |
| DEEPAK CHOPRA, | Judge:    Hon. Charles Novack |
| Defendant. | |

Plaintiff Iqbal Husain respectfully submits this Proposed Findings of Fact and Conclusions of Law.

I.    FINDINGS OF FACT

| Biloxi, Mississippi Condominiums/Undisclosed Commissions (Kickbacks) | |
|---|---|
| **Findings of Fact** | **Witness – Citations (vol.:pg.:line)-- Exhibit** |
| 1.    In or about November, 2005, Plaintiff provided money to SEC at Defendant's instruction for down payments, assignment fees, and closing costs on the joint purchase of five condominium units near Biloxi, Mississippi ("Biloxi Condos") with Defendant. | Joint Pre-Trial Order ("JPTO"), p.4:21-23 |

Case: 10-05196   Doc# 124   Filed: 11/15/12   Entered: 11/15/12 23:21:11   Page 1 of 23

| | |
|---|---|
| 2. Defendant did not have a real estate broker's license at the time of the Biloxi Condominium transactions. | JPTO, p.4:24-25 |
| 3. Plaintiff provided money at Defendant's instruction. | Court - 1:61:12; 1:62:8-11 |
| 4. Mr. Chopra insists that Mr. Carmona approached Mr. Husain regarding purchasing the Biloxi properties. | Chopra - 5:867:10-11 |
| 5. Check written out to SEC at Mr. Chopra's direction in amounts of $50,000 and $41,166.20 (2nd check at direction of Mr. Carmona). | Husain - 1:180:7-8; 2:322:12-14; Ex. 56 |
| 6. Mr. Chopra was the majority and controlling owner of SEC at the time the checks were written out to SEC. | Ex. 97: SEC Operating Agreement, 3rd Amendment, Schedule A |
| 7. Mr. Husain understood from Mr. Chopra that the investment terms regarding the Biloxi Condos would be 50/50 ownership with Mr. Chopra or his entity plus $10,000 assignment fee per unit. | Husain - 2:261:3-23; Ex. 56 |
| 8. Mr. Husain understood from Mr. Chopra that he and Mr. Chopra or Mr. Copra's entity would share the income and expenses 50/50. | Husain - 2:262:10-18; Ex. 55, p.2 |
| 9. Prior to Mr. Husain paying SEC $50,000 and $41,166.20, Mr. Chopra told Mr. Husain that the Biloxi Condo's were a good opportunity, would make a lot of money, and Mr. Husain can't go wrong in this investment. | Husain - 1:179:5-10 |
| 10. Mr. Chopra does not remember telling Mr. Husain that Biloxi Condos were a good deal. | Chopra - 1:63:16-25 |
| 11. Mr. Chopra admits he told Mr. Husain something about Biloxi condos, but does not recall what he said. | Chopra - 1:62:24-25 and 1:63:1-15 |
| 12. Mr. Chopra beats around the bush in his responses. | Court - 1:63:16-19 |
| 13. Mr. Chopra beats around the bush in his deposition about whether or not he got any | Chopra - 1:65:18-66:17 |

| | |
|---|---|
| investors for Mr. McPhail's project. | |
| 14. Mr. Chopra substituted another investor, Mr. McGraw, to invest in Unit 80 and transferred Unit 80 without Mr. Husain's permission. | Husain - 2:262:3-7; 2:261:24-2:262:16 |
| 15. Mr. Chopra stated that he did not negotiate the initial deal with Mr. McPhail. | Chopra - 1:66:19-23 |
| 16. Mr. Chopra misrepresented that neither he nor any of his entities had a marketing agreement with the Biloxi Condo builder, Grant McPhail. | Chopra - 1:64:7-14 |
| 17. In fact, Mr. Chopra negotiated the initial Biloxi deal with Mr. McPhail, but does not recollect the consulting fee arrangement letter from Mr. McPhail. | Chopra - 1:66:24-68:23; 1:68:24; 1:69:11; Ex. 94 |
| 18. Mr. Chopra denied that there was a commission arrangement with Mr. McPhail. | Chopra - 1:64:7-14 |
| 19. Mr. Husain contacted the builder, Mr. McPhail, after Mr. Chopra filed for bankruptcy, which was after March 2010. | Husain - 1:183:12-15 |
| 20. Mr. Chopra misrepresented that he talked to Mr. McPhail 6 months after Mr. Husain bought his condos. | Chopra - 5:867:16; 5:1017:5-10 |
| 21. Mr. Chopra misrepresented that he did not buy any properties after contact with Mr. McPhail. | Chopra - 5:868:15-16 |
| 22. Mr. McPhail stated that none of the condominiums marketed by JMD closed in 2005. | McPhail - 3:483:13-14 |
| 23. Consulting fees were to be paid after closing. | Carmona - 3:420:15-19 |
| 24. The Biloxi Condos closed approximately a year after Katrina, August or October 2006, a year after the checks (Ex 56) were written. | Carmona - 3:420:5-9; 3:421:10-17 Husain - 2:256:23-24 Ex. 56 |
| 25. Mr. McPhail was already in discussion with Mr. Chopra before Mr. McPhail met Mr. Carmona. | McPhail - 3:484:4-9 |

