

The following constitutes
the order of the court. Signed April 17, 2013

Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>DEEPAK CHOPRA,<br>　　　　Debtor. | Case No. 10-52819 CN<br>Chapter 7 |
| IQBAL HUSAIN,<br>　　　　Plaintiff,<br>vs.<br>DEEPAK CHOPRA,<br>　　　　Defendant. | Adversary No. 10-05196<br>**MEMORANDUM DECISION** |

On June 14, 2010, Iqbal Husain ("Husain") commenced this adversary proceeding seeking a § 523(a)(2)(A) non-dischargeable judgment against defendant Deepak Chopra ("Chopra" and, together with Husain, the "Parties"). This court conducted a trial in this adversary proceeding[1] over the course of several days. This memorandum decision constitutes this court's findings of fact and

---

[1] On July 11, 2012, this court entered an order approving a Joint Pre-Trial Statement signed by the Parties. The Joint Pre-Trial Statement recites the undisputed facts, the disputed facts, and the claims for relief and affirmative defenses at issue. Pursuant to Fed. R. Bankr. P. 7016, the Joint Pre-Trial Statement and related order supersede the pleadings filed in this adversary proceeding.

1

conclusions of law under Fed. R. Bankr. P. 7052.

The facts underlying Husain's claims chronicle the Parties' difficult and sporadically undocumented business transactions, seemingly all of which resulted in substantial losses for Hussain. Four of those transactions underlie Hussain's nondischargeability claims. Hussain alleges that Chopra defrauded him by (a) negotiating a settlement between Hussain and Searchtech Medical, Inc. (in which Chopra was an officer and largest shareholder) regarding monies due under an account receivable factoring agreement, when Searchtech had no intention of making the monthly settlement payments; (b) failing to record a deed of trust on Hawaii real property that was provided to Hussain under a buyout agreement wherein Chopra purchased Hussain's interest in the Hawaii property; (c) negotiating yet another settlement agreement (involving other real property investments) which provided Hussain with (among things) deeds of trust as security for Chopra's payments, with the fraud arising from Chopra's failure to disclose his interest in personal and real property which Hussain asserts should have further collateralized the settlement payments; and (d) failing to disclose commissions that a Chopra related entity earned from Hussain's purchase of Biloxi, Mississippi condominiums that Hussain believed would be jointly owned by the Parties. Each of these transactions are discussed in detail below.

## SEARCHTECH MEDICAL, INC.

Between 2001 and 2009, Chopra was the majority owner and president of Searchtech Medical, Inc. ("STM"). STM placed nurses, technicians and other medical professionals in short and long-term positions at hospitals, nursing homes, and other medical facilities. STM directly paid its placed personnel and invoiced its clients for the staffing cost. Given the delay between invoice and payment, STM frequently factored its receivables and provided the factoring party with a lien against its receivables. In April 2003, STM entered into such a factoring agreement (the "Factoring Agreement") with Husain.[2]

---

[2] At trial, every document executed by Husain was signed in his capacity as co-trustee (his wife, Sharmin Khan, was the other trustee) of the "Khan—Husain Living Trust Dated 12/14/1999." Husain prosecuted these claims, however, in his individual capacity. Chopra has not questioned Husain's standing, and this court therefore presumes that Hussain has standing to pursue these

2

STM was in financial distress when it began to factor its receivables with Husain, and its financial condition did not improve. In 2004, STM defaulted on the Factoring Agreement, and issued a promissory note to Husain to address the uncollected or misspent receivables (STM also defaulted on this promissory note).[3] Notwithstanding these defaults, Hussain continued to lend on STM's receivables, which led to substantially more defaults under the Factoring Agreement.

Husain terminated the Factoring Agreement in mid-2006. By this time, STM owed Husain more than $294,000 under the Factoring Agreement, and they ultimately negotiated a settlement agreement to resolve STM's defaults.