| | |
|---|---|
| 26. The arrangement between Mr. McPhail and Mr. Chopra involved some payment for marketing the properties. | McPhail - 3:463:9-16 |
| 27. Mr. McPhail testified that he first called Mr. Chopra who subsequently introduced him to Mr. Carmona to work out the eventual marketing arrangement. | McPhail - 3:459:21-24 |
| 28. Mr. McPhail said that "consulting fees" were paid on all 5 properties that are the subject of this litigation: Units 17, 48, 60, 63, and 80. | McPhail - 3:477:18-22 |
| 29. Mr. Chopra stated that he was not getting the consulting fees. | Chopra - 1:69:6 |
| 30. The arrangement regarding the consulting fees was made prior to Mr. Carmona meeting with Mr. McPhail. | Carmona - 5:693:21 |
| 31. Mr. Chopra was impeached with Exhibit 94, which is a letter from Mr. McPhail to Mr. Chopra, showing that Mr. Chopra was aware of the consulting fees. | Chopra - 7:986:19-20 and Ex. 94 |
| 32. After being impeached, Mr. Chopra admitted that at least prior to June 22, 2006, he may have had conversations with Mr. McPhail to find investors for Biloxi project. | Chopra - 7:990:13-20 |
| 33. Mr. Chopra misstates how many times he spoke to Mr. McPhail. At trial, Mr. Chopra says he only talked once and in his deposition, he states "a couple of times". | Chopra - 7:986:9 and 7:997:15-17 |
| 34. Mr. Husain first became aware of the Biloxi consulting fees to Mr. Chopra after Mr. Chopra filed for bankruptcy protection in March 2010. | Husain - 1:184:12-14 |
| 35. Mr. Carmona was aware of the commissions/consulting fees. | Carmona - 3:582:9-18 |
| 36. Mr. Chopra never disclosed the commissions/consulting fees. | Husain - 1:186:2 |

| | |
|---|---|
| 37.  Mr. Husain would not have invested if commissions/consulting fees were disclosed. | Husain - 1:186:6-16 |
| 38.  Mr. Carmona kept Mr. Chopra aware of all changes to the deal with Mr. McPhail. | Carmona - 5:695:14-16 |
| 39.  Mr. Carmona did not tell Mr. Husain about the commissions during Husain/Mr. Carmona settlement negotiations. | Carmona - 5:698:2 |
| 40.  Mr. Carmona does not recall telling Mr. Husain about consulting fees. | Carmona - 5:714:16 |
| 41.  Mr. Chopra received the assignment fees because CEC marketed the Biloxi Condos and Mr. Chopra deserved 100% of the fees. | Carmona - 5:694:1-4 |
| 42.  Mr. Chopra or CEC kept the assignment fees to himself for bringing the deals and negotiating the terms. | Carmona - 2:407:24-408:4 |
| 43.  The Biloxi commissions went to pay operations of JMD (salary, expenses) and/or loans to Mr. Chopra or his entities. | Carmona - 3:560:18-19; 3:561:9-11; |
| 44.  Money from consulting fees/JMD went to SEC and CEC and to Mr. Chopra. | Carmona - 5:701:11-16 |
| 45.  Equalized by the settlement (which included all monies owed by JMD and CEC including $113k). | Carmona - 3:581:15-22 |
| 46.  Mr. Chopra aware of the amount of commissions. | Carmona - 3:585:4-11 |
| 47.  Mr. Husain's damages through July 6, 2012, resulting from being fraudulently induced into the Biloxi condo deal is $525,896. | Ex. 63 |
| 48.  Defendant did not contest these damages during the trial. | Ex. 63 |
| 49.  In or about, August/September 2007, Mr. Husain traded out his 50-50 interests in 5 Biloxi condos so that he had full ownership of Units 17 and 48 and partial ownership in Unit 80. | Husain – 2:256:23-2:257:8; 2:263:24-2:264:1 |

| Unit 113 Unrecorded Mortgage | |
|---|---|
| 50.    In or about December, 2006, Defendant and CEC entered into an Agreement to Transfer Deed with Plaintiff whereby Defendant and CEC agreed to give Plaintiff a Deed of Trust in the amount of $56,898.35. | JPTO, p.2:7-9; Ex. 51 |
| 51.    Defendant or CEC paid Plaintiff the amount of $36,566.97, leaving a balance of $20,331.80. | JPTO, p.2:9-10 |
| 52.    Several months later, on or about April 17, 2007, Defendant and CEC gave Plaintiff a Mortgage, Security Agreement, Assignment of Rents, and Financing Agreement in the amount of $20,331.80, to be secured in second position by real property in Hawaii commonly known as Unit 113 ("Unit 113 Mortgage"). | JPTO, p.2:11-14 |
| 53.    The Unit 113 Mortgage was the "Deed of Trust" contemplated by the Agreement to Transfer Deed. | JPTO, p.2:14-15 |
| 54.    Defendant agreed to make interest payments on the Unit 113 Mortgage and to pay the balance when due. | JPTO, p.2:16-17 |
| 55.    In or about August 2007, Defendant gave and recorded a separate Deed of Trust against Unit 113 in favor of third parties named Rajinder Jindia and Urmil Jindia in the amount of approximately $45,000.00. | JPTO, p.3:1-3 |
| 56.    Neither Defendant nor CEC made payments on the Unit 113 Mortgage. | JPTO, p.3:4 |
| 57.    Mr. Chopra or his agent was to record the Deed of Trust for the remaining amount, approximately $20,000. | Husain - 1:176:11-15 |
| 58.    Mr. Husain never personally recorded any Deeds of Trust involving deals with Mr. Chopra. | Husain - 1:178:13-17 |
| 59.    Mr. Husain was not aware that the Deed of Trust had not been recorded. | Husain - 1:177 - 1:178; Ex. 51 |