## THE STM SETTLEMENT AND NOTE

The Parties signed a settlement agreement on June 30, 2007. Under its terms, Husain received a $294,831 promissory note (the "STM Note") which represented a) the principal and interest payments due under the Factoring Agreement and b) the cost of STM's purchase of Husain's STM shares[4]. The STM Note required monthly payments of $3,204, the first of which was due on July 1, 2006 (payments were due on the first of each month and late by the 6th of each month). The STM Note payments were to increase by $75 each month until they reached $4,504 per month. STM did not make the initial payment until July 13, 2007 (which check cleared), and delayed making the second payment until August 10, 2007. The second check never cleared, and STM did not make another payment on the STM Note. On August 16, 2007, an STM judgment creditor[5]

---

claims. This court's use of the name "Husain" shall refer to both the individual and the Trust.

[3] The testimony indicated that STM collected and spent Husain's receivables to open new offices. Chopra denied any knowledge of this conduct, and stated that he fired STM's president over this alleged misuse of these funds.

[4] In 2003, Chopra transferred 50,000 shares of STM to Hussain to settle an unspecified, unpaid debt. At the time, Hussain already owned approximately seven percent of STM's outstanding shares and had the option to buy an additional several hundred thousand shares. STM never issued stock certificates in Husain's name. To resolve this omission, STM agreed to purchase Husain's equity interest in STM for $20,000.

[5] The creditor, Sylvester Flowers had been litigating with STM since December 1, 2006 (the "Flowers Litigation").

executed a $36,000 writ of attachment and levied against STM's general bank account (from which the August STM Note payment was drawn). This sudden loss of its working capital prevented STM from making any further STM Note payments, and STM filed a Chapter 11 bankruptcy on September 5, 2007.[6]

Several witnesses, including Husain and Chopra, testified regarding the STM Settlement Agreement and STM Note. These witnesses, and the documents introduced through them, described a company in financial disarray, which carefully juggled its payables each week. Significantly, the emails introduced into evidence indicate that Chopra ultimately informed his accounting department of the STM Note obligations and directed it to make the monthly note payments.

## THE UNIT 113 BUYOUT

Chopra Enterprise Corporation ("CEC") was a corporation wholly owned by Chopra, and it frequently served as Chopra's vehicle for real estate investments. Juan Carmona was CEC's chief operating officer. In early 2005, CEC owned a fifty percent interest in a Maunaloa, Hawaii condominium ("Unit 113"). Husain purchased an interest in Unit 113 later that year, and Husain and CEC ultimately became its joint co-owners.

In the latter half of 2006, Husain informed Chopra that he wanted to sell his fifty percent interest in Unit 113. CEC and Husain thereafter executed an agreement in December 2006 under which CEC purchased Husain's interest (the "Buyout Agreement") for $56,898.35. The Buyout Agreement required the parties to refinance Unit 113 and use the net refinance proceeds to satisfy (in whole or in part) the $56,898.35 purchase price. If the net proceeds were less than the purchase price, CEC agreed to provide Husain with a deed of trust against Unit 113.[7] The refinance netted $36,566.97, and CEC was thus required to execute a junior deed of trust to collateralize the

---

[6] STM's chapter 11 case was dismissed in July 2009.

[7] The Buyout Agreement was signed by Husain, Juan Carmona ("Carmona"), as CEO of CEC, and Chopra, who signed as "share holder." The Buyout Agreement reflects the chaotic nature of the Parties' business relationship. While the Buyout Agreement states that CEC and Husain jointly owned the property, it also states that title was held in Husain's name. In addition, while the Buyout Agreement described the payment terms of the obligation to be secured by the deed of trust, it did not require CEC to execute a separate note.

$20,326.38 balance due Husain.

CEC never recorded a deed of trust in Husain's favor. Carmona, as CEC's chief operating officer, was responsible for its day-to-day operations, including the execution and recordation of various real estate documents. Carmona testified that sometime between January and April 2007, Husain contacted him regarding the status of the deed of trust. Husain and Carmona's testimony indicated that Carmona either told him that the deed of trust had been recorded or that it was in the process of being recorded (Husain could not recall which he was told). Carmona admitted, however, that as of the date of that conversation, CEC had not taken any such action. Instead, Carmona thereafter contacted a Hawaii title company which prepared the deed of trust. Carmona received and executed the deed of trust on CEC's behalf on April 17, 2007, but he did not record it. Carmona testified that when he informed Chopra that he had executed the deed of trust, Chopra took the original deed of trust from him, stuck it in his desk, and told Carmona that he would "take it from here".[8] On April 25, 2007 - after his meeting with Chopra - Carmona faxed a copy of the fully executed and notarized deed of trust to Husain. He did not inform Husain, however, that CEC had not recorded the original deed of trust; nor did he direct Husain to record it himself.