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 6 of 23

| | |
|---|---|
| 60. Mr. Husain received copy of the Deed of Trust by fax or email. | Husain - 2:306:24; Ex. 53 |
| 61. Mr. Chopra says he gave the original Deed of Trust to Mr. Husain to record. | Chopra - 1:47:16-25 |
| 62. Mr. Husain's copy of the Deed of Trust came from CEC's fax machine. | Carmona - 2:381:13-382:7; Ex. 53 |
| 63. Mr. Chopra, not Mr. Carmona, was the 100% owner of CEC. | Chopra – 1:44:8-11 |
| 64. Mr. Chopra misrepresented that he gave the original to Mr. Husain because Mr. Chopra kept the original, signed, and notarized Deed of Trust himself. | Carmona - 2:386:17-19; 2:380:22-25 |
| 65. Mr. Chopra stated in his deposition that he had a note that he had sent the original Deed of Trust to Mr. Husain. | Chopra – 7:998:23-999:11 |
| 66. Mr. Chopra did not produce any such note. | Chopra - 7:999:12-23 |
| 67. Mr. Chopra had no intention of recording the Deed of Trust as he was offering the same collateral to other people. | Carmona - 2:387:2-15 |
| 68. Mr. Carmona said that equity in Unit 113 was offered to a number of people such as Ashraf Tharwani and Raj Jindia | Carmona – 2:388:7-13 |
| 69. Mr. Chopra did not record Ms. Tharwani's Deed of Trust and admitted that he had no intention of recording the Tharwani Deed of Trust. | Chopra - 5:889:14-890:14 |
| 70. Mr. Chopra does not recollect that Ms. Tharwani filed a lawsuit regarding Mr. Chopra's failure to record Ms. Tharwani's Deed of Trust. | Chopra - 7:1015:23 |
| 71. Ms. Tharwani was not paid back. | Carmona - 2:394:11 |
| 72. Mr. Chopra recorded a lien on Unit 113 to Raj and Urmil Jindia for $45,000 in August, 2007. | Ex. 54 |
| 73. Mr. Chopra denies he told Mr. Carmona | Chopra - 5:885:22-24 |

| | |
|---|---|
| not to record the Unit 113 Deed of Trust. | |
| **STM Settlement Agreement & STM Note** | |
| 74.   In or about May, 2007, Defendant and STM on the one hand and Plaintiff on the other hand entered into an agreement for sale of stock ("STM Settlement Agreement") and promissory note in the amount of $294,831.00 ("STM Note"). | JPTO, p.3:6-8; Ex. 2, 3 |
| 75.   The STM Settlement Agreement and STM Note together resolved prior disputes between the parties, mainly relating to unpaid invoices on a factoring agreement between STM and Plaintiff. | JPTO, p.3:8-10 |
| 76.   The first payment was due July 1, 2007. Each subsequent payment was due the first of each month with a grace period of five days. | JPTO, p.3:11-12 |
| 77.   STM and Defendant completed only a single payment on the STM Note. The single payment was made on or about July 13, 2007, which was past due. | JPTO, p.3:13-14 |
| 78.   On or about August 14, 2007, STM and Defendant attempted to make a second payment. That payment, too, was past due. | JPTO, p.3:15-16` |
| 79.   Plaintiff deposited the [second payment] check on or about August 16, 2007.  The check did not clear the bank.  The bank debited the funds from Plaintiff's account due to insufficient funds in Defendant's account. | JPTO, p.3:16-18 |
| 80.   Neither STM nor Defendant made or attempted to make another payment on the STM Note. | JPTO, p.3:18-19 |
| 81.   STM filed for Chapter 11 bankruptcy protection on or about September 9, 2007. That bankruptcy was dismissed on or about July 20, 2009. | JPTO, p.3:20-21 |
| 82.   Neither STM nor Defendant made any further payments on the STM Note thereafter. | JPTO, p.3:22-23 |
| 83.   Ms. Soria, [who was the CEO of STM] | Soria - 1:110:19 |

Case No. 10-52819; Adv. Proc. No. 10-05196                     -8-

Plaintiff's Proposed Findings of Fact and Conclusions of Law

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 8 of 23

| | |
|---|---|
| was not aware before July 9, 2007 about the $294,000 STM Settlement Agreement. | |
| 84.   Ms. Soria had not seen the STM Settlement Agreement prior to the first day of this trial, July 23, 2012. | Soria - 1:112:1-2 |
| 85.   Ms. Soria was unaware of the STM Settlement Agreement. | Soria/Court - 1:115:17 |
| 86.   Only after the first payment was due did Mr. Chopra tell Mr. Ahmed to make sure Mr. Husain was to be paid. | Soria/Court - 1:116:7 |
| 87.   At the time of the STM Settlement Agreement, Mr. Chopra and Mr. Ahmed were in charge of the STM accounts. | Soria - 1:135:8-11 |
| 88.   Mr. Chopra represented to Mr. Husain prior to the STM Settlement Agreement that STM was doing well. | Husain - 1:173:17-18 |
| 89.   At the time that the second payment check to Mr. Husain did not clear the bank, STM had more than one bank account. | Ahmed - 3:496:13-25 |
| 90.   Mr. Chopra used a negotiating ploy with Mr. Husain by stating one week the company was doing well and the next week the company was doing badly depending on what Mr. Chopra wanted to get out of Mr. Husain. | Husain - 2:279:14-16; 2:280:1-3; Ex. 8 |
| 91.   In June, 2007, at the time of the STM Settlement Agreement, STM was not doing well; it was not easy to pay bills regularly, STM was struggling; STM was also juggling creditors. | Ahmed - 3:497:8-10; 19-22; 3:498:4-18; 3:500:9-11 |
| 92.   STM often would not be able to keep up with agreements made to Mr. Husain. | Ahmed - 3:502:11-13 |
| 93.   Mr. Wimp testified that the financial condition of the company was poor. | Wimp - 1:148:24-1:149:14 |
| 94.   More than six months transpired after Mr. Husain complained to Mr. Chopra about unpaid invoices and when Mr. Wimp left STM. | Chopra - 7:956:9 |
| 95.   Mr. Ahmed wrote the first payment check | Ahmed - 3:5043:21-23; Ex. 13, p.2 |