Unfortunately, Carmona was not asked to explain several critical points. Trial counsel did not ask why he delayed in requesting the Hawaii title company to prepare the deed of trust, why he gave the original deed of trust to Chopra (since it was his obligation to record it on CEC's behalf), and whether Chopra instructed him to delay the preparation of the deed of trust and/or fail to disclose to Husain that CEC had not recorded it.

Chopra testified that he was not involved in the preparation of the deed of trust or its recordation, and stated that Husain typically wanted to record his deeds of trust. He denied retaining the original deed of trust.[9]

---

[8] Hawaii Rev. Stat. § 502–31 (2006) provides that "[a]ll instruments to be recorded shall include the original signature . . . ." This statute has since been amended.

[9] The court did not find Chopra's testimony to be credible on this issue. Chopra was an experienced real estate investor. Husain was an engineer by training, and he testified that he did not record deeds of trust.

5

Several months after Carmona's April 25th fax to Husain, Chopra dangled Unit 113 before other creditors in an effort to pacify their clamors for payment. Rajinder and Urmil Jindia[10] were two such creditors. In the spring of 2007, the Jindias demanded that Chopra repay loans that were significantly past due. To appease them, Chopra secured their loans with deeds of trust against several properties, including Unit 113, and on August 8, 2007, a deed of trust (securing a $45,000 promissory note) was recorded against Unit 113 in their favor.[11] No testimony was presented, however, regarding whether the Jindias (or any other creditors) were vigorously demanding repayment when the Parties executed the Buyout Agreement.

Husain learned in 2010 that his Unit 113 deed of trust was unrecorded. He contends that Chopra defrauded him when he failed to record the Unit 113 deed of trust, as his understanding, albeit not stated in the Buyout Agreement, was that CEC would record his deed of trust. As damages, Husain seeks a non-dischargeable judgment for the $20,326.38 balance due under the Buyout Agreement (this amount was not disputed by Chopra). The Parties did not introduce any evidence regarding whether CEC still owns Unit 113, Unit 113's value and the liens against it, and whether Husain could still record his deed of trust to recover the unpaid balance.

## THE CEC SETTLEMENT

The CEC settlement agreement represents yet another Chopra real estate transaction allegedly "gone wrong" for Husain. In 2005, Husain and CEC co-owned real property in Kaunakakai, Hawaii ("Unit 314"). On some unspecified date in 2005, CEC allegedly refinanced Unit 314 without Husain's consent, and used the refinance proceeds for Chopra's benefit. After Husain learned of the refinancing, the parties spent more than a year negotiating a settlement. During the course of these negotiations, Chopra and CEC disclosed their interest in various pieces of real property and either offered to transfer title outright to Hussain or as collateral for any promissory note. Husain

---

[10] The Jindias were friends and business associates of Chopra.

[11] At trial, it was unclear whether the Jindias recorded the deed of trust on their own or if CEC or some third-party recorded it on their behalf.

painstakingly investigated their value, and on November 1, 2007, Husain, Chopra, CEC and SEC[12] executed a settlement agreement (the "CEC Settlement") whereby Husain would receive fee title to four parcels of real property[13] and a $94,512.04 promissory that was due and payable on November 1, 2008 (the "314 Note." Chopra and CEC were the obligors of the 314 Note.). The 314 Note was secured by six additional pieces of real property. Shortly after executing the CEC Settlement, Husain filed a civil suit against Chopra to enforce the settlement terms. The parties eventually settled this litigation, and Chopra and CEC ultimately transferred the fee titles and provided the deeds of trust to Husain. Chopra and CEC did not, however, pay any amount due under the 314 Note.

Husain asserts that Chopra defrauded him by failing to disclose all of his personal and real property (including his SEC interest), which prevented him from demanding this property as collateral for the 314 Note (or to demand its outright transfer to him).