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 9 of 23

| | |
|---|---|
| on July 13, 2007, which was past due. | |
| 96.    Ms. Soria would not know whether or not Mr. Chopra intended to pay Mr. Husain. | Soria - 1:123:9; 1:128:6-10; 1:134:23-1:135:3 |
| 97.    Payments to Mr. Husain under the STM Settlement Agreement were not in the plan to pay right away. | Ahmed - 3:504:9-10 |
| 98.    Mr. Ahmed was the bookkeeper for STM at the time of the STM Settlement Agreement (June 1, 2007).  Before July 10, 2007, Mr. Ahmed had no idea that STM had to pay $3,200 to Mr. Husain. | Ahmed - 3:504:15-19 |
| 99.    Additional $3,000-4,000 per month on the STM Settlement Agreement would have been very difficult to pay. | Ahmed - 3:505:14-15 |
| 100.  First payment to Mr. Husain was not in STM's budget. | Ahmed – Ex. 13, p.2 |
| 101.  Timing (payment to Mr. Husain) is always an issue. | Ahmed - 3:513:16 |
| 102.  Mr. Chopra stated that he was able to perform under the STM Settlement Agreement. | Chopra - 5:850:20-22 |
| 103.  Mr. Chopra was aware of the Writ of Attachment on August 9, 2007, but the second payment check was not written until August 10, 2007. | Chopra - 5:852:1-7; Ex. 14; Ex. 22 |
| 104.  Mr. Chopra misrepresented in email of August 9, 2007 that the second payment check was sent, because check was not written until August 10, 2007. | Chopra – Ex. 14 |
| 105.  Ms. Soria was unaware of the Writ of Attachment until employee checks started to bounce. | Soria - 1:116:13-16 |
| 106.  Mr. Chopra stated that the Writ of Attachment was on the payroll account at Bank of America and $36,000 was pulled out. | Chopra – 1:36:13-37:4 |
| 107.  Mr. Chopra was paid for expenses on August 31, 2007. | Ex. 20 |

111512-12026007
Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 10 of 23

| | |
|---|---|
| 108. Mr. Chopra was also being paid from Guaranty Bank even after the Writ of Attachment. | Chopra - 7:958:12-24; 7:961:16-25; Ahmed - 3:508:12-21 |
| **CEC Property Settlement and Note** | |
| 109. On or about November 1, 2007, as part of a Settlement Agreement and Mutual General Release ("Property Settlement Agreement"), Defendant personally and through CEC promised the following: (1) to give Plaintiff a promissory note in the amount of $94,512.04 ("CEC Note"), (2) to transfer title to four properties to Plaintiff, and (3) to provide additional collateral/security in six other properties. | JPTO, p.3:25-4:2; Ex. 69 |
| 110. On or about November 1, 2007, the CEC note which was part of the CEC Property Settlement Agreement (Ex 69) in part settled Plaintiff's claims against Mr. Chopra regarding Mr. Chopra obtaining a loan from a refinance of Unit 314 in Hawaii, and keeping the loan proceeds for his own use. | Husain – 2:339:23-340:18 |
| 111. Defendant gave Plaintiff the CEC Note. | JPTO, p.4:3; Ex. 69 |
| 112. As part of the Property Settlement Agreement, Defendant agreed to transfer title in full to Unit 314, plus give part ownership to Plaintiff in the other three units listed in the Property Settlement Agreement. | JPTO, p.4:7-9; Ex. 69 |
| 113. Plaintiff then filed a lawsuit for specific performance, breach of contract and other claims to demand delivery of Unit 314 title. Within several weeks of filing the lawsuit, Defendant finally transferred the Unit 314 title to Plaintiff. | JPTO, p.4:11-13 |
| 114. Mr. Husain had to sue Mr. Chopra again to force compliance with the CEC Settlement Agreement. | Husain - 2:326:16-18 |
| 115. Unit 314 was the only property in the CEC Settlement Agreement that was making money. | Husain - 2:328:17-18 |

111512-12026007
Case: 10-05196   Doc# 124   Filed: 11/15/12   Entered: 11/15/12 23:21:11   Page 11 of 23