Chopra denied that any such request was made, and the extensive e-mail trail indicates that Husain was only interested in real property. The CEC Settlement Agreement was excruciatingly negotiated by Husain, and he presented no tangible evidence that he ever requested any information regarding Chopra's personal assets. In addition, while SEC did own real property (beyond the two Hawaii condominiums that were ultimately transferred to Husain as part of the CEC Settlement), SEC required the unanimous consent of its members to transfer or encumber real property. David

---

[12] At the time, SEC Venture Group was an Alabama limited liability company in which Chopra, Carmona and David Cagley were the sole members. The court understands that SEC required the consent of all members to transfer or encumber property owned by SEC. David Cagley signed the CEC Settlement on SEC's behalf. Carmona signed for CEC. In the CEC Settlement, SEC did not agree to transfer any properties to Husain. Rather, as stated in footnote 17 below, CEC and Chopra were required to purchase SEC's interest in two Hawaii condominiums and transfer title to Husain.

[13] Some additional relevant terms of the CEC Settlement are as follows: (a) Chopra disclaimed any interest in real property located 500 Bay Drive, Lahaina, Hawaii in favor of Husain; (b) CEC disclaimed all its interest in Unit 314 in favor of Husain; (c) CEC and Chopra agreed to acquire all of SEC's interest in real property located at 7146 Kamehameha v. Highway, Kaunakakai, Hawaii and transfer this interest to Husain; and (d) CEC and Chopra agreed to (i) acquire all of SEC's and Subodh Banerjee's interest in real property located at 50 Kepuni Place, Maunaloa, Hawaii, and transfer this interest to Husain.

7

Cagley testified that he would not have agreed to transfer or encumber any additional SEC property for Chopra.

### THE BILOXI INVESTMENT

In 2005, Chopra and his wife began buying properties in a large condominium conversion development located in Biloxi, Mississippi ("The Fort Bayou Development"). The Fort Bayou Development's proximity to several casinos offered potential investors the promise of a steady stream of rental income from casino patrons. In mid-2005, Chopra approached Husain about investing in the Fort Bayou Development, and Husain agreed to "jointly" purchase five condominiums known as Units 17, 48, 80, 60 and 63 (the "Fort Bayou Properties").

The evidence regarding Husain's exact investment in the Fort Bayou Properties is murky. First, the evidence is distinctly unclear regarding the identity of Husain's proposed co-owners. While Husain testified that he expected Chopra to be one of his co-owners, no documentary evidence was introduced to support this contention. Instead, his initial purchases (as described below) were followed by self-described "horse trading" of condominium units to adjust his ownership rights, undocumented settlement agreements related to the horse-trading, and ultimately, fraud allegations against Chopra. Putting aside all of these subsequent developments, Husain's fraud allegations are that:

1. Chopra defrauded him by not having any "skin in the game," since he did not invest with Husain in the Fort Bayou Properties as he had anticipated; and
2. Chopra knowingly failed to disclose that Chopra or a Chopra related entity would receive a hefty commission from the sale of the Fort Bayou Properties.

Husain's investment in the Fort Bayou Properties was poorly documented. On November 8, 2005, at Juan Carmona's direction, Husain delivered a $41,166.20 check made payable to SEC Venture Group ("SEC"), representing Husain's one-half share of the ten percent down payment for the Fort Bayou Properties. Husain also paid SEC a $50,000 "assignment fee" for presenting him with this investment opportunity. While Husain testified that he intended to jointly own the Fort Bayou Properties subject to "equity sharing agreements," Husain never executed any such agreement. These agreements presumably would have disclosed to him his co-investors. Husain

8

testified that the equity sharing agreements required the co-investors to jointly share the expenses and profits generated by the condominiums.

The evidence indicates that Chopra had little to do with the nuts and bolts of Husain's Fort Bayou Properties investment. Husain and Carmona worked to close escrow, which was significantly delayed by the devastation caused by Hurricane Katrina's October 29, 2005 landfall. As a result, the Fort Bayou Properties escrow did not close until late 2006. After escrow closed, yet another Chopra related entity, JMD Investments, LLC ("JMD"),[14] managed the properties, collected the rent, interfaced with tenants, and in general, managed the Fort Bayou Properties.