| | |
|---|---|
| 116. The CEC Note became due on November 1, 2008. | JPTO, p.4:14 |
| 117. Neither Defendant nor CEC paid the amount of the CEC Note when due. | JPTO, p.4:15 |
| 118. Neither Defendant nor CEC made a single payment on the CEC Note. | JPTO, p.4:16 |
| 119. Pursuant to the Property Settlement Agreement, Deeds in Lieu of Foreclosure were to be delivered to Plaintiff, to be held in trust by the Law Offices of David S. Pearson. | JPTO, p.4:17-19 |
| 120. Prior to November 1, 2007, Mr. Husain asked Mr. Chopra for full payment of $94,000. | Carmona - 3:532:12 |
| 121. Mr. Chopra stated that neither he nor his entities had cash to pay Mr. Husain $94,000 prior to entering into the CEC Property Settlement and Note. | Chopra - 1:71:25-1:72:1 and 1:75:20 |
| 122. Mr. Chopra negotiated the CEC Settlement and Note with Mr. Husain. | Husain – 1:193:18-20:1:194:2-3 |
| 123. Mr. Chopra misrepresented that he did not negotiate the CEC Settlement and Note with Mr. Husain. | Chopra - 1:78:9 and 1:79:15-80:5 and 1:81:3-82:2 |
| 124. Mr. Husain also asked Mr. Chopra for properties other than the six included in the Settlement Agreement. | Carmona - 3:520:14-21 |
| 125. At the time of the CEC Property Settlement and Note, there were properties other than those identified in the Note available to secure the Note. | Carmona - 3:522:14 |
| 126. Mr. Chopra refused to offer the SEC/Swanner properties, but those properties had equity and cash flow. | Carmona - 3:525:13-14 |
| 127. Mr. Chopra did not give all the properties Mr. Husain wanted as Mr. Husain wanted other properties. | Husain – 1:201:5-13 |
| 128. Mr. Chopra does not re-collect Mr. Husain asking for the SEC/Swanner properties. | Chopra - 7:984:13-14 |

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 12 of 23

| | |
|---|---|
| 129. CEC could have made monthly payments on the $94,000 owed to Mr. Husain. | Carmona - 3:530:23 |
| 130. In November, 2007, Mr. Chopra/CEC could have made full payment of $94,000, if it was important enough. | Carmona - 3:531:15-16 |
| 131. In 2007, the SEC/Swanner properties were not declining in value. | Cagley - 5:723:18-19 |
| 132. In 2007, SEC had no cash flow problem. | Cagley - 5:728:18-19 |
| 133. In 2007, SEC's net operating income $6,000-11,000 a month. | Cagley - 5:746:11-747:3 |
| 134. Mr. Chopra admitted that in October/November, 2007, SEC and Carolyn Clayton had properties with equity. [compare to 148] | Chopra - 5:859:22-23 |
| 135. Prior to the CEC note, there was about $400,000-500,000 in equity in the Swanner properties. | Carmona - 3:526:3 |
| 136. Mr. Chopra's share of the equity in the Swanner properties was $300,000 because Mr. Chopra was 67% owner of SEC in 2007. | Carmona - 3:527:4-5; Ex. 97, Schedule A |
| 137. The value of the Swanner properties in 2007 was about $1.4 million. | Cagley - 5:748:22 |
| 138. In May, 2008, SEC took out a $145,000 Charter Funding loan secured by SEC/Swanner properties. | Cagley - 5:764:10-20 |
| 139. In May, 2008, Mr. Cagley objected to the Charter Funding loan, but Mr. Chopra obtained the loan anyway. | Cagley - 5:755:13-18 |
| 140. In 2008, Mr. Chadha loaned Mr. Chopra a sum of money that was securitized by the assets of SEC; the loans were not related to SEC. | Cagley - 5:754:16-17 |
| 141. Mr. Cagley did not consent to the Chadha loan. | Cagley - 5:766:9 |
| 142. Mr. Cagley also did not consent to securitization of the $145,000 loan with | Cagley - 5:765:2 |

111512-12026007

Case: 10-05196   Doc# 124   Filed: 11/15/12   Entered: 11/15/12 23:21:11   Page 13 of 23

| | |
|---|---|
| SEC/Swanner Properties. | |
| 143. Mr. Chopra could get money for shortages. | Alam - 5:786:11-14 |
| 144. Mr. Chopra was owner of all the entities that Alam worked for. | Alam - 5:834:13-15 |
| 145. Mr. Chopra testified that he gave $150,000 worth of Silver to Chadha in 2008. | Chopra - 5:862:7-8 |
| 146. Mr. Chopra stated that he could not offer SEC/Swanner properties to Mr. Husain in 2007 because he believed he could not get consent from the other owners (Cagley and Carmona). | Chopra -5:860:13-18 |
| 147. Mr. Chopra testified that he gave Mr. Husain all the properties Mr. Husain wanted. | Chopra - 5:865:10-11 |
| 148. Mr. Chopra stated that he had no other property in 2007 for securing the CEC Settlement Agreement. [compare to 134] | Chopra - 5:865:14-16 and 19-23 |
| 149. Mr. Chopra misrepresented to Mr. Husain in 2008, when the CEC note was due, that Mr. Chopra had properties "in escrow" valued at $40,000. | Chopra – Ex. 84 |
| 150. Mr. Carmona testified that Mr. Chopra had properties listed for sale, but did not in fact have properties in escrow. | Carmona - 3:534:13-19 |
| 151. In August, 2008, Mr. Chopra gave approximately $100,000 (mobile home park) to Mr. Cagley for 17% of SEC. | Cagley - 5:737:14-18 |
| 152. Mr. Chopra claims that he could not come up with $94,000 in 2008, but Mr. Chopra's interest in the warehouse itself was worth $300,000 (Carmona). | Chopra - 7:981:2-3; Carmona – 3:527:4-5 |
| 153. Mr. Chopra does not recollect Mr. Husain asking for SEC properties. | Chopra - 7:984:13-14 |
| 154. Mr. Chopra first stated that he made three payments on the CEC Note, but then admitted that he did not. | Chopra – 1:73:8-9; 1:75:12-14 |
| 155. Mr. Husain did not receive Deeds in Lieu, | Husain - 2:230:2-4; Chopra – 5:979:15-16 |