Whatever ambiguities may have existed when Husain delivered his two checks to SEC, the is little dispute that as of November 2005 (1) Chopra already had purchased condominiums in the Fort Bayou Development independent of Husain's investment in the Fort Bayou Properties, and (2) no agreement existed which authorized Chopra or any Chopra related entity to receive a commission from Husain's purchase of the Fort Bayou Properties.

### THE FORT BAYOU MARKETING ARRANGEMENT

Chopra was actively investing in Fort Bayou Development properties before Hurricane Katrina's landfall. His investments attracted the interest of Grant McPhail, a co-managing member of the Fort Bayou Development group. In April 2006, while Husain's escrow was in limbo, McPhail called Chopra to elicit his interest in a joint marketing agreement. McPhail generally proposed to pay a commission for all sales generated by Chopra's marketing of specific Fort Bayou Development condominiums. Chopra instructed McPhail to contact Carmona for all further discussions regarding the marketing agreement. The evidence indicates that Chopra and McPhail cursorily discussed general details regarding the proposed agreement, and that the specifics were negotiated by Carmona and McPhail. Chopra had no further contact with McPhail.[15]

McPhail and Carmona eventually negotiated the terms of a marketing agreement (the

---

[14] JMD was formed by Juan Carmona, Mynette Boykin, and Deepak Chopra. At all relevant times, Carmona owned fifty-one percent of JMD and Chopra owned the remaining forty-nine percent.

[15] Chopra and McPhail met for the first time at trial.

9

"Marketing Agreement."). Under its terms, JMD agreed to market a predetermined bloc of condominiums and receive a commission of between $5,000 - $7,000 for each unit sold. McPhail testified that the Marketing Agreement did not increase the sales price of the subject units (*i.e.*, the Fort Bayou Development Group did not increase the sales price to offset the JMD commission). JMD eventually marketed eighty condominiums, and received approximately $113,000 in commissions. The Fort Bayou Properties were included in JMD's bloc of condominiums, and JMD received commissions on their sale.[16]

The evidence indicates that JMD and McPhail finalized the Marketing Agreement in May/June 2006. While Chopra denied any knowledge of its terms, McPhail, at trial, produced an unsigned letter dated June 22, 2006, in which he describes the Marketing Agreement. This letter was addressed to "JMD Investments, Attention Deepak Chopra." No evidence was introduced indicating that Chopra read or received this document.

JMD's accounting records reflect its receipt of the commissions. Its records also reflect a constant outflow of money, including payments to Chopra's other business entities.[17] No persuasive evidence was introduced, however, that Chopra knew that JMD was receiving commissions, that he requested that Carmona (who controlled JMD's day-to-day business activities) forward those funds to him, or that he personally received a share of these funds.

Husain first learned of the Marketing Agreement in 2010. Husain testified that he never would have invested in the Fort Bayou Properties had he known of the Marketing Agreement. Husain stated that the Marketing Agreement meant that Chopra was working for the seller, that he was not sharing the risk of his investment, and that he thus had no "skin in the game."

---

[16] The evidence did not indicate how many of JMD's assigned units sold nor the amount of the commissions that JMD received on the Fort Bayou Properties. There also was no evidence that the Marketing Agreement - which was signed several months after Hussain provided his checks to SEC - altered the terms of his Fort Bayou Properties investment.

[17] Carmona testified that the various Chopra entities transferred funds to each other as needed.

## THE HORSE TRADING

After the Fort Bayou Properties escrow closed in late 2006, Husain's "equity partners" were not reimbursing him for their share of the expenses. To reduce his exposure, Husain (in 2007) relinquished his fifty percent equity interests in Units 60 and 63 in exchange for a one hundred percent interest in Units 17 and 48 and a $6,800 payment. Unit 80 remained subject to an unspecified equity sharing agreement. The "horse trading" agreement was not reduced to writing and Husain could not recall who "horse traded" with him nor who paid the $6,800.