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 14 of 23

| | |
|---|---|
| but Mr. Chopra still claims to have given Deeds in Lieu. | |
| 156. Mr. Husain stated that his lawyer said that he could not hold Deeds in Lieu for debt that would be paid in the future. | Husain - 2:239:21-25 |
| **Witnesses** | |
| 157. Mr. Alam is currently working for Mr. Chopra. | Alam - 5:803:16-17 |
| 158. Mr. Alam worked at All in One Transportation just days prior to his testimony and regularly 3-5hrs a week. | Alam - 8:804:1-22 |
| 159. Mr. Alam worked at BKMS one month this year. | Alam - 5:802:11-13 |
| 160. Mr. Alam worked at DESC 2-3 hours total. | Alam - 5:803:8-9 |
| 161. Mr. Alam did not request that Mr. Chopra or Mr. Ison provide a Bengali interpreter. | Alam - 5:800:22 |
| 162. Mr. Alam requested that Plaintiff provide him with a Bengali interpreter. | Alam - 5:799:20-24 |
| 163. Mr. Chopra would give written instructions on what to do and have separate meetings with Mr. Alam. | Carmona - 5:705:1:9 |
| 164. Mr. Ison tormented Mr. Carmona and tried to "get his goat." | Carmona - 3:539:1-5 and 3:574:20-21 |
| **Chopra Truthfulness/Character** | |
| 165. Mr. Chopra has a reputation for being untruthful in the community. | Stark - 1:95:5 |
| 166. Ms. Stark would not believe Mr. Chopra's testimony in court. | Stark - 1:96:8 and 1:97:22 |
| 167. Ms. Stark loaned Mr. Chopra $227,000. | Stark -1:100:2 |
| 168. Mr. Chopra did not pay back 65% ($127,000) of her money and told her that he would keep that debt out of Mr. Chopra's bankruptcy. | Stark - 1:103:1-5 |

111512-12026007

Case: 10-05196   Doc# 124   Filed: 11/15/12   Entered: 11/15/12 23:21:11   Page 15 of 23

| | |
|---|---|
| 169. Mr. Chopra prepared the Promissory Note given to Ms. Stark. | Stark - 1:101:6-7 |
| 170. Mr. Chopra suggested 12 and 24% interest rate in the notes. | Stark - 1:101:13-15 |
| 171. Mr. Chopra threatened to sue Ms. Stark for usurious interest to discourage Ms. Stark from suing him. | Stark - 1:98:15-18; 1:102:2-5 |
| 172. Ms. Stark lost her home. | Stark - 1:103:8 |
| 173. Ms. Soria would believe half of what Mr. Chopra says. | Soria - 1:118:12-13 |
| 174. Mr. Chopra has reputation in the community for being untruthful. | Wimp - 1:151:15-16 |
| 175. Mr. Wimp would not believe Mr. Chopra under oath. | Wimp - 1:153:6 |
| 176. Mr. Hao believes that Mr. Chopra is truthful, based on Mr. Chopra being a personal friend, and having only recent business dealings with Mr. Chopra. | Hao - 2:301:7-10 |
| 177. Mr. Chopra repeatedly did not pay individuals back; dragged them out; gave bounced checks; did not record ownership in SEC. | Carmona - 5:711:7-19; 2:360:16-22 |
| 178. Mr. Chopra did not list SEC $660,000 debt to Mr. Chopra in his bankruptcy schedules. | Cagley - 5:773:2; Ex. 90-93 |
| 179. Mr. Chopra falsely showed SEC value as zero on his bankruptcy schedules, when it was worth 67% of $700,000 (Cagley and Carmona). | Ex. 90, p.5 |
| 180. In Schedule B of Mr. Chopra's Bankruptcy filing (Ex. 90 p.5) he incorrectly stated ownership of SEC as 50% when it was actually 83%. | Chopra - 7:923-924:2; Ex. 90, p.5 |
| 181. Mr. Chopra miscalculates his total SEC ownership when factoring in his 100% ownership of CEC. | Chopra - 7:1003:24-25 |

Case No. 10-52819; Adv. Proc. No. 10-05196

-16-

Plaintiff's Proposed Findings of Fact and Conclusions of Law

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 16 of 23

| 182. Mr. Chopra did not list North Carolina property that was transferred to his daughter. | Chopra - 7:943:12-944:21; Ex. 90-93 |

## II.  CONCLUSIONS OF LAW

Section 523(a)(2)(A) of the Bankruptcy Code states in relevant part as follows: (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— ... (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud ...

To succeed with his claim under Section 523(a)(2)(A), Mr. Husain must prove his contentions by a preponderance of the evidence.  *In re Overall*, 248 B.R. 146, 150 (Bankr. W.D. Mo. 2000) (internal citation omitted).  The Court finds that the underlying debts that Mr. Husain seeks to have declared non-dischargeable fall within the scope of section 523(a)(2)(A).  There are no issues of law to the contrary presented in the Joint Pretrial Order.  The Court also finds that Mr. Husain has met his burden of proving by a preponderance of the evidence that Mr. Chopra procured the underlying debts by actual fraud, and alternatively, by false pretenses and false representations.

In addition, while in the typical instance exceptions to discharge are to be narrowly construed against the creditor and liberally against the debtor, the Code, however, has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy of affording relief only to an *honest but unfortunate debtor*.  *Id*.  (emphasis added).  This is an important principle in this Adversary Proceeding because the Court finds that Mr. Chopra is not an honest debtor.