## LEGAL DISCUSSION

Husain's claims for relief all fall under Bankruptcy Code § 523(a)(2)(A). This code section provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" To demonstrate that a debt is non-dischargeable under § 523(a)(2)(A), a creditor must establish five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000). The creditor must prove each element by a preponderance of the evidence. *Id*. A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). A §523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n. 6 (Bankr.S.D. Cal.1995). *See also In re Daquila*, 2011 WL 3300197 (9th Cir. BAP Feb. 28, 2011) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and possessed an intent to deceive."); *In re Miller*, 310 B.R. 185, 196 (Bankr.C.D. Cal.2004) ("The concealment or omission of material facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.").

Case: 10-05196   Doc# 130   Filed: 04/17/13   Entered: 04/17/13 13:29:04   Page 11 of 18

A. **THE STM SETTLEMENT AGREEMENT**

The court finds that Husain has not demonstrated by a preponderance of the evidence that the STM Settlement Agreement resulted from false pretenses, fraud or a false representation. The evidence firmly demonstrates that STM and Chopra intended to make the STM Note payments when the Parties negotiated and signed the STM Settlement Agreement, and that STM made its first payment and would have continued its payments absent the writ of attachment and bank levy. Husain makes much of the fact that STM did not immediately integrate the STM Note payments into its budget, and that Chopra was required to remind STM's accounting department of this monthly obligation. He also emphasizes the fact that STM's then CEO, Angela Soria, was not aware of the STM Settlement. The STM Settlement was not finalized until June 2007. STM's failure to incorporate this as a line item in its monthly budget by July 1, 2007 is not particularly revealing given that STM was a small company that lacked ideal accounting controls. Contributing to the organizational disarray was Soria's recent transition from an administrative position to CEO in early July 2007. Soria had no reason to be familiar with the STM Settlement and Note matter before her promotion. There also is ample evidence that Chopra eventually directed Soria to pay the STM Note.

Moreover, STM's default was caused by the aggressive collection efforts of an unrelated judgment creditor. The evidence indicates that an attachment order in the "Flowers Litigation" was issued in April 2007, and that STM was seeking to resolve this judgment when Flowers levied STM's bank account. While STM was in financial distress when it signed the STM Settlement Agreement, Husain has not convinced this court that it was simply impossible for STM to honor its STM Note obligations when it made its promise to pay.

Husain was well aware of STM's financial difficulties. In April 2007, while negotiating the STM Settlement, Chopra disclosed to Husain that STM was encountering problems with one its major clients, which could result "in [a] 40 percent decrease in profit margins and possibly 50% of the business going away.

Taken as a whole, the evidence does not establish by a preponderance of the evidence that Chopra caused STM to enter into the STM Settlement and Note without any intent to make the STM

12

Note payments. Simply because a debtor's hopes of repaying a loan are "unrealistic in hindsight" does mean that its conduct was actionable under § 523(a)(2)(A). *In re Karelin*, 109 B.R. 943, 948 (9th Cir. BAP 1990).

Finally, even if this court found that Hussain had satisfied the first four elements of his claim for relief, Husain has not demonstrated by a preponderance of the evidence that the STM Settlement Agreement proximately caused his failure to receive the amounts due him under the Factoring Agreement. Simply put, there must be a causal nexus between the fraud and the debt. This claim arises from a settlement agreement where Husain's consideration was his forbearance of litigation and collection. Given this, Husain must demonstrate that he forfeited valuable collection remedies as a result of the STM Settlement Agreement. Under analogous circumstances "the creditor [must] demonstrate[ ] that it had valuable collection remedies at the time of the extension or renewal[ ]that it did not exercise in reliance on the debtor's misrepresentation and that those remedies lost value during the renewal or extension period . . . " *In re Kim*, 163 B.R. 157, 161 (9th Cir. BAP 1994). *See also, Stevens v. Nw. Nat'l Ins. Co. ( In re Siriani)*, 967 F.2d 302 (9th Cir. 1992); *In re Pagnini*, 2012 WL 5489032, at *5 (9th Cir. BAP Nov 13, 2012).