### A.  Actual Fraud

Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.  3 Collier on Bankruptcy ¶ 523.08[5], at 523–57 to 523–58 (footnote omitted), *cited in RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

111512-12026007

1    In proving actual fraud in each of the four transactions that are the subject of this

2   Adversary Proceeding, Mr. Husain must show the following: (1) false representation, omission

3   or deceptive conduct, (2) knowledge of falsity, (3) intent to deceive, (4) justifiable reliance, and

4   (5) damages as a result of the representations, omissions or deceptive conduct.  *In re Slyman* 234

5   F. 3d 1081 (9th Cir 2000); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

6       Further, in particular with respect to the intent element, Mr. Husain may prove fraud by

7   "direct as well as circumstantial evidence, since palpable evidence of the mental state of an

8   individual is rarely, if ever, available."  *In re Overall*, 248 B.R. 146, 150 (Bankr. W.D. Mo.

9   2000).  Mr. Chopra's intent bears out through his own inconsistent testimony, the testimony of

10  key witnesses, character evidence, and documentary evidence.

11      With respect to reliance on false representations, omissions, or deceptive conduct, Mr.

12  Husain must show that his reliance on Mr. Chopra's representations, concealments, or deceptions

13  was "justifiable" under the circumstances.  *Field v. Mans*, 516 U.S. 59, 73-75.  This standard is

14  less exacting than "reasonable" reliance (not reasonable to the hypothetical average person), and

15  means that Mr. Husain must show that the falsity of Mr. Chopra's representations were not

16  readily apparent to Mr. Husain.  This is important because the Court finds that Mr. Husain

17  justifiably relied on either Mr. Carmona, on behalf of Mr. Chopra, or Mr. Chopra himself in each

18  of the four transactions.

19      B.    False Representations and False Pretenses

20      The term "false representation" had been specifically used to refer to express

21  misrepresentations, while the term "false pretenses" had been specifically used with reference to

22  implied misrepresentations or any "conduct intended to create and foster a false impression."  *In*

23  *re Overall*, 248 B.R. 146, 150 (Bankr. W.D. Mo. 2000).  Mr. Chopra made both express and

24  implied misrepresentations in dealing with Mr. Husain in each of the four transactions that are

25  the subject of this Adversary Proceeding.

26      False pretenses "may be implied from conduct or may consist of concealment or non-

27  disclosure where there is a duty to speak, and may consist of any acts intended to deceive."  *Id*,

28  citing Black's Law Dictionary 602 (6th ed.1990).  It is a "series of events, activities, or

communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongly induced by a debtor to transfer property or extend credit to the debtor." *Id*, citing *Sterna v. Paneras* (In re Paneras), 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996). *In re Overall* goes on to note that silence or concealment as to a material fact can constitute false pretenses, and false pretenses can be made in any of the ways in which ideas can be communicated. *Id*. (internal citations omitted).

The court finds that the facts identified by number in the following table (as well as other supporting facts enumerated in the foregoing findings of fact) show by a preponderance of the evidence (1) that Plaintiff has made his prima facie showing of fraud, and (2) that, alternatively, by extension, Plaintiff has shown sufficient facts to prove false pretenses and false representations:

| Fraud Elements | Biloxi Properties | Unit 113 Unrecorded Deed of Trust | STM Settlement Agreement | CEC Property Settlement and Note |
|---|---|---|---|---|
| False Representation | 7, 8, 9, 14, 36 | 54, 64 | 75, 77, 78, 80, 88, 90 | 120, 121, 122, 127, 148 |
| Knowledge of falsity | 11, 12, 13, 16, 17, 25, 26, 27, 31, 38, 44, 46 | 64, 65, 66 | 83, 87, 91, 93 | 112, 121, 122, 124, 125, 127, 131, 132, 133, 134, 135, 136, 148, |
| Intent to deceive | 11, 12, 13, 14, 31, 33 | 55, 56, 61, 63, 68, 69, 70, 72, 73 | 83, 84, 85, 86, 89, 91, 93, 95, 97, 98, 99, 100, 103, 104, 105, 107, 108 | 113, 114, 115, 117, 118, 123, 126, 127, 128, 129, 130, 138, 140, 149, 150, 152 |
| Justifiable reliance | 1, 3, 5, 6, 7, 8, 11, 34, 35, 36, 37 | 50, 51, 52, 53, 57, 58, 59, 60 | 74, 75 | 109, 110, 111 |
| Damages | 47, 48 | Ex. 53 | Ex. 2, 3 | Ex. 69 |

The Court also finds that Debtor cannot rely on statements in the various agreements to avoid liability for using false pretenses, false representations or actual fraud to induce Plaintiff into entering into the agreements in the first place. Such a practice would be against the policy of this Court, thereby permitting a dishonest debtor to avoid debt by using deception.

///

111512-12026007

C.     Rescission of STM Settlement Agreement and CEC Settlement Agreement and Note

Alternatively, the Court finds that Plaintiff has made the proper showing necessary to rescind the STM Settlement Agreement, CEC Settlement Agreement and Note, and the Unit 113 Mortgage based on Mr. Chopra's respective material, willful breaches of these underlying contracts, defeating the very objectives of Mr. Husain entering into the agreements: i.e. to avoid litigation on underlying fraudulent behavior that led to the contracts in the first place.

As the Court in *In re Kolinsky* states: "Rescission is an extraordinary remedy appropriate only where the breach of contract is found to be material and willful, or, if not willful, so substantial and fundamental as to defeat the objective of the parties in making the contract." (internal citations omitted).  *In re Kolinsky*, 110 B.R. 128, 137.  The Court in *In re Kolinsky* states further:

> There is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case. It is permitted for failure of consideration, fraud in making the contract, for inability to perform it after it is made, for repudiation of the contract or an essential part thereof and for such a breach as substantially defeats its purpose. It is not permitted for a slight, casual or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract. Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient. If the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind, but in case of repudiation, or of a breach going to the root of the contract, unless the damages can be ascertained with reasonable certainty, rescission is a matter of right, with restitution instead of compensation.