For example, In *Siriani*, the debtor borrowed funds to purchase an apartment building, and the lender required him to provide a bond to address any loan default. The debtor procured the necessary bond, which authorized the bonding company, among other things, to perfect a security interest in the apartment building. The bonding company, failed, however, to record its deed of trust. When the debtor refinanced the loan, the new lender required that he renew the bond. The debtor submitted false financial documents to the bonding company, which relied upon the false financials and renewed the bond. After the debtor defaulted on the refinanced loan, the bonding company (after paying the lender on the bond) could not foreclose on the apartment building because of its unperfected security interest. The bonding company thereafter sued the borrower for fraud in his Chapter 7 bankruptcy. The Ninth Circuit held that the bonding company could not demonstrate that the debtor's false financials proximately caused its damages. The *Siriani* court held that the bonding company had to demonstrate that it held valuable collection remedies when it renewed its bonding

13

commitment. *Id.* at 305.[18]  Since the bonding company had not perfected its security interest, it did not have any valuable collection remedies, and its damages therefore were not proximately caused by the debtor.

While *Siriani* and its progeny generally address renewals of credit and not settlement agreements, the same principle applies. Under § 523(a)(2)(A), Husain must demonstrate that the STM Settlement Agreement proximately caused his damages, which would be the loss of his "valuable collection remedies" under the Factoring Agreement. No evidence of any kind was presented to demonstrate what these valuable collection remedies were.

**B.    UNIT 113.**

To prevail on the Unit 113 claim, Husain must establish by a preponderance of the evidence that Chopra promised but never intended to record the Unit 113 deed of trust. Despite the absence of any language in the Buyout Agreement, this court believes that CEC was obligated to record the deed of trust. Throughout the course of the investments and loans discussed at trial, Husain clearly was the "investor" and Chopra the sales person, and it was CEC which accepted the responsibility to prepare and record the deed of trust. Accordingly, a representation was made through Chopra that CEC would execute and record the deed of trust, and there is little question that Hussain justifiably relied on that representation to his detriment. There is also no question that CEC did not record the deed of trust. The problematic issue is whether Chopra intended to deceive Husain when the Buyout Agreement was signed. To establish a non-dischargeable debt under § 523(a)(2)(A), the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation. *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (9th Cir. BAP Mar 19, 2013); *see also, New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (9th Cir.BAP2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002).

Husain has not met his burden of proof on this issue.  CEC refinanced the property and paid

---

[18] The *Siriani* court noted that it was unnecessary, however, to show that the creditor necessarily would have made attempts to collect pursuant to its "collection remedies". The creditor need only demonstrate that the such remedies had value.

14

the net refinance proceeds to Husain. CEC took the time and the expense of having a Hawaii title company prepare the deed of trust, and Carmona notarized it. The first material evidence we have of Chopra's malintent is his conduct in April 2007 - several months after the parties signed the Buyout Agreement and refinanced Unit 113 - when Carmona gave him the original deed of trust and he placed it in his desk. While the court recognizes the smoke, Hussain did not sufficiently establish when the fire started to burn. Husain's trial counsel did not ask Carmona why he delayed in ordering the deed of trust, nor establish that the clamoring of creditors was as loud in December 2006 as it was in August 2007 when the Jindia deed of trust was recorded against Unit 113. Husain could not recall whether Carmona told him that the deed of trust was recorded or in the process of being recorded. If Carmona made the latter statement, that statement was truthful, as he did order and execute the deed of trust.

Husain seems to argue that Carmona's April 25, 2007 facsimile is strong circumstantial evidence of Chopra's intent to deceive (or of his deceptive conduct). Trial counsel never asked Carmona, however, why he did not inform Husain that the deed of trust was unrecorded, and Carmona did testify that Chopra never instructed him to send the facsimile or not to disclose to Husain the true state of the deed of trust. Trial counsel also did not provide this court with any legal argument demonstrating that Carmona was acting as Chopra's agent or that they were complicit partners in a "scheme" to defraud Husain. Again, while the court recognizes that there are circumstantial facts indicating liability, Husain has not carried his burden of proof.