*In re Kolinsky*, 110 B.R. 128, 137 (Bankr. S.D.N.Y. 1990).

The Court finds that with respect to the STM Settlement Agreement, the CEC Property Settlement and Note, and the Unit 113 Mortgage, Mr. Chopra materially and willfully breached the agreements, and that the breaches were so substantial and fundamental as to defeat the objective of the parties in making the contracts.  Accordingly, the Court hereby finds the contracts rescinded, awards reasonable attorneys fees to Mr. Husain according to proof, and permits Mr. Husain the opportunity to sue Mr. Chopra on the underlying fraudulent behavior that led to the respective agreements in the first place.

111512-12026007

D. Witnesses

1. Ms. Stark

The Court finds that Ms. Stark is a credible witness, and that her testimony shows that Mr. Chopra should not be believed under oath. Ms. Stark's testimony regarding Mr. Chopra's preparation of her loan documents, including the interest rate, and subsequent threat to sue Ms. Stark for usury based on the interest rate that Mr. Chopra suggested is particularly disconcerting.

2. Mr. Carmona

The Court finds that Mr. Carmona is a credible witness. The Court takes into account that Mr. Carmona's testimony, particularly on Mr. Carmona's first day of cross-examination, was affected by the fact that Mr. Ison himself was cross-examining Mr. Carmona following Mr. Ison threatening and intimidating Mr. Carmona outside of the court room. Mr. Carmona had a sincere and profound belief that Mr. Ison was his former lawyer and should not have been questioning Mr. Carmona on the stand. The Court also questioned, and now reiterates, that Mr. Ison may not have complied fully with respect to the rules of ethics in dealing with Mr. Carmona.

3. Mr. Husain

The Court finds that Mr. Husain is a credible witness. Mr. Husain gave straight forward responses to questions, and did not appear to equivocate or give evasive answers.

4. Ms. Soria

The Court finds that Ms. Soria is a credible witness.

5. Mr. Ahmed

The Court finds that Mr. Ahmed is a credible witness.

6. Mr. Wimp

The Court finds that Mr. Wimp is a credible witness.

7. Mr. McPhail

The Court finds that Mr. McPhail is a credible witness, but notes that Mr. McPhail admitted that he misrepresented to Plaintiff's counsel prior to his testimony that he supplied

111512-12026007
Case: 10-05196   Doc# 124   Filed: 11/15/12   Entered: 11/15/12 23:21:11   Page 21 of 23

counsel for Plaintiff with the same documentation that he provided to Debtor or Debtor's attorney.

### 8.  Mr. Cagley

The Court finds that it has some questions with respect to Mr. Cagley's motives, especially with respect to the property in Oregon to which he had not yet received the deed from Mr. Chopra.

### 9.  Mr. Hao

The Court finds that the testimony of Mr. Hao lacks sufficient foundation or substance for an informed opinion with respect to Mr. Chopra's character for honesty.  Mr. Hao and Mr. Chopra are social acquaintances, and Mr. Hao had no business contacts with Mr. Hao until very recently.

### 10.  Mr. Alam

The Court finds that Mr. Alam is a biased witnessed.  Mr. Alam is a current employee of Mr. Chopra.  Mr. Alam also understated the scope of his employment by Mr. Chopra, and seemed too quick and persistent in his insistence that Mr. Carmona, and not Mr. Chopra, supervised him.  Mr. Alam also seemed to take cues from Mr. Chopra or Mr. Ison during Mr. Alam's testimony.  Further, the Court finds it suspicious that Mr. Alam would have required Plaintiff to provide a Bengali interpreter if Plaintiff was to call Mr. Alam as a witness, while on the other hand Mr. Alam made no such requirement of Debtor.

### 11.  Mr. Chopra

The Court finds that Mr. Chopra is not a believable witness.  Mr. Chopra gave evasive responses.  Much of Mr. Chopra's trial testimony conflicted with his deposition testimony.  Mr. Chopra was also impeached with Exhibit 94, which shows Mr. Chopra's propensity for equivocation and outright misrepresentations.  Mr. Chopra made misrepresentations on his bankruptcy schedules, including without limitation omitting valuable property that he transferred to his minor daughter the month prior to filing for bankruptcy protection.  Further, the testimony of Ms. Stark, Mr. Wimp and Ms. Soria regarding Mr. Chopra's lack of credibility is compelling.

///

E.    Conclusion

Mr. Husain has proven by a preponderance of the evidence that he should prevail on each of his claims. Judgment is hereby entered in favor of Mr. Husain in the principal amount of $935,570.84, plus a multiplier for exemplary damages in the amount of three times the actual damages, plus interest at the respective contractual rates where applicable and the legal rate if no contract, plus costs and attorneys fees to be determined following the conclusion of the trial.

DATED: NOVEMBER 15, 2012                    BERLINER COHEN


                                            BY:  /s/ Marco M. Campagna
                                                FRANK R. UBHAUS
                                                MARCO M. CAMPAGNA
                                                ATTORNEYS FOR PLAINTIFF IQBAL HUSAIN

111512-12026007

Case: 10-05196    Doc# 124    Filed: 11/15/12    Entered: 11/15/12 23:21:11    Page 23 of 23