## C. THE CEC SETTLEMENT

The CEC Settlement Agreement presents a clearer set of facts, and this court finds that Hussain has not established a non-dischargeable claim. Husain did not present credible evidence that he asked Chopra to disclose during the CEC Settlement Agreement negotiations all of his personal assets and all of the real property held by SEC. Husain's testimony and the related emails instead establish that Husain's settlement interests focused on real property that Chopra could transfer or encumber. Accordingly, Chopra did not make any misrepresentations or fraudulent omissions when negotiating the deal.

Husain did not seek information regarding Chopra's personal property, such as his family

15

silver, ivory, or his watch collection. The fact that Chopra later pledged these assets as collateral for debts owed to another creditor is irrelevant. Nor can Husain contend that Chopra concealed his membership interest in SEC. Husain and Chopra had a long-standing business relationship, and Husain was well aware that Chopra was a member in SEC.

While SEC did own valuable real property at the time, Chopra lacked the authority to collateralize the CEC settlement agreement with its real property. In November 1, 2007, Chopra, David Cagley and Carmona were SEC's members.[19] SEC's operating agreement required the members' unanimous approval to pledge SEC assets for a member's personal debts. Cagley testified that he would not have agreed to pledge SEC property as part of the CEC Settlement.[20]

Husain argues, however, that Chopra did pledge SEC's assets as collateral for his personal debts in an unrelated, subsequent agreement (with a third party) without obtaining the consent of SEC's members. Husain contends that if Chopra plundered SEC's assets for this creditor, he should have done so for Husain. Two wrongs generally do not make a right, and Husain's contention is undermined by his failure to ask for such collateral, the lack of any argument that Chopra was obligated to disclose SEC's real estate holdings to him, and that Chopra was not authorized to offer SEC property as collateral.

### D. THE FORT BAYOU PROPERTIES CLAIM

This court also finds that Husain has not established a § 523(a)(A)(2) claim for relief arising from the Fort Bayou Properties investment. First, Husain has not demonstrated any material misrepresentation or omission when he made his investment. To establish a non-dischargeable debt under § 523(a)(2)(A), the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold* at 5. Chopra had "skin in the game" since he invested in the Fort Bayou development, signaling his belief that these

---

[19] CEC also held an ownership interest in SEC. Chopra, however, was the 100% owner of CEC.

[20] CEC and Chopra did acquire SEC's interests in certain Hawaii real property under the CEC Settlement Agreement. Husain never argued, however, that SEC transferred these assets without valuable consideration.

16

Case: 10-05196   Doc# 130   Filed: 04/17/13   Entered: 04/17/13 13:29:04   Page 16 of 18

condominiums represented a good investment. While Husain intimated that he expected Chopra to co-own the Fort Bayou Properties with him, there was insufficient evidence indicating that Husain had a clear idea who his co-investors would be when he deposited funds with SEC or that their identity played a material role in his investment decision (and thus whether he relied on any such representation by Chopra).

Husain also did not persuasively argue that JMD's participation in the Joint Marketing Agreement - which was signed several months after he invested - defrauded or deceived him. The evidence firmly established that Carmona, not Chopra, negotiated the agreement with McPhail, and there is insufficient evidence indicating when and if Chopra became aware of its terms. Nor did Husain present any meaningful evidence demonstrating that Carmona and/or JMD were agents of or controlled by Chopra. Carmona defiantly testified that he controlled and operated JMD at the relevant time.

Assuming that Chopra knew of the Joint Marketing Agreement before escrow closed, this court requested Husain to brief how this fact would impose non-dischargeable liability. Husain failed to present such an argument. Husain has not stated why Chopra had an ongoing duty to disclose the Joint Marketing Agreement to Husain during the extended escrow period nor how this was a material omission. As McPhail testified, the Joint Marketing Agreement did not change the prices charged for the Fort Bayou Properties, and Husain did not explain how its terms affected his investment decision. In truth, the Joint Marketing Agreement did not.

For all these reasons, Husain has not established a § 523(a)(2)(A) claim related to his investment in the Fort Bayou Properties.

## **CONCLUSION**

Having failed to establish any claim for relief under Bankruptcy Code § 523(a)(2)(A), judgment shall be entered in favor of Chopra. Chopra shall prepare and submit an appropriate judgment.

**\* \* \* END OF ORDER \* \* \***

**COURT SERVICE LIST**